ALLEN OVERY SHEARMAN STERLING US LLP
Fredric Sosnick (New York Bar No. 2472488) (*pro hac* pending)
Sara Coelho (New York Bar No. 4530267) (*pro hac* pending)
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
fsosnick@aoshearman.com
sara.coelho@aoshearman.com

McDONALD CARANO LLP
Ryan J. Works (NSBN 9224)
Amanda M. Perach (NSBN 12399)
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Telephone: (702) 873-4100
rworks@mcdonaldcarano.com
aperach@mcdonaldcarano.com

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re: | *Joint Administration Requested* |
| NEVADA COPPER, INC.,[1] | Case No. 24-50566 |
| Debtor. | Chapter 11 |
| | **Hearing Date:** *OST REQUESTED* |
| | **Hearing Time:** *OST REQUESTED* |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING, (B) GRANT LIENS, INCLUDING SENIOR SECURED PRIMING LIENS, AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, AND (C) UTILIZE CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION SECURED PARTIES; (III) MODIFYING THE AUTOMATIC STAY; (IV) SCHEDULING FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

---

[1] The relief requested herein is sought for each of the following Debtors, and joint administration has been requested. The Debtors in these chapter 11 cases and the last four digits of their registration numbers in the jurisdiction in which they are organized are: Nevada Copper, Inc. (1157) (Nevada); Nevada Copper Corp. (5323) (British Columbia); 0607792 B.C. Ltd. (2524) (British Columbia); Lion Iron Corp. (2904) (Nevada); NC Farms LLC (0264) (Nevada); and NC Ditch Company LLC (4396) (Nevada).

**Table of Contents**

Preliminary Statement ........................................................................................................ 1

Relief Requested ............................................................................................................... 1

Jurisdiction & Venue ......................................................................................................... 4

Background ........................................................................................................................ 4

Prepetition Capital Structure ............................................................................................ 5

     A.   *Prepetition Senior Secured Term Loan Credit Agreement* ..................................... 6

     B.   *Prepetition Working Capital Facility* .................................................................... 7

     C.   *Prepetition TF Stream Agreement* ........................................................................ 8

     D.   *Prepetition Junior Secured Term Loan Agreement* .............................................. 9

     E.   *Trisura Surety Bonds* ............................................................................................ 9

     F.   *The Intercreditor Agreements* ............................................................................. 10

     G.   *The Unsecured Loan Agreements* ....................................................................... 11

     H.   *Investor Promissory Notes* ................................................................................. 12

     I.   *Additional Unsecured Loans* .............................................................................. 12

     J.   *Intercompany Loans* ........................................................................................... 12

I.    The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Documents. ......................................................................................................... 30

     A.   *Entry Into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.* .......................................................................................... 30

     B.   *The Debtors Should Be Authorized to Grant Liens and Superpriority Claims and Hold DIP Proceeds Free From Prepetition Liens or Claims.* ...................... 32

     C.   *No Comparable Alternative to the DIP Facility Is Reasonably Available.* ........... 35

II.   The Debtors Should Be Authorized to Pay the Interest and Fees Required by the DIP Secured Parties under the DIP Documents. ...................................................... 36

III.  The Debtors Should Be Authorized to Continue to Use the Cash Collateral. ................. 37

IV.  The DIP Lenders Should Be Afforded Good-Faith Protection Under Section 364(e)...... 38

V.   The Automatic Stay Should Be Modified on a Limited Basis. ........................................ 39

i

VI.    Failure to Obtain Immediate Interim Access to the DIP Facility Would Cause Immediate and Irreparable Harm. ....................................................................... 39

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Ames Dep't Stores*,
  115 B.R. .................................................................................................... 25, 27

*In re Ames Dep't Stores, Inc.*,
  115 B.R. 34 (Bankr. S.D.N.Y. 1990) ......................................................... 23

*Anchor Savs. Bank FSB v. Sky Valley, Inc.*,
  99 B.R. 117 (N.D. Ga. 1989) ...................................................................... 26

*In re Barbara K. Enters., Inc.*,
  Case No. 08-11474, 2008 WL 2439649 (Bankr. S.D.N.Y. June 16, 2008) .......................... 23

*In re BBT*,
  11 B.R. 224 (Bankr. D. Nev. 1981) ............................................................ 29

*In re Capitol Station 65, LLC*,
  No. 17-23627-B-11, 2018 WL 333863 (Bankr. E.D. Cal. Jan. 8, 2018) ......................... 23, 27

*In re Crouse Grp., Inc.*,
  71 B.R. 544 (Bankr. E.D. Pa. 1987) ............................................................ 25

*In re Curlew Valley Assocs.*,
  14 B.R. 506 (Bankr. D. Utah 1981) ............................................................ 23

*In re Def. Drug Stores, Inc.*,
  145 B.R. 312 (B.A.P. 9th Cir. 1992) ........................................................... 22

*In re Exide Techs.*,
  340 B.R. 222 (Bankr. D. Del. 2006) ........................................................... 23

*In re Farmland Indus., Inc.*
  294 B.R. (Bankr. W.D. Mo. 2003) ............................................................. 23

*In re Gardens R'eg'l Hosp.*,
  No. 2:16-BK-17463-ER, 2017 WL 7101146 (Bankr. C.D. Cal. July 28, 2017).................... 23

*In re ION Media Networks, Inc.*,
  Case No. 09-13125, 2009 WL 2902568 (Bankr. S.D.N.Y. July 6, 2009).......................... 23

*In re Las Vegas Monorail Co.*,
  429 B.R. 317 (Bankr. D. Nev. 2010) ........................................................... 29

4892-9244-1543, v. 1

*In re Mosello*,
    195 B.R. 277 (Bankr. S.D.N.Y. 1996) ............................................................. 29

*In re Sky Valley, Inc.*,
    100 B.R. 107 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v.*
    *Sky Valley, Inc.*, 99 B.R. 117 (N.D. Ga. 1989)............................................ 27, 29

*In re Snowshoe Co., Inc.*,
    789 F.2d 1085 (4th Cir. 1986) ....................................................................... 27

*In re St. Mary Hosp.*,
    86 B.R. 393 (Bankr. E.D. Pa. 1988) .............................................................. 25

*In re Stanley Hotel, Inc.*,
    15 B.R. 660 (D. Colo. 1981) .......................................................................... 27

*In re Swedeland Dev. Grp., Inc.*,
    16 F.3d 552 (3d Cir. 1994) ............................................................................. 29

*Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Tr. Co. (In re*
    *Elingsen McLean Oil Co., Inc.*),
    65 B.R. 358 (W.D. Mich. 1986) ..................................................................... 23

**Statutes**

11 U.S.C. § 364(d)(1) ............................................................................................. 26, 27

28 U.S.C. §§ 157 and 1334 ........................................................................................... 3

28 U.S.C. § 157(b) ........................................................................................................ 3

28 U.S.C. §§ 1408 and 1409 ........................................................................................ 3

United States Code title 11 sections 105, 361, 362, 363, 364, 503, and 507, 11
    U.S.C. §§ 101, *et seq.* ................................................................................................ 3

Bankruptcy Code Chapter 7 ........................................................................................ 22

Bankruptcy Code Chapter 11 ............................................................................... *passim*

Bankruptcy Code Section 361 .................................................................................... 28

Bankruptcy Code section 362 ......................................................................... 3, 22, 30

Bankruptcy Code section 363 ........................................................................... 22, 28, 31

Bankruptcy Code Section 363(c)(2)(A) ...................................................................... 28

Bankruptcy Code Section 363(e) ................................................................................ 28

4892-9244-1543, v. 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Bankruptcy Code section 364 ................................................................. *passim*

Bankruptcy Code section 364(b) ................................................................. 25

Bankruptcy Code section 364(c) ............................................................ 25, 27

Bankruptcy Code section 364(d) ................................................................. 26

Bankruptcy Code Section 364(e) ................................................................. 30

Bankruptcy Code section 506(c) ................................................................. 22

Bankruptcy Code section 506(c), (ii) ............................................................ 3

Bankruptcy Code section 507(b) ............................................................ 14, 22

Bankruptcy Code section 546(b) ................................................................. 14

Bankruptcy Code section 552(b) ................................................................. 22

Bankruptcy Code section 552(b) and (iii) ...................................................... 3

Bankruptcy Code section 1101 ................................................................... 22

Bankruptcy Code sections 1106(a)(3) and (a)(4) ........................................ 22

Bankruptcy Code sections 1107(a) and 1108 ............................................... 4

**Other Authorities**

Bankruptcy Rule 1015(b) ............................................................................ 4

Bankruptcy Rule 2002 ............................................................................... 33

Bankruptcy Rule 2002(a)(2) ...................................................................... 33

Bankruptcy Rule 4001(b)(1)(B)(i) .............................................................. 22

Bankruptcy Rule 4001(b)(1)(B)(ii) ............................................................. 22

Bankruptcy Rule 4001(c)(1)(B) ............................................................ 15, 22

Bankruptcy Rule 4001(c)(1)(B)(i) .............................................................. 22

Bankruptcy Rule 4001(c)(1)(B)(iii) ............................................................ 22

Bankruptcy Rule 4001(c)(1)(B)(iv) ............................................................ 22

Bankruptcy Rule 4001(c)(1)(B)(vi) ............................................................ 22

Bankruptcy Rule 4001(c)(1)(B)(vii) ........................................................... 22

4892-9244-1543, v. 1

Bankruptcy Rule 4001(c)(1)(B)(ix) ........................................................ 22

Bankruptcy Rule 4001(c)(1)(B)(xi) ........................................................ 22

Bankruptcy Rule 6003 .............................................................................. 32

Bankruptcy Rule 6004(a) ......................................................................... 33

Bankruptcy Rule 6004(h) ......................................................................... 32

Bankruptcy Rules 4001(b)(2) and 4001(c)(2) ....................................... 32

Bankruptcy Rules 4001(b) and 4001(c) ................................................. 31

Bankruptcy Rules 6004(a) and 6004(h) ................................................. 32

Fed. R. Bankr. P. 6003 .............................................................................. 32

Fed. R. Bankr. P. 6004(h) ......................................................................... 32

Federal Rules of Bankruptcy Procedure Rules 2002, 4001, 6003, 6004, 9013 and
    9014 ................................................................................................... 3

*Local Rules of Bankruptcy Practice for the United States Bankruptcy Court of the
    District of Nevada* (the "**Local Rules**") ........................................ 4

Local Rule 2002 ....................................................................................... 33

Local Rule 9006 ....................................................................................... 31

Local Rule 9014.2 ...................................................................................... 4

United States Constitution Article III ...................................................... 4

4892-9244-1543, v. 1

Nevada Copper, Inc., and its affiliates that are debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), respectfully represent in support of this motion (the "**Motion**") as follows:

**Preliminary Statement**

1.    The Debtors commenced these cases amidst significant funding challenges in order to preserve their assets and finance their operations while pursuing the sale of their business on an expedited timetable.  As described in the *Omnibus Declaration of Gregory J. Martin in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "**First Day Declaration**"), the Debtors faced significant challenges prior to the commencement of Chapter 11 and received substantial interest from potential buyers of their business but ran out of time to consummate a sale due to their acute liquidity constraints.   To fund the sale process and the administration of the Chapter 11 Cases, the Debtors negotiated to obtain a senior secured postpetition financing in the aggregate principal amount of $60 million (the "**DIP Facility**") pursuant to the terms and conditions set forth in the Senior Secured Superpriority Debtor-in-Possession Credit Agreement by and among the Nevada Copper, Inc., as borrower (the "**Borrower**"), each of the Debtors other than the Borrower (collectively, the "**Guarantors**," and together with Borrower, the "**DIP Loan Parties**"), U.S. Bank Trust Company, National Association, as administrative and collateral agent (the "**DIP Agent**"), and one or more affiliates of Elliott Investment Management L.P. ("**Elliott**"), as lenders (collectively, the "**DIP Lenders**" and, together with the DIP Agent, the "**DIP Secured Parties**") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**DIP Credit Agreement**").

2.    The use of cash collateral and the DIP Facility contemplated by this Motion are key to the Debtors' path forward.  The Debtors urgently require the infusion of new money and access to access to cash collateral in order to make the payments for which authorization was requested in the other first-day motions, conduct a viable sale process, and fund their Chapter 11 Cases and their continued care and maintenance operations.

**Relief Requested**

3.    The Debtors request entry of an interim order, substantially in the form attached

1

4892-9244-1543, v. 1

hereto as **Exhibit 1** (the "***Interim Order***"),[2] and a final order (the "***Final Order***" and, together with the Interim Order, the "***DIP Orders***"):

    a.    authorizing the Borrower to obtain the DIP Facility in the aggregate principal amount of $60 million the terms and conditions set forth in the DIP Credit Agreement attached to the Interim Order at Exhibit 1, and for the Guarantors to unconditionally guaranty, on a joint and several basis, the Borrower's obligations in connection with such postpetition financing, consisting of: (i) a new money term loan in an aggregate principal amount not to exceed at any time outstanding aggregate principal commitments of $20 million (the "***Interim DIP Loan***"), which will be funded as a single disbursement on the date on which all of the conditions set forth in Sections 12.1 and 12.3 of the DIP Credit Agreement have been satisfied (the "***Interim Closing Date***"); (ii) subject to entry of the Final Order, a new money delayed-draw term loan to be made in an aggregate principal amount not to exceed at any time outstanding aggregate principal commitments of $40 million (the "***Final DIP Loan***" and, together with the Interim DIP Loan, the "***DIP Facility***"), which will be funded as a single disbursement on the date on which all of the conditions set forth in Sections 12.2 and 12.3 of the DIP Credit Agreement have been satisfied (the "***Final Closing Date***");

    b.    authorizing the DIP Loan Parties to enter into any agreements, documents and instruments in connection with the DIP Facility, including the DIP Credit Agreement and all notices, guarantees, security agreements, ancillary documents and agreements executed in connection therewith (collectively, the "***DIP Documents***") on terms and conditions consistent with the DIP Credit Agreement and the DIP Orders, and to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate or desirable in connection with the DIP Documents;

    c.    authorizing the Debtors to grant to the DIP Agent, for the benefit of itself and the DIP Lenders, and authorizing the Debtors to incur, the DIP Liens (as defined in the DIP Orders) in all DIP Collateral (as defined below), to secure the DIP Obligations (as defined below), which liens and security interests shall be automatically perfected and be subject to the lien priorities set forth in the DIP Credit Agreement, on the terms and conditions set forth in the DIP Orders, in the DIP Credit Agreement and in the DIP Documents;

    d.    authorizing the Debtors to grant to the DIP Agent, for the benefit of itself and the DIP Lenders, allowed superpriority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all DIP Obligations, with priority over any and all administrative expenses of any kind or nature, subject and subordinate only to the Carve-Out (as defined in the DIP Orders), the Administration Charge (as defined in the DIP Orders), and the Petition Date Perfected Liens, and on the terms and conditions set forth in the Interim Order and in the DIP Documents;

    e.    authorizing the Debtors to use the proceeds of the DIP Facility and the Prepetition

---

[2]    Capitalized terms that are undefined in this Motion shall have the respective meanings given to such terms in the Interim Order or DIP Credit Agreement, as applicable.

4892-9244-1543, v. 1

Collateral (as defined in the DIP Orders), including Cash Collateral (as defined in the DIP Orders), in accordance with the terms of the DIP Orders, including pursuant to the 13-week cash flow forecast of receipts, disbursements and intercompany transactions, as updated and supplemented from time to time and approved by the Required DIP Lenders, in each case, in accordance with the applicable DIP Orders and the DIP Credit Agreement (the "***Approved Budget***"), to: (i) pay fees and interest under the DIP Facility; (ii) provide working capital for, and for other general corporate purposes of, the Debtors; (iii) pay for bankruptcy-related costs and expenses, including costs and expenses incurred in connection with the Recognition Proceedings (as defined in the DIP Orders) and to fund the Carve-Out; and (iv) pay Adequate Protection Fees (as defined in the DIP Orders);

f.    authorizing the Debtors to pay, on a final and irrevocable basis, the principal, interest, expenses, fees, premiums and other amounts payable under the DIP Documents as such become earned, due and payable, including, without limitation, (i) the Upfront Fee, (ii) the Exit Fee, (iii) the Unused Commitment Fee, (iv) the Agency Fee (each as defined in the DIP Credit Agreement), and (v) the reasonable fees and disbursements of the DIP Secured Parties' attorneys, advisors, accountants, appraisers, bankers, and other consultants, all to the extent provided in, and in accordance with the DIP Documents (collectively, the "***DIP Obligations***");

g.    granting adequate protection to the Prepetition Secured Parties (as defined in the DIP Orders) on the terms set forth in the DIP Documents and the DIP Orders on account of any Diminution in Value (as defined in the DIP Orders) of the Prepetition Secured Parties' interests in the Prepetition Collateral, including Cash Collateral;

h.    authorizing waivers upon of entry of the Final Order (but retroactive to the Petition Date) of: (i) the Debtors' and the estates' rights to surcharge against the DIP Collateral or the Prepetition Collateral pursuant to the Bankruptcy Code section 506(c), (ii) the "equities of the case" exception under Bankruptcy Code section 552(b) and (iii) the equitable doctrine of marshalling with respect to the DIP Collateral, including all Prepetition Collateral;

i.    authorizing the DIP Secured Parties to exercise remedies under the DIP Documents on the terms described in the DIP Orders, upon the occurrence and during the continuance of a Termination Event (as defined in the DIP Orders);

j.    modifying the automatic stay imposed pursuant to Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms of the DIP Orders;

k.    scheduling a final hearing (the "***Final Hearing***"); and

l.    granting related relief.

4892-9244-1543, v. 1

## MEMORANDUM OF POINTS AND AUTHORITIES

### Jurisdiction & Venue

4.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "***Bankruptcy Code***"); Rules 2002, 4001, 6003, 6004, 9013 and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"); and Rules 2002, 4001, 6004, 9006 and 9014 of the *Local Rules of Bankruptcy Practice for the United States Bankruptcy Court of the  District of Nevada* (the "***Local Rules***").

5.     Pursuant to Local Rule 9014.2, the Debtors consent to the Court's entry of a final order in connection with this Motion to the extent that it is later determined that, absent consent of the parties, the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.

### Background

6.     On the date hereof (the "***Petition Date***"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the Court and contemporaneously herewith have requested joint administration of the Chapter 11 Cases for procedural purposes only, pursuant to Bankruptcy Rule 1015(b).  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no official committees have been appointed or designated.

7.     The Debtors have been in the business of mining copper, and other minerals, and operating a processing plant that refines copper ore into copper concentrate, with the bulk of the Debtors' operations focused on their Pumpkin Hollow project (the "***Project***"), which is located outside of Yerington, Nevada.  The Project, which contains substantial mineral reserves and resources, including not only copper, but gold, silver, and iron magnetite, consists of an underground

4

mine and processing facility, together with an open-pit project that is in the pre-feasibility stage of development.  The Debtors, in the period leading up to the commencement of the Chapter 11 Cases operated under significant liquidity constraints.  In an effort to conserve liquidity, the Debtors have suspended mining operations and the operation of their processing plant, as they pursue a sale of substantially all of their assets.

8.    Additional facts relating to the Debtors' business and capital structure, and the commencement of these Chapter 11 Cases, are set forth in the First Day Declaration, which was filed contemporaneously with this Motion and is incorporated herein by reference.  Additional information regarding the DIP Facility, including the process through which the Debtors solicited lender interest in providing financing, is set forth in the *Declaration of Zul Jamal in support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Liens, Including Senior Secured Priming Liens, and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* (the "**DIP Declaration**" and, together with the First Day Declaration, the "**Declarations**"), filed contemporaneously herewith and incorporated herein by reference.

## Prepetition Capital Structure

9.    Set forth below is a summary of the Debtors' prepetition funded indebtedness.[3]  The chart below (which contains terms defined later in the body of this Motion), is designed to assist in that summary.[4]

---

[3]    The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.

[4]    In addition to the funded debt contained in the chart below, as explained below in more detail, there are obligations to Trisura Insurance Company ("**Trisura**") for the potential reimbursement obligations under surety bonds that are secured by liens on the assets of Nevada Copper Corp.

4892-9244-1543, v. 1

| Secured Funded Debt | | |
|---|---|---|
| **Debt Agreement** | **Obligors** | **Amount Outstanding[5]** |
| Prepetition Senior Secured Term Loan Credit Agreement | Debtors[6] | $188 million |
| Prepetition Working Capital Agreement | NCI | $3 million |
| Prepetition TF Stream Agreement | Debtors | $78.2 million |
| Prepetition Junior Secured Term Loan Agreement | Debtors | $10 million |
| **Unsecured Debt** | | |
| Pala Unsecured Loans | NCU | $56.7 million |
| Mercuria Unsecured Loans | NCU | $10.3 million |
| Investor Promissory Notes | NCU | $1.0 million |
| Additional Unsecured Loans | NCI | $10.2 million |
| Intercompany Loans | NCI | $148.3 million |

    **A.**    *Prepetition Senior Secured Term Loan Credit Agreement*

    10.    Debtor, Nevada Copper, Inc. ("***NCI***"), as borrower, Nevada Copper Corp. ("***NCU***"), and NCU's direct and indirect subsidiaries (other than NCI) each of which are Debtors herein, as guarantors (the "***Subsidiary Guarantors***"), KfW IPEX-Bank GmbH ("***KfW***") as sole lead arranger, UFK Agent, collateral agent and administrative agent (the "***Prepetition Senior Secured Term Loan Agent***"), Pala Investments Limited ("***Pala***"), TF R&S Canada Ltd. ("***TF Canada***"), KfW, and Mercuria Investments US, Inc. ("***Mercuria***"), as lenders (collectively, the "***Prepetition Senior Secured Term Loan Lenders***" and, together with the Prepetition Senior Secured Term Loan Agent, the "***Prepetition Senior Secured Term Loan Parties***"), are each party to that certain second amended and restated credit agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "***Prepetition Senior Secured Term Loan Credit Agreement***"), dated October 28, 2022 (and the facilities thereunder, the "***Prepetition First Lien Loans***"). The Prepetition First Lien Loans consist of three tranches of term loans: (i) a term loan funded by KfW in the aggregate principal amount of $115 million (the "***Prepetition Senior Secured Term Loan A Obligations***"); (ii) a term loan funded by KfW in

---

[5]    These amounts include capitalized interest as of the Petition Date.

[6]    As discussed in greater detail below, Tranche B Prepetition of Senior Secured Term Loan Credit Agreement is guaranteed by a non-debtor, Pala (as defined below).

the aggregate principal amount of $15 million (the "**Prepetition Senior Secured Term Loan B Obligations**"); and (iii) a series of term loans funded by Pala, TF Canada,[7] and Mercuria, in the aggregate principal amount of approximately $30.55 million (the "**Prepetition Senior Secured Term Loan A-2 Obligations**").

11.    The obligations of NCI under the Prepetition First Lien Loans are guaranteed by NCU and the Subsidiary Guarantors and secured by a first-lien security interest in substantially all of the property and assets of the Debtors, other than marketable metal-bearing material that is extracted or otherwise recovered from the Project (the "**WCF Collateral**") (substantially all of the Debtors assets other than the WCF Collateral are defined as the "**Project Collateral**"), and a second-lien security interest (together with the first lien security interest, the "**Prepetition Senior Secured Term Loan Liens**") in the WCF Collateral.  In connection therewith, the Debtors entered into that certain Amended and Restated Collateral Agency, Accounts and Security Agreement, dated October 28, 2022, granting a first lien security interest and lien on all of their cash and bank accounts, which include accounts at NCI and NCU.

12.    The Prepetition Senior Secured Term Loan A Obligations bear interest at a rate of SOFR plus 2.10% per annum, the Prepetition Senior Secured Term Loan B Obligations bear interest at a rate of SOFR plus 5.40% per annum, and the Prepetition Senior Secured Term Loan A-2 Obligations bear interest at a rate of SOFR plus 5.00% per annum.  Under the Prepetition Senior Secured Term Loan Agreement, several interest payments under each tranche were capitalized.  The Prepetition Senior Secured Term Loan A Obligations and Prepetition Senior Secured Term Loan A-2 Obligations have a scheduled maturity date of July 31, 2029, and the Tranche B Loans have a scheduled maturity date of July 31, 2025.  As of the Petition Date, the principal amount outstanding under the Prepetition First Lien Loans is approximately $188 million.

**B.**    *Prepetition Working Capital Facility*

13.    NCI, as seller, entered into an advance payment facility (the "**Concord Working Capital Facility**") with Concord Resources Limited ("**Concord**"), as purchaser, on May 6, 2019 (as

---

[7]    The first Tranche A-2 Funding was provided by Triple Flag International Ltd., but subsequently assigned to its affiliate, TF Canada.

7

amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "***Prepetition Working Capital Agreement***"). Pursuant to the Prepetition Working Capital Agreement and offtake agreements entered into in connection therewith, Concord agreed to make advance payments for, and NCI agreed to sell and deliver to Concord, flotation copper concentrates produced at and originating from the Project. The Prepetition Working Capital Agreement has a scheduled maturity date of September 1, 2026.

14.     The Concord Working Capital Facility, as an advance payment facility, is repaid through deliveries of flotation copper concentrates, and in cash, when such deliveries do not occur. As of the Petition Date, the outstanding principal amount under the Prepetition Working Capital Agreement is approximately $3 million (the "***Prepetition Working Capital Obligations***"). The Prepetition Working Capital Obligations are secured by a first-lien security interest in the WCF Collateral and a third-lien security interest in the Project Collateral (the "***Prepetition Working Capital Facility Liens***").

**C.     *Prepetition TF Stream Agreement***

15.     The Debtors are party to a metal purchase and sale agreement, dated as of December 21, 2017 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "***Prepetition TF Stream Agreement***"), with Triple Flag International Ltd. ("***Triple Flag***") (as successor to Triple Flag Mining Finance Bermuda Ltd.), as purchaser, whereby NCI agreed to sell refined gold and refined silver mined from the Project's underground mine (the "***Underground Mine***") to Triple Flag. Pursuant to the terms of the Prepetition TF Stream Agreement, Triple Flag agreed to pay certain deposits to NCI, and NCI agreed to deliver to Triple Flag 97.5% of the gold and silver production from the Underground Mine, calculated based on a fixed ratio of 162.5 ounces of gold and 3,131.0 ounces of silver for each 1 million pounds of copper in concentrate produced. Deliveries made to Triple Flag under the Prepetition TF Stream Agreement will be credited until the applicable deposit is depleted, at which point Triple Flag will be required to make additional payments for the refined gold and refined silver that are delivered under the Prepetition TF Stream Agreement. The Prepetition TF Stream

Agreement has an initial term of 40 years, with automatic extension for 10-year periods thereafter.

16.     As security for NCI's obligations under the Prepetition TF Stream Agreement, Triple Flag has a second-lien security interest in the Project Collateral and a third-lien security interest in the WCF Collateral.  Since inception, the Debtors have made approximately $2.68 million worth of deliveries under the Prepetition TF Stream Agreement, and approximately $78.2 million of the deposits remains outstanding as of the Petition Date.  NCI's obligations under the Prepetition TF Stream Agreement are guaranteed by NCU and the Subsidiary Guarantors.

**D.**     *Prepetition Junior Secured Term Loan Agreement*

17.     The Debtors, as obligors, and Pala (together with Concord, Triple Flag, and the Prepetition Senior Secured Term Loan Parties, the "***Prepetition Secured Parties***") as lender, are party to that certain Third Amended and Restated Loan Agreement dated December 21, 2023 (the "***Prepetition Junior Secured Term Loan Agreement***").  The obligations to Pala under the Prepetition Junior Secured Term Loan Agreement are secured by a fourth lien security interest on substantially all of the Debtors' assets.  The loan facility under the Prepetition Junior Secured Term Loan Agreement (the "***Junior Secured Facility***") bears interest at SOFR plus 9% per annum and could be paid in NCU common stock or paid in kind at Pala's option.  The Junior Secured Facility has a scheduled maturity date of January 31, 2026.  As of the Petition Date, the aggregate principal amount outstanding under the Prepetition Junior Secured Term Loan Agreement is approximately $10 million.

**E.**     *Trisura Surety Bonds*

18.     Although not funded indebtedness, NCU has granted a fourth priority lien on substantially all of its property, including its shares in NCI, to secure potential reimbursement obligations that may arise in favor of Trisura in connection with surety bonds securing performance of certain obligations of NCI to third-party contractors and to the State of Nevada.  The Debtors have two outstanding surety bonds (the "***Surety Bonds***") provided by Trisura.  The Surety Bonds have been issued in favor of: (i) Sierra Pacific Power Company d/b/a NV Energy in connection with the High Voltage Distribution Agreement, dated January 7, 2019, as amended on February 21, 2019; and (ii) the Nevada Division of Environmental Protection to secure future mine reclamation

9

4892-9244-1543, v. 1

requirements.

### F.    *The Intercreditor Agreements*

19.    *WCF Intercreditor Agreement*.  KfW, Triple Flag, Concord and NCI are parties to that certain Working Capital Facility Intercreditor Agreement, dated as of May 22, 2019, (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "***WCF Intercreditor Agreement***"), which governs, among other things, the rights, interests, obligations, priority and positions of the Prepetition Senior Secured Term Loan Parties, the Prepetition Working Capital Purchaser and the Prepetition TF Stream Purchaser.

20.    *TF Intercreditor Agreement*.  KfW, Triple Flag, NCI,  NCU and the Subsidiary Guarantor are party to that certain Intercreditor Agreement, dated as of May 22, 2019, (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "***TF Intercreditor Agreement***"), which governs the rights, interests, obligations, priority and positions of the Prepetition Senior Secured Term Loan Parties and the Prepetition TF Stream Purchaser.

21.    *Fourth Lien Intercreditor Agreement*.  KfW, Triple Flag, Concord, Pala, NCI, NCU and the Subsidiary Guarantors are party to that certain Intercreditor Agreement, dated as of October 28, 2022 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "***Fourth Lien Intercreditor Agreement***" and, together with the WCF Intercreditor Agreement and the TF Intercreditor Agreement, the "***Prepetition Intercreditor Agreements***"), which governs the rights, interests, obligations, priority and positions of the Prepetition Senior Secured Term Loan Parties, the Prepetition Working Capital Purchaser, the Prepetition TF Stream Purchaser and the Prepetition Junior Secured Term Loan Parties.

22.    Pala and Triple Flag consented to the Debtors obtaining DIP Financing (as defined in the TF Intercreditor Agreement and the Fourth Lien Intercreditor Agreement) from any Prepetition Senior Secured Term Loan Party or an affiliate of a Prepetition Senior Secured Term Loan Party pursuant to their respective Prepetition Intercreditor Agreements.  *See*, *e.g.*, Fourth Lien Intercreditor Agreement § 5.2 ("Until the Discharge of the Senior Obligations . . . no Junior Secured Party will . . . contest . . . and the Junior Secured Parties . . . hereby consent in advance to, (x) any

4892-9244-1543, v. 1

use, sale, or lease of 'cash collateral' . . . and (y) any [Debtor] obtaining DIP Financing from, or with the consent of any Senior Secured Party or any affiliate of a Senior Secured Party."); TF Intercreditor Agreement § 6.2 ("[u]ntil the Discharge of the Loan Obligations . . . the Purchaser will not . . . contest . . . and hereby consents in advance to, (x) any use, sale, or lease of 'cash collateral' . . . and (y) any [Debtor] obtaining DIP Financing from, or with the consent of any Senior Secured Party or any affiliate of a Senior Secured Party."). The DIP Lenders are affiliates of TF Canada and Triple Flag through Elliott who holds a controlling stake in the parent company of Triple Flag. DIP Declaration ¶ 15. Accordingly, Pala and Triple Flag consented to the DIP Facility pursuant to the Prepetition Intercreditor Agreements.

23.     Similarly, Concord provided the same consent pursuant to the WCF Intercreditor Agreement so long as the Debtors' DIP financing (as defined in the WCF Intercreditor Agreement) is not secured by WCF Collateral. *See, e.g.*, WCF Intercreditor Agreement § 5.2 ("[T]he Buyer . . . hereby consents in advance to, (x) any use, sale, or lease of 'cash collateral' . . . and (y) any [Debtor] obtaining DIP Financing from any Senior Secured Loan Party or any affiliate of a Senior Secured Loan Party; provided, that . . . the [WCF] Collateral shall not secure such DIP Financing. . . ."). The Debtors submit that the DIP Liens will not extend to the WCF Collateral until the Prepetition Working Capital Obligations are paid in full.

### G.     *The Unsecured Loan Agreements*

24.     On December 21, 2023, NCU entered into two separate unsecured loan agreements with Pala (the "***Pala Unsecured Loan Agreement***") and Mercuria (the "***Mercuria Unsecured Loan Agreement***" and, together with the Pala Unsecured Loan Agreement, the "***Unsecured Loan Agreements***"). The Unsecured Loan Agreements are on substantially similar terms as the Prepetition Junior Secured Term Loan Agreement, except that the loans (each, an "***Unsecured Loan***") pursuant to the Unsecured Loan Agreements are not secured, are not guaranteed by the Subsidiary Guarantors, and have a maturity date of December 21, 2024. As of the Petition Date, the outstanding principal amount is approximately $56.7 million under the Pala Unsecured Loan Agreement and approximately $10.3 million under the Mercuria Unsecured Loan Agreement.

4892-9244-1543, v. 1

### H.    *Investor Promissory Notes*

25.    In relation to entering into exclusivity agreements with potential purchasers, NCU issued promissory notes to two potential purchasers (the "***Potential Purchasers***") of the Debtors' business in principal amount of $500,000 each (each, an "***Investor Promissory Note***") in exchange for equivalent funding from such investor.  Interest on each Investor Promissory Note was fixed at $9,250 if the Investor Promissory Note was paid in full within 45 days (the "***Investor Note Maturity Date***"), or 15% per annum if not paid in full by the Investor Note Maturity Date.  Pala guaranteed NCU's obligations under each Investor Promissory Note solely to the extent of any cash payments it receives from NCI pursuant to the Prepetition Senior Secured Term Loan Credit Agreement. As of the Petition Date, the aggregate outstanding principal amount under both Investor Promissory Notes is approximately $1.0 million.

### I.    *Additional Unsecured Loans*

26.    In addition, in April and May of 2024, Pala provided NCI with a total of approximately $5.3 million in unsecured funding through a series of advances and Triple Flag contributed an additional $4.9 million in unsecured funding.  Both of those were memorialized in separate unsecured promissory notes prior to the commencement of the Chapter 11 Cases.

### J.    *Intercompany Loans*

27.    As of the Petition Date, there is approximately $148.3 million (inclusive of capitalized interest and accrued but unpaid interest) due to NCU from NCI under documented intercompany loans from NCU to NCI (the "***Intercompany Loans***").  The Intercompany Loans comprise: (i) an intercompany loan from NCU to NCI in the aggregate principal amount of $85 million, pursuant to the intercompany loan agreement dated May 31, 2019 (as amended, "***NCU Loan I***"); (ii) an intercompany loan from NCU to NCI in the aggregate principal amount of $30 million, pursuant to an intercompany loan agreement dated December 31, 2010 (as amended, "***NCU Loan II***"); and (iii) in the first quarter of 2024, a loan from NCU to NCI in the aggregate principal amount of approximately $33.3 million.   Both NCU Loan I and II have a maturity date of December 31, 2025, but NCU I accrues interest at a rate of LIBOR plus 7.25%, to be paid on the maturity date and NCU Loan II accrues interest at a rate of 10% per annum, paid-in-kind on a quarterly basis.

4892-9244-1543, v. 1

The Debtors enter chapter 11 with no cash at NCU, and they will need to use cash borrowed under the DIP Facility to fund NCU's cash needs.

### Immediate Need for DIP Financing and Cash Collateral

28.     Despite the stakeholders providing additional funding prepetition to restart mining operations after encountering geotechnical challenges in 2022 that restricted underground mine access, the costs of continued development and operations grew too high, and stakeholders became unwilling to finance continued operations or an out-of-court sale.  The Debtors took various measures to conserve liquidity, including halting further mining and milling operations, and creating a protocol to retain only essential employees needed to maintain the value of their assets. Notwithstanding these efforts, as of the Petition Date, the Debtors have less than $500,000 of cash on hand, which is simply not enough to administer these cases and pursue a sale process.  The Debtors require additional funding to prosecute these Chapter 11 Cases, and without such funding the Debtors will likely be forced to cease operations, jeopardizing their entire reorganization.

### The DIP Facility

29.     The DIP Facility allows the Debtors to access up to a total of $60 million, with $20 million available immediately upon the Interim Closing Date and up to $40 million available upon the Final Closing Date.  The funds advanced under the DIP Facility will be used in accordance with the Approved Budget.

30.     The DIP Facility contains the following milestones, each of which may be extended with the consent of the majority DIP Lenders (the "***Required DIP Lenders***"):

    (i)    No later than one (1) calendar day following the Petition Date, the Debtors shall have filed a motion in the Bankruptcy Court seeking approval of the DIP Facility, in form and substance acceptable to the majority DIP Lenders (the "***Required DIP Lenders***");

    (ii)    No later than five (5) business days following the Petition Date, the Bankruptcy Court shall have entered the Interim Order

    (iii)    No later than ten (10) calendar days following the Petition Date, the Debtors shall have filed a motion (the "***Bidding Procedures Motion***"), in form and substance acceptable to the Required DIP Lenders, for entry of an order (the "***Bidding Procedures***") (a) approving the procedures to be used and bid protections to be provided (as may be amended from time to time in accordance with their terms) in

13

connection with the sale (or sales) of all or substantially all of the business and assets of the Debtors (the "***Sale Transaction***"), (b) setting the dates for the submission of bids, the auction (if any) and the hearing on the approval of the Sale Transaction and approving all notices related thereto and (c) authorizing certain procedures related to the assumption and assignment of executory contracts and unexpired leases in connection with the Sale Transaction;

(iv)    No later than fourteen (14) calendar days following entry of the Interim Order by the Bankruptcy Court, the Canadian Court shall have granted the Initial Recognition Order and the Interim DIP Recognition Order (each as defined in the DIP Credit Agreement), in each case, in form and substance satisfactory to the DIP Agent and the Required DIP Lenders;

(v)    No later than forty-five (45) calendar days following the Petition Date, the Bankruptcy Court shall have entered the Bidding Procedures Order, which shall be in form and substance acceptable to the Required DIP Lenders;

(vi)    No later than forty-five (45) calendar days following the Petition Date, the Bankruptcy Court shall have entered the Final Order;

(vii)    No later than fourteen (14) calendar days following the entry of the Bidding Procedures Order by the Bankruptcy Court, the Canadian Court shall have entered (A) the Final DIP Recognition Order (as defined in the DIP Credit Agreement) and (B) an order recognizing and enforcing the Bidding Procedures Order in Canada, in each case, in form and substance acceptable to the Required DIP Lenders;

(viii)    No later than one hundred and eight (108) calendar days following the Petition Date, the Bankruptcy Court shall have entered an order approving the Sale Transaction, in form and substance acceptable to the Required DIP Lenders;

(ix)    No later than fourteen (14) calendar days following the entry of the Sale Approval Order by the Bankruptcy Court, the Canadian Court shall have granted an order, in form and substance acceptable to the Required DIP Lenders, recognizing and enforcing the Sale Approval Order in Canada; and

(x)    No later than one hundred and twenty (120) days following the Petition Date, the Sale Transaction shall be consummated.

31.    Subject to the Carve-Out and the Administration Charge, the DIP Facility will be secured (subject to customary permitted liens) by security interests and liens on substantially all of the Debtors' property (such property, the "***DIP Collateral***").  The liens to be provided in respect of the DIP Facility include: (i) fully-perfected first priority liens on all of the DIP Collateral that, as of the Petition Date, is unencumbered and not subject to any liens (including Prepetition Prior Liens (defined below)); (ii)  fully-perfected liens on all DIP Collateral, subject to an aggregate amount of

14

$12 million of liens that are (a) valid, enforceable, perfected, non-avoidable and in existence immediately prior to the Petition Date or (b) valid, enforceable, non-avoidable and in existence immediately prior to the Petition Date, but perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, (the "*Petition Date Perfected Liens*"); (iii) a fully-perfected first priority priming lien upon all DIP Collateral that constitutes Non-WCF Collateral, subject to Petition Date Perfected Liens, and, prior to entry of the Final Order, any prepetition security interest in or lien on assets of NCU that are in favor of Trisura ("*Trisura Liens*"); (iv) a fully-perfected springing first priority lien on all assets constituting WCF Collateral upon the satisfaction of obligations owing to Concord under the Prepetition Working Capital Agreement; (v) a first priority lien on all claims in respect of intercompany transfers of proceeds from the DIP Facility or of Cash Collateral from any Debtor to NCU. It also is proposed that the DIP Facility would benefit from superpriority administrative expense claims.

32.    The Prepetition Senior Secured Term Loan Agent, on behalf of the lenders thereunder, has consented to the execution of the DIP Facility and the priming of the liens securing such facility. Currently, that consent only is for a financing of up to $51.4 million, which, while in excess of the amount of the Interim DIP Loan, is less than the full amount of the DIP Facility. The Debtors will be pursuing a consent for the full size of the DIP Facility prior to entry of the Final Order.

33.    In addition, as described in detail above and in the First Day Declaration, the other Senior Secured Parties have consented to the Debtors' DIP Financing pursuant to the Prepetition Intercreditor Agreements. The Debtors will seek consent to the priming of the Trisura Liens prior to the Final Hearing. Presently, the DIP Facility does not seek to prime the liens of any other prepetition secured indebtedness that might exist.

34.    As adequate protection, the Prepetition Secured Parties will, to the extent of any diminution of value in their collateral during the pendency of these Chapter 11 Cases, receive: (i) additional and replacement liens on, except as otherwise set forth in the Interim Order, all property of the Debtors' estates that constitutes DIP Collateral (the "*Adequate Protection Liens*"), subject to the lien priorities set forth on Exhibit C to the Interim Order; (ii) superpriority

administrative expense claims against each of the Debtors pursuant to section 507(b) of the Bankruptcy Code, subject to the same relative priorities as the Adequate Protection Liens; and (iii) financial reporting provided to the DIP Lenders.  In addition, in consideration for its consent to the priming liens contemplated by the DIP Facility, KfW will receive adequate protection in the form of: (i) the indefeasible payment of interest in amounts equal to 100% of the accrued and unpaid interest under the Prepetition Senior Secured Term Loan Credit Agreement (at the non-default rate) whether such interest accrued prior to the Petition Date or following the Petition Date, with amounts (A) relating to the Prepetition Senior Secured Term Loan A and B Obligations paid in cash and (B) amounts relating to the Prepetition Senior Secured Term Loan A-2 Obligations paid in kind, and (ii) the reimbursement of reasonable and documented professional fees and expenses of the Prepetition Senior Secured Term Loan Agent as provided in the Interim Order.  The Debtors will not pay any adequate protection for the priming of the Trisura Liens.

### Summary of the DIP Credit Agreement

35.     In accordance with Bankruptcy Rule 4001(c)(1)(B), the below chart summarizes the significant terms of the proposed Interim Order and the DIP Facility.

| Material Terms | |
| --- | --- |
| **Borrower** <br> Bankruptcy Rule 4001(c)(1)(B); DIP Credit Agreement Preamble | Nevada Copper, Inc., a Nevada corporation. |
| **Guarantors** <br> Bankruptcy Rule 4001(c)(1)(B); DIP Credit Agreement Preamble | All of the Debtors other than the Borrower. |
| **DIP Lenders** <br> Bankruptcy Rule 4001(c)(1)(B); DIP Credit Agreement Preamble | Manchester Securities Corp. and Ziwa Investments Limited. |
| **DIP Agent** <br> Bankruptcy Rule 4001(c)(1)(B); DIP Credit Agreement Preamble | U.S. Bank Trust Company, National Association. |

16

| Material Terms | |
|---|---|
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B); DIP Credit Agreement § 5.2 | Interest will be payable on the unpaid principal amount of all DIP Loans and all accrued and unpaid interest thereon at a rate per annum equal to the aggregate of (a) Term SOFR (as defined in the DIP Credit Agreement) for an Interest Period (as defined in the DIP Credit Agreement) of one month, (b) the Credit Spread Adjustment (as defined in the DIP Credit Agreement) of 10 basis points per annum, and (c) 9.00%, payable monthly in cash on the first (1st) business day of each month in arrears.<br><br>The Term SOFR applicable to each DIP Loan for the initial one-month period beginning on the date on which such DIP Loan is funded and each succeeding one-month thereafter shall be determined in accordance with the provisions of the DIP Credit Agreement for determining the Term SOFR for an Interest Period of one month thereunder, which provisions are incorporated by reference into the DIP Credit Agreement *mutatis mutandis*; provided, that in no event shall the Term SOFR be less than 0.00%. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B);<br>DIP Credit Agreement § 13.1 | Each of following shall constitute an "Event of Default":<br>(i) If the Borrower fails to pay on or before the due date, (x) any principal amount due to the Senior Lenders or (y) any other amount payable by it to any Finance Party (unless the failure to pay is remedied within two (2) Business Days);<br>(ii) Any Obligor shall default in the due performance or observance of any term, condition or provision of a Finance Document to which they are a party, not otherwise specified in Section 13.1 (Events of Default) of the DIP Credit Agreement and, other than in the case of any breach of Section 11.2 (DIP Budget and Variance Reporting), Section 11.12 (Negative Covenants), Section 11.13 (Milestones) and Section 11.3(a)(i) (Notifications to the Senior Lenders) (in each case for which no cure period shall apply), such breach remains unremedied for a period of ten (10) Business Days after the earlier of: (i) written notice by the Administrative Agent to the Borrower (acting at the direction of the Majority Lenders), and (ii) any Obligor becoming aware of such breach;<br>(iii) the Borrower makes any representation or warranty under any Finance Document to which it is a party, or in any certificate, Financial Statement or other document furnished by it to any Secured Party, which is incorrect or incomplete when made or deemed to be made (except to the extent any such representation or warranty expressly relates to an earlier date, and in such case, shall be true and correct on and as of such earlier date) and, to the extent such representation or warranty is not already qualified by materiality, such representation or warranty is incorrect or incomplete in a material respect when made or deemed to be made and in each case the circumstances so misrepresented are (i) susceptible to cure and (ii) not corrected within ten (10) Business Days after the earlier of (A) written notice by the Administrative Agent to the Borrower (acting at the direction of the Majority Lenders), and (B) any Obligor becoming aware of such breach; |

17

| Material Terms |
|---|
| (iv) the Borrower (i) fails to make any payment when such payment is due and payable to any Person in relation to any Debt (other than Debt subject to the Automatic Stay) having a principal amount in excess of $1,000,000, and any applicable grace period in relation thereto as provided for under the applicable instrument or agreement evidencing such Debt has expired; (ii) defaults in the observance or performance of any other agreement or condition in relation to any such Debt or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs or condition exists, the effect of which is to cause the holder of such Debt to declare such Debt to become due prior to its stated maturity date, in each case to the extent not subject to the Automatic Stay; or (iii) fails to pay any Adequate Protection Obligations when due and payable in accordance with the DIP Order; |
| (v) an order is made or a resolution is passed for the winding up, liquidation or dissolution of the Borrower; |
| (vi) any Finance Document is repudiated, contested or disaffirmed by any Obligor in whole or in part, ceases to be in full force and effect, or is invalidated, becomes unlawful, or rendered unenforceable by any act, regulation or governmental action or is determined to be invalid or unenforceable by a court or other judicial entity or if any Obligor has ceased to perform its obligations under any Finance Document; |
| (vii) security interests intended to be granted by or pursuant to the DIP Credit Agreement or any other Finance Document over the Collateral, shall not be valid, perfected, first priority security interests (subject, in the case of the Collateral, to the existence of any Permitted Encumbrances) in favor of the Collateral Agent for the benefit of the Secured Parties and enforceable thereby; |
| (viii) an adverse final judgment, order, writ of execution, garnishment, attachment, arbitral award or similar process that is not capable of further appeal, for an amount in excess of $1,500,000, is issued or levied against the Borrower, the Collateral, in each case, to the extent not subject to the automatic stay under the Chapter 11 Cases; provided that, to the extent that any such action or process is appealable or contestable, such judgment, order, writ of execution, garnishment, attachment, arbitral award or similar process remains unpaid, unstayed on appeal, undischarged, unbonded or undismissed for a period of thirty (30) days after the right of appeal or contest arises; |
| (ix) all or any material portion of the Collateral is attached, sold, transferred, Encumbered or assigned by a Person other than the Secured Parties or without the consent of the Senior Lenders (other than pursuant to a Permitted Asset Disposition or Permitted Encumbrance, as applicable) and in the case of such attachment shall remain unlifted, unstayed or undischarged for a period of thirty (30) days; |

18

| Material Terms |
| --- |

(x) an Encumbrancer, or any other Person, other than the Secured Parties, legally takes possession of (i) any Collateral Account (other than by the collateral agent under the First Lien Facility), or (ii) any portion of the Collateral with a value in excess of $1,500,000 by appointment of a receiver, receiver and manager, or otherwise but excluding the legal possession of any cash collateral held as security by third parties;

(xi) the Borrower abandons all or any material portion of the Collateral other than in regard to its transition into care and maintenance operations;

(xii) the Borrower fails to obtain, or loses the right to, or benefit of, a Material Project Authorization, or any Material Project Authorization in respect of the transactions contemplated by the Transaction Documents is modified in a manner that has a Material Adverse Effect; provided, that the foregoing shall not constitute the occurrence of an Event of Default if such circumstance is capable of being remedied and the Borrower is diligently pursuing and obtains a replacement of such Material Project Authorization within forty-five (45) days after failing to obtain or losing the right to, or benefit of, a Material Project Authorization;

(xiii) a Change of Control occurs;

(xiv) any Material Project Document is terminated (other than at scheduled maturity, with the prior written consent of the Majority Lenders) or otherwise becomes invalid, illegal or otherwise ceases to be in full force and effect; provided, that the foregoing shall not constitute the occurrence of an Event of Default in the case of the NV Energy Power Supply Contract, if the Majority Lenders have, acting reasonably, determined that the NV Energy Power Supply Contract is capable of replacement;

(xv) (i) the Borrower or any director or officer thereof has violated, any AML Laws, Anti-Corruption Laws or Sanctions, or (ii) any employee or agent of the Borrower has violated any AML Laws, Anti-Corruption Laws or Sanctions, unless such Obligor takes action to remedy such violation as may be reasonably acceptable to the Administrative Agent within ten (10) days of acquiring actual knowledge of such violation and thereafter continues to take such action as may be reasonably acceptable to the Administrative Agent;

(xvi) the occurrence of an Expropriation Event which is continuing for thirty (30) days or more; provided, that such cure period shall apply only if the Obligors are actively and diligently pursuing a resolution to regain ownership and control over the Project substantially as held prior to such event;

(xvii) failure by any Obligor to be in compliance in all material respects with the applicable provisions of any Finance Document, the DIP Order or DIP Recognition Order, after giving effect to applicable cure periods set forth in the DIP Credit Agreement or the applicable document;

19

| Material Terms |
|---|
| (xviii)    any request made by any Obligor for, or the reversal, modification, amendment, stay, reconsideration or vacatur of any DIP Order, as entered by the Bankruptcy Court, or any DIP Recognition Order, as granted by the Canadian Court, in each case, without the prior written consent of the Majority Lenders;<br><br>(xix) the filing of any application by any Obligor (other than the application for financing provided by a third party which seeks authority to pay all of the Obligations in full in cash upon the closing of such financing) for the approval of (or an order is entered by the Bankruptcy Court approving) any claim arising under section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest or other Encumbrance in any of the Chapter 11 Cases which is pari passu with or senior to the Encumbrances securing the Obligations, excluding (i) the Carve-Out, (ii) the Administration Charge, (iii) solely with respect to the WCF Collateral, the Encumbrances securing the Working Capital Facility, (iv) prior to the entry of the Final Order, any Prepetition Trisura Lien, (v) Encumbrances arising under the DIP Order or pursuant to any other financing agreement made with the prior written consent of the Majority Lenders or (vi) as provided in the First Day Orders with the prior written consent of the Majority Lenders;<br><br>(xx) any Obligor (or any direct or indirect non-Debtor affiliate or Subsidiary of an Obligor) commences (or supports) any action (other than an action permitted by the DIP Order and the DIP Recognition Order) seeking or consenting to, or any order is entered granting, (i) the invalidation, subordination or other challenge to the Prepetition Secured Obligations, the Prepetition Funded Debt Liens, the Adequate Protection Liens, the Adequate Protection Claims (as defined in the DIP Order), the Encumbrances securing the Obligations or the DIP Superpriority Claims (as defined in the DIP Order) or (ii) any relief under sections 506(c) or 552(b) of the Bankruptcy Code with respect to any Prepetition Collateral (as defined in the DIP Order) (including cash collateral), any Collateral or against any of the Prepetition Secured Parties (as defined in the DIP Order), the Agent or the Senior Lenders;<br><br>(xxi) (i) any Obligor files a pleading in any court seeking or supporting an order to revoke, reverse, stay, vacate, amend, supplement or otherwise modify any Finance Document or any DIP Order or DIP Recognition Order, or to disallow any Obligations, in whole or in part, or (ii) any material provision of any Finance Document, the DIP Order, any DIP Recognition Order or any other order of the Bankruptcy Court or Canadian Court approving the Obligors' use of Cash Collateral (as defined in the DIP Order), shall for any reason cease to be valid and binding (without the prior written consent of the Majority Lenders); |

| Material Terms |
|---|

(xxii) the entry of an order by the Bankruptcy Court in favor of the Creditors' Committee (if any), any ad hoc committee or any other party in interest, (i) granting such party standing to pursue any claims against the Senior Lenders or the Prepetition Secured Parties, (ii) sustaining an objection to claims of the Senior Lenders or the Prepetition Secured Parties or (iii) avoiding any liens held by the Senior Lenders or the Prepetition Secured Parties, provided, that the foregoing shall not be deemed to prohibit the investigation by any such committee of any such claims or liens in respect of the Prepetition Secured Obligations in accordance with the terms of the DIP Order;

(xxiii)        without the prior written consent of the Majority Lenders, the filing with the Bankruptcy Court of a motion seeking approval of a sale under section 363 of the Bankruptcy Code or a plan of reorganization or liquidation in any of the Chapter 11 Cases that, in either case, does not provide for indefeasible payment in full in cash of all Obligations upon closing of such sale or the effective date of such plan;

(xxiv)        the appointment in any of the Chapter 11 Cases of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of any Debtor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code);

(xxv) without the prior written consent of the Majority Lenders, the granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Chapter 11 Cases with respect to any portion of the Collateral with an aggregate value of at least $1,500,000;

(xxvi)        the conversion of any Chapter 11 Case into a case pursuant to Chapter 7 of the Bankruptcy Code;

(xxvii)        the termination of any of the Debtors' exclusive right to propose a plan of reorganization under Chapter 11 of the Bankruptcy Code;

(xxviii)        a dismissal of any of the Chapter 11 Cases or Recognition Proceedings;

(xxix)        without the prior written consent of the Majority Lenders, a request by the Debtors to use cash collateral or to obtain financing under section 364 of the Bankruptcy Code (other than pursuant to the DIP Credit Agreement), unless such financing would repay in full in cash all Obligations upon consummation thereof;

(xxx) without the consent of the Majority Lenders, the filing of any motion seeking approval of a sale of any Collateral;

(xxxi)        a Material Adverse Effect has arisen after the Petition Date and is continuing;

(xxxii)        the failure to meet any Milestone; or

21

| Material Terms | |
|---|---|
| | (xxxiii)    the entry of an Interim Order or Final Order in form or substance that is not acceptable to the Majority Lenders in their sole discretion. |
| **Liens and Priorities** Bankruptcy Rule 4001(c)(1)(B)(i); Interim Order ¶ 6(c); DIP Credit Agreement Recitals | The DIP Facility will be a superpriority multi-draw term loan credit facility. (1)    *First Priority Lien on Unencumbered Property*. Pursuant to Bankruptcy Code section 364(c)(2), a valid, binding, continuing, enforceable and fully-perfected first priority senior security interest in and lien upon all DIP Collateral that, as of the Petition Date, is unencumbered and not subject to any liens (including Petition Date Perfected Liens), which security interest and lien shall be junior and subordinate only to (A) the Carve-Out, and (B) the Administration Charge. (2)    *Priming Lien on WCF Collateral*. Upon the payment in full of the obligations under the Prepetition Working Capital Facility, pursuant to Bankruptcy Code section 364(d)(1), a valid, binding, continuing, enforceable and fully-perfected first priority security interest in and lien upon all DIP Collateral that constitutes WCF Collateral, which security interest and lien shall be junior and subordinate only to (A) the Carve-Out, (B) the Administration Charge, (C) Petition Date Perfected Liens, and (D) prior to entry of the Final Order, any security interest in or lien on the assets of NCU that are in favor of Trisura Guarantee Insurance Company. (3)    *Priming Lien on Non-WCF Collateral.* Pursuant to Bankruptcy Code section 364(d)(1), a valid, binding, continuing, enforceable and fully-perfected first priority security interest in and lien upon all DIP Collateral that constitutes Non-WCF Collateral, *provided that* such lien shall be junior and subordinate only to (A) the Carve-Out, (B) the Administration Charge and (C) Petition Date Perfected Liens, and (D) prior to entry of the Final Order, any security interest in or lien on the assets of NCU that are in favor of Trisura Guarantee Insurance Company. (4)    *Lien on Intercompany Superpriority Claims.*    Pursuant to Bankruptcy Code section 364(d)(1), a valid, binding, continuing, enforceable and fully-perfected first priority priming security interest in and lien on all claims in respect of intercompany transfers of proceeds from the DIP Facility or of Cash Collateral from any Debtor to NCU, *provided that* such lien shall be junior and subordinate only to (A) the Carve-Out, (B) the Administration Charge, and (C) Petition Date Perfected Liens (excluding any Prepetition Trisura Lien). |
| **Milestones** Bankruptcy Rule 4001(c)(1)(B)(vi); DIP Credit Agreement § 11.13 | The DIP Facility will be subject to the following milestones: a)  No later than one (1) calendar day following the Petition Date, the Debtors shall have filed a motion in the Bankruptcy Court seeking approval of the DIP Facility, in form and substance acceptable to the Majority Lenders; b)  No later than five (5) business days following the Petition Date, the Bankruptcy Court shall have entered the Interim Order; c)  No later than ten (10) calendar days following the Petition Date, the Debtors shall have filed the Bidding Procedures Motion d)  No later than fourteen (14) calendar days following the entry of the Interim Order by the Bankruptcy Court, the Canadian Court shall |

22

| Material Terms | |
|---|---|
| | have granted the Initial Recognition Order and Interim DIP Recognition Order. |
| | e) No later than fourteen (14) calendar days following entry of the Final DIP Order by the Bankruptcy Court, the Canadian Court shall have entered the Final DIP Recognition Order. |
| | f) No later than fourteen (14) calendar days following entry of the Sale Approval Order by the Bankruptcy Court, the Canadian Court shall have granted an order, in form and substance satisfactory to the Administrative Agent and Senior Lenders in their sole discretion, recognizing and enforcing the Sale Approval Order in Canada. |
| | g) No later than fourteen (14) calendar days following the entry of the Bidding Procedures Order by the Bankruptcy Court, the Canadian Court shall have granted an order, in form and substance satisfactory to the Administrative Agent and Senior Lenders in their sole discretion, recognizing and enforcing the Bidding Procedures Order in Canada. |
| | h) No later than forty-five (45) calendar days following the Petition Date, the Bankruptcy Court shall have entered a Bidding Procedures Order approving the Bidding Procedures Motion, which shall be in form and substance acceptable to the Majority Lenders. |
| | i) No later than forty-five (45) calendar days following the Petition Date, the Bankruptcy Court shall have entered the Final Order. |
| | j) No later than one hundred and eight (108) calendar days following the Petition Date, the Bankruptcy Court shall have entered an order approving the Sale Transaction, in form and substance acceptable to the Majority Lenders; and |
| | k) No later than one hundred and twenty (120) days following the Petition Date, the Sale Transaction shall be consummated. |
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B); DIP Credit Agreement § 12.1 | The DIP Credit Agreement includes standard and customary conditions, including, without limitation: (i) receipt of DIP Documents by the DIP Lenders, including the Approved DIP Budget; (ii) payment by the Debtors of all required fees and expenses to the DIP Agents; (iii) the accuracy of representations and warranties in all material respects; (iv) the Final Order or the Interim Order, as applicable, shall be in full force and effect; (iv) delivery of a utilization request; and (v) no default or event of default. |
| **Use of DIP Facility and Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(ii) DIP Credit Agreement § 2.3 | Subject to Bankruptcy Court approval, proceeds of the DIP Facility will be used strictly in accordance with the DIP Documents and the Approved DIP Budget (subject to the Permitted Variances), for (a) working capital and general corporate purposes of the Debtors, (b) for bankruptcy-related costs and expenses (including costs and expenses incurred in connection with the Recognition Proceedings) and (c) for costs and expenses related to the DIP Facility. |

23

4892-9244-1543, v. 1

| Material Terms | |
|---|---|
| **Adequate Protection** Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii); Interim Order ¶ 10-11 | Adequate Protection for Prepetition Secured Parties: <br><br> The Prepetition Secured Parties are entitled to adequate protection of their interests in the Prepetition Collateral, including the Cash Collateral, to the extent of any postpetition diminution in value of their interests in the Prepetition Collateral resulting from, among other things, (i) subordination of the Prepetition Secured Parties' interests in the Prepetition Collateral, (ii) the use of Cash Collateral during the Chapter 11 Cases, (iii) the use, sale or lease of any of the Prepetition Collateral, (iv) the imposition of the automatic stay pursuant to Bankruptcy Code section 362(a), and/or (v) for any other reason for which adequate protection may be granted under the Bankruptcy Code ("***Diminution in Value***"). <br><br> (i) all Prepetition Secured Parties shall, to the extent of any Diminution in Value, during the pendency of the Chapter 11 Cases: <br>     a. be granted (a) additional and replacement liens on, except as set forth in the Interim Order, all property of the Debtors' estates that constitutes DIP Collateral (the "**Adequate Protection Liens**"), subject to the lien priorities set forth on <u>Exhibit C</u> to the Interim Order, and (b) superpriority administrative expense claims against each of the Debtors pursuant to section 507(b) of the Bankruptcy Code (the "**Adequate Protection Claims**"), which claims shall have the same relative priorities as the Adequate Protection Liens (as set forth on <u>Exhibit C</u> to the Interim Order), subject only to the Carve-Out, the Administration Charge and the DIP Superpriority Claims; and <br>     b. receive financial reporting provided to the DIP Lenders (and their advisors) in respect of the DIP Facility, and other information rights as specified in section 10 of the Interim Order (with specific information rights provided to KfW and the technical advisor). <br> (ii) KfW shall, to the extent of any Diminution in Value, during the pendency of the Chapter 11 Cases: <br>     a. The Prepetition Senior Secured Term Loan Agent shall during the pendency of the Chapter 11 Cases, receive indefeasible payments in amounts equal to 100% of the accrued and unpaid interest, whether accruing prior to, on or after the Petition Date, due to the Prepetition Senior Secured Term Loan Agent under the Prepetition Senior Secured Term Loan Documents (calculated at the applicable non-default rates) (the "***Adequate Protection Monthly Payments***" and, together with the Adequate Protection Fees, the "***Adequate Protection Payments***"), which shall be payable (i) in respect of payments relating to the Prepetition Senior Secured KfW Term Loan Obligations, in cash and (ii) in respect of payments relating to the Prepetition Senior Secured Term Loan A-2 Obligations, in kind; provided that in the event of a final determination that the Prepetition Senior |

24

| Material Terms | |
|---|---|
| | Secured Term Loan Lenders are undersecured as of the Petition Date, payments received by the applicable undersecured Prepetition Senior Secured Term Loan Lender pursuant to this paragraph 10(d) may be recharacterized and applied as payments of principal. |
| | b.  as further adequate protection, the Debtors are authorized and directed to pay, without further Court order, reasonable and documented fees and expenses (the "***Adequate Protection Fees***"), whether incurred before or after the Petition Date, of the Prepetition Senior Secured Term Loan Agent, consisting of the following: (i) Milbank, as counsel to KfW; (ii) one Canadian counsel to KfW;  (iii) one Nevada counsel to KfW; and (iv) one technical advisor to KfW; (collectively, the "***Prepetition Secured Parties' Professionals***") in accordance with the notice and review procedures set forth in paragraph 19 of the Interim Order. |
| **Entities with Interests in Cash Collateral** <br> Bankruptcy Rule 4001(b)(1)(B)(i); Interim Order ¶ 6 | The following secured parties have an interest in Cash Collateral: (i) the DIP Secured Parties; (ii) the Prepetition Secured Parties; |
| **Fees** <br> Bankruptcy Rule 4001(c)(1)(B); Interim Order ¶ 3, 19; DIP Credit Agreement § 5.9 | The Debtors shall pay all fees, expenses (including legal and other reasonable and documented professional fees and expenses, subject to a review period of 10 business days (the "***Review Period***"), during which the Debtors, the Creditors' Committee, or the U.S. Trustee may make an objection) and other charges payable under the terms of the DIP Documents as and when due thereunder.  The Debtors will pay also professional fees, costs, and expenses of the Prepetition Secured Parties' professionals, as provided in the Interim Order. The DIP Facility will also include the following fees: <br><br> • **Unused Commitment Fee**: a fee on the average daily Unused Commitment of such Senior Lender for the period from and including the Entry Date to the Maturity Date, at a rate per annum of 1.0%; <br> • **Upfront Fee**: 5.0% of the total DIP Commitments, earned upon entry of the Interim Order, with the portion of the Upfront Fee allocable to (x) the Interim DIP Loan becoming due and payable in cash upon the entry of the Interim Order and the funding of the Interim DIP Loan and (y) the Final DIP Loan becoming due and payable in cash upon the entry of the Final Order and the funding of the Final DIP Loan; <br> • **Exit Fee**: 1.0% fee that is due and payable upon repayment of the DIP Facility in accordance with the DIP Credit Agreement; and <br> • **Agency Fee**: an agency fee as set forth in the letter agreement between the DIP Agent and the Borrower payable in accordance with the terms of such letter agreement. |

25

| Material Terms | |
|---|---|
| **Carve Out**<br>Bankruptcy Rule 4001(c)(1)(B); Interim Order ¶ 13 | Carve out (the "<u>Carve Out</u>") that covers United States Trustee and Court fees, up to $50,000 in fees for a chapter 7 trustee and allowed unpaid fees and expenses of estate/committee professionals, and a capped amount of professional fees for the period after delivery of a "<u>Carve Out Trigger Notice</u>". The Carve Out reserve will be funded upon delivery of a Carve Out Trigger Notice. |
| **DIP Budget; Reporting Requirement**<br>Bankruptcy Rule 4001(c)(1)(B); Interim Order ¶ 8 | *Initial Budget.* The Debtors have prepared and delivered to the DIP Lenders and the DIP Professionals an itemized thirteen-week cash flow forecast attached to the Interim Order as **Exhibit B** (the "***Initial Budget***," as amended, replaced, supplemented or otherwise modified from time to time in accordance with the terms of the Interim Order and the DIP Documents, the "***Approved Budget***"). Except as otherwise provided in the Interim Order or in the DIP Documents, the Debtors may only use Cash Collateral and the proceeds of the DIP Facility to fund payments benefitted by the Carve-Out and otherwise in accordance with the Approved Budget (subject to the Permitted Variances).<br><br>*Proposed Budget; Budget Transition.* By no later than 12:00 p.m. (Pacific Time) on the third Thursday after the Petition Date (commencing from June 27, 2024), and continuing at 12:00 p.m. (Pacific Time) on the Thursday of every second week thereafter, the Debtors shall deliver to the DIP Lenders, DIP Professionals, and KfW an updated and supplemented forecast (a "***Proposed Budget***") for the thirteen-week period commencing with the calendar week in which such Proposed Budget is delivered (the "***Budgeted Period***"); *provided*, *however*, that in no event shall the Budgeted Period extend past four weeks after the Maturity Date (as defined in the DIP Credit Agreement) of the DIP Facility. For the avoidance of doubt, if the Budgeted Period is anticipated to extend beyond the Maturity Date, the projected receipts, disbursements, intercompany transfers and all other line items set forth in the Proposed Budget for all weeks following the Maturity Date shall assume that the Debtors continue to operate in the ordinary course consistent with prior postpetition practices and that no sale of the Debtors' business will occur during such portion of the Budgeted Period. The Proposed Budget (including any subsequent revisions to any such Proposed Budget) shall become the Approved Budget effective five (5) business days after such submission (such date, the "***Budget Transition Date***") unless the Debtors receive a written objection from the Required DIP Lenders (with e-mail from professionals acting on behalf of the Required DIP Lenders to the Debtors' counsel being sufficient) prior to 5:00 p.m. (Pacific Time) on the Budget Transition Date. If the Required DIP Lenders do not object, in writing, to a Proposed Budget, or an amendment, supplement or modification to the Approved Budget or Approved Variance Report (defined below) within five (5) business days after the Required DIP Lenders' receipt thereof, then such Proposed Budget, amendment, supplement or modification shall be deemed acceptable to and approved by the DIP Lenders. In the event the Required DIP Lenders timely object to a Proposed Budget, the prior Approved Budget shall remain in full force and |

| Material Terms |
|---|

effect until any such Proposed Budget is approved by the Required DIP Lenders (with e-mail from the advisors acting on behalf of the Required DIP Lenders to the Debtors' counsel being sufficient). The consent of the Required DIP Lenders to any Proposed Budget or any Approved Budget shall not be construed as consent to the use of any Cash Collateral or proceeds of the DIP Facility after the occurrence of a Termination Event regardless of whether the aggregate funds shown on the Approved Budget have been expended. Until any Proposed Budget, amendment, supplement or modification has been approved (or is deemed approved in accordance with this paragraph) by the Required DIP Lenders, the Debtors shall be subject to and be governed by the terms of the Approved DIP Budget then in effect.

*Budget Reporting*. By no later than 12:00 p.m. (Pacific Time) on the second Thursday following the Petition Date (the "***First Reporting Date***", which, for the avoidance of doubt, shall be June 20, 2024), and no later than 12:00 p.m. (Pacific Time) on each Thursday thereafter (together with the First Reporting Date, each a "***Weekly Reporting Date***"), the Debtors shall provide to the DIP Lenders (and their advisors) and KfW (and its counsel) a report, in form and substance reasonably acceptable to the DIP Lenders (the "***Weekly Variance Report***"), setting forth in reasonable detail: (i) the intercompany transfers from Debtor entities to NCU on a Debtor-by-Debtor and an aggregate basis; (ii) the actual receipts of the Debtors on a line-by-line and aggregate basis (the "***Actual Receipts***") and the actual disbursements of the Debtors on a line-by-line and aggregate basis (such aggregate actual disbursements, the "***Actual Disbursements***"), in each case, during the applicable week ending on the Sunday preceding each such Weekly Reporting Date (each such week, the "***Reporting Week***"); (iii) a comparison (whether positive or negative, expressed as a percentage) for the Reporting Week between (A) the Actual Receipts (and each line item thereof) for such Reporting Week to the amount of the Debtors' projected receipts (and each line item thereof) set forth in the Approved Budget for such Reporting Week, (B) the Actual Disbursements (and each line item thereof) for such Reporting Week to the amount of the Debtors' projected disbursements (and each line item thereof) set forth in the Approved Budget for such Reporting Week and (C) the actual intercompany transfers from each Debtor entity to NCU to the amount of each such Debtor's projected intercompany transfers to NCU set forth in the Approved Budget for such Reporting Week. In addition, by no later than 12:00 p.m. (Pacific Time) on each Weekly Reporting Date that occurs on and after the three-week anniversary of the First Reporting Date, (each such date, a "***Rolling Four-Week Testing Date***" (which such initial Rolling Four-Week Testing Date shall be July 11, 2024) and each subsequent four-week period commencing from the beginning of the week in which the Petition Date occurs and ending on the Sunday preceding each such Rolling Four-Week Testing Date, a "***Rolling Four-Week Testing Period***") the Debtors shall provide the DIP Lenders (and their advisors) and KfW (and its counsel) a report, in form and

27

4892-9244-1543, v. 1

| Material Terms | |
|---|---|
| | substance reasonably acceptable to the DIP Lenders (a "***Rolling Four-Week Variance Report***" and, together with the Weekly Variance Report, the "***Approved Variance Reports***"), setting forth in reasonable detail: (x) the aggregate Actual Receipts of the Debtors, aggregate Actual Disbursements of the Debtors, and aggregate intercompany transfers from each Debtor entity to NCU, in each case, during the applicable Rolling Four-Week Testing Period; and (y) a comparison (whether positive or negative, expressed as a percentage) detailing (1) the aggregate Actual Receipts (and each line item thereof) for such Rolling Four-Week Testing Period compared to the projected receipts (and each line item thereof) for such Rolling Four-Week Testing Period set forth in the Approved Budget for such Rolling Four-Week Testing Period; (2) the aggregate Actual Disbursements (and each line item thereof) for such Rolling Four-Week Testing Period compared to the projected disbursements (and each line item thereof) for such Rolling Four-Week Testing Period set forth in the Approved Budget for such Rolling Four-Week Testing Period; and (3) the aggregate intercompany transfers from each Debtor entity to NCU made by each such Debtor during such Rolling Four-Week Testing Period compared to the aggregate projected intercompany transfers from each such Debtor entity to NCU for such Rolling Four-Week Testing Period set forth in the Approved Budget for such Rolling Four-Week Testing Period. |
| **Variance Covenant** Bankruptcy Rule 4001(c)(1)(B); Interim Order ¶ 8 | *Budget Testing; Permitted Variances.*  During any Rolling Four-Week Testing Period, the Debtors shall not permit (1) total disbursements, minus (2) disbursements in respect of (i) interest, fees, and expenses in relation to the DIP Facility; (ii) Adequate Protection Obligations; (iii) DIP Professional Fees; and (iv) professional fees paid by the Debtors on behalf of themselves or any other party (the disbursements remaining after such subtractions, the "***Total Tested Disbursements***") to be more than 120% of such Total Tested Disbursements set forth in the Approved Budget for such Rolling Four-Week Testing Period (collectively, the "***Permitted Variances***").  Additional disbursement variances, if any, from an Approved Budget, and any proposed amendments, supplements or modifications to an Approved Budget, shall be subject to the prior written approval of the Required DIP Lenders.  For the avoidance of doubt, any reference to "written consent" or "written approval" hereunder shall include consent or approval granted by e-mail, including email from counsel to the DIP Lenders on behalf of the DIP Lenders. |
| **Challenge Period** Bankruptcy Rule 4001(c)(l)(B); Interim Order ¶ 21 | The DIP Orders provide for an investigation period of not less than forty-five (45) calendar days following (i) with respect to the Creditors' Committee (if any), the later of (x) its appointment in the Chapter 11 Cases and (y) entry of the Final Order; and (ii) with respect to all other parties, forty-five (45) days following entry of the Interim Order. |
| **Waiver/Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv); | Pursuant to the Interim Order, the automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement and effectuate the terms of the Interim Order and the DIP Documents. |

4892-9244-1543, v. 1

| Material Terms | |
|---|---|
| Interim Order ¶ 12 | |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix); DIP Credit Agreement § 7.5; Interim Order ¶ 3(e) | The DIP Credit Agreement and Interim Order include customary expense and release and indemnification provisions. |
| **Term** Bankruptcy Rule 4001(c)(1)(B); DIP Credit Agreement § 1.1 | Maturity at earliest of (i) the date that is four (4) months following the Petition Date, (ii) forty-five (45) calendar days after the Petition Date if the Final Order has not been entered by the Bankruptcy Court on or before such date, (iii) fourteen (14) calendar days after the Petition Date if the Interim DIP Recognition Order has not been entered by the Canadian Court on or before such date, (iv) the date of consummation of any sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code, (v) the date of "substantial consummation" (as defined in section 1101 of the Bankruptcy Code, and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court, (vi) the date of entry of an order by the Bankruptcy Court approving (a) a motion seeking conversion or dismissal of any or all of the Chapter 11 Cases or (b) a motion seeking appointment or election of a trustee, a responsible officer or examiner with enlarged powers relating to the operation of the Debtors' business, (vii) the date the Bankruptcy Court orders the conversion of the bankruptcy case of any of the Debtors to a liquidation pursuant to chapter 7 of the Bankruptcy Code, and (viii) the date of acceleration of all or any portion of the Loans and the termination of the Commitments upon the occurrence of an Event of Default. |
| **Stipulation as to Validity of Prepetition Claims, Obligations, and Liens** Bankruptcy Rule 4001(c)(1)(B)(iii); Interim Order ¶ F(1) | The Debtors stipulate as to the validity of the Prepetition Secured Parties' claims, obligations, and liens under the Prepetition Senior Secured Term Loan Credit Agreement. |
| **Liens on Avoidance Actions** Bankruptcy Rule 4001(c)(1)(B)(xi); Interim Order ¶ 6 | Subject to entry of the Final Order, the DIP Collateral will include the proceeds of avoidance actions, and the DIP Liens and the Adequate Protection Liens will attach to any such proceeds, subject to the Carve-Out and the Administration Charge. |
| **Remedies** Bankruptcy Rule 4001(c)(1)(B)(iv); Interim Order ¶ 23 | The DIP Secured Parties will have the right to exercise any and all rights and remedies under the DIP Loan Documents and applicable law, including, the right to credit bid in a Sale Transaction, provided that the rights of the DIP Agent and each DIP Lender to credit bid on any DIP Collateral that constitutes WCF Collateral shall be subject to the right of the Prepetition |

29

| Material Terms | |
|---|---|
| | Working Capital Purchaser to credit bid for all or any portion of the WCF Collateral. |
| **Waiver of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens** <br> Bankruptcy Rule 4001(c)(1)(B)(vii); Interim Order ¶ F | Subject to the Challenge Period, any challenge to the validity of the liens securing the Prepetition Secured Obligations under the Bankruptcy Code or non-bankruptcy law is waived. |
| **Waiver of Sections 552(b) and 506(c)** <br> Bankruptcy Rule 4001(c)(1)(B); Interim Order ¶ 16 | Each of the DIP Secured Parties and the Prepetition Secured Parties is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code. Subject to the Final Order, the right of the Debtors to surcharge the DIP Collateral or the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code and the "equities of the case" exception of section 552(b) of the Bankruptcy Code with respect to the DIP Secured Parties and the Prepetition Secured Parties are waived. The DIP Secured Parties and, subject to entry of the Final Order, the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine. |

### Basis for Relief

**I.      The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Documents.**

36.      The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and use the proceeds of the DIP Facility and Cash Collateral in accordance with the DIP Orders and the Budget.  As discussed in greater detail below, such authorization is amply supported by applicable law.

**A.      *Entry Into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.***

37.      If an agreement to obtain postpetition secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts give debtors considerable deference in acting in accordance with their sound business judgment in obtaining such credit.  *See, e.g.*, *In re Def. Drug Stores, Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992) (noting that a bankruptcy court may approve favorable terms to DIP lenders as a result of the debtor's business judgment,

4892-9244-1543, v. 1

though the court cannot go so far as approving financing arrangements that evade confirmation requirements; *In re Capitol Station 65, LLC*, No. 17-23627-B-11, 2018 WL 333863, at *13 (Bankr. E.D. Cal. Jan. 8, 2018) (holding that the debtors' selection of DIP lender reflected the debtors' valid and legitimate exercise of prudent business judgment consistent with their fiduciary duties); *In re Gardens R'eg'l Hosp.*, No. 2:16-BK-17463-ER, 2017 WL 7101146, at *4 (Bankr. C.D. Cal. July 28, 2017) (same); *In re Barbara K. Enters., Inc.*, Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (stating that "cases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."). Specifically, to determine whether a debtor has met this business judgment standard, a court need only "examine whether a reasonable businessperson would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

38.    In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.* 294 B.R. at 885, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Tr. Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization). The court also can take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility. *See, e.g.*, *In re ION Media Networks, Inc.*, Case No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6,

31

2009) ("Relevant features of [postpetition] financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.").

39.     The Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment following an arm's-length process and careful evaluation of available alternatives.  Specifically, the Debtors and their advisors determined that the Debtors would require significant postpetition financing to support the administration of this case and the Debtors' ongoing operations.  DIP Declaration ¶ 7-10.  The terms of the DIP Facility are necessary to secure postpetition financing and to accomplish the Debtors' comprehensive restructuring.  The Debtors negotiated the DIP Documents with the DIP Lenders in good faith, at arm's-length, and with the assistance of their advisors, and the Debtors believe that they have obtained the best financing available under the circumstances.  DIP Declaration ¶ 2, 16-18.  Accordingly, the Court should authorize the Debtors' entry into the DIP Documents, as doing so is a reasonable exercise of the Debtors' business judgment.

**B.**     ***The Debtors Should Be Authorized to Grant Liens and Superpriority Claims and Hold DIP Proceeds Free From Prepetition Liens or Claims.***

40.     The Debtors propose obtaining financing under the DIP Facility, in part, by providing superpriority claims and liens pursuant to section 364 of the Bankruptcy Code in favor of the DIP Lenders.  Specifically, the Debtors propose to provide the DIP Secured Parties with (i) superpriority claims and (ii) perfected and non-avoidable liens, including first-priority claims and fully consensual "priming liens" and security interests in the DIP Collateral, subject to the Carve Out, the Administration Charge, and, as applicable, for DIP Collateral other than proceeds of the DIP Facility and which was in existence prior to the Petition Date, Petition Date Perfected Liens.  The Debtors also propose to provide the Prepetition Secured Parties with adequate protection for the priming of their prepetition liens and the use of Cash Collateral in the form of replacement liens over the DIP Collateral (in the relative priority described above and subject to the Carve Out, the Administration Charge, and any Prepetition Prior Liens that are senior in relation to such Prepetition Secured Party's liens and the DIP Liens) and, with respect to the Prepetition Secured Parties, superpriority

32

administrative expense claims (junior to the Carve Out and the DIP Superpriority Claims).  In addition, the Debtors propose to make additional adequation payments to KfW as described above in paragraph 34.

41.    In addition, the DIP Order provides that no liens arising prepetition may attach to the proceeds of the DIP Facility, other than those provided for in the DIP Order.  *See* Interim Order ¶ 7(c).  The DIP Lenders are providing fresh capital on a postpetition basis to facilitate the preservation and sale of the Debtors' assets, thereby benefiting every stakeholder.  Accordingly, DIP Facility proceeds are postpetition assets of the estate, and are not available for attachment of liens arising from prepetition claims.  *See* 11 U.S.C. § 541; *see also* 11 U.S.C. § 552(a).  Given certain provisions in the Nevada Revised Statutes providing for the possibility of mechanics' and materialmen's liens attaching to bank accounts, however, the Debtors, out of an abundance of caution, seek a ruling in the DIP Order ensuring prepetition liens cannot attach to proceeds of the DIP Facility, except as provided for in the DIP Order with respect to the adequate protection package negotiated with the Prepetition Secured Parties.  *See*, *e.g.*, N.R.S. 108.222.

42.    The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (stating that secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether: (i) the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim; (ii) the credit transaction is necessary to preserve the assets of the estate; and (iii) the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and proposed lenders. *In re Ames Dep't Stores*, 115 B.R. at 37–40; *In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *In re Crouse Grp.*, 71 B.R. at 549.

43.    As described above and as set forth in the Declarations, the Debtors need an

immediate capital infusion, yet substantially all of the Debtors' assets are encumbered under their existing capital structure.  Moreover, neither the Prepetition Secured Parties nor any entities that Moelis & Company contacted as part of their market test were interested in providing DIP financing to the Debtors on a junior basis.  DIP Declaration ¶ 10.  In light of the foregoing, the Debtors, in consultation with their advisors, concluded that the success of these cases hinges on whether any DIP financing had the support of, or could be provided by, the Debtors' Prepetition Senior Secured Term Loan Lenders.

44.    Without DIP financing, the Debtors lack sufficient funds to preserve and maintain their assets and continue paying their debts as they come due, while pursuing a sale and restructuring through chapter 11.  Absent the DIP Facility, which will provide the Debtors with sufficient liquidity to administer the case through the sale or reorganization process, the value of the Debtors' estates would be impaired significantly, to the detriment of all stakeholders.  In light of the current circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Documents, are fair, reasonable, and adequate.  For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

45.    With regards to the priority of the postpetition financing, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  Consent by the secured creditors to priming obviates the need to show adequate protection.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) (holding that "by tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (i) the affected parties have consented, or (ii) the affected parties' interests in collateral are adequately protected.

46.    As described above, the Prepetition Senior Secured Term Loan Agent, on behalf of the Prepetition Senior Secured Term Loan Lenders, has consented to the use of Cash Collateral and

34

the DIP Facility up to $51.4 million, which is in excess of the amount of the Interim DIP Loan. Further, pursuant to the Prepetition Intercreditor Agreements, Pala, as lender under the Prepetition Junior Secured Term Loan Facility, and Triple Flag, as purchaser under the Prepetition Stream Agreement, have consented or are deemed to have consented through the Prepetition Intercreditor Agreements, to the use of Cash Collateral and the DIP Financing requested by the Debtors in this Motion. Concord, as buyer under the Prepetition Working Capital Facility Agreement, consents to priming liens other than in respect of WCF Collateral, and because only its interest in the Project Collateral is proposed to be primed, no further consent or adequate protection is required.[8]    In addition, the Prepetition Secured Parties will receive adequate protection of their interests in the Project Collateral and WCF Collateral, as set forth in the DIP Orders.

47.    The Interim Order does not impact the Trisura Liens, which, as provided in the Interim Order, will only be primed by the DIP Facility pursuant to a Final Order. Nevertheless, the Debtors anticipate obtaining Trisura's consent to the DIP Facility prior to entry of the Final Order. Indeed, the DIP Facility will benefit Trisura by providing the Debtors with critical funding needed to pay their obligations in the ordinary course of business, which, in turn, will significantly reduce the likelihood that any of the Debtors' surety bonds will be drawn.[9]    Accordingly, the Debtors submit that the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is both warranted and appropriate under the circumstances.

**C.    *No Comparable Alternative to the DIP Facility Is Reasonably Available.***

48.    A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by section 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Capitol Station 65, LLC*, No. 17-23627-B-11, 2018 WL 333863, at *12 (Bankr. E.D. Cal. Jan. 8, 2018) (noting that the

---

[8]    The Debtors expect to continue to make some deliveries of copper concentrate to Concord after the Petition Date, which effectively will serve as adequate protection for Concord to the extent of such deliveries.

[9]    In addition, as part of the Debtors' first day relief, the Debtors are seeking to pay Trisura the surety premiums in the ordinary course of business on a postpetition basis. *See Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue their Prepetition Insurance Policies, (B) Continue their Prepetition Surety Bond Program, and (C) Enter Into New Premium Financing Agreements and (II) Granting Related Relief*, filed contemporaneously herewith.

4892-9244-1543, v. 1

debtors made diligent and good faith efforts to obtain postpetition financing on the best terms possible). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, as here, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)) (citing *Snowshoe Co.*, 789 F.2d at 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area)); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (holding that bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

49.    The proposed DIP Facility provides desperately needed liquidity to the Debtors without a value-destructive, and ultimately uncertain, priming fight, and the Debtors have determined that the DIP Facility provides the best opportunity available under the circumstances to fund these Chapter 11 Cases. The Debtors, therefore, submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

**II.    The Debtors Should Be Authorized to Pay the Interest and Fees Required by the DIP Secured Parties under the DIP Documents.**

50.    Under the DIP Documents, the Debtors have agreed, subject to court approval, to pay certain interest and fees to the DIP Secured Parties, and certain of the Prepetition Senior Secured Term Loan Lenders, as described above. Additionally, pursuant to the proposed Interim Order, the Debtors have agreed to pay the prepetition and postpetition professional fees and expenses of the DIP Secured Parties and the Prepetition Senior Secured Term Loan Agent.

51.    The Debtors, in consultation with their advisors, believe that the payment of the fees and expenses required under the DIP Facility, including those of the advisors to the DIP Lenders, is an integral component of the overall terms of the DIP Facility, was required by the DIP Lenders as

36

consideration for the extension of postpetition financing, and is reasonable and customary for similar transactions.  Accordingly, the Court should authorize the Debtors to pay the fees and expenses provided under the DIP Documents and the Interim Order.

### III.    The Debtors Should Be Authorized to Continue to Use the Cash Collateral.

52.    Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor-in-possession to use cash collateral with the consent of the secured party.  Here, each of the Prepetition Secured Parties have consented (including by way of deemed consents under the Intercreditor Agreements) to the Debtors' use of any Cash Collateral, subject to the terms and limitations set forth in the Interim Order.

53.    Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral.  Section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims; however, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *See, e.g., In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case-by-case basis"); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case").

54.    The Prepetition Secured Parties will inherently benefit from the Debtors' proposed use of the Cash Collateral by enhancing the likelihood of preserving the Debtors' overall going-concern value as the Debtors move toward confirmation of a plan.  Preservation of the Debtors' business as a going concern in and of itself serves to provide such parties "adequate protection" for Bankruptcy Code purposes.  *See In re Las Vegas Monorail Co.*, 429 B.R. 317, 341 (Bankr. D. Nev. 2010) (noting that adequate protection came in the form of increase or maintenance of collateral's value); *In re BBT*, 11 B.R. 224, 230 (Bankr. D. Nev. 1981) (same); *495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (noting that, in determining whether protection is "adequate," courts consider "whether the value of the debtor's property will increase as a result of" use of collateral or provision of financing); *In re Sky Valley, Inc.*, 100 B.R. at 114 ("an increase in the value

4892-9244-1543, v. 1

of the collateral . . . resulting from superpriority financing could result in adequate protection." (citation omitted)), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117 (N.D. Ga. 1989).

55.     The Debtors submit that the proposed adequate protection measures protect the Prepetition Secured Parties from any diminution in value to the Cash Collateral.  In light of the foregoing, the Debtors further submit, and the Prepetition Secured Parties agree, that the proposed adequate protection to be provided for the benefit of the Prepetition Secured Parties is appropriate and sufficient.  Not only is the proposed adequate protection necessary to protect the Prepetition Secured Parties against any diminution in value, but it is fair and appropriate under the circumstances of this case and ensures that the Debtors have consent to use Cash Collateral, subject to the terms and limitations set forth in the Interim Order.

**IV.     The DIP Lenders Should Be Afforded Good-Faith Protection Under Section 364(e).**

56.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any liens securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C § 364(e).

57.     As provided in the DIP Declaration, the DIP Documents are the result of (i) the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain vital postpetition financing, and (ii) vigorous, arm's-length and good-faith negotiations between the Debtors and the DIP Lenders.  DIP Declaration ¶ 2, 18.  The Debtors submit that the terms and conditions of the DIP Documents are reasonable and appropriate under the circumstances.  The proceeds of the DIP Facility will be used only for purposes that are

4892-9244-1543, v. 1

permissible under the Bankruptcy Code, and no consideration is being provided to any party to the DIP Documents other than as described herein.  Accordingly, the court should find that the obligations arising under the DIP Facility and other financial accommodations made to the Debtors have been extended by the DIP Secured Parties in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and therefore the DIP Secured Parties are entitled to all of the protections afforded thereby.

**V.      The Automatic Stay Should Be Modified on a Limited Basis.**

58.      The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to permit the Debtors to: (i) grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Lenders may request to assure the perfection and priority of the DIP Liens; (ii) take all appropriate action to grant the replacement liens and to take all appropriate action to ensure that such replacement liens are perfected and maintain the priority set forth in the Interim Order; and (iii) implement the terms of the Interim Order.  In addition, as set forth in paragraph 18 of the proposed Interim Order, if a Termination Event occurs, unless the Debtors or any party in interest files a motion disputing the occurrence of such Termination Event within four business days of receiving notice of such Termination Event, the automatic stay, as to the DIP Secured Parties, shall terminate.  The Debtors submit that the stay modifications requested herein, in addition to being conditions required by the DIP Secured Parties as part of their agreement to fund the DIP Facility, are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these Chapter 11 Cases.

**VI.     Failure to Obtain Immediate Interim Access to the DIP Facility Would Cause Immediate and Irreparable Harm.**

59.      Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court may conduct a preliminary, expedited hearing on

4892-9244-1543, v. 1

the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

60.    Pursuant to Local Rule 9006, the Debtors request that the Court conduct an expedited interim hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive initial funding under the DIP Facility. The Debtors require the initial funding in the amount of $20 million prior to the Final Hearing and entry of the Final Order to continue operating, pay its administrative expenses and implement the relief requested in the Debtors' other "first day" motions. Absent receipt of the initial funding amount and access to the Cash Collateral, the Debtors will be unable to continue operating during these Chapter 11 Cases or consummate their value-maximizing restructuring. *See* DIP Declaration ¶ 6-12. Accordingly, this relief will enable the Debtors to preserve and maximize value and avoid immediate and irreparable harm and prejudice to its estate and all parties in interest, pending the Final Hearing. For the same reasons, to the extent that Bankruptcy Rule 6003 is applicable to the relief requested, the Debtors submit that the relief requested in this Motion is necessary to avoid immediate and irreparable harm.[10]

## **Request for a Final Hearing**

61.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is no later than 21 days after the entry of the Interim Order and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## **Reservation of Rights**

62.    Nothing contained herein is or should be construed as: (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' rights to dispute any claim on any grounds; (iii) a promise or requirement to pay any claim; (iv) an admission that any particular claim is of a type specified or defined hereunder; (v) a request to assume any executory contract or unexpired lease; or (vi) a waiver of the Debtors' rights under the Bankruptcy Code or any other

---

[10]    Bankruptcy Rule 6003 provides that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding . . . a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate . . . ." Fed. R. Bankr. P. 6003.

4892-9244-1543, v. 1

applicable law.

### Request for Waiver of Bankruptcy Rules 6004(a) and 6004(h)

63.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As described in detail above, any delay in obtaining the funding provided by the DIP Facility would be detrimental to the Debtors, their estates, and their creditors, as the Debtors' ability to manage and run their business and maintain and preserve their assets requires such funding.  In light of the foregoing, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable to the Proposed Orders.

64.     To implement the relief requested in this Motion immediately, the Debtors also respectfully request a waiver of the 21-day advance notice requirements of Bankruptcy Rule 2002(a)(2) as made applicable in Bankruptcy Rule 6004(a), for cause shown, to the extent applicable to the Interim Order.

### Notice

65.     Notice of this Motion will be provided to:  (i) the Office of the United States Trustee for the District of Nevada; (ii) the 20 largest unsecured creditors of each of the Debtors; (iii) the Internal Revenue Service; (iv) the Office of the United States Attorney for the District of Nevada; (v) counsel to the DIP Lenders, (a) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY  10036, Attn:  Brad Kahn; 2001 K St. NW, Washington, D.C.  20006, Attn:  Kate Doorley; and (b) Shea Larsen PC, 1731 Village Center Circle, Suite 150, Las Vegas, NV  89134, Attn: James Patrick Shea and Bart Larsen; (vi) Milbank LLP, as counsel to KfW IPEX-Bank GmbH as administrative agent under the Debtors' prepetition credit agreement, 55 Hudson Yards, New York, NY  10001, Attn:  Tyson Lomazow; (vii) Bennett Jones LLP, as counsel to Mercuria Investments US, Inc., 3400 One First Canadian Place, P.O. Box 130, Toronto, Ontario  M5X 1A4, Canada, Attn:  Simon Grant; (viii) White & Case LLP, as counsel to Concord Resources Limited as buyer under the Debtors' prepetition advance payment agreement, 1221 6th Avenue, New York, NY  10020, Attn:  Philip Abelson; (ix) Davis, Graham & Stubbs LLP, as counsel to Triple Flag

41

1    Mining Finance Bermuda Ltd. as purchaser under the Debtors' prepetition purchase and sale

2    agreement, 1550 17th Street, Suite 500, Denver, CO  80202, Attn:  Kyler Burgi; (x) Cleary Gottlieb

3    Steen & Hamilton LLP, as counsel to Pala Investments Limited as lender under the Debtors'

4    prepetition unsecured loan agreement, 2 London Wall Place, London  EC2Y 5AU, United Kingdom,

5    Attn:  Solomon J. Noh; One Liberty Plaza, New York, NY  10006, Attn:  Lisa M. Schweitzer (xi)

6    Kelley Drye & Warren, LLP, as counsel to the DIP Agent, 3 World Trade Center, 175 Greenwich

7    Street, New York, NY  10007, Attn:  James S. Carr, Esq.; (xii) Trisura, as surety under the Debtors'

8    surety bonds, Bay Adelaide Centre, 333 Bay Street, Suite 1610, Box 22, Toronto, Ontario, Canada

9    M5H 2R2, Attn: Richard A. Grant and Andrew Neilans; and (xiii) any party that is required to

10    receive or has requested notice pursuant to Bankruptcy Rule 2002 or Local Rule 2002.  The Debtors

11    respectfully submit that, in light of the nature of the relief requested, no other or further notice need

12    be given.

13                        *[Remainder of page intentionally left blank.]*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4892-9244-1543, v. 1

1           WHEREFORE, the Debtors respectfully request that the Court enter the Orders granting the

2  relief requested herein and such other relief as the Court deems appropriate under the circumstances.

3           Dated this 10th day of June, 2024.

4                            McDONALD CARANO LLP

5                            */s/ Ryan J. Works*

6                            Ryan J. Works (NSBN 9224)

                               Amanda M. Perach (NSBN 12399)

7                            2300 West Sahara Avenue, Suite 1200

                               Las Vegas, Nevada 89102

8                            ALLEN OVERY SHEARMAN STERLING US LLP

9                            Fredric Sosnick (NYSBN 2472488) (*pro hac* pending)

                               Sara Coelho (NYSBN 4530267) (*pro hac* pending)

10                           599 Lexington Avenue

                               New York, New York 10022

11                           *Proposed Counsel to the Debtors and*

12                         *Debtors in Possession*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4892-9244-1543, v. 1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 1**

**Proposed Interim Order**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re: | *Joint Administration Requested* |
| NEVADA COPPER, INC.,[1] | Case No. BK-24-[_____-___] |
| Debtor. | Chapter 11 |
| | Hearing Date: |
| | Hearing Time: |

**INTERIM ORDER (I) AUTHORIZING THE**
**DEBTORS TO (A) OBTAIN POSTPETITION FINANCING, (B) GRANT LIENS,**
**INCLUDING SENIOR SECURED PRIMING LIENS AND SUPERPRIORITY**
**ADMINISTRATIVE EXPENSE CLAIMS, AND (C) UTILIZE CASH COLLATERAL;**
**(II) GRANTING ADEQUATE PROTECTION TO CERTAIN**
**PREPETITION SECURED PARTIES; (III) MODIFYING THE AUTOMATIC STAY;**
**(IV) SCHEDULING FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "***Motion***"),[2] of the Debtors for entry of an interim order (this "***Interim Order***") and Final Order (defined below) pursuant to sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of the Bankruptcy Code, and Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014 of, and Local Rules 4001 and 9006 seeking, among other things:

(a)    authorization for Nevada Copper, Inc. (the "***Borrower***") to obtain a senior secured postpetition financing on terms and conditions consistent with the terms and conditions set forth in the Senior Secured Superpriority Term Loan Debtor in Possession Credit Agreement by and among the Borrower, each of the Debtors

---

[1]    The Debtors in these chapter 11 cases and the last four digits of their registration numbers in the jurisdiction in which they are organized are: Nevada Copper, Inc. (1157) (Nevada); Nevada Copper Corp. (5323) (British Columbia); 0607792 B.C. Ltd. (2524) (British Columbia); Lion Iron Corp. (2904) (Nevada); NC Farms LLC (0264) (Nevada); and NC Ditch Company LLC (4396) (Nevada).

[2]    Capitalized term used but not defined herein have the meanings ascribed to such terms in the Motion.

other than the Borrower, (collectively, the "***Guarantors***," and together with Borrower, the "***DIP Loan Parties***") U,S Bank Trust Company, National Association, as administrative agent and collateral agent (the "***DIP Agent***"), one or more affiliates of Elliott Investment Management L.P., as lenders (collectively, the "***DIP Lenders***" and, together with the DIP Agent, the "***DIP Secured Parties***") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***DIP Credit Agreement***") attached to this Interim Order at **<u>Exhibit A</u>**, and for the Guarantors to unconditionally guaranty, on a joint and several basis, the Borrower's obligations in connection with such postpetition financing, consisting of: (i) a new money term loan in an aggregate principal amount not to exceed at any time outstanding aggregate principal commitments of $20,000,000 (the "***Interim DIP Loan***"), which will be funded as a single disbursement on the date upon which all conditions set forth in Sections 12.1 and 12.3 of the DIP Credit Agreement have been satisfied (the "***Interim Closing Date***"); (ii) subject to entry of the Final Order, a new money delayed-draw term loan to be made in an aggregate principal amount not to exceed at any time outstanding aggregate principal commitments of $40,000,000 (the "***Final DIP Loan***" and, together with the Interim DIP Loan, the "***DIP Facility***"), which will be funded as a single disbursement on the date upon which all conditions set forth in Sections 12.2 and 12.3 of the DIP Credit Agreement have been satisfied;

(b)     authorization for the DIP Loan Parties to enter into any agreements, documents and instruments in connection with the DIP Facility, including the DIP Credit Agreement and all notices, guarantees, security agreements, ancillary documents and agreements executed in connection therewith, (collectively, the "***DIP Documents***") on terms and conditions consistent with the DIP Credit Agreement and this Interim Order, and to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate or desirable in connection with the DIP Documents;

(c)     authorization for the Debtors to grant to the DIP Agent, for the benefit of itself and the DIP Lenders, and authorizing the Debtors to incur, the DIP Liens (as defined below) in all DIP Collateral (as defined below), to secure the DIP Obligations (as defined below), which liens and security interests shall be automatically perfected and be subject to the lien priorities set forth in the DIP Credit Agreement, on the terms and conditions set forth herein, in the DIP Credit Agreement and in the DIP Documents;

(d)     authorization for the Debtors to grant to the DIP Agent, for the benefit of itself and the DIP Lenders, allowed superpriority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all DIP Obligations (as defined below), with priority over any and all administrative expenses of any kind or nature, subject and subordinate only to the Carve-Out and the Administration Charge (as defined below), on the terms and conditions set forth herein and in the DIP Documents;

(e)     authorization for the Debtors to use the proceeds of the DIP Facility and the Prepetition Collateral (as defined below), including Cash Collateral (as defined below), in accordance with the terms hereof, including pursuant to the Approved Budget (as defined below) as further described herein, to: (i) pay fees and interest under the DIP Facility; (ii) provide working capital for, and for other general corporate purposes of, the Debtors, including for funding the Carve-Out (as defined below); (iii) pay for bankruptcy-related costs and expenses, including costs and

expenses incurred in connection with the Recognition Proceedings (as defined below); and (iv) pay Adequate Protection Payments (as defined below);

(f)     authorization for the Debtors to pay, on a final and irrevocable basis, the principal, interest, expenses, fees, premiums and other amounts payable under the DIP Documents as such become earned, due and payable, including, without limitation, (i) the Upfront Fee, (ii) the Unused Commitment Fee, (iii) the Exit Fee, (iv) the Agency Fee (each as defined in the DIP Credit Agreement), and (iv) the reasonable fees and disbursements of the DIP Secured Parties' attorneys, advisors, accountants, appraisers, bankers, and other consultants, all to the extent provided in, and in accordance with the DIP Documents (collectively, the "***DIP Obligations***");

(g)     authorization to grant adequate protection to the Prepetition Secured Parties (as defined below) on the terms set forth in the DIP Documents and this Interim Order on account of any Diminution in Value (as defined below) of the Prepetition Secured Parties' interests in the Prepetition Collateral, including Cash Collateral;

(h)     waivers of (i) the Debtors' and the estates' rights to surcharge against the DIP Collateral or the Prepetition Collateral pursuant to the Bankruptcy Code section 506(c), (ii) the "equities of the case" exception under Bankruptcy Code section 552(b) and (iii) the equitable doctrine of marshalling with respect to the DIP Collateral, including all Prepetition Collateral, in each case, subject to entry of the Final Order (but retroactive to the Petition Date);

(i)     subject to the terms of this Interim Order, authorization for the DIP Secured Parties to exercise remedies under the DIP Documents on the terms described herein upon the occurrence and during the continuance of a Termination Event (as defined below);

(j)     the modification of the automatic stay imposed pursuant to Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms of this Interim Order; and

(k)     that this Court schedule a final hearing (the "***Final Hearing***") to consider entry of a final order (the "***Final Order***") authorizing and approving, on a final basis, among other things, the Debtors' entry into the DIP Facility, the borrowings under the DIP Facility, the continued use of Cash Collateral and the granting of adequate protection, in each case, as described in the Motion and as set forth in the DIP Documents.

The Court having held a hearing to consider entry of this Interim Order (the "***Interim Hearing***"); and the Court having considered the Motion and the exhibits thereto, the *Declaration of Zul Jamal in support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Liens, Including Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* (the "***DIP Declaration***"),

the evidence submitted or proffered and the arguments of counsel made at the Interim Hearing; and proper and sufficient notice of the Motion and the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and 9014; and all objections, if any, to the relief requested in the Motion and to the entry of this Interim Order having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the relief requested in necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, creditors and parties in interest; and after due deliberation and consideration, and for good and sufficient cause appearing therefor; IT IS FOUND AND DETERMINED THAT:[3]

A.    **Petition Date**.  On June 9, 2024 (the "***Petition Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

B.    **Debtors in Possession**.  The Debtors have continued in the management and operation of their business and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.    **Jurisdiction and Venue**.  This Court has jurisdiction over the Chapter 11 Cases commenced on the Petition Date, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

D.    **Committee Formation**.  As of the date hereof, the United States Trustee for Region 17 (the "***U.S. Trustee***") has not yet appointed an official committee of unsecured creditors in these Chapter 11 Cases (a "***Creditors' Committee***") pursuant to section 1102 of the Bankruptcy Code.

E.    **Notice**.  Under the circumstances, the notice given by the Debtors of, and described in the Motion, the relief requested therein, and the Interim Hearing constitutes due and sufficient notice thereof and complies with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules,

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

and no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

       F.    **Debtors' Stipulations**.  Without prejudice to the rights of any other party, but subject to the limitations thereon contained in paragraphs 21 and 22 of this Interim Order, the Debtors represent, admit, stipulate and agree as follows:

       1.    **Prepetition Senior Secured Term Loan Facility.**

       (a)    Under that certain Second Amended and Restated Credit Agreement, dated as of October 28, 2022 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "*Prepetition Senior Secured Term Loan Credit Agreement*" and together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other documents delivered or executed in connection therewith, the "*Prepetition Senior Secured Term Loan Documents*") by and among Borrower, as borrower, the financial institutions party thereto from time to time, as lenders (the "*Prepetition Senior Secured Term Loan Lenders*"), KfW IPEX-Bank GmbH ("*KfW*"), as sole lead arranger, UFK agent, as administrative agent and collateral agent (in such capacities, the "*Prepetition Senior Secured Term Loan Agent*" and together with the Prepetition Senior Secured Term Loan Lenders, the "*Prepetition Senior Secured Term Loan Parties*") the Borrower was provided with a first-lien secured term loan facility (the loans borrowed thereunder, the "*Prepetition First Lien Loans*") consisting of:

       (a)    Tranche A Loans (as defined in the Prepetition Senior Secured Term Loan Credit Agreement) provided by KfW, which, as of the Petition Date, amount to an aggregate principal amount of approximately $129,191,475.89 million (together with all accrued interest, premiums (if any), costs, fees, expenses and other obligations in respect thereof, the "*Prepetition Senior Secured Term Loan A Obligations*");

       (b)    Tranche A-2 Loans (as defined in the Prepetition Senior Secured Term Loan Credit Agreement) provided by Pala Investments Limited ("*Pala*"), Mercuria Investments US, Inc. ("*Mercuria*") and TF R&S Canada Ltd. ("*TF Canada*," and collectively with Pala and Mercuria, the "*Prepetition Senior Secured Term Loan A-2 Parties*"), which, as of the Petition Date, amount to an aggregate principal amount of approximately $40,919,608.57 million (together with all accrued interest, premiums (if any), costs, fees, expenses and other obligations in respect thereof, the "*Prepetition Senior Secured Term Loan A-2 Obligations*"); and

(c)    Tranche B Loans (as defined in the Prepetition Senior Secured Term Loan Credit Agreement) provided by KfW, which, as of the Petition Date, amount to an aggregate principal amount of approximately $17,973,301.40 million (together with all accrued interest, premiums (if any), costs, fees, expenses and other obligations in respect thereof, the "***Prepetition Senior Secured Term Loan B Obligations***" and, together with the Prepetition Senior Secured Term Loan A Obligations, the "***Prepetition Senior Secured KfW Term Loan Obligations***").

(b)    *Prepetition Senior Secured Term Loan Obligations*.  As of the Petition Date, the Debtors, without defense, counterclaim or offset of any kind, were jointly and severally indebted and liable to the Prepetition Senior Secured Term Loan Parties under the Prepetition Senior Secured Term Loan Documents in the principal aggregate amount of not less than $188,084,385.86 million, *plus* accrued and unpaid interest thereon as of the Petition Date, plus all other fees, costs, expenses, indemnification obligations, reimbursement obligations, charges, premiums, if any, additional interest, any other "Obligations" (as defined in the Prepetition Senior Secured Term Loan Documents) and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition Senior Secured Term Loan Documents (collectively, the "***Prepetition Senior Secured Term Loan Obligations***").  The Prepetition Senior Secured Term Loan Obligations constitute legal, valid, binding and non-avoidable obligations against each of the Debtors and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claims, cause of action or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  No payments or transfer made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition Senior Secured Term Loan Parties by or on behalf of any of the Debtors prior to the Petition Date under or in connection with any of the Prepetition Senior Secured Term Loan Documents are subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

(c)    *Prepetition Senior Secured Term Loan Liens*.  Pursuant to the Prepetition Senior Secured Term Loan Documents, the Prepetition Senior Secured Term Loan

Obligations are secured by valid, binding, perfected and enforceable liens on and security interests in (the "***Prepetition Senior Secured Term Loan Liens***") the "Collateral" (as defined in the Prepetition Senior Secured Term Loan Documents) (the "***Prepetition Collateral***"), subject to certain permitted liens as permitted under the Prepetition Senior Secured Term Loan Documents. The Prepetition Senior Secured Term Loan Liens are (i) senior to all other Prepetition Funded Debt Liens (as defined below) with respect to Prepetition Collateral constituting "Project Collateral" (as defined in the WCF Intercreditor Agreement (as defined below)) (the "***Non-WCF Collateral***"), and (ii) subject to the Prepetition Working Capital Lien (as defined below) with respect to Prepetition Collateral constituting "APA Collateral" (as defined in the WCF Intercreditor Agreement) (the "***WCF Collateral***"), in each case, in accordance with the terms and conditions of the WCF Intercreditor Agreement, the TF Intercreditor Agreement and the Fourth Lien Intercreditor Agreement (as defined below).  Each of the Debtors acknowledges and agrees that, in each case as of the Petition Date, the Prepetition Senior Secured Term Loan Liens: (i)  are valid, binding, perfected and enforceable liens and security interests in the Prepetition Collateral, with the priority set forth in the Prepetition Senior Secured Term Loan Documents and the Prepetition Intercreditor Agreements; (ii) are not subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as defined in the Bankruptcy Code) of any kind; and (iii) as of the Petition Date are subject and/or subordinate only to Prepetition Prior Liens (defined below), and solely with respect to the WCF Collateral, the Prepetition Working Capital Lien. In this Interim Order the term "***Prepetition Prior Liens***" shall mean, in relation to any Prepetition Funded Debt Facility (defined below), liens that are senior in relation to the liens securing such facility and are (1) valid, enforceable, perfected, non-avoidable and in existence immediately prior to the Petition Date or (2) valid, enforceable, non-avoidable and in existence immediately prior to the Petition Date, that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (the liens described in items (1) and (2), the "***Petition Date Perfected Liens***"), and in relation

to the DIP Facility, shall mean, the Petition Date Perfected Liens not to exceed a total aggregate amount of $12 million.

2.    **Prepetition Working Capital Facility**.

(a)    Under that certain Advance Payment Agreement, dated as of May 6, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "***Prepetition Working Capital Agreement***" and, together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other documents, the "***Prepetition Working Capital Documents***") by and among the Borrower, as seller, and Concord Resources Limited ("***Concord***"), as purchaser (the "***Prepetition Working Capital Purchaser***") the Borrower received certain Advance Payments (as defined in the Prepetition Working Capital Agreement) from the Prepetition Working Capital Purchaser in exchange for the sale and delivery of certain Material (as defined in the Prepetition Working Capital Documents).

(b)    *Prepetition Working Capital Obligations*.  As of the Petition Date, the Borrower, without defense, counterclaim or offset of any kind, was indebted and liable to the Prepetition Working Capital Purchaser under the Prepetition Working Capital Documents in the aggregate principal amount of not less than $3.0 million under the Prepetition Working Capital Agreement, *plus* accrued and unpaid interest thereon as of the Petition Date, plus all other fees, costs, expenses, charges, additional interest, any other "Advance Payment Obligations" as defined in the WCF Intercreditor Agreement and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition Working Capital Documents (collectively, the "***Prepetition Working Capital Obligations***").  The Prepetition Working Capital Obligations constitute legal, valid, binding and non-avoidable obligations against the Borrower and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  No payments or transfers made to or for the benefit of (or obligations incurred to or

8

for the benefit of) the Prepetition Working Capital Purchaser by or on behalf of any of the Debtors prior to the Petition Date under or in connection with any of the Prepetition Working Capital Documents are subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

(c)    *Prepetition Working Capital Lien*.    Pursuant to the Prepetition Working Capital Documents, the Prepetition Working Capital Obligations are secured by a valid, binding, perfected and enforceable lien on and security interest in (the "***Prepetition Working Capital Lien***") the Prepetition Collateral, subject to certain permitted liens as permitted under the Prepetition Working Capital Agreement.  The Prepetition Working Capital Lien is (i) subject to the Prepetition Senior Secured Term Loan Liens and the Prepetition TF Stream Lien (as defined below) with respect to all Prepetition Collateral constituting Non-WCF Collateral and (ii) senior to all other Prepetition Funded Debt Liens with respect to Prepetition Collateral constituting WCF Collateral, in each case, in accordance with the terms and conditions of the WCF Intercreditor Agreement, the TF Intercreditor Agreement and the Fourth Lien Intercreditor Agreement.  Each of the Debtors acknowledges and agrees that, in each case as of the Petition Date, the Prepetition Working Capital Lien: (i) is a valid, binding, perfected and enforceable lien and security interest in the Prepetition Collateral, with the priorities set forth in the Prepetition Working Capital Documents; (ii) is not subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as defined in the Bankruptcy Code) of any kind; and (iii) as of the Petition Date, is subject and/or subordinate only to (1) the Prepetition Prior Liens, in relation to the Working Capital Facility, and, (2) solely with respect to the Non-WCF Collateral, the Prepetition Senior Secured Term Loan Liens and the Prepetition TF Stream Lien.

3.    **Prepetition TF Stream Obligations**.

(a)    Under that certain Metals Purchase and Sale Agreement, dated as of December 21, 2017 (as amended, restated, amended and restated, supplemented, or otherwise

modified from time to time prior to the date hereof, the "**_Prepetition TF Stream Agreement_**" and, together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other documents, the "**_Prepetition TF Stream Documents_**") by and among Borrower, as seller, NCU and its subsidiaries, as guarantor and Triple Flag International Ltd. ("**_Triple Flag_**") (as successor by name change to Triple Flag Mining Finance Bermuda Ltd.), as purchaser (the "**_Prepetition TF Stream Purchaser_**"), the Prepetition TF Stream Purchaser paid certain deposits to the Borrower and Borrower committed to make specified deliveries of Refined Gold and Refined Silver (each as defined in the Prepetition TF Stream Agreement) to the Prepetition TF Stream Purchaser.

(b)      _Prepetition TF Stream Obligations_.  As of the Petition Date, the Debtors, without defense, counterclaim or offset of any kind, were jointly and severally indebted and liable to the Prepetition TF Stream Purchaser under the Prepetition TF Stream Documents in the aggregate principal amount of not less than $78,269,229.75 under the Prepetition TF Stream Agreement, _plus_ accrued and unpaid interest thereon as of the Petition Date, plus all other fees, costs, expenses, charges, additional interest, any other "Obligations" (as defined in the Prepetition TF Stream Agreement) and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition TF Stream Documents (collectively, the "**_Prepetition TF Stream Obligations_**").  The Prepetition TF Stream Obligations constitute legal, valid, binding and non-avoidable obligations against each of the Debtors and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  No payments or transfers made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition TF Stream Purchaser by or on behalf of any of the Debtors prior to the Petition Date under or in connection with any of the Prepetition TF Stream Documents are subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action

10

or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

(c)     *Prepetition TF Stream Lien.*  Pursuant to the Prepetition TF Stream Documents, the Prepetition TF Stream Obligations is secured by a valid, binding, perfected and enforceable lien on and security interest in (the "**Prepetition TF Stream Lien**") the Prepetition Collateral, subject to certain permitted liens as permitted under the Prepetition TF Stream Agreement.  The Prepetition TF Stream Lien is (i) subject to the Prepetition Senior Secured Term Loan Liens with respect to all Prepetition Collateral constituting Non-WCF Collateral, (ii) subject to the Prepetition Working Capital Lien and Prepetition Senior Secured Term Loan Liens with respect to Prepetition Collateral constituting WCF Collateral, and (iii) senior to the Prepetition Junior Secured Term Loan Liens, in each case, in accordance with the terms and conditions of the WCF Intercreditor Agreement, the TF Intercreditor Agreement and the Fourth Lien Intercreditor Agreement.  Each of the Debtors acknowledges and agrees that, in each case as of the Petition Date, the Prepetition TF Stream Lien:  (i) is a valid, binding, perfected and enforceable lien and security interest in the Prepetition Collateral, with the priority set forth in the Prepetition TF Stream Documents and the Prepetition Intercreditor Agreements; (ii) is not subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as defined in the Bankruptcy Code) of any kind; and (iii) as of the Petition Date is subject and/or subordinate only to (1) the Prepetition Prior Liens, in relation to the Prepetition TF Stream Obligations, (2) with respect to the Non-WCF Collateral, the Prepetition Senior Secured Term Loan Liens and (3) with respect to the WCF Collateral, the Prepetition Working Capital Lien and the Prepetition Senior Secured Term Loan Liens.

4.     **Prepetition Junior Secured Term Loan Obligations**.

(a)     Under that certain Third Amended and Restated Loan Agreement, dated as of December 21, 2023 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "**Prepetition Junior Secured**

11

*Term Loan Agreement*," together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other documents, the "***Prepetition Junior Secured Term Loan Documents***," and, together with the Prepetition Senior Secured Term Loan Documents, the Prepetition Working Capital Documents and the Prepetition TF Stream Documents, the "***Prepetition Debt Documents***") by and among NCU, as borrower, Borrower, 0607792 B.C. Ltd., Lion Iron Corp., NC Farms LLC and NC Ditch Company LLC, as guarantors, the lenders party thereto from time to time (the "***Prepetition Junior Secured Term Loan Lenders***"), and Pala, as lead arranger and collateral agent (the "***Prepetition Junior Secured Term Loan Agent***," together with the Prepetition Junior Secured Term Loan Lenders, the "***Prepetition Junior Secured Term Loan Parties***" and, together with the Prepetition Senior Secured Term Loan Parties, the Prepetition Working Capital Purchaser and the Prepetition TF Stream Purchaser the "***Prepetition Secured Parties***"), NCU was provided with a junior secured term loan facility.

(b)     *Prepetition Junior Secured Term Loan Obligations*.  As of the Petition Date, the Debtors, without defense, counterclaim or offset of any kind, were jointly and severally indebted and liable to the Prepetition Junior Secured Term Loan Parties under the Prepetition Junior Secured Term Loan Documents in the aggregate principal amount of not less than $10 million under the Prepetition Junior Secured Term Loan Agreement, *plus* accrued and unpaid interest thereon as of the Petition Date, plus all other fees, costs, expenses, charges, additional interest, any other "Obligations" (as defined in the Prepetition Junior Secured Term Loan Agreement) and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition Junior Secured Term Loan Documents (collectively, the "***Prepetition Junior Secured Term Loan Obligations***" and, together with the Prepetition Senior Secured Term Loan Obligations, the Prepetition Working Capital Obligations and the Prepetition TF Stream Obligations, the "***Prepetition Secured Obligations***").  The Prepetition Junior Secured Term Loan Obligations constitute legal, valid, binding and non-avoidable obligations against each of the Debtors and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset,

subordination, other claim, cause of action or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  No payments or transfers made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition Junior Secured Term Loan Parties by or on behalf of any of the Debtors prior to the Petition Date under or in connection with any of the Prepetition Junior Secured Term Loan Documents are subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

(c)    *Prepetition Junior Secured Term Loan Liens*.  Pursuant to the Prepetition Junior Secured Term Loan Documents, the Prepetition Junior Secured Term Loan Obligations are secured by valid, binding, perfected and enforceable liens on and security interests in (the "***Prepetition Junior Secured Term Loan Liens***" and, together with the Prepetition Senior Secured Term Loan Liens, the Prepetition Working Capital Lien and the Prepetition TF Stream Lien, the "***Prepetition Funded Debt Liens***") the Prepetition Collateral, subject to certain permitted liens as permitted under the Prepetition Junior Secured Term Loan Agreement.  The Prepetition Junior Secured Term Loan Liens are subject to the Prepetition Senior Secured Term Loan Liens, the Prepetition Working Capital Lien and the Prepetition TF Stream Lien with respect to all Prepetition Collateral, in each case, in accordance with the terms and conditions of the Fourth Lien Intercreditor Agreement (as defined below).  Each of the Debtors acknowledges and agrees that, in each case as of the Petition Date, the Prepetition Junior Secured Term Loan Liens:  (i) are valid, binding, perfected and enforceable liens and security interests in the Prepetition Collateral, with the priority set forth in the Prepetition Junior Secured Term Loan Documents and the Prepetition Intercreditor Agreements; (ii) are not subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as defined in the Bankruptcy Code) of any kind; and (iii) as of the Petition Date are subject and/or subordinate only to the (1) Prepetition Prior Liens, in relation to the Prepetition

Junior Secured Term Loan Obligations, (2) the Prepetition Senior Secured Term Loan Liens, (3) the Prepetition Working Capital Lien, and (4) the Prepetition TF Stream Lien.

     5.    **Prepetition Intercreditor Agreements**.

(a)    *WCF Intercreditor Agreement*.  KfW, Triple Flag, Concord and the Borrower are parties to that certain Working Capital Facility Intercreditor Agreement, dated as of May 22, 2019, (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "***WCF Intercreditor Agreement***"), which governs, among other things, the rights, interests, obligations, priority and positions of the Prepetition Senior Secured Term Loan Parties, the Prepetition Working Capital Purchaser and the Prepetition TF Stream Purchaser.

(b)    *TF Intercreditor Agreement*.  KfW, Triple Flag, the Borrower,  NCU and NCU's subsidiaries are party to that certain Intercreditor Agreement, dated as of May 22, 2019, (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "***TF Intercreditor Agreement***"), which governs the rights, interests, obligations, priority and positions of the Prepetition Senior Secured Term Loan Parties and the Prepetition TF Stream Purchaser.

(c)    *Fourth Lien Intercreditor Agreement*.  KfW, Triple Flag, Concord, Pala, the Borrower, NCU and NCU's subsidiaries are party to that certain Intercreditor Agreement, dated as of October 28, 2022 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "***Fourth Lien Intercreditor Agreement***" and, together with the WCF Intercreditor Agreement and the TF Intercreditor Agreement, the "***Prepetition Intercreditor Agreements***"), which governs the rights, interests, obligations, priority and positions of the Prepetition Senior Secured Term Loan Parties, the Prepetition Working Capital Purchaser, the Prepetition TF Stream Purchaser and the Prepetition Junior Secured Term Loan Parties.

(d)    Each of the Debtors either is party to or otherwise acknowledged and agreed to, and are bound by, the Prepetition Intercreditor Agreements.  Pursuant to Bankruptcy

Code section 510, the Prepetition Intercreditor Agreements, and any other applicable intercreditor or subordination provisions contained in any of the Prepetition Debt Documents shall (i) remain in full force and effect, (ii) continue to govern the relative obligations, priorities, rights, and remedies of the applicable Prepetition Secured Parties, and (iii) not be deemed to be amended, altered or modified by the terms of this Interim Order unless expressly set forth herein or therein.

6. **Cash Collateral**.  Any and all of the Debtors' cash, including any amounts generated by the collection of accounts receivable, all cash proceeds of the Prepetition Collateral, and the cash in the Debtors' banking, checking or other deposit accounts with financial institutions as of the Petition Date (excluding cash deposits that secure any outstanding letters of credit) or deposited into the Debtors' banking, checking or other deposit accounts with financial institutions after the Petition Date constitutes cash collateral of the Prepetition Secured Parties within the meaning of Bankruptcy Code section 363(a) (the "*Cash Collateral*").

7. **Adequate Protection**.  Pursuant to Bankruptcy Code sections 105, 361, 362 and 363(e), the Prepetition Secured Parties are entitled to adequate protection of their interests in the Prepetition Collateral, including the Cash Collateral, to the extent of any postpetition diminution in value of their interests in the Prepetition Collateral resulting from, among other things, and without limitation, (i) subordination of the Prepetition Secured Parties' interests in the Prepetition Collateral, (ii) the use of Cash Collateral during the Chapter 11 Cases, (iii) the use, sale or lease of any of the Prepetition Collateral, (iv) the imposition of the automatic stay pursuant to Bankruptcy Code section 362(a), and/or (v) for any other reason for which adequate protection may be granted under the Bankruptcy Code ("*Diminution in Value*").  Based on the Motion, the DIP Declaration, and the record presented to the Court at the Interim Hearing, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral, including the Cash Collateral, are fair and reasonable and reflect the Debtors' prudent business judgment.

G. **Findings Regarding the DIP Facility and Use of Cash Collateral**.  Based on the record established and evidence presented at the Interim Hearing, including the DIP Declaration, and the representations of the parties, the Court makes the following findings:

1          1.    **Need for Postpetition Financing and Use of Cash Collateral**.    The

2    Debtors have a need to use Cash Collateral on an interim basis and obtain credit in the form of the

3    Interim DIP Loans pursuant to the DIP Facility in order to, among other things, (a) permit the

4    orderly continuation of their business, (b) maintain business relationships with their vendors,

5    suppliers, customers and other parties, (c) make payroll, (d) pay Adequate Protection Payments

6    and (e) pay the costs of administering the Chapter 11 Cases, in each case, in compliance with, and

7    subject in all respects to, the Approved Budget, the terms hereof and the DIP Documents.    The

8    ability of the Debtors to maintain business relationships with their vendors, suppliers, and

9    customers, to pay their employees, and otherwise finance their operations requires the availability

10   of working capital from the DIP Facility and the use of Cash Collateral, the absence of either of

11   which, on an interim basis as contemplated hereunder, would immediately and irreparably harm

12   the Debtors, their estates, and parties-in-interest.    The Debtors do not have sufficient available

13   sources of working capital and financing to operate their business, maintain their properties in the

14   ordinary course of business, and fund the Chapter 11 Cases without the authorization to use Cash

15   Collateral and to borrow the Interim Amount.    Without the ability to access the DIP Facility and

16   the authority to use Cash Collateral, the Debtors' chances for a successful chapter 11 restructuring

17   would be jeopardized.

18          2.    **Priming of Prepetition Liens**.    The priming of the Prepetition Funded Debt

19   Liens on the Prepetition Collateral, to the extent set forth herein, under Bankruptcy Code section

20   364(d)(1), as contemplated by this Interim Order and the DIP Facility, and as further described

21   below, will enable the Debtors to obtain the DIP Facility and, among other benefits, to continue to

22   operate their businesses for the benefit of their estates and stakeholders.

23          3.    **No Credit Available on More Favorable Terms**.    As set forth in the DIP

24   Declaration, the Debtors have been unable to obtain financing from sources other than the DIP

25   Lenders on terms more favorable than those provided under the DIP Facility, as set forth in the

26   DIP Documents.    The Debtors have been unable to obtain adequate unsecured credit allowable

27   under Bankruptcy Code section 503(b)(1) as an administrative expense.    The Debtors also have

28

16

been unable to obtain sufficient credit (i) on an unsecured basis having priority over all other administrative expenses, (ii) secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien or (iii) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  Postpetition financing is not otherwise available without granting the DIP Agent, for the benefit of itself and the DIP Lenders, (x) the DIP Liens (as defined below) on all DIP Collateral (as defined below), as set forth herein, (y) the DIP Superpriority Claims (as defined below) and (z) the other protections set forth in this Interim Order. The terms of the DIP Documents and the use of Cash Collateral are fair and reasonable, reflect the Debtors' exercise of sound and prudent business judgment consistent with their fiduciary duties, constitute reasonably equivalent value and fair consideration and are in the best interest of the Debtors' estates and stakeholders.

4.    **Good Faith**.  The DIP Facility and the Adequate Protection Obligations have been negotiated in good faith and at arm's length among the Debtors, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties and all of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the DIP Documents including, without limitation, all loans made to and guarantees issued by the Debtors pursuant to the DIP Documents, and all other DIP Obligations shall be deemed to have been extended by the DIP Agent and the DIP Lenders in good faith as that term is used in Bankruptcy Code section 364(e) and in express reliance upon the protections offered by Bankruptcy Code section 364(e).  The DIP Obligations and the DIP Liens shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed or modified on appeal or otherwise, and any liens or claims granted to the DIP Agent or the DIP Lenders hereunder arising prior to the effective date of any such vacatur, reversal or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

H.    **Consent of the Prepetition Secured Parties**.  The Prepetition Secured Parties have consented to or are deemed to consent under the applicable Prepetition Intercreditor Agreements

to the priming of the Prepetition Funded Debt Liens, as applicable, to the extent set forth herein, and the Debtors' use of Cash Collateral, in accordance with and subject to the terms and conditions provided for in this Interim Order; *provided* that nothing in this Interim Order shall constitute the consent of the Prepetition Senior Secured Term Loan Agent to priming of the Prepetition Senior Secured Term Loan Liens by DIP Liens securing DIP Obligations in an amount greater than $51.4 million, and KfW reserves its rights with respect to the Final Order in all respects.

I.    **Sections 506(c) and 552(b)**.  As a material inducement to the DIP Lenders to agree to provide the DIP Facility and the Prepetition Secured Parties to agree to the use of Cash Collateral, and in exchange for (i) the DIP Agent's and DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out to the extent set forth herein and (ii) the Prepetition Secured Parties' agreement to (a) subordinate their Prepetition Funded Debt Liens and the Adequate Protection Liens to the Carve-Out and the DIP Liens, each to the extent provided herein, and (b) consent to the use of Cash Collateral in accordance with and subject to the Approved Budget (subject to the Permitted Variances (as defined below)), the DIP Documents and the terms of this Interim Order, each of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties is entitled to receive (1) a waiver of any "equities of the case" exceptions or claims under Bankruptcy Code section 552(b), (2) a waiver of the provisions of Bankruptcy Code section 506(c), and (3) a waiver of the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral (as applicable).

J.    **Immediate Entry**.  The Debtors have requested entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2), (c) and (d) and Local Rules 4001(c)(2) and 9006.  Absent granting the interim relief sought by this Interim Order, the Debtors' estates could be immediately and irreparably harmed.  Thus, sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2), (c), and (d) and Local Rules 4001(c)(2) and 9006.

Based upon the foregoing findings and conclusions, the Motion, the DIP Declaration, and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1. **Motion Granted**.  The relief sought by the Motion is granted, and the DIP Facility and the use of Cash Collateral are hereby authorized and approved, in each case, upon the terms and conditions of this Interim Order and the DIP Documents.

2. **Objections Overruled**.  Any objections to the Motion that have not been withdrawn, waived or settled, and all reservations of rights or other statements inconsistent with this Interim Order, are hereby denied and overruled.  This Interim Order shall become effective and enforceable immediately upon its entry.

3. **Approval and Authorization of DIP Facility**.

(a) *Authorization of DIP Facility and DIP Documents*.  The DIP Facility is hereby approved on an interim basis on the terms and conditions set forth herein. The DIP Loan Parties are expressly and immediately authorized and empowered to: (i) (A) enter into and perform all of their obligations, (B) as required by the DIP Lenders, execute, deliver and perform under the DIP Documents and (C) pay all fees, costs, expenses, indemnities and other amounts contemplated under this Interim Order and the applicable DIP Documents; and (ii) perform all acts, to make, execute, deliver, enter into and perform under any and all other agreements, instruments, certificates and other documents (including, without limitation, the execution and/or recordation of any collateral, pledge and security documents, mortgages, deeds of trust, control agreements, financing statements or other documents), and to perform all such other and further acts, that may be necessary, required or desirable for the DIP Agent or the DIP Lenders to perform their obligations under the DIP Facility, this Interim Order and any applicable DIP Document and to implement the transactions contemplated thereunder and hereunder.

(b) **Authorization to Borrow**.  The Debtors are hereby authorized to borrow under the DIP Facility, from the period between the date of entry of this Interim Order and the Final Hearing (the "***Interim Period***"), a principal amount of up to $20,000,000, subject to the terms

1    and conditions (including any conditions precedent to such borrowing) set forth in this Interim

2    Order and the DIP Documents.  The DIP Lenders shall have no obligation to make any loan or

3    advance under the DIP Documents, unless all of the conditions precedent to the making of such

4    extension of credit under the DIP Documents and this Interim Order have been satisfied in full or

5    waived in accordance with the DIP Documents and this Interim Order.

6              (c)    *Use of DIP Proceeds and Cash Collateral*.   The Debtors are hereby

7    authorized to use the proceeds of the DIP Facility and all Cash Collateral solely in the manner and

8    for the purposes expressly permitted in the Approved Budget (subject to the Permitted Variances),

9    this Interim Order and the DIP Documents.

10             (d)    *DIP Interest, Fees and Expenses*.  The Debtors are authorized and directed

11   to pay any and all (i) interest, fees, premiums or other amounts payable under the DIP Documents,

12   including, without limitation, the Upfront Fee, the Unused Commitment Fee, the Exit Fee, the

13   Agency Fee, (ii) amounts due (or that may become due) to any Indemnified Person (as defined

14   below) in respect of the indemnification obligations under this Interim Order and the DIP

15   Documents and (iii) any other amounts payable in connection with the DIP Facility, including all

16   reasonable and documented pre- and postpetition fees, expenses and disbursements in connection

17   with the DIP Facility and these Chapter 11 Cases of (A) Akin Gump Strauss Hauer & Feld LLP

18   ("***Akin***"), as counsel to the DIP Lenders, (B) Blake, Cassels & Graydon LLP, as Canadian counsel

19   to the DIP Lenders, (C) Shea Larson PC, as Nevada local counsel to the DIP Lenders, (D) Kelley

20   Drye & Warren, LLP, as counsel to the DIP Agent ("***DIP Agent Counsel***"), and (E) any other

21   attorneys, financial advisors, consultants or other professionals retained by the DIP Secured Parties

22   (the professionals set forth in clauses (A) through (E), collectively, the "***DIP Professionals***"), in

23   each case whether or not such payments, premiums, fees, costs, expenses and disbursements arose

24   before or after the Interim Closing Date.   The payment of the fees, costs, expenses and

25   disbursements of the DIP Professionals other than DIP Agent Counsel (the "***DIP Professional***

26   ***Fees***") shall be subject to the notice and review procedures set forth in paragraph 19 of this Interim

27

28

Order.  For the avoidance of doubt, the Debtors shall be jointly and severally liable for the obligations to pay the DIP Professional Fees in accordance with this Interim Order.

(e)    *Indemnification*.  As set forth in the DIP Documents, the Debtors will jointly and severally indemnify the DIP Agent, the DIP Lenders, the DIP Professionals and their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each an "***Indemnified Person***"), and hold them harmless from and against any and all losses, claims, damages, costs, expenses (including, but not limited to reasonable and documented legal fees and expenses) and liabilities arising out of or relating to the execution or delivery of the DIP Documents, transactions contemplated hereby and thereby and any actual or proposed use of the proceeds of any loans made under the DIP Facility in accordance with the terms of the DIP Credit Agreement and the other DIP Documents; *provided* that no such Indemnified Person will be indemnified for costs, expenses or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the actual gross negligence or willful misconduct of such person (or their related persons).  No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's gross negligence or willful misconduct, and in no event shall any Indemnified Person be liable on any theory for any special indirect, consequential or punitive damages.

(f)    *Modification of DIP Documents*.  The DIP Agent (acting at the direction of the Required DIP Lenders)[4] and the Required DIP Lenders are hereby authorized to execute, deliver and perform under one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in accordance with the provisions of any applicable

---

[4]    The term "***Required DIP Lenders***" as used in this Interim Order, shall have the same meaning ascribed to the term "Majority Lenders" in the DIP Credit Agreement.

DIP Documents governing amendments thereto, each without further application to or order of the Court; *provided*, *however*, that any amendments, waivers, consents or other modifications to and under the DIP Documents that (i) modify the original stated maturity of the DIP Facility, (ii) increase the aggregate commitments thereunder or (iii) increase the rate of interest or fees payable with respect thereto shall require further Court approval; *provided further*, that any amendment that may affect the rights, obligations, protections, immunities or indemnities of the DIP Agent shall require the consent of the DIP Agent.

4.      **DIP Obligations**

(a)      Upon entry of this Interim Order, the obligations under any applicable DIP Documents shall constitute valid, binding, enforceable, and non-avoidable obligations of each Debtor, and shall be fully enforceable against each of the Debtors, their estates and any successors thereto, including, without limitation, any estate representative or trustee appointed in any of these Chapter 11 Cases or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or relating to any of the foregoing, and/or upon the dismissal of any of the Chapter 11 Cases or any such successor cases (collectively, the "***Successor Cases***"), in each case, in accordance with the terms of the DIP Documents and this Interim Order.

(b)      Upon entry of this Interim Order, the Debtors shall be jointly and severally liable for all DIP Obligations, including, without limitation, all loans, advances, indebtedness, obligations, extensions of credit, financial accommodations, principal, interest, payments or similar amounts, fees, costs, expenses, charges, indemnification and reimbursement obligations (whether contingent or absolute), and all other amounts, whether or not such obligations arose before or after the Petition Date, whenever the same shall become due and payable, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, to the DIP Lenders under the DIP Documents or this Interim Order.

(c)      All obligations incurred, payments made and transfers or grants of liens and security interests set forth in this Interim Order and/or the DIP Documents by the Debtors are

granted to or for the benefit of the DIP Secured Parties for fair consideration and reasonably equivalent value and are granted contemporaneously with the making of the loans and commitments and other financial accommodations secured thereby.  No obligation, payment, transfer or grant of liens or security interests under this Interim Order or the DIP Documents to the DIP Secured Parties shall be limited, stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law, or subject to any challenge, objection, defense or claim, including, without limitation, avoidance (whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge, recovery or other cause of action of any kind or nature whatsoever, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise (subject, solely in the case of the DIP Professional Fees, only to the procedures set forth in paragraph 19 of this Interim Order).

5.    **DIP Superpriority Claims**.  Pursuant to Bankruptcy Code section 364(c)(1), all of the DIP Obligations shall constitute allowed senior administrative expense claims of the DIP Secured Parties, against each of the Debtors' estates (the "***DIP Superpriority Claims***"), without the need to file any proof of claim or request for payment of administrative expenses, with priority over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b), and over any and all administrative expenses or other claims arising under Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 726, 1113 or 1114 or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for the purposes of Bankruptcy Code section 1129(a)(9)(A) be considered administrative expenses allowed under Bankruptcy Code section 503(b) and 507(b),

23

and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including actions to recover property transferred pursuant to Bankruptcy Code section 549, and subject to the entry of the Final Order, the proceeds of, and property that is recovered from or becomes unencumbered as a result of (whether by judgment, settlement or otherwise), all claims and causes of action arising under chapter 5 of the Bankruptcy Code or under any applicable state law of a similar nature (such claims and causes of action, "*Avoidance Actions*" and the proceeds thereof, "*Avoidance Action Proceeds*"), subordinate only to the Carve-Out and the administrative charge granted by the Ontario Superior Court of Justice (Commercial List) (the "*Canadian Court*") in the proceedings (the "*Recognition Proceedings*") under Part IV of the Companies' Creditors Arrangement Act (Canada) (the "*CCAA*") commenced by the Debtors in Canada in respect of certain Canadian-related professional fees, in an aggregate amount not to exceed CAD$500,000 (the "*Administration Charge*").  Except as set forth in, or permitted by, this Interim Order, or otherwise permitted pursuant to an order of this Court, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases.

6.    **DIP Liens**.

(a)    As security for the DIP Obligations, effective and automatically perfected upon the date of this Interim Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Agent or any DIP Lender of, or over, any DIP Collateral (as defined below), the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted by the DIP Loan Parties continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens (collectively, the "*DIP Liens*") upon all DIP Collateral as security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of all of the DIP Obligations.

(b)    The term "*DIP Collateral*" means all assets and properties of each of the Debtors and their estates, of any kind or nature whatsoever, wherever located, whether tangible or

intangible, real, personal or mixed, whether now owned or consigned by or to, or leased from or to, or hereafter acquired by, or arising in favor of, each of the Debtors (including under any trade names, styles or derivations thereof), whether prior to or after the Petition Date, including, without limitation: (i) all Prepetition Collateral (including Cash Collateral); (ii) all intercompany claims, including, but not limited to, all Intercompany Superpriority Claims (as defined below); (iii) all money, cash and cash equivalents; (iii) all funds in any deposit accounts (excluding cash deposits that secure any outstanding letters of credit), securities accounts, commodities accounts, or other accounts (together with and all money, cash and cash equivalents, instruments and other property deposited therein or credited thereto from time to time); (iv) all accounts and other receivables (including those generated by intercompany transactions); (v) all contracts and contract rights; (vi) all instruments, documents and chattel paper; (vii) all securities (whether or not marketable); (viii) all goods, as-extracted collateral, furniture, machinery, equipment, inventory and fixtures; (ix) all real property interests; (x) all interests in leaseholds; (xi) all franchise rights; (xii) all patents, tradenames, trademarks, copyrights, licenses and all other intellectual property; (xiii) all general intangibles, tax or other refunds or insurance proceeds; (xiv) all equity interests, capital stock, limited liability company interests, partnership interests and financial assets; (xv) all investment property; (xvi) all supporting obligations; (xvii) all letters of credit and letter of credit rights; (xviii) all commercial tort claims; (xix) subject to the entry of the Final Order, all Avoidance Action Proceeds (but not avoidance actions themselves), (xx) all books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials, and records); (xxi) to the extent not covered by the foregoing, all other goods, assets or properties of the Debtors, whether tangible, intangible, real, personal or mixed; and (xxii) all products, offspring, profits and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, including any and all proceeds of any insurance (including any business interruption and property insurance), indemnity, warranty or guaranty payable to such Debtor from time to time with respect to any of the foregoing.

(c)    Subject in all cases to the terms of this Interim Order and the DIP Documents, the DIP Secured Parties shall be granted the following DIP Liens in respect of the DIP Facility:

(1)    _First Priority Lien on Unencumbered Property_. Pursuant to Bankruptcy Code section 364(c)(2), a valid, binding, continuing, enforceable and fully-perfected first priority senior security interest in and lien upon all DIP Collateral that, as of the Petition Date, is unencumbered and not subject to any liens (including Petition Date Perfected Liens), which security interest and lien shall be junior and subordinate only to (A) the Carve-Out, and (B) the Administration Charge.

(2)    _Priming Lien on WCF Collateral_. Upon the payment in full of the obligations under the Prepetition Working Capital Facility, pursuant to Bankruptcy Code section 364(d)(1), a valid, binding, continuing, enforceable and fully-perfected first priority security interest in and lien upon all DIP Collateral that constitutes WCF Collateral, which security interest and lien shall be junior and subordinate only to (A) the Carve-Out, (B) the Administration Charge, (C) Petition Date Perfected Liens, and (D) prior to entry of the Final Order, any security interest in or lien on the assets of NCU that are in favor of Trisura Guarantee Insurance Company.

(3)    _Priming Lien on Non-WCF Collateral_. Pursuant to Bankruptcy Code section 364(d)(1), a valid, binding, continuing, enforceable and fully-perfected first priority security interest in and lien upon all DIP Collateral that constitutes Non-WCF Collateral, _provided_ that such lien shall be junior and subordinate only to (A) the Carve-Out, (B) the Administration Charge and (C) Petition Date Perfected Liens, and (D) prior to entry of the Final Order, any security interest in or lien on the assets of NCU that are in favor of Trisura Guarantee Insurance Company.

(4)    _Lien on Intercompany Superpriority Claims_. Pursuant to Bankruptcy Code section 364(d)(1), a valid, binding, continuing, enforceable and fully-perfected first priority priming security interest in and lien on all claims in respect of intercompany transfers of proceeds from the DIP Facility or of Cash Collateral from any Debtor to NCU (the "**_Intercompany Superpriority Claims_**"), _provided_ that such lien shall be junior and subordinate only to (A) the Carve-Out, (B) the Administration Charge, and (C) Petition Date Perfected Liens (excluding any Prepetition Trisura Lien).

(d)    To the fullest extent permitted by the Bankruptcy Code or applicable law, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document or other instrument or agreement that requires the consent or the payment of any fees or obligations to any governmental entity or non-governmental entity for the Debtors to pledge, grant, mortgage, sell, assign or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral, shall have no force or effect with respect to the DIP Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of

26

any assignment and/or sale thereof by any Debtor, in favor of the DIP Secured Parties in accordance with the terms of the DIP Documents and this Interim Order.

       7.    **Use of DIP Collateral and Cash Collateral**

       (a)    The Debtors are hereby authorized to use the proceeds of DIP Facility and all Cash Collateral solely to the extent expressly permitted under the Approved Budget (subject to the Permitted Variances) and subject to the terms and conditions set forth in this Interim Order and any applicable DIP Documents. Except on the terms and conditions of this Interim Order, the Debtors shall be enjoined and prohibited from at any time using the Cash Collateral absent further order of the Court.

       (b)    Without the prior written consent of the Required DIP Lenders, the Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral (or enter into any binding agreement to do so), except as may be expressly permitted by this Interim Order and any applicable DIP Documents. All proceeds of DIP Collateral, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnation or otherwise, will be deposited and applied as required by this Interim Order and any applicable DIP Documents. The Debtors shall not transfer any cash, assets, properties or other DIP Collateral to any affiliate of the Debtors that is not a Debtor in these Chapter 11 Cases without the prior written consent of the Required DIP Lenders, in their sole discretion.

       (c)    Proceeds of the DIP Facility constitute postpetition assets of the Debtors, subject only to the Carve Out, Administrative Charge, DIP Liens, and adequate protection liens of the Prepetition Secured Parties, with the priorities set forth herein, and shall, for the avoidance of doubt, not be subject to any liens arising from prepetition claims against any of the Debtors, whether perfected prior to the Petition Date, after the Petition Date pursuant to section 546(b) of the Bankruptcy Code, or otherwise, regardless of where or how held. The Debtors may deposit proceeds of the DIP Facility into their existing bank accounts, and such proceeds shall not be subject to any liens or claims arising prepetition, including pursuant to chapter 108 of the Nevada Revised Statutes, whether or not eligible for perfection after the Petition Date, except for junior

27

liens or claims of the Prepetition Secured Parties, as set forth herein. For the avoidance of doubt, to the extent of any proceeds of the DIP Facility deposited therein, no bank account of the Debtors may be a "construction disbursement account" for purposes of chapter 108 of the Nevada Revised Statutes.

8.    **Budget**

(a)    *Initial Budget*. The Debtors have prepared and delivered to the DIP Lenders and the DIP Professionals an itemized thirteen-week cash flow forecast attached hereto as **Exhibit B** (the "***Initial Budget***," as amended, replaced, supplemented or otherwise modified from time to time in accordance with the terms of this Interim Order and the DIP Documents, the "***Approved Budget***"). Except as otherwise provided herein or in the DIP Documents, the Debtors may only use Cash Collateral and the proceeds of the DIP Facility to fund payments benefitted by the Carve-Out and otherwise in accordance with the Approved Budget (subject to the Permitted Variances).

(b)    *Proposed Budget; Budget Transition*. By no later than 12:00 p.m. (Pacific Time) on the third Thursday after the Petition Date (commencing from June 27, 2024), and continuing at 12:00 p.m. (Pacific Time) on the Thursday of every second week thereafter, the Debtors shall deliver to the DIP Lenders, DIP Professionals, and KfW an updated and supplemented forecast (a "***Proposed Budget***") for the thirteen-week period commencing with the calendar week in which such Proposed Budget is delivered (the "***Budgeted Period***"); *provided*, *however*, that in no event shall the Budgeted Period extend past four weeks after the Maturity Date (as defined in the DIP Credit Agreement) of the DIP Facility. For the avoidance of doubt, if the Budgeted Period is anticipated to extend beyond the Maturity Date, the projected receipts, disbursements, intercompany transfers and all other line items set forth in the Proposed Budget for all weeks following the Maturity Date shall assume that the Debtors continue to operate in the ordinary course consistent with prior postpetition practices and that no sale of the Debtors' business will occur during such portion of the Budgeted Period. The Proposed Budget (including any subsequent revisions to any such Proposed Budget) shall become the Approved Budget effective five (5) business days after such submission (such date, the "***Budget Transition Date***")

unless the Debtors receive a written objection from the Required DIP Lenders (with e-mail from professionals acting on behalf of the Required DIP Lenders to the Debtors' counsel being sufficient) prior to 5:00 p.m. (Pacific Time) on the Budget Transition Date.  If the Required DIP Lenders do not object, in writing, to a Proposed Budget, or an amendment, supplement or modification to the Approved Budget or Approved Variance Report (defined below) within five (5) business days after the Required DIP Lenders' receipt thereof, then such Proposed Budget, amendment, supplement or modification shall be deemed acceptable to and approved by the DIP Lenders.  In the event the Required DIP Lenders timely object to a Proposed Budget, the prior Approved Budget shall remain in full force and effect until any such Proposed Budget is approved by the Required DIP Lenders (with e-mail from the advisors acting on behalf of the Required DIP Lenders to the Debtors' counsel being sufficient).  The consent of the Required DIP Lenders to any Proposed Budget or any Approved Budget shall not be construed as consent to the use of any Cash Collateral or proceeds of the DIP Facility after the occurrence of a Termination Event regardless of whether the aggregate funds shown on the Approved Budget have been expended.  Until any Proposed Budget, amendment, supplement or modification has been approved (or is deemed approved in accordance with this paragraph) by the Required DIP Lenders, the Debtors shall be subject to and be governed by the terms of the Approved DIP Budget then in effect.

(c)     *Budget Reporting.*  By no later than 12:00 p.m. (Pacific Time) on the second Thursday following the Petition Date (the "***First Reporting Date***", which, for the avoidance of doubt, shall be June 20, 2024), and no later than 12:00 p.m. (Pacific Time) on each Thursday thereafter (together with the First Reporting Date, each a "***Weekly Reporting Date***"), the Debtors shall provide to the DIP Lenders (and their advisors) and KfW (and its counsel) a report, in form and substance reasonably acceptable to the DIP Lenders (the "***Weekly Variance Report***"), setting forth in reasonable detail: (i)  the intercompany transfers from Debtor entities to NCU on a Debtor-by-Debtor and an aggregate basis; (ii) the actual receipts of the Debtors on a line-by-line and aggregate basis (the "***Actual Receipts***") and the actual disbursements of the Debtors on a line-by-

line and aggregate basis (such aggregate actual disbursements, the "***Actual Disbursements***"), in each case, during the applicable week ending on the Sunday preceding each such Weekly Reporting Date (each such week, the "***Reporting Week***"); (iii) a comparison (whether positive or negative, expressed as a percentage) for the Reporting Week between (A) the Actual Receipts (and each line item thereof) for such Reporting Week to the amount of the Debtors' projected receipts (and each line item thereof) set forth in the Approved Budget for such Reporting Week, (B) the Actual Disbursements (and each line item thereof) for such Reporting Week to the amount of the Debtors' projected disbursements (and each line item thereof) set forth in the Approved Budget for such Reporting Week and (C) the actual intercompany transfers from each Debtor entity to NCU to the amount of each such Debtor's projected intercompany transfers to NCU set forth in the Approved Budget for such Reporting Week. In addition, by no later than 12:00 p.m. (Pacific Time) on each Weekly Reporting Date that occurs on and after the three-week anniversary of the First Reporting Date, (each such date, a "***Rolling Four-Week Testing Date***" (which such initial Rolling Four-Week Testing Date shall be July 11, 2024) and each subsequent four-week period commencing from the beginning of the week in which the Petition Date occurs and ending on the Sunday preceding each such Rolling Four-Week Testing Date, a "***Rolling Four-Week Testing Period***") the Debtors shall provide the DIP Lenders (and their advisors) and KfW (and its counsel) a report, in form and substance reasonably acceptable to the DIP Lenders (a "***Rolling Four-Week Variance Report***" and, together with the Weekly Variance Report, the "***Approved Variance Reports***"), setting forth in reasonable detail: (x) the aggregate Actual Receipts of the Debtors, aggregate Actual Disbursements of the Debtors, and aggregate intercompany transfers from each Debtor entity to NCU, in each case, during the applicable Rolling Four-Week Testing Period; and (y) a comparison (whether positive or negative, expressed as a percentage) detailing (1) the aggregate Actual Receipts (and each line item thereof) for such Rolling Four-Week Testing Period compared to the projected receipts (and each line item thereof) for such Rolling Four-Week Testing Period set forth in the Approved Budget for such Rolling Four-Week Testing Period; (2) the aggregate Actual Disbursements (and each line item thereof) for such Rolling Four-Week Testing

Period compared to the projected disbursements (and each line item thereof) for such Rolling Four-Week Testing Period set forth in the Approved Budget for such Rolling Four-Week Testing Period; and (3) the aggregate intercompany transfers from each Debtor entity to NCU made by each such Debtor during such Rolling Four-Week Testing Period compared to the aggregate projected intercompany transfers from each such Debtor entity to NCU for such Rolling Four-Week Testing Period set forth in the Approved Budget for such Rolling Four-Week Testing Period.

(d)     *Budget Testing; Permitted Variances*.   During any Rolling Four-Week Testing Period, the Debtors shall not permit (1) total disbursements, minus (2) disbursements in respect of (i) interest, fees, and expenses in relation to the DIP Facility; (ii) Adequate Protection Obligations; (iii) DIP Professional Fees; and (iv) professional fees paid by the Debtors on behalf of themselves or any other party (the disbursements remaining after such subtractions, the "***Total Tested Disbursements***") to be more than 120% of such Total Tested Disbursements set forth in the Approved Budget for such Rolling Four-Week Testing Period (collectively, the "***Permitted Variances***").  Additional disbursement variances, if any, from an Approved Budget, and any proposed amendments, supplements or modifications to an Approved Budget, shall be subject to the prior written approval of the Required DIP Lenders.  For the avoidance of doubt, any reference to "written consent" or "written approval" hereunder shall include consent or approval granted by e-mail, including email from counsel to the DIP Lenders on behalf of the DIP Lenders.

9.     **Reporting Requirements; Access to Records**.  The Debtors shall provide (i) Akin, as counsel to the DIP Lenders, (ii) Milbank LLP ("***Milbank***"), as counsel to KfW, (iii) White & Case LLP, as counsel to Concord, (iv) Davis, Graham & Stubbs LLP, as counsel to Triple Flag (v) Cleary, Gottlieb, Steen & Hamilton LLP, as counsel to Pala,  (vi) Bennett Jones LLP, as counsel to Mercuria, and (vii) Alvarez & Marsal Canada Inc., in its capacity as the Information Officer in the Recognition Proceedings, with all reporting and other information required to be provided to the DIP Agent under the DIP Documents.  In addition to, and without limitation, whatever rights to access the DIP Secured Parties or KfW have under the DIP Documents, upon reasonable notice, at reasonable times during normal business hours, the Debtors shall permit representatives, agents

and employees of the DIP Secured Parties and KfW to (x) have access to and inspect the Debtors'
assets, (y) examine the Debtors' books and records and (z) discuss the Debtors' affairs, finances
and condition with the Debtors' officers and financial advisors.

10. **Adequate Protection for the Prepetition Secured Parties**.    Pursuant to
Bankruptcy Code sections 361, 363, and 364, and in consideration of the stipulations and consents
set forth herein, as adequate protection of their interests in the Prepetition Collateral (including
Cash Collateral), for and equal in amount to the aggregate postpetition Diminution in Value of
such interests, the Prepetition Secured Parties are hereby granted the following (collectively, the
"*Adequate Protection Obligations*"):

(a)    *Adequate Protection Liens*.  As security for and solely to the extent of any
Diminution in Value, the Prepetition Secured Parties are hereby granted additional and replacement
valid, binding, enforceable, non-avoidable and effective and automatically perfected postpetition
security interests in, and liens on, as of the date of this Interim Order (the "*Adequate Protection
Liens*"), subject in all cases to the priorities set forth on **Exhibit C** hereto, without the necessity of
the execution by the Debtors (or recordation or other filing) of security agreements, control
agreements, pledge agreements, financing statements, mortgages or other similar documents, all
DIP Collateral.

(b)    *Adequate Protection Superpriority Claims*.  As further adequate protection,
and to the extent provided by Bankruptcy Code sections 503(b) and 507(b), the Prepetition Secured
Parties are hereby granted allowed administrative expense claims in the Chapter 11 Cases against
each of the Debtors to the extent of any Diminution in Value (the "*Adequate Protection
Superpriority Claims*").  The Adequate Protection Superpriority Claims shall be payable from and
have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof
(excluding Avoidance Actions, but including, subject to entry of the Final Order, Avoidance Action
Proceeds).  Subject to the terms of this Interim Order, the Adequate Protection Superpriority
Claims shall have the same relative priorities as the Adequate Protection Liens (as set forth on
**Exhibit C** hereto) and be subject to (i) the Carve-Out, (ii) the Administration Charge and (iii) the

DIP Superpriority Claims.  Except as set forth in this Interim Order, the Adequate Protection Superpriority Claims shall not be junior to any other claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(d), 726, 1113 and 1114.

(c)    *Fees and Expenses of the Prepetition Secured Parties*.  As further adequate protection, the Debtors are authorized and directed to pay, without further Court order, reasonable and documented fees and expenses (the "**Adequate Protection Fees**"), whether incurred before or after the Petition Date, of the Prepetition Senior Secured Term Loan Agent, consisting of the following: (i) Milbank, as counsel to KfW; (ii) one Canadian counsel to KfW;  (iii) one Nevada counsel to KfW; and (iv) one technical advisor to KfW; (collectively, the "**Prepetition Secured Parties' Professionals**") in accordance with the notice and review procedures set forth in paragraph 19 of this Interim Order.

(d)    *Monthly Payments*.  The Prepetition Senior Secured Term Loan Agent shall during the pendency of the Chapter 11 Cases, receive indefeasible payments in amounts equal to 100% of the accrued and unpaid interest, whether accruing prior to, on or after the Petition Date, due to the Prepetition Senior Secured Term Loan Agent under the Prepetition Senior Secured Term Loan Documents (calculated at the applicable non-default rates) (the "**Adequate Protection Monthly Payments**" and, together with the Adequate Protection Fees, the "**Adequate Protection Payments**"), which shall be payable (i) in respect of payments relating to the Prepetition Senior Secured KfW Term Loan Obligations, in cash and (ii) in respect of payments relating to the Prepetition Senior Secured Term Loan A-2 Obligations, in kind; *provided* that in the event of a final determination that the Prepetition Senior Secured Term Loan Lenders are undersecured as of the Petition Date, payments received by the applicable undersecured Prepetition Senior Secured

Term Loan Lender pursuant to this paragraph 10(d) may be recharacterized and applied as payments of principal.

(e)    *Information Rights*.  The Debtors shall contemporaneously provide the Prepetition Secured Parties with all reporting and information that is required to be provided to the DIP Lenders under the DIP Documents (as currently in effect, or pursuant to any additional requirements that may be added after the date hereof).  The Debtors shall (a) provide the Prepetition Senior Secured Term Loan Agent and its advisors with copies of any material proposal, offer, indication of interest, or bid within two (2) business days of receipt, and (b) at the Prepetition Senior Secured Term Loan Agent's request, host a weekly call with the Prepetition Senior Secured Term Loan Agent and its advisors regarding the status of the Debtors' sale process.  The Debtors shall provide the Prepetition Senior Secured Term Loan Agent and its advisors with any information reasonably requested by the Prepetition Senior Secured Term Loan Agent or its advisors in connection with any Proposed Budget, Approved Budget, or Weekly Variance Report within three (3) business days of such request.  The Debtors shall conduct weekly status calls with KfW (and their technical advisor) on the status of the Underground Mine and shall respond timely to any reasonable request of KfW's technical advisor to provide information with respect to the status of the Underground Mine.

11.    **Perfection of DIP Liens and Adequate Protection Liens**.

(a)    This Interim Order shall be sufficient and conclusive evidence of the attachment, validity, perfection and priority of all liens and security interests granted under this Interim Order and the DIP Documents, including, without limitation, the DIP Liens and the Adequate Protection Liens, without the necessity of the execution, recordation or filing of any pledge, collateral or security agreements, mortgages, deeds of trust, lockbox or control agreements, financing statements, notations of certificates of title for titled goods, or any other document or instrument, or the taking of any other action (including, without limitation, entering into any deposit account control agreement or other act to take possession or control of any DIP Collateral, including Cash Collateral), to attach, validate, perfect or prioritize such liens and security interests,

1    or to entitle the DIP Agent (acting at the direction of the Required DIP Lenders) and the Prepetition

2    Secured Parties to the priorities provided hereby and set forth on **Exhibit C** hereto (a "***Perfection***

3    ***Act***").

4                    (b)        Without in any way limiting the automatically effective perfection of the

5    liens granted under this Interim Order and the DIP Documents (including, without limitation, the

6    DIP Liens and the Adequate Protection Liens), each of the Required DIP Lenders, the Prepetition

7    Senior Secured Term Loan Agent, the Prepetition Working Capital Purchaser, the Prepetition TF

8    Stream Purchaser and the Prepetition Junior Secured Term Loan Agent, without any further

9    consent of any party, is hereby authorized on a final basis, to execute, file or record, and such

10   parties, as applicable, may require the execution, filing or recording, as each, in its sole discretion

11   deems necessary, of such financing statements, mortgages, notices of lien and other similar

12   documents to enable the Required DIP Lenders, the Prepetition Senior Secured Term Loan Agent,

13   the Prepetition Working Capital Purchaser, the Prepetition TF Stream Purchaser and the Prepetition

14   Junior Secured Term Loan Agent, as applicable, to further validate, perfect, preserve and enforce

15   the DIP Liens or Adequate Protection Liens granted hereunder, as applicable, perfect in accordance

16   with applicable law or to otherwise evidence the DIP Liens and/or the Adequate Protection Liens,

17   as applicable, and all such financing statements, mortgages, notices and other documents shall be

18   deemed to have been executed, filed or recorded as of the Petition Date; *provided*, *however,* that,

19   notwithstanding any otherwise applicable law or regulation to the contrary, whether or not the

20   Required DIP Lenders, the Prepetition Senior Secured Term Loan Agent, the Prepetition Working

21   Capital Purchaser, the Prepetition TF Stream Purchaser or the Prepetition Junior Secured Term

22   Loan Agent, as applicable, determine, in their sole discretion, to execute, file, record or otherwise

23   effectuate any Perfection Act with respect to any liens or security interests granted under this

24   Interim Order and the DIP Documents, such liens and security interests shall be deemed valid,

25   perfected, allowed, enforceable, non-avoidable and not subject to objection, challenge, dispute,

26   avoidance, recharacterization or subordination.  The Debtors are hereby authorized and directed

27   on a final basis to execute and deliver promptly upon demand to the Required DIP Lenders, the

28

Prepetition Senior Secured Term Loan Agent, the Prepetition Working Capital Purchaser, the Prepetition TF Stream Purchaser and the Prepetition Junior Secured Term Loan Agent, as applicable, all such financing statements, notices and other documents as such parties may reasonably request.  The Required DIP Lenders, the Prepetition Senior Secured Term Loan Agent, the Prepetition Working Capital Purchaser, the Prepetition TF Stream Purchaser or the Prepetition Junior Secured Term Loan Agent, as applicable, each in its discretion, may file a copy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instruments, and in such event, the filing or recording office shall be authorized to file or record such copy of this Interim Order.

12.    **Modification of Automatic Stay**.  The automatic stay imposed by Bankruptcy Code section 362(a) is hereby modified, without application to or further order of this Court, to permit: (i) the Debtors to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Agent (acting at the direction of the Required DIP Lenders) and/or the Required DIP Lenders may request to assure the perfection and priority of the DIP Liens; (ii) the Debtors to incur all liabilities and obligations to the DIP Secured Parties as contemplated under this Interim Order and the DIP Documents; (iii) the Debtors to grant the Adequate Protection Liens and Adequate Protection Superpriority Claims and to perform such acts as the Prepetition Secured Parties may request to assure the perfection and priority of the Adequate Protection Liens; (iv) the Debtors to incur all liabilities and obligations to the Prepetition Secured Parties, including all Adequate Protection Superpriority Claims and other Adequate Protection Obligations, as contemplated under this Interim Order and the DIP Documents; (v) the Debtors to pay all amounts required under this Interim Order and the DIP Documents; (vi) the DIP Secured Parties and the Prepetition Secured Parties to retain and apply payments made in accordance with the terms of this Interim Order and the DIP Documents; (vii) subject in all respects to paragraph 18 of this Interim Order, the DIP Agent (acting at the direction of the Required DIP Lenders) and the applicable Prepetition Secured Parties to exercise, upon the occurrence of any Termination Event (as defined

below), all rights and remedies provided for in this Interim Order, the DIP Documents or applicable law; (viii) the Debtors to perform under this Interim Order and the DIP Documents and to take any and all other actions that may be necessary, required or desirable for the performance by the Debtors under this Interim Order and the DIP Documents and the implementation of the transactions contemplated hereunder and thereunder; and (ix) the implementation of all of the terms, rights, benefits, privileges, remedies and provisions of this Interim Order and the DIP Documents.

13.    **Carve-Out.**

(a)    *Carve-Out*.  As used in this Interim Order, the "***Carve-Out***" means the sum of: (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code, together with interest, if any, under section 3717 of title 31 of the United States Code (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under Bankruptcy Code section 726(b) (without regard to the notice set forth in (iii) below); (iii) to the extent allowed, whether by interim order, procedural order or otherwise, all unpaid fees and expenses (the "***Allowed Professional Fees***") incurred by persons or firms retained by the Debtors pursuant to Bankruptcy Code sections 327, 328 or 363 (the "***Debtor Professionals***") and the Creditors' Committee pursuant to Bankruptcy Code sections 328 or 1103 (the "***Committee Professionals***" and, together with the Debtor Professionals, the "***Estate-Retained Professionals***") at any time before or on the first calendar day following delivery of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) Allowed Professional Fees of Estate-Retained Professionals, in an aggregate amount not to exceed $750,000 incurred after the first calendar day following delivery of the Carve-Out Trigger Notice, to the extent allowed, whether by interim order, procedural order or otherwise (the amounts set forth in this clause (iv) being the "***Post-Carve-Out Trigger Notice Cap***").  For purposes of the foregoing, the "***Carve-Out Trigger Notice***" shall mean a written notice delivered by e-mail by the DIP Agent (acting at the direction of the Required DIP Lenders and in accordance with the terms of this

Interim Order), to the Debtors' proposed bankruptcy counsel Allen Overy Shearman & Sterling US LLP, 599 Lexington Avenue, New York, NY 10022 (Attn: Fredric Sosnick and Sara Coelho), the U.S. Trustee, the Creditors' Committee, if any, and the Prepetition Secured Parties, which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined in the DIP Credit Agreement) and acceleration of the obligations under the DIP Facility or the occurrence of a Maturity Date (as defined in the DIP Credit Agreement), stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

(b)    *Carve-Out Reserves*.  On the day on which a Carve-Out Trigger Notice is delivered (the "***Carve-Out Trigger Date***"), the Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date to fund a reserve in an amount equal to the then unpaid amounts of (i) the Allowed Professional Fees of Estate-Retained Professionals and (ii) the obligations accrued as of the Carve-Out Trigger Date with respect to clauses (i) and (ii) of the definition of Carve-Out set forth in paragraph 13(a) (the "***Additional Carve-Out Obligations***"). The Debtors shall deposit and hold such amounts in a segregated account in a manner reasonably acceptable to the DIP Agent (acting at the direction of the Required DIP Lenders) or the Required DIP Lenders, and, following the Discharge of DIP Obligations, the Prepetition Senior Secured Term Loan Agent, in trust to pay such unpaid Allowed Professional Fees of Estate-Retained Professionals and Additional Carve-Out Obligations (the "***Pre-Carve-Out Trigger Notice Reserve***") prior to the use of such reserve to pay any other claims.  On the Carve-Out Trigger Date, after funding the Pre-Carve-Out Trigger Notice Reserve, the Debtors shall utilize all remaining cash on hand as of such date to fund a reserve in an amount equal to the Post-Carve-Out Trigger Notice Cap (the "***Post-Carve-Out Trigger Notice Reserve***" and, together with the Pre-Carve-Out Trigger Notice Reserve, the "***Carve-Out Reserves***") prior to the use of such reserve to pay any other claims.  All funds in the Pre-Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve-Out set forth in paragraph 13(a) (the "***Pre-Carve-Out Amounts***"), but not, for the avoidance of doubt, the Post-Carve-Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve-Out Trigger Notice

Reserve has not been reduced to zero, subject to the terms of this Interim Order, to pay any other amounts (if owing) benefitted by the Carve-Out and then to the DIP Agent for the benefit of itself and the DIP Lenders in accordance with the terms of this Interim Order and the DIP Documents, unless the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) have been indefeasibly paid in full, in cash, and all commitments under the DIP Facility have been terminated (the "***Discharge of DIP Obligations***"), in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with the Prepetition Debt Documents and this Interim Order.  All funds in the Post-Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve-Out set forth above (the "***Post-Carve-Out Amounts***"), and then, to the extent the Post-Carve-Out Trigger Notice Reserve has not been reduced to zero, subject to the terms of this Interim Order, to pay the DIP Agent for the benefit of itself and the DIP Lenders in accordance with the terms of this Interim Order and the DIP Documents, unless the Discharge of DIP Obligations shall have occurred, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with the Prepetition Debt Documents and this Interim Order.  Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, if either of the Carve-Out Reserves are not funded in full in the amounts set forth in this paragraph 13(b), then, any excess funds in one of the Carve-Out Reserves following the payment of the Pre-Carve-Out Amounts and Post-Carve-Out Amounts, respectively, shall be used to fund the other Carve-Out Reserve, up to the applicable amount set forth in this paragraph 13(b), prior to making any payments to the DIP Agent or the Prepetition Secured Parties, as applicable.  Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, following delivery of a Carve-Out Trigger Notice, the DIP Agent (in accordance with the terms of this Interim Order and the DIP Documents) shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Reserves have been fully funded, but shall have a valid and perfected security interest in any residual interest in the Carve-Out Reserves, with any excess paid to the DIP Agent for the benefit of itself and the DIP Lenders in accordance with the terms of this Interim Order and

the DIP Documents, unless the Discharge of DIP Obligations shall have occurred, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with the Prepetition Debt Documents.  Further, notwithstanding anything to the contrary in this Interim Order, (x) disbursements by the Debtors from the Carve-Out Reserves shall not increase or reduce the DIP Obligations or constitute additional loans under the DIP Facility and (y) the failure of the Carve-Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve-Out in respect of DIP Collateral or any recoveries thereon.  For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Documents or in any Prepetition Debt Documents, the Carve-Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Obligations and the Prepetition Secured Obligations, and any and all other forms of adequate protection, liens or claims securing the DIP Obligations or the Prepetition Secured Obligations.

(c)    *Payment of Allowed Professional Fees Prior to the Carve-Out Trigger Date*. Any payment or reimbursement made prior to the occurrence of the Carve-Out Trigger Date in respect of any Allowed Professional Fees shall not reduce the Carve-Out.

(d)    *No Direct Obligation to Pay Allowed Professional Fees*.  None of the DIP Secured Parties or Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Estate-Retained Professional incurred in connection with the Chapter 11 Cases or any Successor Cases.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Secured Parties or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Estate-Retained Professional or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)    *Payment of Carve-Out on or After the Carve-Out Trigger Date*.  Any payment or reimbursement made on or after the occurrence of the Carve-Out Trigger Date in respect of any Allowed Professional Fees incurred after the first business day following delivery by the DIP Agent (acting at the direction of the Required DIP Lenders) of the Carve-Out Trigger Notice shall permanently reduce the Post-Carve-Out Trigger Notice Cap on a dollar-for-dollar

basis. Any funding of the Carve-Out under the DIP Facility shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code and applicable law.

14.    **Limitation on Charging Expenses Against Collateral**.  Subject to entry of the Final Order (but retroactive to the Petition Date), and subject to the Carve-Out and the Administration Charge, no costs or expenses of administration of the Chapter 11 Cases, the Recognition Proceedings or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code or the CCAA, shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral, the DIP Secured Parties or the Prepetition Secured Parties pursuant to Bankruptcy Code sections 506(c) and 105(a), or any similar principle of law or equity, without the prior written consent of the DIP Secured Parties and the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Secured Parties or the Prepetition Secured Parties.

15.    **No Marshaling/Application of Proceeds**.  Subject to entry of the Final Order, the DIP Agent and the Prepetition Secured Parties shall be entitled to apply the payments or proceeds of the DIP Collateral and the Prepetition Collateral, as applicable, in accordance with the provisions of the Interim Order or the Final Order, as applicable, the DIP Documents and the Prepetition Debt Documents, as applicable, and in no event shall the DIP Secured Parties or any of the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral.

16.    **Equities of the Case**.  Subject to entry of the Final Order (but retroactive to the Petition Date), (i) the Prepetition Secured Parties shall be entitled to all of the rights and benefits of Bankruptcy Code section 552(b) and (ii) the Debtors shall not invoke the "equities of the case" exception under Bankruptcy Code section 552(b) with respect to the proceeds, products, offspring or profits of any of the Prepetition Collateral.

17.    **Termination Events**.  The occurrence of any of the following shall constitute a "*Termination Event*": (i) the occurrence of an Event of Default (as defined in the DIP Documents)

to the extent not waived by the Required DIP Lenders or subject to a forbearance or similar agreement with the Required DIP Lenders; (ii) the Debtors' failure to comply in any material respect with any provision of this Interim Order unless waived by the applicable lenders; or (iii) the occurrence of the Maturity Date (as defined in the DIP Documents).

18.    **Remedies Upon a Termination Event**.

(a)    Upon the occurrence of the Termination Event, the DIP Agent (acting at the direction of the Required DIP Lenders) shall be entitled to declare (A) all DIP Obligations due and payable without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Debtors, (B) the termination, reduction or restriction of all future commitments to the Borrower under the DIP Facility to the extent any such commitment remains (including, for the avoidance of doubt, any commitment to fund the DIP Facility) but without affecting the DIP Liens and DIP Obligations, (C) the termination of the DIP Facility and any DIP Documents as to any future obligation of the DIP Secured Parties, but without affecting any of the DIP Liens or any DIP Obligation, (D) the termination, reduction or restriction on the ability of the Debtors to use any Cash Collateral and the proceeds of the DIP Facility (any such declaration made by the DIP Agent to counsel to the Debtors, counsel to the applicable Prepetition Secured Parties, the U.S. Trustee and counsel to the Creditors' Committee, if any, (which may be made by e-mail), a "***Termination Declaration***," and the date which is the earliest to occur of any such Termination Declaration and the Maturity Date being herein referred to as the "***Termination Declaration Date***").    The DIP Agent shall provide any Termination Declaration to the Debtors' lead restructuring counsel, the Creditors' Committee, if any, the U.S. Trustee, and Milbank, as counsel to KfW.

(b)    The Debtors, the Committee (if appointed), and/or any party in interest shall be entitled to seek an emergency hearing before the Court within four (4) business days after the delivery of a Termination Declaration (such period being the "***Remedies Notice Period***"), for the sole purpose of contesting whether a Termination Event (other than with respect to the Maturity Date) has occurred or is continuing or for the contested use of Cash Collateral (a "***Stay***

*Enforcement Motion*").[5]   The Debtors shall be entitled to continue to use Cash Collateral in accordance with the terms of this Interim Order and the DIP Documents during any Remedies Notice Period only to make payroll and fund critical expenses necessary to preserve the Prepetition Collateral, in each case, in accordance with the terms of the Approved Budget and this Interim Order, but shall not be permitted to use Cash Collateral following any Remedies Notice Period absent further order of the Court approving such use (and only to the extent so approved).  Unless the Court has determined that a Termination Event has not occurred and/or is not continuing, or the Court orders otherwise, the automatic stay, as to the DIP Secured Parties shall automatically be terminated at the end of the Remedies Notice Period without further notice, order, or any further action in the Chapter 11 Cases or the Recognition Proceedings and the DIP Agent (acting at the direction of the Required DIP Lenders) shall be permitted to exercise any rights and remedies against the DIP Collateral available to the DIP Secured Parties under this Interim Order, the DIP Documents and applicable non-bankruptcy law without any further order of or application or motion to the Court, including, but not limited to, any rights to setoff against deposits and financial assets of the Debtors and to foreclose on all or any portion of the DIP Collateral, in each case, subject to the Carve-Out, the Administration Charge and any Prepetition Permitted Liens; *provided, however*, that the Required DIP Lenders shall consult with the Prepetition Secured Term Loan Agent in advance of exercising any remedies or taking action in connection with any of the DIP Collateral and shall provide the Prepetition Senior Secured Term Loan Agent with five (5) Business Days' notice in advance of taking such actions; which period may be waived by the Prepetition Senior Secured Term Loan Agent, in its reasonable discretion.

---

[5]   If a hearing to consider a Stay Enforcement Motion is requested to be heard before the end of the Remedies Notice Period but is scheduled for a  later date by the Court, the Remedies Notice Period shall automatically be extended to the date of such hearing, but in no event later than ten (10) business days after delivery of the Termination Declaration or at such other date that may be agreed to by the parties after good faith negotiations.

19.    **Fees and Expenses of DIP Professionals and Prepetition Secured Parties' Professionals.**

(a)    The payment of all DIP Professional Fees and Adequate Protection Fees hereunder shall not be subject to (i) further application to or approval of the Court, (ii) allowance or review by the Court or (iii) the U.S. Trustee's fee guidelines, and no attorney or advisor to the DIP Secured Parties or the Prepetition Secured Parties shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court; *provided*, *however*, that any time the DIP Professionals (other than DIP Agent Counsel) seek payment of fees and expenses from the Debtors from and after the Petition Date but prior to the effective date of any chapter 11 plan,[6] each such party or professional shall provide summary copies of its invoices (which shall not be required to contain time entries, and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product or any other confidential information, and the provision of their invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine) to the Debtors' counsel, the U.S. Trustee, and lead counsel to the Creditors' Committee, if any (collectively, the "***Invoice Review Parties***").  Any objections raised by any Invoice Review Party with respect to such invoices must (x) be in writing (email from such party or their counsel being sufficient) (y) state with particularity the grounds for such objection and (z) be submitted to the affected professional(s) within ten (10) calendar days after delivery of such invoices to the Invoice Review Parties (such ten (10) calendar day period, the "***Invoice Review Period***").  If no written objection is received prior to the expiration of the Invoice Review Period from the Invoice Review Parties, the Debtors shall pay such invoices within two (2) calendar days following the expiration of the Invoice Review Period.  If an objection is received within the Invoice Review Period from the Invoice Review Parties, the Debtors shall

---

[6]    For the avoidance of doubt, nothing contained in this paragraph 19 shall prevent the DIP Secured Parties or KfW from seeking payment from the Debtors of professional fees and expenses incurred prior to the Petition Date in accordance with the terms of this Interim Order and the DIP Documents.

promptly pay the undisputed amount of the invoice, and the disputed portion of such invoice shall not be paid until such dispute is resolved by agreement between the affected party or professional(s) and the objecting party or by order of this Court.  Any hearing to consider such an objection to the payment of any fees, costs or expenses set forth in a professional fee invoice hereunder shall be limited to the reasonableness of the fees, costs and expenses that are the subject of such objection.

(b)    Notwithstanding anything contained in this Interim Order to the contrary, any and all payments, fees, costs, expenses and other amounts paid at any time by any of the Debtors to the DIP Secured Parties or the Prepetition Secured Parties (including such parties' respective professionals), as applicable, pursuant to the requirements of this Interim Order or the DIP Documents, whether prior to, on or after the Petition Date, shall be non-refundable and irrevocable, are hereby approved (and to the extent paid prior to entry of the Interim Order, ratified in full), and shall not be subject to any challenge, objection, defense, claim or cause of action of any kind or nature whatsoever, including, without limitation, avoidance (whether under Chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), reclassification, disgorgement, disallowance, impairment, marshaling, surcharge or recovery or any other cause of action, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, by any person or entity.

20.    **Limitation on Use of DIP Facility Proceeds, DIP Collateral and Cash Collateral**.

(a)    Notwithstanding anything to the contrary set forth in this Interim Order, none of the DIP Facility, the DIP Collateral, the Prepetition Collateral or the proceeds thereof, including Cash Collateral, or the Carve-Out may be used: (i) to investigate (except as expressly provided herein), initiate, prosecute, join or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense or other

litigation of any type (A) against any of the DIP Secured Parties or the Prepetition Secured Parties (in each case, in their capacities as such) and each of their respective affiliates, officers, directors, employees, agents, representatives, attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, any so-called "lender liability" claims and causes of action, or seeking relief that would impair the rights and remedies of the DIP Secured Parties or the Prepetition Secured Parties (in each case, in their capacities as such) under this Interim Order, the DIP Documents or the Prepetition Debt Documents, as applicable, to the extent permitted or provided hereunder, including, without limitation, for the payment of any services rendered by any Estate-Retained Professional in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration or similar relief that would impair the ability of any of the DIP Secured Parties or the Prepetition Secured Parties to recover on the DIP Collateral or the Prepetition Collateral (as applicable), as provided for herein, or seeking affirmative relief against any of the DIP Secured Parties or the Prepetition Secured Parties related to the DIP Obligations or the Prepetition Secured Obligations, as applicable, (B) seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Liens, DIP Superpriority Claims, the DIP Obligations, the Prepetition Funded Debt Liens or the Prepetition Secured Obligations or (C) for monetary, injunctive or other affirmative relief against the DIP Secured Parties or the Prepetition Secured Parties (in each case, in their capacities as such) that would impair the ability of any of the DIP Secured Parties or the Prepetition Secured Parties to assert or enforce any lien, claim, right or security interest or to realize or recover on the DIP Obligations or the Prepetition Secured Obligations to the extent permitted or provided hereunder; (ii) for objecting to or challenging in any way the legality, validity, priority, perfection or enforceability of the claims, liens or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Secured Obligations, or by or

on behalf of the DIP Secured Parties related to the DIP Obligations; (iii) for asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions related to the DIP Liens, the DIP Superpriority Claims, the DIP Obligations, the Prepetition Liens or the Prepetition Secured Obligations; or (iv) for prosecuting an objection to, contesting in any manner or raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of (A) any of the DIP Liens, the DIP Superpriority Claims, or any other rights or interests of the DIP Secured Parties related to the DIP Obligations or the DIP Liens or (B) any of the Prepetition Liens, Prepetition Secured Obligations or any other rights or interests of any of the Prepetition Secured Parties related to the Prepetition Secured Obligations; *provided* that no more than $50,000 of the proceeds of the DIP Facility, the DIP Collateral, or the Prepetition Collateral, including the Cash Collateral, in the aggregate, may be used by the Creditors' Committee (if any) solely to investigate (but not seek formal discovery or commence any challenge, objection or prosecute any claim or cause of action relating to) the foregoing matters with respect to the Prepetition Liens or the Prepetition Secured Obligations within the Challenge Period (as defined below) (the "***Investigation Budget***").

(b)    Any fees and expenses of the Committee Professionals in connection with the investigation of the matters described in paragraph 20(a) of this Interim Order in excess of the Investigation Budget shall not be entitled to administrative expense priority pursuant to section 503(b) of the Bankruptcy Code or otherwise.

21.    **Effect of Stipulations on Third Parties**.

(a)    The Debtors' acknowledgments, stipulations, admissions, agreements, waivers and releases set forth in this Interim Order shall be binding on the Debtors, their respective estates, representatives, successors and assigns upon entry of this Interim Order and the Debtors shall be deemed to have irrevocably waived and relinquished all Challenges (as defined below) as of the Petition Date.

(b)    The acknowledgments, stipulations, admissions, agreements, waivers and releases contained in this Interim Order shall also be binding upon all other parties in interest,

including the Creditors' Committee or non-statutory committees appointed or formed in these Chapter 11 Cases (if any) and any other person or entity seeking to act on behalf of the Debtors' estates, including any chapter 7, chapter 11 trustee or examiner appointed or elected for any of the Debtors in these Chapter 11 Cases or any Successor Cases, and each of their respective successors and assigns, in all circumstances and for all purposes, unless: (i) any such party, having obtained requisite standing, timely and properly commences and serves an adversary proceeding or contested matter (subject to the limitations contained herein) (A) objecting to or challenging the validity, perfection, priority, scope, extent or enforceability of the Prepetition Funded Debt Liens or the Prepetition Secured Obligations, (B) objecting to or alleging any basis to impair, restrict, deny or otherwise challenge the right of any of the Prepetition Secured Parties to credit bid, in whole or in part, the Prepetition Funded Debt Liens or the Prepetition Secured Obligations under Bankruptcy Code section 363(k) or otherwise or (C) otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "***Challenges***") against the Prepetition Secured Parties in connection with any matter related to the Prepetition Collateral, the Prepetition Funded Debt Liens or the Prepetition Secured Obligations by no later than (1) with respect to any Creditors' Committee, the date that is 45 days after the later of (a) its appointment in the Chapter 11 Cases and (b) entry of the Final Order and (2) with respect to all other parties in interest, no later than the date that is 45 days after the entry of this Interim Order (the time period established by the foregoing clauses (1) and (2) the "***Challenge Period***"); *provided* that in the event that, prior to the expiration of the Challenge Period, (x) these Chapter 11 Cases are converted to chapter 7 or (y) a chapter 11 trustee is appointed in these Chapter 11 Cases, then, in each such case, the Challenge Period shall be extended for a period of 10 days solely with respect to any Trustee, commencing on the occurrence of either of the events described in the foregoing clauses (x) and (y); and (ii) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such challenge in any such duly filed adversary proceeding or contested matter.

(c)     If no such adversary proceeding or contested matter is timely filed prior to the expiration of the Challenge Period, without further order of this Court: (i) the Prepetition Secured Obligations shall constitute allowed claims, not subject to any Claims and Defenses (whether characterized as a counterclaim, setoff, subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by Bankruptcy Code section 101(5)), impairment, subordination (whether equitable, contractual or otherwise) or other challenge of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law), for all purposes in these Chapter 11 Cases and any Successor Cases, if any; (ii) the Prepetition Funded Debt Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected and of the priority specified in paragraphs F.1(c), F.2(c), F.3(c), and F.4(c), not subject to setoff, subordination, defense, avoidance, impairment, disallowance, recharacterization, reduction, recoupment or recovery; and (iii) the Prepetition Secured Obligations, the Prepetition Funded Debt Liens on the Prepetition Collateral and the Prepetition Secured Parties (solely in their capacities as such) shall not be subject to any other or further challenge and all parties in interest shall be forever enjoined and barred from seeking to exercise the rights of the Debtors' estates or taking any such action, including any successor thereto (including any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period).

(d)     If any such adversary proceeding or contested matter is timely filed prior to the expiration of the Challenge Period, (i) the stipulations, admissions, agreements, waivers and releases contained in this Interim Order shall nonetheless remain binding and preclusive on the Creditors' Committee (if any) and any other party in these Chapter 11 Cases, including any Trustee, except as to the party (or parties) that timely initiated such adversary proceeding or contested matter and, with respect to such party (or parties), solely as to any stipulations, admissions, agreements, waivers and releases that are specifically and expressly challenged in such adversary proceeding or contested matter and (ii) any Claims and Defenses not brought in such adversary proceeding or contested matter shall be forever barred; *provided* that, if and to the extent any

49

challenges to a particular stipulation, admission, agreement, waiver or release are withdrawn, denied or overruled by a final non-appealable order, such stipulation, admission, agreement, waiver and/or release also shall be binding on the Debtors' estates and all parties in interest.

(e)    Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including any Creditors' Committee (if any), standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any challenge with respect to the Prepetition Debt Documents, the Prepetition Funded Debt Liens or the Prepetition Secured Obligations.

22.    **Release**.  Subject to the rights and limitations set forth in paragraphs 20 and 21 of this Interim Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors and assigns shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge each of the DIP Secured Parties, and subject to the entry of the Final Order, the Prepetition Secured Parties (in each case, in their capacities as such) and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, affiliated investment funds or investment vehicles, managed, advised or sub-advised accounts, funds or other entities, investment advisors, sub-advisors or managers, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates and predecessors in interest, each in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses or judgments of every type, whether known, unknown, asserted, unasserted, suspected unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof solely with respect to or relating to the DIP Liens, the DIP Superpriority Claims, the DIP Obligations, the Prepetition Funded Debt Liens and the Prepetition

Secured Obligations, as applicable, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection or avoidability of the liens or claims of the DIP Secured Parties and the Prepetition Secured Parties.

23.    **Credit Bidding**.

(a)    Consistent with Bankruptcy Code section 363(k) and applicable law, the DIP Agent (acting at the direction of the Required DIP Lenders) and each DIP Lender (in any case, either directly or through one or more acquisition vehicles), shall have the right to credit bid for all or any portion of the DIP Collateral, as applicable, up to the full amount of any DIP Superiority Claims, as part of any sale of Debtors' assets (in whole or in part), including without limitation, sales occurring pursuant to (i) Bankruptcy Code section 363, (ii) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129 or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725 (each, a "***Sale Transaction***"), *provided*, that, until payment in full of the obligations under the Prepetition Working Capital Facility, the rights of the DIP Agent and each DIP Lender to credit bid on any DIP Collateral that constitutes WCF Collateral shall be subject to the right of the Prepetition Working Capital Purchaser to credit bid for all or any portion of the WCF Collateral, as applicable, up to the full amount of any Prepetition Working Capital Obligations as part of any Sale Transaction.  The DIP Agent shall have the absolute right to assign, sell or otherwise dispose of its right to credit bid in connection with any credit bid by or on behalf of the DIP Lenders to any acquisition entity or joint venture formed in connection with such bid.

(b)    The Prepetition Secured Parties' rights to credit bid for all or a portion of the Prepetition Collateral as part of any Sale Transaction are fully preserved, subject in all respects to (i) payment in full in cash of all DIP Obligations and (ii) the terms and conditions of this Interim Order and the applicable Prepetition Debt Documents, including the lien and claim priorities set forth herein and therein.

24. **Interim Order Governs**.  In the event of any inconsistency between the provisions of this Interim Order and any DIP Documents, the provisions of this Interim Order shall govern.

25. **Binding Effect; Successors and Assigns**.  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Secured Parties, the Prepetition Secured Parties, the Creditors' Committee (if any), the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to Bankruptcy Code section 1104 or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Secured Parties and the Prepetition Secured Parties; *provided*, that, except to the extent expressly set forth in this Interim Order, the Prepetition Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

26. **Limitation of Liability**.  In determining to make any loan under the DIP Documents, permitting the use of Cash Collateral or exercising any rights or remedies as and when permitted pursuant to this Interim Order, the DIP Documents or the Prepetition Debt Documents, the DIP Secured Parties and the Prepetition Secured Parties (in each case, solely in their capacities as such) shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or their respective business (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq*. as amended, or any similar federal or state statute), nor shall they owe any fiduciary duty to any of the Debtors, their creditors or estates, or constitute or be deemed to constitute a joint venture or partnership with any of the Debtors.  Furthermore, nothing in this Interim Order, the DIP Documents or the Prepetition Debt Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or the Prepetition Secured Parties

of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their direct or indirect subsidiaries.

27.    **Proofs of Claim**. Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under Bankruptcy Code section 503(b), (i) the Prepetition Secured Parties shall not be required to file any proof of claim or request for payment of administrative expenses with respect to any of the Prepetition Secured Obligations or the Adequate Protection Obligations and (ii) the DIP Secured Parties shall not be required to file any proof of claim or request for payment of administrative expenses with respect to any DIP Obligations.  The failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority or enforceability of any of the Prepetition Debt Documents, the DIP Documents or of any other indebtedness, liabilities or obligations arising at any time thereunder or under this Interim Order, or prejudice or otherwise adversely affect the Prepetition Secured Parties' or the DIP Secured Parties' rights, remedies, powers or privileges under any of the Prepetition Debt Documents, the DIP Documents, this Interim Order or applicable law.  The applicable Prepetition Secured Parties and DIP Secured Parties may (but are not required to) in their discretion file (and amend and/or supplement) applicable proofs of claim and/or aggregate proofs of claim in each of the Chapter 11 Cases or any successor cases for any claim allowed herein, and any such proof of claim may (but is not required to) be filed in the Debtors' lead Chapter 11 Case *In re [__],* Case No. [__] ([__]) as one consolidated proof of claim against all of the Debtors, rather than as separate proofs of claim against each Debtor.  The provisions set forth in this paragraph 27 are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

28.    **Insurance**.  The Debtors shall continue to maintain all property, operational and other insurance as required and as specified in the DIP Documents (which shall be deemed satisfied if such insurance as required under the Prepetition Secured Term Loan Credit Agreement remains

in place).  The Debtors shall provide the DIP Agent (for distribution to the DIP Lenders) with commercially reasonable evidence of such insurance upon a request to counsel for the Debtors from the DIP Agent (acting at the direction of the Required DIP Lenders).  Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Agent (on behalf of itself and the DIP Lenders) is, and is deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral (including all property damage and business interruption insurance policies of the Debtors, whether expired, currently in place or to be put in place in the future), and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies.

29.    **Protection of Lenders' Rights**.

(a)    Except as expressly permitted in this Interim Order or the DIP Documents, in the event any person or entity that holds a lien on or security interest in DIP Collateral that is junior or otherwise subordinate to the DIP Liens receives any DIP Collateral or proceeds of DIP Collateral, in each case, that is subject to such junior lien, or receives any payment on account of such junior lien or security interest in the DIP Collateral on account of such junior lien (whether in connection with the exercise of any right or remedy (including setoff), any payment or distribution from the Debtors, mistake or otherwise) prior to the Payment in Full[7] of all DIP Obligations, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Secured Parties, and shall immediately turn over all such proceeds to the DIP Agent, for the benefit of itself and the DIP Lenders, in the same form as received, with any necessary endorsements, for application in accordance with this Interim Order and the DIP Documents; *provided, however,* that until the

---

[7]    For purposes hereof, the term "Paid in Full" or "Payment in Full" means, with respect to the DIP Obligations or any Prepetition Secured Obligations (as the case may be), the irrevocable and indefeasible payment in full in cash of all DIP Obligations or such Prepetition Secured Obligations (as the case may be), other than contingent indemnification and expense reimbursement obligations for which no claim or demand has been asserted, and all commitments thereunder shall have irrevocably, permanently and finally expired or shall have been terminated, cancelled and discharged.

Payment in Full of the Prepetition Working Capital Obligations, upon receipt by the DIP Agent or any DIP Lender of any such payment or proceeds from DIP Collateral that constitutes WCF Collateral, the DIP Agent or the applicable DIP Lender shall segregate and hold in trust such payment or proceeds for the benefit of, and turn over all such payments and proceeds to, the Prepetition Working Capital Purchaser in the same form as received, with any necessary endorsements, for application in accordance with this Interim Order, the DIP Documents and the Prepetition Debt Documents.

(b)    Other than with respect to the Carve Out, the Administration Charge and Petition Date Perfected Liens, and as otherwise expressly provided in this Interim Order and/or the DIP Documents (including **Exhibit C** hereto), no claim or lien having a priority senior to or *pari passu* with those granted to any of the DIP Secured Parties or the Prepetition Secured Parties by this Interim Order shall be granted or permitted while any of the DIP Obligations or the Prepetition Secured Obligations, respectively, remains outstanding.  Except as expressly provided in this Interim Order and the DIP Documents (including **Exhibit C** hereto), each of the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, the Prepetition Funded Debt Liens or the Prepetition Secured Obligations: (i) shall not be made junior or subordinated to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any Successor Cases, whether under Bankruptcy Code section 364(d) or otherwise, (B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code section 551 or otherwise, (C) any lien arising after the Petition Date including, without limitation, any lien or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors or (D) any intercompany or affiliate lien or claim; and (ii) shall not be subject to Bankruptcy Code sections 510, 549, 550 or 551 and, subject to entry of the Final Order, Bankruptcy Code section 506(c).

(c)     In the event this Interim Order or any provision hereof is vacated, reversed or modified on appeal or otherwise, any liens or claims granted to the DIP Secured Parties or Prepetition Secured Parties hereunder arising prior to the effective date of any such vacatur, reversal or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein, and the DIP Secured Parties and the Prepetition Secured Parties shall be entitled to the protections afforded in Bankruptcy Code sections 363(m) and 364(e), as applicable, with respect to all uses of the DIP Collateral (including all Cash Collateral and all Prepetition Collateral), all DIP Obligations and all Adequate Protection Obligations.

(d)     Subject to the Carve-Out, the Administration Charge and Petition Date Perfected Liens, unless and until all DIP Obligations and Prepetition Secured Obligations are Paid in Full and all commitments to extend credit under the DIP Facility are terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly: (i) except as permitted under the DIP Documents, and with the prior written consent of the Required DIP Lenders and the Prepetition Senior Secured Term Loan Agent, (A) any modification, stay, vacatur or amendment of this Interim Order, (B) a priority claim for any administrative expense, secured claim or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, without limitation, any administrative expense of the kind specified in Bankruptcy Code sections 503(b), 507(a) or 507(b)) in any of the Chapter 11 Cases, equal or superior to the DIP Superpriority Claims and the Adequate Protection Superpriority Claims or (C) any other order allowing the use of DIP Collateral; (ii) except as permitted under the DIP Documents, any lien on any of the DIP Collateral (including all Prepetition Collateral) with priority equal or superior to the DIP Liens, the Adequate Protection Liens or the Prepetition Funded Debt Liens; (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents and this Interim Order; (iv) except as set forth in the DIP Documents, the return of goods pursuant to Bankruptcy Code section 546(h) (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor; (v) an order converting or dismissing any of the

Chapter 11 Cases without the consent of the Required DIP Lenders; (vi) an order appointing a chapter 11 trustee in any of the Chapter 11 Cases; or (vii) an order appointing an examiner with enlarged powers in any of the Chapter 11 Cases.

(e)    Notwithstanding any order dismissing any of the Chapter 11 Cases under Bankruptcy Code section 1112 or otherwise entered at any time, (i) the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims and any other administrative claims granted pursuant to this Interim Order, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order and the DIP Documents until such time as all DIP Obligations and Adequate Protection Obligations are Paid in Full; and (ii) the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (i) above.

(f)    Except as expressly provided in this Interim Order and the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims and all other rights and remedies of the DIP Secured Parties and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall survive, shall maintain their priority as provided in this Interim Order, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases, terminating the joint administration of these Chapter 11 Cases or by any other act or omission, or (ii) the entry of an order approving the sale of any DIP Collateral (including any Prepetition Collateral) pursuant to Bankruptcy Code section 363(b), except to the extent that such order provides for the attachment of DIP Liens or prepetition liens to the proceeds of such sale) or (iii) the entry of an order confirming a plan of reorganization in any of the Chapter 11 Cases and, pursuant to Bankruptcy Code section 1141(d)(4), the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Interim Order and the DIP Documents shall continue in these Chapter 11 Cases and any Successor Cases.

30.    **Reservation of Rights of the DIP Secured Parties and Prepetition Secured Parties**.  Except as otherwise expressly set forth in this Interim Order, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, as applicable: (i) any of the rights of any of the Prepetition Secured Parties to seek any other or supplemental relief in respect of the Debtors including the right to seek additional adequate protection; (ii) any of the rights of the DIP Secured Parties or the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of any of the DIP Secured Parties or the Prepetition Secured Parties to (A) request modification of the automatic stay of Bankruptcy Code section 362, (B) request dismissal of any of the Chapter 11 Cases, conversion of any of the Chapter 11 Cases to cases under chapter 7 or appointment of a chapter 11 trustee or examiner with expanded powers in any of the Chapter 11 Cases or (C) seek to propose, subject to the provisions of Bankruptcy Code section 1121, a chapter 11 plan or plans; or (iii) any other rights, claims or privileges (whether legal, equitable or otherwise) of any of the DIP Secured Parties or the Prepetition Secured Parties.  The delay in or failure of the DIP Secured Parties and/or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the DIP Secured Parties' or the Prepetition Secured Parties' rights and remedies under this Interim Order, the DIP Documents, the Prepetition Debt Documents or applicable law, as applicable.

31.    **Effectiveness**.  Subject to the terms hereof, this Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024, any other Bankruptcy Rule or Rules 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

32.    **Final Hearing**.  The final hearing (the "***Final Hearing***") on the Motion shall be held on _____, 2024, at__:__ _.m. (Prevailing Pacific Time).  Any party in interest objecting to the relief sought at the Final Hearing or in the Final Order shall file and serve a written objection,

which objection shall be served upon: (i) proposed counsel for the Debtors, (a) Allen Overy Shearman Sterling US LLP, 599 Lexington Avenue, New York, NY 10022, Attn: Fredric Sosnick and Sara Coelho; (b) McDonald Carano LLP, 2300 West Sahara Avenue, Suite 1200, Las Vegas, Nevada 89102, Attn: Ryan J. Works; and (c) Torys LLP, 79 Wellington St. W., 30th Floor, Box 270, TD South Tower Toronto, Ontario M5K 1N2 Canada, Attn: Tony DeMarinis, Mike Noel, Hanna Singer and Jeremy Opolsky; (ii) the Office of the United States Trustee for Region 17, C. Clifton Young Federal Building, 300 Booth Street, Room 3009, Reno, Nevada 85909; (iii) counsel to the DIP Lenders, (a) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attn: Brad Kahn,; 2001 K Street NW, Washington D.C. 20006, Attn: Kate Doorley and (b) Shea Larsen PC, 1731 Village Center Circle, Suite 150, Las Vegas, Nevada 89134, Attn: James Patrick Shea and Bart Larsen; (iv) Milbank LLP, as counsel to KfW IPEX-Bank GmbH as administrative agent under the Debtors' prepetition credit agreement, 55 Hudson Yards, New York, NY 10001, Attn: Tyson Lomazow; (v) Bennett Jones LLP, as counsel to Mercuria Investments US, Inc., 3400 One First Canadian Place, P.O. Box 130, Toronto, Ontario M5X 1A4, Canada, Attn: Simon Grant; (vi) White & Case LLP, as counsel to Concord Resources Limited as buyer under the Debtors' prepetition advance payment agreement, 1221 6th Avenue, New York, NY 10020, Attn: Philip Abelson; (vii) Davis, Graham & Stubbs LLP, as counsel to Triple Flag Mining Finance Bermuda Ltd. as purchaser under the Debtors' prepetition purchase and sale agreement; 1550 17th Street, Suite 500, Denver, CO 80202, Attn: Kyler Burgi; (viii) Cleary Gottlieb Steen & Hamilton LLP, as counsel to Pala Investments Limited as prepetition lender, 2 London Wall Place, London, EC2Y 5AU, United Kingdom, Attn: Solomon J. Noh; One Liberty Plaza, New York, NY 10006, Attn: Lisa M. Schweitzer; (ix) Alvarez & Marsal Canada Inc., in its capacity as the Information Officer in the Recognition Proceedings, Royal Bank Plaza, South Tower 200 Bay Street, Suite 3501 Toronto ON M5J 2J1 Canada, Attn: Al Hutchens; (x) Kelley Drye & Warren, LLP, as counsel to the DIP Agent, 3 World Trade Center, 175 Greenwich Street, New York, NY 10007, Attn: James S. Carr, Esq.; and (xi) counsel to any statutory committee appointed in these Chapter 11 Cases, in each case so as to be received no later than

_____, 2024, at 11:59 p.m. (Prevailing Pacific Time). If no objections to the entry of the Final Order are timely filed, this Court may enter the Final Order without further notice or a hearing.

33.    **Headings**.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

34.    **Retention of Jurisdiction**.  This Court retains exclusive jurisdiction to resolve any dispute arising from or related to the interpretation or enforcement of this Interim Order.

Dated: __, 2024


_____
THE HONORABLE [___]
UNITED STATES BANKRUPTCY JUDGE


Prepared and submitted by:

_/s/ Ryan Works_____
**McDONALD CARANO LLP**
Ryan J. Works (Nevada Bar No. 9224)
Amanda M. Perach (Nevada Bar No. 12399)
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102

**ALLEN OVERY SHEARMAN STERLING US LLP**
Fredric Sosnick (New York Bar No. 2472488) (_pro hac vice pending_)
Sara Coelho (New York Bar No. 4530267) (_pro hac vice pending_)
599 Lexington Avenue
New York, New York 10022

_Proposed Counsel to the Debtors and_
_Debtors in Possession_

APPROVED/DISAPPROVED

60

## EXHIBIT A

**DIP Credit Agreement**

**EXECUTION VERSION**

**SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

June 9, 2024

among

**NEVADA COPPER, INC.**
as Borrower

**the Guarantors party hereto from time to time**

**U.S. Bank Trust Company, National Association**
as Administrative Agent and Collateral Agent

– and –

**the Senior Lenders party hereto from time to time**

# Table of Contents

Page

**ARTICLE 1 INTERPRETATION** ......................................................................................... 1
    1.1    Definitions ................................................................................................. 1
    1.2    Certain Rules of Interpretation ................................................................ 34
    1.3    Currency.................................................................................................... 35
    1.4    Time of Essence ....................................................................................... 35
    1.5    Knowledge ................................................................................................ 35
    1.6    No Subordination ...................................................................................... 36
    1.7    Conflict .................................................................................................... 36
**ARTICLE 2 LOANS**............................................................................................................ 36
    2.1    Loan ......................................................................................................... 36
    2.2    Finance Parties' Rights and Obligations ................................................. 36
    2.3    Purpose and Use of Proceeds ................................................................... 37
    2.4    Monitoring ............................................................................................... 37
    2.5    Evidence of Debt ..................................................................................... 37
**ARTICLE 3 UTILIZATION OF LOANS**............................................................................ 38
    3.1    Delivery of a Utilization Request ............................................................ 38
    3.2    Completion of a Utilization Request......................................................... 38
    3.3    [Reserved] ................................................................................................ 38
    3.4    Notification of Utilization of the Loan .................................................... 38
    3.5    Senior Lenders' Participation .................................................................. 38
    3.6    Partial Payments ...................................................................................... 39
**ARTICLE 4 REPAYMENT, PREPAYMENT AND CANCELLATION** ............................ 39
    4.1    Repayments .............................................................................................. 39
    4.2    Mandatory Prepayments .......................................................................... 39
    4.3    [Reserved] ................................................................................................ 40
    4.4    [Reserved] ................................................................................................ 40
    4.5    Voluntary Cancellation ........................................................................... 40
    4.6    Voluntary Prepayment ............................................................................. 41
    4.7    Automatic Cancellation ........................................................................... 41
    4.8    Right of Cancellation and Repayment in Relation to a Single Senior Lender................. 41
    4.9    Application................................................................................................ 42
    4.10   Miscellaneous .......................................................................................... 42
**ARTICLE 5 INTEREST, INTEREST PERIODS AND FEES**........................................... 43
    5.1    Payment of Interest and Interest Payment Dates ..................................... 43
    5.2    Interest Rate ............................................................................................. 43
    5.3    Default Interest ........................................................................................ 45
    5.4    Limitation on Interest............................................................................... 46
    5.5    Determination of Interest Periods ............................................................ 46
    5.6    Non-Business Days................................................................................... 46
    5.7    Market Disruption.................................................................................... 46
    5.8    Break Costs .............................................................................................. 47
    5.9    Fees .......................................................................................................... 47
**ARTICLE 6 TAXES** ........................................................................................................... 48
    6.1    Taxes........................................................................................................ 48
**ARTICLE 7 OTHER PROVISIONS RELATING TO THE LOANS** ................................ 52
    7.1    Payments Generally ................................................................................. 52
    7.2    Illegality .................................................................................................. 52

| | 7.3 | Change in Circumstances | 53 |
|---|---|---|---|
| | 7.4 | Payment of Costs and Expenses | 54 |
| | 7.5 | Indemnities | 54 |
| **ARTICLE 8** | **REPRESENTATIONS AND WARRANTIES** | | **55** |
| | 8.1 | Representations and Warranties of the Borrower | 55 |
| | 8.2 | Survival of Representations and Warranties | 65 |
| **ARTICLE 9** | **SECURITY** | | **65** |
| | 9.1 | Grant of Security Interest | 65 |
| | 9.2 | Security for Obligations | 69 |
| | 9.3 | Obligors Remain Liable | 69 |
| | 9.4 | Delivery and Control of Account and Investment Property | 69 |
| | 9.5 | Further Assurances – Security | 70 |
| | 9.6 | Remedies | 71 |
| | 9.7 | Security Effective Notwithstanding Date of the Loans | 73 |
| | 9.8 | No Merger | 73 |
| | 9.9 | Stockpiling | 73 |
| **ARTICLE 10** | **GUARANTY** | | **73** |
| | 10.1 | Guaranty; Limitation of Liability | 73 |
| | 10.2 | Guaranty Absolute | 74 |
| | 10.3 | Waivers and Acknowledgments | 75 |
| | 10.4 | Subrogation | 75 |
| | 10.5 | Continuing Guaranty; Assignments | 76 |
| | 10.6 | Release | 76 |
| **ARTICLE 11** | **COVENANTS** | | **77** |
| | 11.1 | Affirmative Covenants | 77 |
| | 11.2 | Approved Budget and Variance Reporting | 81 |
| | 11.3 | Notifications to the Senior Lenders | 82 |
| | 11.4 | Other Reports | 86 |
| | 11.5 | Project Reporting | 86 |
| | 11.6 | [Reserved] | 86 |
| | 11.7 | Quarterly Financial Reporting | 86 |
| | 11.8 | [Reserved] | 86 |
| | 11.9 | Corporate Policies | 86 |
| | 11.10 | Changes to Accounting Policies | 87 |
| | 11.11 | Know Your Customer Documentation; Beneficial Ownership Certification | 87 |
| | 11.12 | Negative Covenants | 88 |
| | 11.13 | Milestones | 92 |
| **ARTICLE 12** | **CONDITIONS PRECEDENT** | | **93** |
| | 12.1 | Conditions Precedent to the Interim Loan | 93 |
| | 12.2 | Conditions Precedent to the Final Loans | 95 |
| | 12.3 | Conditions Precedent to All Utilizations | 96 |
| **ARTICLE 13** | **EVENTS OF DEFAULT AND REMEDIES** | | **97** |
| | 13.1 | Events of Default | 97 |
| | 13.2 | Remedies Upon Default | 101 |
| | 13.3 | Set-Off upon Event of Default | 103 |
| | 13.4 | Application of Proceeds | 103 |
| **ARTICLE 14** | **CHANGES TO PARTIES** | | **103** |
| | 14.1 | Assignment by Senior Lenders | 103 |
| | 14.2 | Assignment by Borrower | 106 |
| **ARTICLE 15** | **ADMINISTRATIVE PARTIES** | | **106** |
| | 15.1 | Appointment of the Administrative Agent and the Collateral Agent | 106 |

| 15.2 | Instructions to the Agents | 106 |
| 15.3 | Duties of the Agents | 107 |
| 15.4 | Rights of the Agents | 108 |
| 15.5 | No Fiduciary Duties | 109 |
| 15.6 | Business with the Borrower | 109 |
| 15.7 | Responsibility for Documentation | 109 |
| 15.8 | Exclusion of Liability | 110 |
| 15.9 | Senior Lender's Indemnity | 110 |
| 15.10 | Reliance by Agents | 111 |
| 15.11 | Delegation of Duties | 111 |
| 15.12 | Resignation and Replacement of the Agents | 111 |
| 15.13 | [Reserved] | 112 |
| 15.14 | [Reserved] | 112 |
| 15.15 | General Provisions Relating to the Collateral Agent | 112 |
| 15.16 | Agents Appointed Attorneys-in-Fact | 113 |
| 15.17 | [Reserved] | 113 |
| 15.18 | [Reserved] | 114 |
| 15.19 | [Reserved] | 114 |
| 15.20 | [Reserved] | 114 |
| 15.21 | Agent's Confidentiality | 114 |
| 15.22 | [Reserved] | 114 |
| 15.23 | Credit Appraisal by the Senior Lenders | 114 |
| 15.24 | Deduction from Amounts Payable by Agents | 114 |
| 15.25 | Notice Period | 115 |
| 15.26 | [Reserved] | 115 |
| 15.27 | Payments | 115 |
| 15.28 | Agents as Senior Lender | 115 |
| 15.29 | Erroneous Payments | 115 |
| **ARTICLE 16 [RESERVED]** | | **117** |
| **ARTICLE 17 CONDUCT OF BUSINESS BY THE FINANCE PARTIES** | | **117** |
| 17.1 | Conduct of Business by the Finance Parties | 117 |
| **ARTICLE 18 SHARING AMONG THE FINANCE PARTIES** | | **118** |
| 18.1 | Payments to Senior Lenders | 118 |
| 18.2 | Redistribution of Payments | 118 |
| 18.3 | Recovering Finance Party's Rights | 118 |
| 18.4 | Reversal of Redistribution | 118 |
| 18.5 | Exceptions | 119 |
| **ARTICLE 19 PAYMENT MECHANICS** | | **119** |
| 19.1 | Payments to the Agents | 119 |
| 19.2 | Distributions by the Agents | 119 |
| 19.3 | Distributions to the Borrower | 119 |
| 19.4 | Clawback | 120 |
| 19.5 | [Reserved] | 120 |
| 19.6 | [Reserved] | 120 |
| 19.7 | No Set-Off by the Borrower | 120 |
| 19.8 | Business Days | 120 |
| 19.9 | Currency of Account | 120 |
| 19.10 | Change of Currency | 120 |
| **ARTICLE 20 SET-OFF** | | **121** |
| 20.1 | Set-Off | 121 |

**ARTICLE 21 BAIL-IN PROVISIONS** ........................................................................ **121**
    21.1    Contractual Recognition of Bail-In ................................................................ 121
**ARTICLE 22 CALCULATIONS AND CERTIFICATES** .......................................... **122**
    22.1    Day Count Conventions ................................................................................. 122
    22.2    Financial Calculations .................................................................................... 122
**ARTICLE 23 CONFIDENTIAL INFORMATION** ..................................................... **122**
    23.1    Confidential Information ................................................................................ 122
    23.2    Entire Agreement Regarding Confidentiality ................................................ 123
    23.3    Inside Information .......................................................................................... 123
    23.4    [Reserved] ...................................................................................................... 123
    23.5    Continuing Obligations .................................................................................. 123
    23.6    Equator Principles .......................................................................................... 123
**ARTICLE 24 NOTICES** ............................................................................................... **123**
    24.2    Notification of Address and Fax Number ...................................................... 125
    24.3    Electronic Communication ............................................................................. 125
    24.4    Communications to the Agents ...................................................................... 125
**ARTICLE 25 GENERAL** ............................................................................................. **126**
    25.1    Partial Invalidity ............................................................................................ 126
    25.2    Reliance and Non-Merger ............................................................................. 126
    25.3    Remedies and Waivers ................................................................................... 126
    25.4    Amendment and Waiver ................................................................................ 126
    25.5    English Language ........................................................................................... 128
    25.6    Further Assurances ........................................................................................ 128
    25.7    [Reserved] ...................................................................................................... 128
    25.8    Judgment Currency ........................................................................................ 128
    25.9    Remedies Cumulative .................................................................................... 129
    25.10   Entire Agreement ........................................................................................... 129
    25.11   Governing Law; Jurisdiction ......................................................................... 129
    25.12   Service of Process .......................................................................................... 130
    25.13   Waiver of Jury Trial ...................................................................................... 130
    25.14   USA PATRIOT Act ...................................................................................... 130
    25.15   Counterparts ................................................................................................... 131
    25.16   No Third-Party Beneficiaries ........................................................................ 131
    25.17   Severability .................................................................................................... 131
    25.18   Survival .......................................................................................................... 131
    25.19   Reinstatement ................................................................................................. 132
    25.20   Incorporation of DIP Order by Reference. .................................................... 132

Schedule A     Commitments
Schedule B     Prepetition Encumbrances
Schedule C     Pledged Interests
Schedule D     [Reserved]
Schedule E     Interim Order
Schedule F     Interim Loan Utilization Certificate
Schedule G     Final Loan Utilization Certificate
Schedule H     [Reserved]
Schedule I      [Reserved]
Schedule J     Project Real Property
Schedule K     [Reserved]
Schedule L     Terms of Subordination
Schedule M    Transfer Certificate

v

Schedule N        Utilization Request
Schedule O        Form of Note
Schedule P        [Reserved]
Schedule Q        Corporate Organization Chart
Schedule R        Bank Accounts
Schedule S        [Reserved]
Schedule T        Related-Party Transactions
Schedule U        [Reserved]
Schedule V        [Reserved]
Schedule W        Litigation Disclosure
Exhibit A-1       U.S. Tax Compliance Certificate
Exhibit A-2       U.S. Tax Compliance Certificate
Exhibit A-3       U.S. Tax Compliance Certificate
Exhibit A-4       U.S. Tax Compliance Certificate

**SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT** (this "**Agreement**"), dated as of June 9, 2024 (the "**Entry Date**"), among **NEVADA COPPER, INC.**, a corporation that is duly incorporated and validly existing under the laws of Nevada (the "**Borrower**"); the **GUARANTORS** from time to time party hereto, **U.S. Bank Trust Company, National Association**, as Administrative Agent (in such capacity together with its successors and permitted assigns, the "**Administrative Agent**") and as Collateral Agent (in such capacity together with its successors and permitted assigns, the "**Collateral Agent**"), and **THE FINANCIAL INSTITUTIONS** listed on Schedule A (*Commitments*) as lenders; and other parties party hereto from time to time.

           **WHEREAS**, on June 9, 2024 (the "**Petition Date**"), the Borrower and certain of its affiliates and subsidiaries (collectively, the "**Debtors**" and, each individually, a "**Debtor**") commenced a case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Nevada (the "**Bankruptcy Court**");

           **WHEREAS**, from and after the Petition Date, each of the Debtors continues to operate its business and manage its property as a debtor and a debtor in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code;

           **WHEREAS**, shortly after the Petition Date, the Debtors will commence a recognition proceeding under Part IV of the *Companies' Creditors Arrangement Act* (the "**CCAA**") in the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**") to recognize in Canada the Chapter 11 Cases (as defined herein) as "foreign main proceedings" (the "**Recognition Proceedings**");

           **WHEREAS**, the Borrower has requested, and the Senior Lenders have agreed, subject to the conditions and terms set forth herein, to commit and provide a senior secured superpriority multi-draw credit facility to the Borrower, in an aggregate principal amount not to exceed $60,000,000;

           **NOW THEREFORE THIS AGREEMENT WITNESSES** that, in consideration of the covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

<div align="center">

**Article 1**
**INTERPRETATION**

</div>

**1.1**    **Definitions**.

For the purposes of this Agreement, the following capitalized terms shall have the following meanings:

"**Acceptable Insurer**" means:

(a)    any insurance company or international reinsurance company (i) authorized to do business in Nevada if required by law or regulation and (ii) with a minimum of "A-" or higher from A.M. Best or Standard & Poor's Rating Services; or

(b)    any other insurance company reasonably acceptable to the Majority Lenders.

"**Accretive Investment**" means an Investment or Acquisition.

"**Account and Investment Property**" has the meaning ascribed to such term in Section 9.1(e) (*Grant of Security Interest*).

"**Acquisition**" means, with respect to any Person, any purchase or other acquisition by such Person, regardless of how accomplished or effected (including any such purchase or other acquisition effected by way of amalgamation, merger, arrangement, business combination or other form of corporate reorganization or by way of purchase, lease or other acquisition arrangements), of (a) any other Person (including any purchase or acquisition of such number of the issued and outstanding securities of, or such portion of an equity interest in, such other Person so that such other Person becomes a Subsidiary of the purchaser or of any of its Affiliates) or of all or substantially all of the property of any other Person, or (b) any division, business, project, operation or undertaking of any other Person or of all or substantially all of the property of any division, business, project, operation or undertaking of any other Person.

"**Additional Material Project Documents**" means each agreement (a) involving the potential expenditure by or revenue to any Obligor of more than $1,000,000 individually and, the breach, loss or termination of which would reasonably be expected to be materially adverse to the care and maintenance of the Project or otherwise result in a Material Adverse Effect relating to the Project; or (b) involving the potential expenditure by or revenue to any Obligor of more than $2,500,000 individually.

"**Adequate Protection Superpriority Claims**" has the meaning assigned to such term in the DIP Order.

"**Adequate Protection Liens**" has the meaning assigned to such term in the DIP Order.

"**Adequate Protection Obligations**" has the meaning assigned to such term in the DIP Order.

"**Administration Charge**" has the meaning assigned to such term in the DIP Order.

"**Administrative Agent**" has the meaning ascribed to such term in the preamble hereto.

"**Affiliate**" means, with respect to any Person, any other Person which directly or indirectly, through one or more intermediaries, Controls, or is Controlled by, or is under common Control with, such Person.

"**Agency Fee Letter**" means the fee letter of the Agent, accepted by the Borrower on June 3, 2024.

"**Agent**" means the Collateral Agent and/or the Administrative Agent.

"**Agreement**" has the meaning ascribed to such term in the preamble hereto.

"**AML Laws**" means any laws, rules or regulations relating to money laundering or terrorism financing, including, but not limited to, the Bank Secrecy Act, as amended by the USA PATRIOT ACT, and Canada's Proceeds of Crime (Money Laundering) and Terrorist Financing Act.

"**Anti-Corruption Laws**" means any laws, rules or regulations relating to corruption or bribery, including, but not limited to, the U.S. Foreign Corrupt Practices Act of 1977 (15 U.S.C. §§ 78dd-1 et seq.), as amended, and the Corruption of Foreign Public Officials Act (Canada).

"**Applicable Law**" means any law (including common law and equity), any international or other treaty, any domestic or foreign constitution or any multinational, federal, provincial, territorial, state, municipal, county or local statute, law, ordinance, code, rule, regulation, Order (including any consent, decree or administrative Order), or Authorization of a Governmental Body in any case applicable to any specified Person, property, transaction or event, or any such Person's property or assets (and, in the case of Section 7.3 (*Change in Circumstances*), whether or not having the force of law).

"**Applicable Margin**" means 9.00% per annum.

"**Applicable Percentage**" means, with respect to any Senior Lender at any time, the percentage of the total principal amount of the Loans held by such Senior Lender or, if at such time, no Loans have yet been advanced, the percentage of the Total Commitments of all Senior Lenders held by such Senior Lender at such time.

"**Approved Bidding Procedures**" means the Bidding Procedures set forth in the Bidding Procedures Motion that are approved by the Bankruptcy Court pursuant to an order of the Bankruptcy Court.

"**Approved Budget**" means the Initial Approved Budget as amended, replaced, supplemented or otherwise modified from time to time in accordance with the terms of the Interim Order and Section 11.2 of this Agreement.

"**Approved Sale**" means a sale of all or substantially all of the Debtor's assets pursuant to section 363 of the Bankruptcy Code consummated in accordance with the Approved Bidding Procedures and the Sale Approval Order.

"**Approved Variance Reports**" has the meaning assigned to such term in Section 11.2(c) (*Approved Budget and Variance Reporting*).

"**Assigned Agreements**" has the meaning assigned to such term in Section 9.1(f) (*Grant of Security Interest*).

"**Assigned Insurance Policies**" has the meaning assigned to such term in Section 9.1(i) (*Grant of Security Interest*).

"**Aurubis Offtake Agreement**" means that certain offtake agreement, dated May 6, 2019, entered into by and among the Borrower, Concord as Borrower's agent, and Aurubis AG, Hamburg, Germany and Aurubis Bulgaris AD, Pirdop, Bulgaria.

"**Authorization**" means any authorization, approval, consent, concession, exemption, license, lease, grant, permit, franchise, right, privilege or no-action letter from any Governmental Body having jurisdiction with respect to any specified Person, property, transaction or event, or with respect to any of such Person's property or business and affairs (including any zoning approval, mining permit, development permit or building permit) or from any Person in connection with any easements, contractual rights or other matters.

"**Automatic Stay**" shall mean the automatic stay imposed pursuant to section 362 of the Bankruptcy Code.

"**Avoidance Actions**" has the meaning assigned to such term in the DIP Order.

"**Bail-In Action**" means the exercise of any Write-down and Conversion Powers.

"**Bail-In Legislation**" means in relation to an EEA Member Country which has implemented, or which at any time implements, Article 55 of Directive 2014/59/EU establishing a framework for the recovery and resolution of credit institutions and investment firms, the relevant implementing law or regulation as described in the EU Bail-In Legislation Schedule from time to time.

"**Bankruptcy Code**" has the meaning ascribed to such term in the recitals.

"**Bankruptcy Court**" has the meaning ascribed to such term in the recitals.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Bidding Procedures**" has the meaning given to it in Section 11.13(g)(i) (*Milestones*).

"**Bidding Procedures Motion**" has the meaning given to it in Section 11.13(g) (*Milestones*).

"**Bidding Procedures Order**" has the meaning given to it in Section 11.13(g) (*Milestones*).

"**Borrower**" has the meaning ascribed to such term in the preamble hereto.

"**Break Costs**" means the amount (if any) by which:

(a)    the interest which a Senior Lender should have received for the period from the date of funding (or proposed funding) of all or any part of its participation in the Loans to the last day of the current Interest Period in respect of the Loans, had the Loans been made and the principal amount been paid on the last day of such Interest Period;

exceeds:

(b)    the sum of the amount it did receive as interest plus the amount which such Senior Lender would be able to obtain by placing an amount equal to the principal amount received by it on deposit with a leading bank in the interbank market for a period starting on the Business Day following receipt or recovery and ending on the last day of the current Interest Period.

"**Budget Period**" means the thirteen-week period set forth in the Approved Budget in effect at such time.

"**Business**" means the maintenance and care of, and sale of Minerals (to the extent extracted prior to the Entry Date) from, the Underground Project.

"**Business Day**" means any day, other than a Saturday, Sunday or statutory holiday in any one of New York City, New York; Reno, Nevada; or Vancouver, British Columbia Canada or a day on which banks are generally closed in any one of those cities.

"**Canadian Collateral**" means the Collateral of the Debtors located in Canada.

"**Canadian Court**" has the meaning ascribed to such term in the recitals.

"**Canadian Priority Charges**" means the Administration Charge and the DIP Charge.

"**Capital Expenditures**" means expenditures (including in respect of any Capitalized Lease Obligations) made by (or on behalf of) the Borrower to acquire or construct fixed assets, plant and equipment (including renewals, improvements and replacements, but excluding repairs) during such period computed in accordance with the IFRS applicable to the Borrower (other than (a) such expenditures paid out of Net Insurance Proceeds, (b) replacement property acquired with asset sale proceeds in accordance with the terms of the Finance Documents and (c) the purchase price of equipment that is purchased simultaneously with the trade-in of existing equipment to the extent of any credit granted by the seller of such equipment for the equipment being traded in at such time).

5

"**Capital Stock**" shall mean, with respect to any Person, any and all shares (whether common or preferred), interests, participations, certificates and other instruments, partnership interests or other equity or ownership interests in such person (however designated and whether or not voting) and any warrants, rights or options to purchase any of such equity or ownership interests.

"**Capitalized Lease Obligation**" means, for any Person, any payment obligation of such Person under an agreement for the lease, license or rental of, or providing such Person with the right to use, property that, in accordance with IFRS, is required to be classified and accounted for as capital leases on a balance sheet of such Person and the amount of such obligation shall be the capitalized amount thereof determined in accordance with IFRS.

"**Carve-Out**" has the meaning assigned to such term in the DIP Order.

"**Cash Management Order**" an order of the Bankruptcy Court, in form and substance satisfactory to the Administrative Agent and the Majority Lenders, authorizing the Debtors to continue their cash management system and/or continue performing intercompany transfers.

"**CAT Equipment Lease**" means that certain Master Equity Lease Agreement, dated February 8, 2019, by and between the Borrower and Caterpillar Financial Services Corporation.

"**CCAA**" has the meaning ascribed to such term in the recitals.

"**Change of Control**" means:

(a)     the Parent ceases to have control or direction (directly or indirectly) over 100% of the outstanding voting shares and economic interests of the Borrower or its Subsidiaries, or otherwise ceases to have the ability (directly or indirectly) to elect a majority of the board of directors of any such Obligor;

(b)     Pala ceases to have control or direction (directly or indirectly) over 19.9% of the outstanding voting shares and economic interests of the Parent;

(c)     the occupation of a majority of the seats (other than vacant seats) on the board of directors of an Obligor by an entity which is neither (i) nominated by such board of directors nor (ii) appointed by directors so nominated as of the date hereof; or

(d)     Pala or any Obligor, as applicable, takes any actions to effect any of the foregoing.

"**Chapter 11 Cases**" means the chapter 11 cases of the Obligors which are being jointly administered under the Bankruptcy Code and are pending in the Bankruptcy Court.

"**Claim**" means any claim, loss or liability of any nature whatsoever, including but not limited to administrative, regulatory enforcement or judicial or equitable action, claim, suit, or judgment by any other Person or any written notice by any Governmental Body.

"**Collateral**" has the meaning given to it in Section 9.1 (*Grant of Security Interest*) and the term "DIP Collateral" in the DIP Order.

"**Collateral Accounts**" means, collectively, the accounts set forth on Schedule R.

"**Collateral Agent**" has the meaning ascribed to such term in the preamble hereto.

"**Commercial Tort Claims Collateral**" has the meaning assigned to such term in Section 9.1(h) (*Grant of Security Interest*).

"**Commitment**" means, an Interim Commitment and/or Final Commitment.

"**Compounded SOFR Calculated Daily Rate**" means the percentage rate per annum calculated by the Administrative Agent (rounded if necessary to five decimal places with 0.000005 being rounded upwards) which results from the formula set out below:

$$\left[ \prod_{i=1}^{d_b} \left(1 + \frac{r_i * n_i}{360}\right) - 1 \right] * \frac{360}{d_c}$$

where:

$d_b$    is, for any Observation Period, the number of US SOFR Banking Days in that Observation Period.

$d_c$    is the number of calendar days in that Observation Period.

i    is a series of whole numbers from 1 (one) to $d_b$, each representing the relevant US SOFR Banking Day in chronological order from, and including, the first US SOFR Banking Day in the relevant Observation Period.

$r_i$    is the SOFR Daily Rate applicable on US SOFR Banking Day i in the relevant Observation Period, as published on the US SOFR Banking Day immediately after US SOFR Banking Day i.

$n_i$    is, for any US SOFR Banking Day "i" in the relevant Observation Period, the number of calendar days for which rate $r_i$ applies, being the number of calendar days from (and including) such US SOFR Banking Day "i" to (but excluding) the following US SOFR Banking Day, irrespective of whether that following US SOFR Banking Day is included in the Observation Period. (Therefore, on most days, $n_i$ will be 1, but on a Friday it will generally be 3, and it will also be greater than 1 on the US SOFR Banking Day before a holiday).

"**Compounded SOFR Calculated Index Rate**" means the percentage rate per annum calculated by the Administrative Agent (rounded if necessary to five decimal places with 0.000005 being rounded upwards) which results from applying the formula set out below:

$$\left(\frac{SOFR\ Index_{End}}{SOFR\ Index_{Start}} - 1\right) * \left(\frac{360}{d_c}\right)$$

where:

$SOFR\ Index_{Start}$    is the value of the SOFR Index that is applicable to the first day of the Observation Period relating to the relevant Interest Period;

| | |
|---|---|
| *SOFR Index$_{End}$* | is the value of the SOFR Index that is applicable to the last day of the Observation Period relating to the relevant Interest Period; and |
| $d_c$ | is the number of calendar days in the relevant Observation Period. |

"**Compounded SOFR Primary Screen Rate**" means the publicly available percentage rate per annum (before any correction, recalculation or republication by its administrator) which:

(a)     is constituted primarily by the daily compounding of the SOFR reference rate over a period similar to the Observation Period and uses a compounding methodology which is the same as that specified in this Agreement for the calculation of the Compounded SOFR Calculated Daily Rate;

(b)     is produced by an administrator;

(c)     is made available no later than the following US SOFR Banking Day on which the Observation Period to which it relates ends; and

(d)     is specified as the "Compounded SOFR Primary Screen Rate" by the Administrative Agent in a Technical Adjustment Notification.

"**Compounded SOFR Reference Rate**" means each of the Compounded SOFR Primary Screen Rate, the Compounded SOFR Calculated Index Rate and the Compounded SOFR Calculated Daily Rate.

"**Computer Software**" has the meaning assigned to such term in Section 9.1(g)(iv) (*Grant of Security Interest*).

"**Concord**" means Concord Resources Limited.

"**Confidential Information**" has the meaning given to it in Section 23.1 (*Confidential Information*).

"**Contested**" or "**Contest**" means, with respect to any matter or claim involving any Person, that such Person is contesting such matter or claim in good faith and by appropriate proceedings timely instituted; provided, that the following conditions are satisfied:

(a)     such Person has posted a bond or other security acceptable to the Administrative Agent or has established adequate reserves with respect to the contested items in accordance with IFRS;

(b)     during the period of such contest, the enforcement of any contested item is effectively stayed; and

(c)     such contest and any resultant failure to pay or discharge the claimed or assessed amount does not, and could not reasonably be expected to, result in a Material Adverse Effect or the sale, forfeiture or loss of any material part of the Collateral.

"**Contract**" means any agreement, contract, lease, license, concession, option, indenture, or other instrument or similar arrangement.

"**Contract Rights**" means all of the applicable Obligor's right, title and interest in and to each and all of the Project Documents, including but not limited to:  (a)(i) all of the applicable Obligor's rights to payment, accounts and payment intangibles under any such Project Document and (ii) all payments, accounts and payment intangibles due and to become due to such Obligor under each such Project Document, whether as contractual obligations, damages or otherwise; (b) all of such Obligor's claims, rights, powers or privileges and remedies under any such Project Document, including all general intangibles, whether as

contractual obligations, damages or otherwise; (c) all rights of the Obligor to receive any proceeds of any payment or performance bond, insurance, indemnity, warranty or guaranty with respect to any such Project Document; and (d) all of the Obligor's rights under any such Project Document to take any action, to make determinations, to exercise any election (including, but not limited to, election of remedies) or option to give or receive any notice, consent, waiver or approval with respect to any such Project Document, together with full power and authority to demand, receive, enforce, collect or receive any of the foregoing rights or any Project Property which is the subject of any such Project Document, to enforce or execute any checks, or other instruments or orders, to file any claims and to take any action which may be necessary or advisable in connection with any of the foregoing.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Control**" means, in respect of a particular Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ability to exercise voting power including the ownership of voting securities, by contract or otherwise in respect of both ordinary and extraordinary matters (including reorganization, restructuring and the amendment of any applicable constitutional document). "Controlled" shall have the meaning correlative thereto.

"**Corrective Action Plan**" means a written plan from the Borrower approved by the Administrative Agent to correct and remedy any E&S Event, which plan shall include:

(a)     the proposed actions to specifically correct, and to remedy damage caused by, such E&S Event;

(b)     the proposed assignment of primary responsibility for implementing such proposed actions;

(c)     a time schedule for implementing such proposed actions to remedy the E&S Event, including the start date, the estimated end date and key milestones; and

(d)     an estimated cost for implementing such actions or any other costs arising from the E&S Event.

"**Creditors' Committee**" has the meaning assigned to such term in Section 2.3 (*Purpose and Use of Proceeds*).

"**Credit Spread Adjustment**" means 10 basis points per annum.

"**Debt**" means, at any time, with respect to any Person, without duplication:

(a)     all obligations, that would be considered to be indebtedness for borrowed money, and all obligations, whether or not with respect to the borrowing of money, that are evidenced by bonds, debentures, notes or other similar instruments;

(b)     the face amount of all bankers' acceptances and similar instruments;

(c)     any capital stock of that Person, or of any Subsidiary of that Person, which capital stock, by its terms or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder, or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part;

(d)    all Capitalized Lease Obligations, synthetic lease obligations, obligations under Sale-Leasebacks and Purchase Money Obligations;

(e)    the amount of all contingent liabilities in respect of letters of credit and similar instruments;

(f)    (i) all obligations in respect of the deferred purchase price of property and (ii) accounts payable and accruals, in each case that are over one hundred twenty (120) days past due (except to the extent being Contested or subject to stay of collection pursuant to the Automatic Stay);

(g)    any hedging, swap, forward, option, future or other derivative transaction (it being understood that when calculating the value of any such Debt, only the marked-to-market value shall be considered);

(h)    contingent liabilities in respect of performance bonds and surety bonds, in each case only to the extent that the contingent liability is required by IFRS to be treated as a liability on a balance sheet of the Person contingently liable; and

(i)    the amount of the contingent liability under any Guarantee of all or any part of an obligation of another Person of the type included in paragraphs (a) through (h) above.

"**Debtor**" has the meaning ascribed to such term in the recitals.

"**Default**" means any event or condition which, upon notice, lapse of time, or both, would constitute an Event of Default.

"**DIP Charge**" means the superpriority charge on the Canadian Collateral granted by the Canadian Court in favor of the Senior Lenders pursuant to the Interim DIP Recognition Order, which DIP Charge shall be subordinate to the Administration Charge.

"**DIP Order**" means the Interim Order, unless the Final Order shall have been entered, in which case it means the Final Order.

"**DIP Recognition Order**" means the Interim DIP Recognition Order and the Final DIP Recognition Order, as applicable under the circumstances.

"**Disposition**" means any sale, assignment, transfer, conveyance, lease, license, granting of an option or other disposition (or agreement to dispose) of any nature or kind whatsoever of any property or of any right, title or interest in or to any property, but does not include the payment of a dividend, and the verb "**Dispose**" has a correlative meaning.

"**E&S Event" means**:

(a)    (i) any event, incident, accident or condition, including any Environmental or Social Matter, that has had, or would reasonably be expected to have, a Material Adverse Environmental and Social Effect or (ii) non-compliance by the Borrower or its Subsidiaries with any Environmental and Social Requirement that has either resulted in material damage to the Environment; or

(b)    any event, incident, accident or condition, including any Environmental or Social Matter, that requires a material corrective action by, or imposes material liability upon, Borrower or any of its Subsidiaries pursuant to any Environmental and Social Requirement.

"**EEA Member Country**" means any member state of the European Union, Iceland, Liechtenstein and Norway, as well as any other country which becomes an EEA Member country in the future.

"**Encumbrance**" means any mortgage, debenture, pledge, hypothec, lien, charge, deed of trust, trust arrangement, assignment by way of security, contractual right of set-off, consignment, lease, hypothecation, security interest, including a purchase money security interest, or other security agreement, trust or arrangement having the effect of security for the payment of any debt, liability or obligation, and "**Encumbered**", "**Encumbrancer**" and "**Encumbrances**" shall have corresponding meanings.

"**Entitled Person**" has the meaning assigned to that term in Section 25.8 (*Judgment Currency*).

"**Entry Date**" has the meaning ascribed to such term in the preamble hereto.

"**Environment**" means all or any of the following media:

(a)     air (including, without limitation, air within natural or man-made structures, whether above or below ground);

(b)     water (including, without limitation, territorial, coastal and inland waters, water under or within land and water in drains and sewers);

(c)     soil and land (including, without limitation, land under water); and

(d)     any ecological systems, animals, plants and all other living organisms supported by these media.

"**Environmental and Social Requirements**" means all Environmental Laws, the Performance Standards, Equator Principles and any Corrective Action Plan.

"**Environmental Bond**" means each environmental bond to be provided and maintained in accordance with the Environmental Licenses and Environmental Law.

"**Environmental Claim**" means any Claim alleging or asserting that, in relation to the Project, the Borrower or any of its Subsidiaries is liable under any Environmental and Social Requirements for investigatory costs, cleanup costs, remediation, corrective action, governmental response costs, damage to natural resources (including without limitation wetlands, wildlife, aquatic and terrestrial flora and fauna), damage to the Environment, damage to property, personal injuries, or fines or penalties, in each case arising out of, based on or resulting from:

(a)     any Release;

(b)     any violation of any Environmental Law; or

(c)     any other Environmental or Social Matter.

"**Environmental Law**" means all Applicable Laws of any Governmental Body relating to the protection of the Environment, natural resources, Hazardous Substances including human health and safety, as such relates to exposure to Hazardous Substances, and the rehabilitation, reclamation and closure of lands used in connection with, the Project.

"**Environmental License**" means each Project Authorization required or issued pursuant to Environmental Law or with respect to any Environmental or Social Matter.

11

"**Environmental or Social Matter**" means:

(i)       any Release of Hazardous Substances into the Environment;

(ii)      any nuisance, noise, health and safety at work, industrial illness, or industrial injury due to environmental factors;

(iii)     any conservation, preservation or protection of the Environment;

(iv)      any conservation of archaeological and historical sites;

(v)       any resettlement of or adverse impact to indigenous peoples;

(vi)      labor, worker rights or human rights;

(vii)     any community impact or development activities; and

(viii)    any other matter whatsoever relating to human, environmental or social issues or health and safety that has or could reasonably be expected to have a significant adverse impact or risk relating to the Project.

"**Epiroc Equipment Lease**" means that certain Master Lease Agreement, dated July 10, 2018, by and between the Borrower and Epiroc Financial Solutions USA LLC.

"**Equator Principles**" means those principles set out in the paper entitled "A financial industry benchmark for determining, assessing and managing environmental and social risk in projects" dated June 2013 and available at: https://equator-principles.com/wp-content/uploads/2017/03/equator_principles_III.pdf.

"**EU Bail-In Legislation Schedule**" means the document described as such and published by the Loan Market Association (or any successor person) from time to time.

"**Event of Default**" has the meaning ascribed to it in Section 13.1 (*Events of Default*).

"**Event of Loss**" means an event which causes all or a substantial portion of the Project to be damaged, destroyed or rendered unfit for normal use for any reason whatsoever including through a failure of title.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Senior Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Senior Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Senior Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Senior Lender acquires such interest in the Loan or Commitment or (ii) such Senior Lender changes its lending office, except in each case to the extent that, pursuant to Section 6.1 (*Taxes*), amounts with respect to such Taxes were payable either to such Senior Lender's assignor immediately before such Senior Lender became a party hereto or to such Senior Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 6.1(g) (*Taxes*) and (d) any withholding Taxes imposed under FATCA.

"**Existing Lender**" has the meaning ascribed to it in Section 14.1(b) (*Assignment to by Senior Lenders*).

"**Exit Fee**" has the meaning ascribed to it in Section 5.9(c) (*Exit Fee*).

"**Exit Fee Event**" has the meaning ascribed to it in Section 5.9(c) (Exit Fee).

"**Expropriation Event**" means, with respect to any Project Property (including any rights to use the Project Property) or equity interests of the Borrower or Subordinated Intercompany Debt issued by the Borrower, any action or series of actions, omission or series of omissions, that has the effect of:

(a)     a *de jure* or *de facto* taking, seizure, confiscation, requisition, exercise of rights of eminent domain, public improvement, inverse condemnation, condemnation, rescission or similar action or proceeding, by a Governmental Body of:

     (i)      all or a material portion of the Project;

     (ii)     all or a material portion of the assets of the Borrower (including the RGGS Lease); or

     (iii)    the equity interests of or Subordinated Intercompany Debt issued by the Borrower;

     provided, that (A) insofar as such action relates to a material portion of the Project or the assets of the Borrower, such action shall cause or reasonably be likely to cause a material adverse impact on deliveries of copper on the terms set forth in the Finance Documents or the ability of such Person to operate the Project or perform its obligations under the Finance Documents or (B) such action shall (1) result in a material loss (in each case), irreparable damage to, destruction of any, or diminution in value of the Collateral or otherwise materially and adversely affect (x) the ability of the Secured Parties to access or utilize Collateral or (y) the liens granted in the Collateral pursuant to the Finance Documents or (2) impair to any material extent the validity or priority of any security interest purported to be granted to the Secured Parties under the Finance Documents, except for negotiated expropriations by the government, planned for and agreed upon as part of, and that would not reasonably be expected to result in a material impact on, the expected normal operations of the Project, subject to the approval of the Majority Lenders, such approval not to be unreasonably withheld; or

(b)     any taking or any action by a Governmental Body for the dissolution or disestablishment of the Borrower;

(c)     actually depriving the Borrower whether *de jure* or *de facto* by the implementation of Applicable Law or actions by Governmental Bodies of its rights necessary to construct or operate the Underground Project; or

(d)     a decision of a judicial or arbitral tribunal with respect to any of the events described in paragraphs (a) through (c) above;

provided, that no action described in paragraph (a), (b), (c) or (if the decision of a judicial tribunal or arbitral tribunal is with respect to the events described in paragraph (a), (b) or (c)) (d) above shall constitute a Expropriation Event if it is a *bona fide* non-discriminatory measure of general application of a kind that governments normally take for such purposes as ensuring public safety, protecting the Environment or regulating economic activities, and, where applicable, adequate compensation has been paid to the affected party and does not have a confiscatory effect.

"**Extraordinary Receipts**" means any cash received by or paid to or for the account of any Obligor or any of its Subsidiaries not in the ordinary course of business after the Petition Date consisting of (i) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action that was pending as of the Petition Date, (ii) foreign, United States, state, or local Tax refunds, in each case, net of reasonable and documented costs and expenses associated therewith; provided that, Extraordinary Receipts shall not include sales tax receipts contemplated to be received by any of the Obligors as set forth in the Approved Budget).

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the IRC and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Bodies and implementing such Sections of the IRC.

"**Final Commitment**" means, in respect of each Senior Lender at any time, the amount specified with respect to such Senior Lender on Schedule A (*Commitments*) (as amended in accordance with Section 14.1 (*Assignment by Senior Lenders*) from time to time), as such amount may be reduced from time to time by such Senior Lender's Applicable Percentage of any cancellation of any unused portion of the Final Commitment.

"**Final DIP Recognition Order**" means an order of the Canadian Court in the Recognition Proceedings recognizing the Final Order in the Recognition Proceedings and giving it full force and effect in Canada, in a form acceptable to the Administrative Agent and the Senior Lenders in their sole discretion, on the one hand, and the Borrower on the other hand.

"**Final Loans**" means the loans extended pursuant to Section 2.1(b) (*Loan*).

"**Final Order**" means an order of the Bankruptcy Court in the Chapter 11 Cases, substantially in the form of the Interim Order or with such changes (other than conforming changes necessary to transform the Interim Order into the Final Order) acceptable to the Administrative Agent and the Senior Lenders in their sole discretion, on the one hand, and the Borrower, on the other hand, authorizing and approving on a final basis, among other things, the borrowings by the Borrower under this Agreement.

"**Finance Documents**" means:

(a)      this Agreement;

(b)      the DIP Order;

(c)      each Note;

(d)      the Agency Fee Letter; and

(e)      any Transfer Certificate;

and all other agreements, instruments and documents from time to time (both before and after the date of this Agreement) designated as such by the Administrative Agent and the Borrower.

"**Finance Party**" means each Senior Lender and the Agents.

"**Financial Statements**" means the financial statements required to be delivered pursuant to Sections 11.7(b) (*Quarterly Financial Reporting*).

"**First Day Orders**" has the meaning given to it in Section 12.1(g) (*Conditions Precedent to the Interim Loan*).

"**First Lien Facility**" means that certain Second Amended and Restated Credit Agreement, entered into on or about the October 28, 2022, among the Borrower, the Guarantors, the lenders party thereto and KfW IPEX-Bank as administrative agent (as amended, amended and restated, supplemented or otherwise modified from time to time).

"**First Reporting Date**" has the meaning assigned to such term in Section 11.2(b) (*Approved Budget and Variance Reporting*).

"**Fiscal Quarter**" means each calendar quarter ending on March 31, June 30, September 30 and December 31 of each year.

"**Fiscal Year**" means the period of January 1 to December 31 of each year.

"**Foreign Senior Lender**" means a Senior Lender that is not a U.S. Person.

"**Fourth Lien Facility**" means that certain Third Amended and Restated Loan Agreement, dated as of December 21, 2023, by and among Parent, as borrower, Borrower, as guarantor, the other guarantors party thereto, the lenders party thereto and Pala, as agent and lead arranger (as amended, amended and restated, supplemented or otherwise modified from time to time).

"**Funding Rate**" means in relation to a Loan and Interest Period, the rate which expresses as a percentage rate per annum the average cost (determined either on an actual or a notional basis) which a Senior Lender would incur if it were to fund, from whatever source(s) it may reasonably select, an amount equal to the relevant Loan for a period equal in length to that Interest Period.

"**Good Industry Practice**" means, in relation to any decision, undertaking, practice, method or act, the exercise of that degree of diligence, skill, care, prudence, oversight, economy and stewardship which is commonly observed by skilled and experienced professionals in the United States of America engaged in the mining industry in the same type of decision, undertaking, practice, method or act, as the case may be, under, and with the same or similar circumstances and/or degree of complexity to accomplish the desired result in a manner consistent with applicable standards, equipment manufacturing recommendations, good business practice, reliability, safety, dependability, efficiency, environmental protection and Applicable Law.

"**Governmental Body**" means the government of the United States of America or Canada or any other nation, or of any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, arbitrator or arbitrators, tribunal, central bank or enterprise that is owned, sponsored, or controlled by any government, or any other entity exercising executive, legislative, judicial or arbitral, taxing, regulatory or administrative powers or functions or pertaining to government (including any supra- national bodies such as the European Union or the European Central Bank) and in each case having jurisdiction over an Obligor, the Project, the Project Property or the Finance Documents, as the context may require.

"**Guarantee**" means, with respect to any Person, any direct or indirect liability, contingent or otherwise, of such Person with respect to any Debt of another, including any such Debt directly or indirectly guaranteed,

endorsed (otherwise than for collection or deposit in the ordinary course of business) or discounted or sold with recourse by such Person, or in respect of which such Person is otherwise directly or indirectly liable, including any such Debt in effect guaranteed by such Person through any agreement (contingent or otherwise) to purchase, repurchase or otherwise acquire such Debt or any security therefor, or to provide funds for the payment or discharge of such Debt (whether in the form of loans, advances, stock purchases, capital contributions or otherwise), or to maintain the solvency or any balance sheet or other financial condition of the obligor of such Debt (including keep-well covenants), or to make payment for any products, materials or supplies or for any transportation or services regardless of the non-delivery or non- furnishing thereof, in any such case if the purpose or intent of such agreement is to provide assurance that such Debt will be paid or discharged, or that any agreements relating thereto will be complied with, or that the lender of such Debt will be protected against loss in respect thereof.  The amount of any guarantee shall be equal to the outstanding principal amount of the Debt guaranteed or such lesser amount to which the maximum exposure of the guarantor shall have been specifically limited.

"**Guaranteed Obligations**" has the meaning ascribed to it in Section 10.1(a) (*Guaranty; Limitation of Liability*).

"**Guarantors**" means Parent and each Subsidiary thereof that Guarantees the Obligations pursuant to Article 10 (*Guaranty*).

"**Guaranty**" has the meaning ascribed to it in Section 10.1(a) (*Guaranty; Limitation of Liability*).

"**Hazardous Substances**" means any pollutant, contaminant or deleterious, hazardous or toxic substances, materials or wastes defined, listed, regulated or prohibited in or by any applicable Environmental Law, including toxic mine tailings; radioactive materials; flammable substances; explosives; petroleum and petroleum products; polychlorinated biphenyls; chlorinated solvents; and asbestos or asbestos-containing materials.

"**Hedge Agreements**" means any agreement or instrument relating to hedging, swap, forward, option, future or other derivative transactions in respect of interest rate or copper price exposure (including a swap, option, cap, collar or floor).

"**Hedge Termination Value**" means, in respect of any Hedge Agreement, after taking into account the effect of any legally enforceable netting agreement relating to such Hedge Agreement:

(a)     for any date on or after the date such Hedge Agreement has been closed out and termination value determined in accordance therewith, such termination value; and

(b)     for any date prior to the date referenced in paragraph (a) above, the amount determined as the mark-to-market value for such Hedge Agreement, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedge Agreement.

"**IFC Environmental, Health and Safety Guidelines**" means the following guidelines:

(a)     IFC General Environmental, Health and Safety Guidelines (2007); and

(b)     IFC Environmental, Health and Safety Guidelines for Mining (2007).

"**IFRS**" means the International Financial Reporting Standards adopted by the International Accounting Standards Board from time to time.

"**Indemnified Party**" has the meaning ascribed to such term in Section 7.5(a).

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Finance Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"**Information Officer**" means the information officer appointed by the Canadian Court in the Recognition Proceedings.

"**Initial Approved Budget**" means the first thirteen-week cash flow forecast that has been approved by the Senior Lenders on the Petition Date.

"**Initial Pledged Interests**" has the meaning ascribed to such term in Section 9.1(e)(ii) (*Grant of Security Interest*).

"**Initial Recognition Order**" means an order of the Canadian Court recognizing the Chapter 11 Cases in form and substance satisfactory to the Administrative Agent and the Senior Lenders in their sole discretion.

"**Interest Payment Date**" means, subject to Article 5 (*Interest, Interest Periods and Fees*), the first Business Day of each month.

"**Interest Period**" means each period determined in accordance with Article 5 (Interest, Interest Periods and Fees) of this Agreement and, in relation to overdue amounts, each period determined in accordance with Section 5.2 (*Default Interest*).

"**Interest Rate**" means any interest rate determined in accordance with either Section 5.2 (Interest Rate) or Section 5.7 (*Market Disruption*).

"**Interim Commitment**" means, in respect of each Senior Lender at any time, the amount specified with respect to such Senior Lender on Schedule A (*Commitments*) (as amended in accordance with Section 14.1 (*Assignment by Senior Lenders*) from time to time), as such amount may be reduced from time to time by such Senior Lender's Applicable Percentage of any cancellation of any unused portion of the Interim Commitment.

"**Interim DIP Recognition Order**" means an order of the Canadian Court in the Recognition Proceedings in such form acceptable to the Administrative Agent and the Senior Lenders in their sole discretion, recognizing the Interim Order in the Recognition Proceedings and giving it full force and effect in Canada and granting the DIP Charge, which order for greater certainty may be the supplemental recognition order granted by the Canadian Court concurrently with the Initial Recognition Order.

"**Interim Loans**" means the loans extended pursuant to Section 2.1(a) (*Loan*).

"**Interim Order**" means an order issued by the Bankruptcy Court in the Chapter 11 Cases substantially in the form of Schedule E (*Interim Order*) or with such changes acceptable to the Administrative Agent and the Senior Lenders in their sole discretion, on the one hand, and the Borrower, on the other hand, authorizing and approving on an interim basis, among other things, the borrowings by the Borrower under this Agreement.

"**Investment**" means, with respect to any Person, the making by such Person of:

17

(a)        any direct or indirect investment in or purchase or other acquisition of the securities of or an equity interest in any other Person;

(b)        any loan or advance to, or arrangement for the purpose of providing funds or credit to (excluding extensions of trade credit in the ordinary course of business in accordance with customary commercial terms and excluding advances of cash from the Borrower to Parent in accordance with the terms of the Cash Management Order), any other Person; or

(c)        Investments consisting of money deposits required in connection with surety bonds;

(d)        any capital contribution to (whether by means of a transfer of cash or other property or any payment for property or services for the account or use of) any other Person; provided, that, for greater certainty, an Acquisition shall not be treated as an Investment.

"**IRC**" means the US Internal Revenue Code of 1986, as amended.

"**IRS**" means the United States Internal Revenue Service.

"**Issuer**" means, individually or collectively as the context may require, each of (i) the Borrower, (ii) 0607792 B.C. Ltd., a limited company incorporated under the laws of British Columbia, Canada, and (iii) Lion Iron Corp., a corporation incorporated under the laws of the State of Nevada.

"**Judgment Currency**" has the meaning assigned to that term in Section 25.8 (*Judgment Currency*).

"**KfW IPEX-Bank**" means KfW IPEX-Bank GmbH.

"**Lag Time**" means the time period as stipulated under Section 5.2(d) (*Interest Rate*).

"**Loans**" means, collectively or individually as context requires, the Interim Loans and the Final Loans.

"**Majority Lenders**" means, at any time, one or more Senior Lenders holding in the aggregate more than fifty percent (50%) of the Commitments or, if Loans have been made, of outstanding principal amount of the Loans.

"**Majuba/Renegade Royalty Deed**" means that certain Royalty Deed, dated August 21, 2006, by and between the Borrower, Majuba Mining Ltd. and Renegade Resources Corporation.

"**Material Adverse Effect**" means a material adverse effect on:

(a)        the business, assets, results of operations or financial condition of the Borrower and the Guarantors taken as a whole, excluding the effect of filing the Chapter 11 Cases, the events and conditions customarily resulting from the commencement and continuation of the Chapter 11 Cases, the effects thereof and any action required to be taken under the Finance Documents or the DIP Order, and the Chapter 11 Cases themselves;

(b)        [reserved];

(c)        the ability of the Borrower or any other Obligor, to consummate the transactions contemplated by the Finance Documents or to perform its obligations under the Finance Documents in accordance with their respective terms;

(d)        the validity, legality or enforceability of any Finance Document;

(e)     the rights and remedies of the Administrative Agent or Senior Lenders under the Finance Documents; or

(f)     the validity or priority of any security interest in the Collateral purported to be granted to any Secured Party under the DIP Order.

"**Material Adverse Environmental and Social Effect**" means:

(a)     any fatality;

(b)     any material adverse community or worker-related impact, including any protestation or challenge to the Project; or

(c)     any Environmental or Social Matter that is materially adverse to the Environment or the community or requires material measures or corrective action to remediate or restore the Environment or causes material damage to critical habitats or endangered, threatened or other protected species.

"**Material Project Authorizations**" means any Project Authorization, the breach, loss, modification or termination of which, or failure to obtain, could reasonably be expected to have a material adverse effect on the development, construction, procurement, engineering or operation of commercial production (including commercial production transactions) of the Underground Project.

"**Material Project Documents**" means (a) the RGGS Lease, (b) the NV Energy Power Supply Contract, (c) that certain water service agreement, dated August 10, 2009, by and between the Borrower and the City of Yerington, as amended, and (d) the Additional Material Project Documents, if any.

"**Maturity Date**" means the earliest to occur of (i) the date that is four (4) months following the Petition Date, (ii) forty-five (45) calendar days after the Petition Date if the Final Order has not been entered by the Bankruptcy Court on or before such date, (iii) fourteen (14) calendar days after the Petition Date if the Interim DIP Recognition Order has not been entered by the Canadian Court on or before such date, (iv) the date of consummation of any sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code, (v) the date of "substantial consummation" (as defined in section 1101 of the Bankruptcy Code, and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court, (vi) the date of entry of an order by the Bankruptcy Court approving (a) a motion seeking conversion or dismissal of any or all of the Chapter 11 Cases or (b) a motion seeking appointment or election of a trustee, a responsible officer or examiner with enlarged powers relating to the operation of the Debtors' business, (vii) the date the Bankruptcy Court orders the conversion of the bankruptcy case of any of the Debtors to a liquidation pursuant to chapter 7 of the Bankruptcy Code, and (viii) the date of acceleration of all or any portion of the Loans and the termination of the Commitments upon the occurrence of an Event of Default.

"**Minerals**" means any and all marketable metal bearing material in whatever form or state that is mined, produced, extracted, severed or otherwise recovered from the Project Real Property, and including any such material derived from any processing or reprocessing of any tailings, waste rock or other waste products originally derived from the Project Real Property, and including ore, concentrates, doré, specimens, minerals in solution and any other products resulting from the further milling, processing or other beneficiation of Minerals whether stored or stockpiled on the Project Real Property or elsewhere.

"**Monthly Operations Report**" means a written report prepared by or on behalf of the Borrower in relation to the immediately preceding calendar month (consistent with generally accepted operational reporting

standards common in the mining industry), which report shall include all material information pertaining to the development, production or operations of the Project, including the following information for such quarter:

(a)     a review of the operating activities for the quarter and a report on any material issues arising in connection with the operation and maintenance of the Project;

(b)     details of any new material environmental, social, health or safety activities or events, including any material E&S Events, Environmental Claims, or any material non-compliance with the Environmental and Social Requirements;

(c)     such other information regarding the performance of the Borrower's obligations under the Finance Documents as the Majority Lenders may reasonably request; and

(d)     details of planned or actual material maintenance.

The Monthly Operations Report shall also contain a report on any Encumbrances placed on the Collateral after the Petition Date securing amounts greater than $1,000,000 in the aggregate, other than the Security.

"**Net Cash Proceeds**" means, with respect to any sale of, or any dividend, distribution, return of capital or other return on investment in respect of equity interests, the cash proceeds thereof, net of all Taxes and customary fees, discounts, commissions, costs and other expenses incurred in connection therewith.

"**Net Disposition Proceeds**" means, with respect to any disposition of assets or Expropriation Event, the aggregate amount of cash payments net of (a) the amount of any costs, expenses, commissions and fees paid or payable by or on behalf of the Borrower in connection with such disposition (as evidenced by supporting documentation provided to the Senior Lenders upon request), and (b) any Taxes imposed on and payable or reasonably estimated to be payable by the Borrower as a result of such disposition.

"**Net Insurance Proceeds**" means the aggregate cash proceeds of (a) business interruption insurance (only to the extent the Project is being abandoned) and (b) insurance received by the Borrower in respect of any loss, damage to or destruction of any of the Collateral, in each case, after deducting therefrom all reasonable fees, costs and expenses (including legal and accounting fees) incurred in connection with the collection of such proceeds (as evidenced by supporting documentation provided to the Senior Lenders upon request), without deduction for any insurance premiums or similar payments; provided, however, that insurance proceeds arising from third- party liability insurance shall not constitute Net Insurance Proceeds.

"**Normet Equipment Lease**" means that certain equipment lease agreement, dated January 17, 2019, by and between the Borrower and Normet Americas, Inc.

"**Note**" has the meaning ascribed to such term in Section 2.5(b) (*Evidence of Debt*).

"**NV Energy Power Supply Contract**" means that certain power supply agreement dated November 30, 2018, by and between the Borrower and Sierra Pacific Power Company d/b/a NV Energy as amended by the First Amendment to the Rule 9, Section B.2 High Voltage Distribution Agreement, dated February 21, 2019.

"**NY Fed OBFR**" means the overnight bank funding rate as provided by the Federal Reserve Bank of New York (or a successor administrator) on the New York Fed's Website (currently published on: https://apps.newyorkfed.org/markets/autorates/obfr).

20

"**NY Fed OBFR Adjustment Spread**" means the arithmetic mean (calculated by the Administrative Agent) of the daily difference between SOFR and the NY Fed OBFR over an observation period of the thirty (30) most immediately preceding US SOFR Banking Days for which SOFR was Available.

"**NY Fed Target Rate**" means the short-term interest rate target set by the US Federal Open Market Committee as published by the Federal Reserve Bank of New York on the Federal Reserve's Website from time to time or, if the Federal Open Market Committee does not target a single rate, the mid-point of the short-term interest rate target range set by the Federal Open Market Committee as published on the Federal Reserve's Website (calculated as the arithmetic average of the upper bound of the target range and the lower bound of the target range, rounded, if necessary, upwards to five (5) decimal places).

"**NY Fed Target Rate Adjustment Spread**" means in relation to the NY Fed Target Rate prevailing at the close of business on a US SOFR Banking Day, the twenty (20) percent trimmed arithmetic mean (calculated by the Administrative Agent) of the daily difference between SOFR and the NY Fed Target Rate over an observation period of the five (5) most immediately preceding US SOFR Banking Days for which SOFR was Available.

"**Obligations**" means all indebtedness, liabilities, indemnities and other obligations owed by any Obligor to any Secured Party hereunder or under any other Finance Document, whether actual or contingent, direct or indirect, matured or not, now existing or hereafter arising (including any fees or premium payable hereunder, including the Exit Fee).

"**Obligor**" means each of the Borrower and the Guarantors.

"**Observation Period**" means, in relation to an Interest Period, the time period the beginning of which and the end of which is in each case the Lag Time before the beginning and the end of the relevant Interest Period to which such Observation Period belongs (including the first day but excluding the last day of such time period).

"**OFAC**" means the Office of Foreign Assets Control of the U.S. Department of the Treasury.

"**Officer's Certificate**" means a certificate signed on behalf of any Obligor by the chief executive officer, the chief financial officer or any other officer or representative who has been given sufficient powers and authority under Applicable Law and such Obligor's constitutional documents (or powers of attorney or written resolutions executed in accordance with such Obligor's constitutional documents) and, in each case, whose name appears on a certificate of incumbency delivered to the Administrative Agent concurrently with the execution of this Agreement, as such certificate of incumbency may be amended from time to time (and delivered to the Administrative Agent) to identify names of the individuals then holding such offices or the names of such representatives and the capacity in which they are acting.

"**Offtake Agreement**" means:

(a)      the Aurubis Offtake Agreement; and

(b)      any other offtake arrangements entered into by the Borrower for the sale of copper or other Minerals from the Project.

"**Order**" means any order, directive, decree, judgment, ruling, award, injunction, direction or request of any Governmental Body or other decision-making authority.

"**Other Connection Taxes**" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Finance Document, or sold or assigned an interest in any Loan or Finance Document).

"**Other Rights**" means all licenses, approvals, authorizations, consents, rights (including surface rights, access rights and rights of way), privileges, concessions or franchises held by the Borrower or required to be obtained from any Person (other than a Governmental Body) for the development, construction, procurement, engineering and operation of the Project.

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Finance Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"**Pala**" means Pala Investments Limited.

"**Parent**" means Nevada Copper Corp., a corporation organized under the laws of British Columbia, Canada.

"**Participant**" has the meaning ascribed to such term in Section 14.1(h) (*Assignment by Senior Lenders*).

"**Participant Register**" has the meaning ascribed to such term in Section 14.1(i) (*Assignment by Senior Lenders*).

"**Performance Standards**" means, to the extent applicable to the Borrower or the Underground Project, (i) each of the eight (8) IFC Performance Standards on Environmental and Social Sustainability (January 2012) and (ii) the IFC Environmental, Health and Safety Guidelines.

"**Permitted Asset Disposition**" means, as at any particular time, a sale, transfer or other Disposition of:

(a)     inventory on arm's length terms and in the ordinary course of business;

(b)     tangible personal property that is obsolete, or worn-out property no longer required in the conduct of the Business;

(c)     Transmission Line and associated Project Real Property and access rights to NV Energy pursuant to the terms of the NV Energy Power Supply Contract;

(d)     minerals pursuant to this Agreement, the Streaming Agreement, the Royalty Agreements, the Offtake Agreements or otherwise in the ordinary course of business in compliance with the terms of this Agreement; and

(e)     assets to the extent approved by the Bankruptcy Court and either approved by the Majority Lenders or sold in accordance with the Approved Bidding Procedures;

in each case excluding any such sale, transfer or other disposition of minerals to another Debtor.

"**Permitted Capital Expenditures**" means, with respect to the Borrower, Capital Expenditures that are in accordance with the Approved Budget (subject to Permitted Variances).

"**Permitted Debt**" means:

(a)     the Obligations;

(b)     Debt of the Borrower representing Purchase Money Obligations and Capitalized Lease Obligations not to exceed at any time outstanding the amount permitted by paragraph (i) of the definition of "Permitted Encumbrances";

(c)     in respect of the Borrower, Subordinated Intercompany Debt or intercompany debt permitted by and incurred in accordance with the Cash Management Order;

(d)     [reserved];

(e)     in respect of the Borrower, Debt in respect of performance, surety or completion bonds, standby letters of credit or letters of guarantee securing mine closure, asset retirement, environmental reclamation and labor related obligations of the Borrower to the extent required by Applicable Laws or a Governmental Body; provided, that the aggregate principal amount of all such Debt pursuant to this paragraph (e) incurred by the Borrower and that remains outstanding at any time shall not at any time exceed $15,000,000;

(f)     CAT Equipment Lease, Epiroc Equipment Lease and Normet Equipment Lease;

(g)     [reserved];

(h)     [reserved]; and

(i)     Debt incurred in respect of the Prepetition Funded Debt Liens.

"**Permitted Encumbrances**" means any of the following:

(a)     any Encumbrances created in favor of the Secured Parties or pursuant to the terms of the Finance Documents;

(b)     the Encumbrances securing: (i) the Obligations; (ii) the Adequate Protection Liens; (iii) the Carve-Out; and (iv) the Canadian Priority Charges;

(c)     any Encumbrances arising from any tax, assessment or other governmental charge or other Encumbrances arising by operation of law, in each case if the obligation underlying any such Encumbrances is timely paid, paid under a First Day Order, not yet due or, if due, is being Contested.

(d)     carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Encumbrances arising in the ordinary course of business which are not overdue for a period of more than thirty (30) days or which are subject to Contest and, where Contested, individually or together with all other Permitted Encumbrances outstanding on any date of determination do not materially adversely affect the use of the property to which they relate;

(e)     pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Encumbrances

imposed by ERISA (*The Employee Retirement Income Security Act of 1974* of the United States of America and the rules and regulations promulgated thereunder, together with any successors) or which interferes with the ordinary conduct of business of the Project;

(f)    deposits not to exceed $2,000,000 to secure the performance of bids, trade contracts and leases (other than Debt), statutory obligations, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(g)    easements, rights of way and other similar non-monetary encumbrances affecting real property which do not in any case materially detract from the value of the property subject thereto or interfere with the ordinary conduct of the business of the Borrower;

(h)    Encumbrances securing judgments for the payment of money not constituting an Event of Default hereunder or securing appeal or other surety bonds related to such judgments;

(i)    Encumbrances securing (i) Permitted Debt or (ii) Purchase Money Obligations and Capitalized Lease Obligations, in the case of (i) and (ii) incurred on and after the Petition Date and relating solely to the acquisition of mobile equipment necessary for the development, construction or operation of the Project; provided, that the aggregate amount of the Debt outstanding at any time in respect of the Permitted Debt and the Purchase Money Obligations and Capitalized Lease Obligations referred to in this paragraph (i) of the Borrower shall not exceed $2,000,000;

(j)    the Prepetition Trisura Lien;

(k)     the Prepetition Funded Debt Liens;

(l)    Tax Encumbrances;

(m)    the Prepetition Encumbrances set forth on Schedule B hereto, as may be amended with the consent of the Majority Lenders from time to time; and

(n)    Prepetition Encumbrances that are (i) valid, enforceable, perfected, non-avoidable and in existence immediately prior to the Petition Date or (ii) valid, enforceable, non-avoidable and in existence immediately prior to the Petition Date, that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, up to an aggregate total amount under this paragraph (m) not to exceed $12,000,000.

"**Permitted Transferee**" means (a) any Senior Lender or any Affiliate of any Senior Lender, and (b) any other lending, bank or financial institution which is regularly engaged in or established for the purposes of making or investing in loans.

"**Permitted Variances**" has the meaning ascribed to such term in Section 11.12(z)(2)(iv) (*Negative Covenants*).

"**Person**" means and includes individuals, corporations, bodies corporate, limited or general partnerships, joint stock companies, limited liability companies, joint ventures, associations, companies, trusts, banks, trust companies, funds, Governmental Bodies or any other type of organization or entity, whether or not a legal entity.

"**Petition Date**" has the meaning ascribed to such term in the recitals.

"**Pledged Interests**" has the meaning assigned to such term in Section 9.1(e)(iii) (*Grant of Security Interest*).

"**PPSA**" means the *Personal Property Security Act* (Ontario), the *Personal Property Security Act* (British Columbia) or any other applicable Canadian federal, provincial or territorial statute pertaining to the granting, perfecting, priority or ranking of security interests, liens, and hypothecs on personal property, and any successor statutes, together with any regulations thereunder, in each case as in effect from time to time. References to sections of the PPSA shall be construed to also refer to any successor sections.

"**Prepetition Debt Documents**" has the meaning assigned to such term in the DIP Order.

"**Prepetition Encumbrances**" means Encumbrances arising from obligations or payments that arise or would have been due prior to the Petition Date, including, without limitation, the Prepetition Funded Debt Liens, Prepetition Trisura Lien.

"**Prepetition Funded Debt Liens**" has the meaning assigned to such term in the DIP Order.

"**Prepetition Indebtedness**" means the Debt of the Borrower and its Subsidiaries outstanding immediately prior to the Petition Date.

"**Prepetition Secured Obligations**" has the meaning assigned to such term in the DIP Order.

"**Prepetition Secured Parties**" has the meaning assigned to such term in the DIP Order.

"**Prepetition Trisura Lien**" means the Encumbrance on the assets of the Parent in favor of Trisura Guarantee Insurance Company with respect to surety bonds in an amount not to exceed $14,600,000.

"**Project**" means the Pumpkin Hollow copper project located in Lyon County, Nevada, including all owned or leased fee lands, patented mining claims, unpatented mining claims or mill sites or other interests in real property that contain the Project's ore deposits, which includes the Project Property, whether open-pit, underground or otherwise.

"**Project Authorization**" means an Authorization or other right (including an environmental Authorization) necessary for the development, construction, procurement, engineering and operation of the Underground Project.

"**Project Documents**" means, individually or collectively, as the context may require, the following:

(a)    each Material Project Document;

(b)    any performance bond, advanced payment bond, guarantee or other credit support provided to the Borrower pursuant to any agreement referred to in this definition of "Project Documents"; and

(c)    any other Contract to which the Borrower or its Subsidiaries are a party from time to time in relation to the Project (including any replacement of an existing Project Document) other than a Finance Document or the Working Capital Facility, the First Lien Facility or the Fourth Lien Facility.

"**Project Property**" means all of the property, assets, undertaking, approvals, licenses, permits and rights of the Obligors in and relating to the Project, whether now owned or existing or hereafter acquired or arising, including real property, personal property and mineral interests, and specifically including, but not limited to:

(a)      the Project Real Property and appurtenances thereto, water rights and Minerals;

(b)      all accounts, instruments, chattel paper, deposit accounts, documents, intangibles, goods (including inventory, equipment and fixtures), money, letter of credit rights, supporting obligations, contracts, bonds, claims, causes of action and other legal rights and investment property in each case relating to the Project;

(c)      all products, proceeds (including proceeds of proceeds), rents and profits of the foregoing; and

(d)      all books and records of the Obligors related to any of the foregoing.

"**Project Real Property**" means all real property interests, rights of ways, easements, leases and licenses, whether severed estate or otherwise, all patented mining claims, unpatented mining claims, mineral claims, mineral leases and other mineral rights, water rights, ditch rights, interests in any ditch company or cooperative, weirs, pipes, concessions and interests, and all surface access rights held by any Obligor relating to the Project (which as of the date hereof, are as set forth on Schedule J (*Project Real Property*)), and all buildings, structures, improvements, appurtenances and fixtures thereon or attached thereto, whether created privately or by the action of any Governmental Body. "**Project Real Property**" shall also include any term extension, renewal, replacement, conversion or substitution of any such real property interests, mineral claims, mineral leases, mineral rights, waste dump, heap leach pad and any material placed thereon, whether currently in process or abandoned, concessions or interests, and surface access rights, owned or in respect of which an interest is held, directly or indirectly, by any Obligor at any time during the term of this Agreement, whether or not such ownership or interest is held continuously.

"**Proposed Budget**" means the rolling thirteen-week cash flow forecast delivered by the Obligors to the Administrative Agent and Senior Lenders in accordance with Section 11.2(a) of this Agreement (*DIP Budget and Variance Reporting*).

"**Purchase Money Obligations**" means the outstanding balance of the purchase price of real and/or personal property, title to which has been acquired or will be acquired upon payment of such purchase price, or indebtedness to non-vendor third parties incurred to finance the acquisition of such new and not replacement real and/or personal property, or any refinancing of such indebtedness or outstanding balance.

"**Receivables**" has the meaning ascribed to such term in Section 9.1(d) (*Grant of Security Interest*).

"**Recipient**" means (a) the Administrative Agent or (b) any Senior Lender.

"**Recognition Proceedings**" has the meaning ascribed to such term in the recitals.

"**Recovered Amount**" has the meaning ascribed to such term in Section 18.1 (*Payments to Finance Parties*).

"**Recovering Finance Party**" has the meaning ascribed to such term in Section 18.1 (*Payments to Finance Parties*).

"**Redistributed Amount**" has the meaning ascribed to such term in Section 18.4(a) (*Reversal of Redistribution*).

"**Reference Rate**" means Term SOFR, each Compounded SOFR Reference Rate and any other reference interest rate selected by the Majority Lenders in consultation with the Borrower.

"**Reference Rate Determination Date**" means, in relation to an Interest Period for which a variable interest rate is to be determined:

(a)     [reserved];

(b)     if the Reference Rate is Term SOFR, the second US SOFR Banking Day before the first day of that Interest Period;

(c)     if the Reference Rate is any Compounded SOFR Reference Rate, the US SOFR Banking Day immediately following the last day of the Observation Period relating to the relevant Interest Period; and

(d)     in relation to any other Reference Rate, the date as determined by the Majority Lenders in accordance with market practice for such Reference Rate;

provided that, if market practice differs or changes in the relevant market with respect to any of the Reference Rates, the Reference Rate Determination Date for such Reference Rate will be determined by the Majority Lenders in accordance with the market practice applicable in the relevant market and notified to the Borrower by way of a Technical Adjustment Notification.

"**Reference Rate Non-Utilisation Event**" means any of the following events in relation to a Reference Rate:

(a)     *Unavailability*.  The Reference Rate is Unavailable; or

(b)     *Non-representativeness*.  The later of (x) one (1) month and (y) the future date specified in the relevant official statement has passed since the supervisor of the administrator of a Reference Rate has published an official statement that the relevant Reference Rate is no longer or, as of a specified future date will no longer be, representative of the underlying market or the economic reality that it is intended to measure and that such representativeness will not be restored (as determined by such supervisor) and such official statements is made with awareness that any such announcement or publication will engage certain triggers for fallback provisions in contracts which may be activated by any such pre-cessation announcement or publication;

and such Reference Rate Non-Utilisation Event is continuing on a Reference Rate Determination Date if on such date:

(i)     in relation to clause (a) above, the Reference Rate remains Unavailable; and

(ii)     in relation to clause (b) above, the supervisor has not revoked or rescinded its official statement or has in any other way re-confirmed the representativeness of the relevant Reference Rate.

"**Register**" has the meaning ascribed to such term in Section 14.1(f) (*Assignment by Senior Lenders*).

"**Related Contracts**" has the meaning ascribed to such term in Section 9.1(d) (*Grant of Security Interest*).

"**Related Party**" means, with respect to any Person (the "first named Person"), any Person that does not deal at arm's length with the first named Person or is an associate of the first named Person and, in the case of any Obligor, includes:

(a)    any director, officer, employee or associate of Pala or any of its Affiliates;

(b)    any Person that does not deal at arm's length with Pala or any of its Affiliates; and

(c)    any Person that does not deal at arm's length with, or is an associate of, a director, officer, employee or associate of Pala or any of its Affiliates.

"**Release**" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration of Hazardous Substances into the indoor or outdoor Environment, including the movement of such Hazardous Substances through ambient air, soil, surface water, groundwater, wetlands, land or subsurface strata.

"**Reporting Week**" has the meaning assigned to such term in Section 11.2(b) (*Approved Budget and Variance Reporting*).

"**Rolling Four-Week Testing Date**" has the meaning assigned to such term in Section 11.2(c) (*Approved Budget and Variance Reporting*).

"**Rolling Four-Week Testing Period**" has the meaning assigned to such term in Section 11.2(c) (*Approved Budget and Variance Reporting*).

"**Rolling Four-Week Variance Report**" has the meaning assigned to such term in Section 11.2(c) (*Approved Budget and Variance Reporting*).

"**Remedies Notice Period**" has the meaning assigned to such term in Section 13.2(a)(iii) (*Remedies Upon Default*).

"**Resolution Authority**" means anybody which has authority to exercise any Write-Down and Conversion Powers.

"**Restricted Payment**" means any payment by a Person to:

(a)    any other Person, of dividends or other distribution (whether in cash, securities or other property or assets) and any return of capital including any payment in respect, or on the redemption, of any share capital whether at a premium or otherwise;

(b)    any other Person on account of any payment of interest, principal or any other amount in respect of any loans or loan notes or in respect of any financial indebtedness owed by the Borrower (other than (i) any adequate protection payments for the benefit of the Prepetition Secured Parties as set forth in the DIP Order or (ii) any repayment of the Working Capital Facility, solely to the extent paid from the proceeds of the WCF Collateral, in each case, as expressly provided for in the Interim Order or in the Approved Budget);

(c)    [reserved];

(d)    any other Person of any payment of any management, administration, advisory, consultancy or other similar type of fees or expenses made by the Borrower to any of its Affiliates (but excluding any amount paid by the Borrower to its Affiliates in reimbursement of costs and expenses incurred (i) by such Affiliate and (ii) any amounts paid to cure contracts assumed in connection with an Approved Sale on behalf of the Borrower, in each case to the extent approved by the Administrative Agent); and

(e)    redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire equity interest of such Person now or hereafter outstanding;

provided that Restricted Payment shall not include any payment to any Debtor (other than Parent), any advances of cash from the Borrower to Parent in accordance with the terms of the Cash Management Order, or any payments made with the consent of the Majority Lenders.

"**RGGS Lease**" means that certain Mining Lease, dated May 4, 2006 by and between the Borrower and RGGS Land & Mineral Ltd., L.P, as amended.

"**RGGS Royalty Deed**" means that certain Royalty Deed, dated January 10, 2017 by and between the Borrower and RGGS Land & Mineral Ltd., L.P.

"**Royalties**" means those royalties for which the Borrower is liable under the Royalty Agreements.

"**Royalty Agreements**" means each of: (a) RGGS Royalty Deed and royalty payable under the RGGS Lease and (b) Majuba/Renegade Royalty Deed.

"**Sale-Leaseback**" means an arrangement under which title to any property or an interest therein is transferred by or on the direction of a Person ("**X**") to another Person which leases or otherwise grants the right to use such property, asset or interest (or other property, which X intends to use for the same or a similar purpose) to X (or nominee of X), whether or not in connection therewith X also acquires a right or is subject to an obligation to acquire the property, asset or interest, and regardless of the accounting treatment of such arrangement.

"**Sale Approval Order**" has the meaning given to it in Section 11.13(j) (*Milestones*).

"**Sale Transaction**" has the meaning given to it in Section 11.13(j) (*Milestones*).

"**Sanctioned Jurisdiction**" means, at any time, a country, territory or geographical region which is itself the subject or target of any comprehensive territorial-based Sanctions.

"**Sanctions**" means any laws, rules, regulations and requirements relating to economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by any U.S. Governmental Body (including, but not limited to, OFAC and the U.S. Department of State), the United Nations Security Council, the European Union and each of its member states, His Majesty's Treasury of the United Kingdom, any Governmental Body of Canada (including but not limited to, Global Affairs Canada and Public Safety Canada), or any other relevant Governmental Body with jurisdiction over the Obligors or any of their Subsidiaries.

"**Sanctions List**" means any list of designated Persons that are the subject or target of Sanctions, including, without limitation: (a) the Specially Designated Nationals and Blocked Persons List maintained by OFAC; (b) the Consolidated United Nation Security Council Sanctions List; (c) the consolidated list of persons, groups and entities subject to EU financial sanctions maintained by the European Union; (d) the Consolidated List of Financial Sanctions Targets in the UK maintained by Her Majesty's Treasury of the United Kingdom; and (e) the Consolidated Canadian Autonomous Sanctions List maintained by Global Affairs Canada.

"**Sanctions Target**" means any Person:

(a)    identified on any Sanctions List;

(b)      located, organized or resident in, or the government or any agency or instrumentality of the government of, any Sanctioned Jurisdiction;

(c)      owned or controlled by, or acting for or on behalf of, one or more Persons described in the foregoing paragraph (a) or (b);

(d)      otherwise the subject or target of any Sanctions.

"**Secured Parties**" means, collectively, the Agents and the Senior Lenders.

"**Security**" means the Encumbrances granted in favor of the Collateral Agent pursuant to the Finance Documents.

"**Senior Lender**" means each Person that is a party on the date hereof to this Agreement as an "initial Senior Lender" and each other lender party hereto from time to time pursuant to Section 14.1 (Assignment by Senior Lenders), and their respective permitted successors and assigns.

"**Sharing Finance Parties**" has the meaning ascribed to such term in Section 18.2 (*Redistribution of Payments*).

"**Sharing Payment**" has the meaning ascribed to such term in Section 18.1(c) (*Payments to Finance Parties*).

"**SOFR**" means the secured overnight financing rate (SOFR) administered by the Federal Reserve Bank of New York (or any other person which takes over the administration of that rate) published (before any correction, recalculation or republication by the administrator) by the Federal Reserve Bank of New York (or any other person which takes over the publication of that rate) on the relevant date at approximately 8:00 a.m. New York time.

"**SOFR Daily Rate**" means, in relation to any US SOFR Banking Day:

(a)      the SOFR rate for that US SOFR Banking Day; or

(b)      if SOFR is Unavailable for that US SOFR Banking Day, the percentage rate per annum which is the aggregate of:

(i)      the NY Fed Target Rate for that US SOFR Banking Day; and

(ii)     the applicable NY Fed Target Rate Adjustment Spread; or

(c)      if both rates stipulated under clauses (a) and (b) above are Unavailable, the percentage rate per annum which is the aggregate of:

(i)      the NY Fed OBFR for that US SOFR Banking Day; and

(ii)     the applicable NY Fed OBFR Adjustment Spread.

"**SOFR Index**" means, either:

(a)      the publicly available index produced by the Federal Reserve Bank of New York (before any correction, recalculation or republication by its administrator) which measures the cumulative

impact of compounding SOFR on a unit of investment over time, with the initial value set to 1.00000000 on 2 April 2018; or

(b)     any other publicly available index which is produced by an administrator (before any correction, recalculation or republication by its administrator) which measures the cumulative impact of compounding SOFR on a unit of investment over time using a compounding methodology which is the same as that specified in this Agreement for the calculation of the Compounded SOFR Calculated Daily Rate,

as published by such administrator or on a page or screen of an information service and, with respect to clause (b) above, specified as the "SOFR Index" by the Administrative Agent in a Technical Adjustment Notification.

"**Streaming Agreement**" means the purchase and sale agreement dated December 21, 2017 (as amended, amended and restated, modified or supplemented from time to time), by and among the Borrower, the Parent and Triple Flag.

"**Streaming Documents**" mean the Streaming Agreement and each "Security Document" under and as defined in the Streaming Agreement.

"**Subordinated Intercompany Debt**" means any debts, liabilities or obligations owing by an Obligor to any other Obligor, on any account and in any capacity, subordinated in accordance with the provisions of the Subordination Agreement.

"**Subordination Agreement**" means a Subordination Agreement in favor of the Collateral Agent in respect of Subordinated Intercompany Debt substantially in the form of Schedule L (*Terms of Subordination*) to this Agreement.

"**Subsidiary**" means with respect to any Person, any other Person which is Controlled directly or indirectly by that Person, and "**Subsidiaries**" means all of such other Persons.

"**Tax Returns**" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes, including any schedule or attachment thereto or amendment thereof.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Body, including any interest, additions to tax or penalties applicable thereto.

"**Tax Encumbrance**" means the liens placed on the Project for delinquent tax payments as set forth on that certain Notice of Seizure from the Assessor of Lyon County, Nevada dated April 23, 2024.

"**Technical Adjustment Notification**" has the meaning ascribed to such term in Section 5.2(g) (*Interest Rate*).

"**Term SOFR**" means, for the relevant Interest Period, the publicly available percentage rate per annum (before any correction, recalculation or republication by its administrator) which:

(a)     is a forward-looking term rate based on SOFR;

(b)     is produced by an administrator;

(c)     is constituted as a term adjusted SOFR reference rate for a period equal in length to the Interest Period and uses a term adjustment methodology approved by the relevant supervisory authority of the administrator;

(d)     is made available on the relevant Reference Rate Determination Date; and

(e)     is specified as the "Term SOFR" for this Agreement by the Administrative Agent in a Technical Adjustment Notification;

as such rate is quoted in the USD wholesale market on the relevant Reference Rate Determination Date for the same period as the relevant Interest Period or, if none of the periods available are the same as that Interest Period, interpolating, where appropriate, between the yield quotations for the next shorter and next longer maturities; provided that if no such Term SOFR rates are published or provided on the relevant Reference Rate Determination Date and it is therefore not possible for the Administrative Agent to determine the relevant Term SOFR on the basis of this paragraph, but any such rates were published or were otherwise available for any US SOFR Banking Day within the last five (5) US SOFR Banking Days before the relevant Reference Rate Determination Date, the Administrative Agent will use the relevant most recent rate(s) available for determining and/or calculating (e.g. by way of interpolation) the relevant Term SOFR for the relevant Interest Period and Term SOFR shall be deemed to be Available.

"**Termination Amounts**" means the Hedge Termination Value described in paragraph (a) of the definition thereof payable by the Borrower in connection with an early termination (whether as a result of the occurrence of an event of default thereunder or other termination event) of any Hedge Agreement in accordance with the terms thereof; provided, that, for the avoidance of doubt, "Termination Amounts" shall not include any regularly scheduled payments due under any Hedge Agreement from time to time, calculated in accordance with the terms of such Hedge Agreement, including all cash settlement payments due in connection with interest rate swaps and forward- starting interest rate swaps due under any such Hedge Agreement.

"**Termination Declaration**" has the meaning assigned to such term in Section 13.2(a)(iii) (*Remedies Upon Default*).

"**Termination Declaration Date**" has the meaning assigned to such term in Section 13.2(a)(iii) (*Remedies Upon Default*).

"**Termination Declaration Notice**" has the meaning assigned to such term in Section 13.2(a)(iii) (*Remedies Upon Default*).

"**Total Commitments**" means $60,000,000.

"**Total Tested Disbursements**" has the meaning given such term in Section 11.12(z)(2)(iv) (*Negative Covenants*).

"**Transfer Certificate**" means a certificate substantially in the form set out on Schedule M (*Transfer Certificate*) with any amendments which the Administrative Agent may approve or reasonably require or any other form agreed between the Administrative Agent and the Borrower.

"**Transfer Date**" means the Transfer Date as indicated on the Transfer Certificate delivered pursuant to Section 14.1(c) (*Assignment by Senior Lenders*).

"**Transmission Line**" means the 120 kV transmission line from the Wassuk substation to the Project, owned and operated by Sierra Pacific Power Company d/b/a NV Energy.

"**Triple Flag**" means Triple Flag International Ltd.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, that, if by reason of mandatory provisions of law, perfection or the effect of perfection or non-perfection or the priority of the security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority and for purposes of definitions related to such provisions.

"**Unavailability of a Reference Rate**" means Reference Rates whereby:

(a)     *Factual*.  no screen rate(s) of the relevant Reference Rate is or are published or are in any other way provided by the administrator of such Reference Rate on the relevant Reference Rate Determination Date or for the relevant Observation Period and no other means exist or calculations are possible for the Administrative Agent (including by way of interpolation) to determine the relevant Reference Rate on its Reference Rate Determination Date;

(b)     *Legal*. it is prohibited or in any other way unlawful for the Administrative Agent, a Senior Lender or the Borrower the use such Reference Rate under this Agreement, in particular for calculating or paying interest;

(c)     *Identity change*.  the methodology, economic characteristics or formulas for calculating the Reference Rate have materially changed; provided that as long as the underlying interest or market or economic reality that the Reference Rate is intended to measure remains unchanged, any change in formulas, economic characteristics or other methodology is not considered material; or

(d)     *Other*.  the relevant Reference Rate may, for any other reason in the reasonable opinion of the Majority Lenders no longer be used for the purposes of this Agreement;

and, correspondingly, such Reference Rate is "**Available**" if it is not Unavailable.

"**Underground Minerals**" means any and all marketable metal bearing material in whatever form or state that is mined, produced, extracted or otherwise recovered from underground operations of the Project including any such material derived from any processing or reprocessing of any tailings, waste rock or other waste products originally derived from those underground operations, and including ore and any other products resulting from the further milling, processing or other beneficiation of such material, including concentrates, derived from those underground operations.

"**Underground Project**" means that portion of the Project that is or was used or is or will be reasonably expected to be used, for or in connection with the exploration, development, extraction, beneficiation, processing, treatment, refining, transportation, sale or commercialization of Underground Minerals.

"**Unpaid Sum**" means any sum due and payable but unpaid by an Obligor under the Finance Documents.

"**Unused Commitment**" means, in respect of each Senior Lender at any time, such Senior Lender's Commitment (including, for the avoidance of doubt, the Interim Commitment and Final Commitment) *minus* the aggregate of (i) the principal amount of Loans then held by such Senior Lender, (ii) the principal

that was held by such Senior Lender and prepaid by the Borrower and (iii) the principal that was held by such Senior Lender and assigned to another Senior Lender.

"**Unused Commitment Fee**" has the meaning ascribed to it in Section 5.9(a) (*Unused Commitment Fee*).

"**Upfront Fee**" means the upfront fee payable to the Senior Lenders in accordance with Section 5.9(b)(*Fees*).

"**USA PATRIOT ACT**" means the *Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act* of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)), as amended or modified from time to time.

"**U.S. Person**" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the IRC.

"**US SOFR Banking Day**" means any day other than (i) a Saturday or Sunday or (ii) a day on which the Securities Industry and Financial Markets Association (or any successor organization) recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in US Government securities.

"**U.S. Tax Compliance Certificate**" has the meaning specified in Section 6.1(g)(ii)(B)(3) (Taxes).

"**Utilization**" means the borrowing of a Loan.

"**Utilization Date**" means the date of a Utilization, being the date on which the relevant Loan is made or is to be made.

"**Utilization Request**" means a written notice (substantially in the form set out on Schedule N (*Utilization Request*)) requesting a Utilization in accordance with Section 3.1 (*Delivery of a Utilization Request*).

"**WCF Collateral**" means the as extracted copper concentrates from the Underground Project, together with any such copper concentrates in process and finished goods inventory derived therefrom located at such Underground Project, and all proceeds thereof.

"**WCF Intercreditor Agreement**" means the intercreditor agreement, dated on or about the May 22, 2019, entered into by and among KfW IPEX-Bank (on behalf of the secured parties under the First Lien Facility), the secured parties under the Streaming Documents and the secured parties under the Working Capital Facility (as amended, amended and restated, supplemented or otherwise modified from time to time).

"**Weekly Reporting Date**" has the meaning assigned to such term in Section 11.2(b) (*Approved Budget and Variance Reporting*).

"**Weekly Variance Report**" has the meaning assigned to such term in Section 11.2(b) (*Approved Budget and Variance Reporting*). "**Withholding Agent**" means the Borrower and the Administrative Agent.

"**Working Capital Facility**" means the Advance Payment Agreement, entered into on or about the May 6, 2019 among the Borrower and Concord (as amended, amended and restated, supplemented or otherwise modified from time to time).

"**Working Capital Facility Documents**" means (i) the WCF Intercreditor Agreement; (ii) the Working Capital Facility; (iii) the Third Lien Security Agreement entered into on or about May 6, 2019, by and

among the Borrower, Concord, as collateral agent, and Concord, as secured party (as amended, amended and restated, supplemented or otherwise modified from time to time); (iv) the Third Lien Pledge Agreement entered into on or about May 6, 2019, by and among the Borrower, Concord, as collateral agent, and Concord, as secured party (as amended, amended and restated, supplemented or otherwise modified from time to time); and (v) the Third Lien Deed of Trust entered into on or about May 6, 2019, by the Borrower, as trustor, in favor of the trustee named therein for the benefit of Concord, as beneficiary (as amended, amended and restated, supplemented or otherwise modified from time to time).

"**Write-down and Conversion Powers**" means, in relation to any Bail-In Legislation described in the EU Bail-In Legislation Schedule from time to time, the powers described as such in relation to that Bail-In Legislation in the EU Bail-In Legislation Schedule.

**1.2**     **Certain Rules of Interpretation**.

In this Agreement, unless otherwise specifically <u>provided</u> or unless the context otherwise requires:

(a)     the terms "Agreement," "this Agreement," "the Agreement," "hereto," "hereof," "herein," "hereby," "hereunder" and similar expressions refer to this Agreement in its entirety and not to any particular Article, Section, Schedule, or other portion hereof or thereof;

(b)     references to a "paragraph," "Section" or "Article" followed by a number or letter refer to the specified paragraph, Section or Article of this Agreement;

(c)     the division of this Agreement into articles, sections and paragraphs and the insertion of headings are for convenience reference only and shall not affect the construction or interpretation of this Agreement;

(d)     words importing the singular shall include the plural and vice versa, and words importing gender shall include all genders;

(e)     the words "including," "includes" and "include" shall be deemed to be followed by the words "without limitation";

(f)     the terms "party" and "the parties" refer to a party or the parties to this Agreement, and references to a Person in this Agreement means such Person or its successors or permitted assigns;

(g)     the term "continuing," when used in relation to a Default or Event of Default, means that such Default or Event of Default is continuing unremedied or unwaived in accordance with the terms of the Finance Documents;

(h)     the term "repay" (or any derivative form thereof) shall, subject to any contrary indication, be construed to include "prepay" (or, as the case may be, the corresponding derivative form thereof);

(i)     the words "will" and "shall" are to be treated as synonymous;

(j)     references to agreements (including this Agreement) and other contractual instruments shall be deemed to include all subsequent amendments and other modifications thereto, but only to the extent such amendments and other modifications are not prohibited by the terms of this Agreement;

(k)     references to statutes or regulations are to be construed as including all statutory and regulatory provisions consolidating, amending, supplementing, interpreting or replacing the statute or regulation referred to;

(l)     except as otherwise specifically provided herein, where any payment is required to be made or any other action is required to be taken on a particular day and such day is not a Business Day and, as a result, such payment cannot be made or action cannot be taken on such day, then this Agreement shall be deemed to provide that such payment shall be made or such action shall be taken on the next Business Day in the same calendar month (if there is one) or the immediately preceding Business Day (if there is not);

(m)     an amendment includes a supplement, novation, extension (whether of maturity or otherwise), restatement, re-enactment or replacement (however fundamental and whether or not more onerous) and amended will be construed accordingly;

(n)     a period equal in length to an Interest Period shall disregard any inconsistency arising from the first or last day of that Interest Period being adjusted or determined pursuant to the Business Day rules or other terms of this Agreement;

(o)     a page or screen of an information service displaying a rate shall include:

     (i)     any replacement page of that information service which displays that rate; and

     (ii)     the appropriate page of such other information service which displays that rate from time to time in place of that information service,

     and, if such page or service ceases to be available, shall include any other page or service displaying that rate specified by Majority Lenders; and

(p)     a law or provision of law is a reference to that law or provision as amended and includes any subordinate legislation.

**1.3**     **Currency**.

Any reference in this Agreement to currency, "**Dollar**", "**U.S. Dollar**" or to "**$**", unless otherwise expressly indicated, shall be to the lawful currency of the United States of America, being referred to herein as United States dollars.  Any amounts to be advanced, paid, prepaid, or repaid shall be made in United States dollars.

**1.4**     **Time of Essence**.

Time shall be of the essence of this Agreement.

**1.5**     **Knowledge**.

Where any representation or warranty contained in this Agreement is expressly qualified by reference to the "knowledge" of a Person, it shall be deemed to refer to the actual knowledge of any Chief Executive Officer, Chief Financial Officer, General Counsel, Chief Operations Officer, any Vice President or any other officer or director (or Person performing any role of substantially the same scope and responsibility of any of the foregoing) of such Person and all information which ought to have been known by any of them after conducting a reasonable inquiry into the matters in question, whether or not any such inquiry was actually made; <u>provided</u>, that each such Person shall be deemed to have knowledge of all events,

conditions and circumstances described in any notice delivered to the Borrower pursuant to the terms of this Agreement or any other Finance Document.

**1.6**    **No Subordination**.

The use of the term "Permitted Encumbrances" to describe any interests and Encumbrances permitted hereunder shall mean that they are permitted to exist (whether in priority to, *pari passu* with or subordinated to the Security, as determined by Applicable Law or set forth in the DIP Order) and shall not be interpreted as meaning that such interests and Encumbrances are entitled to priority over the Security.

**1.7**    **Conflict**.

In the case of any conflict or inconsistency between this Agreement (or any Finance Document) and any DIP Order, the applicable DIP Order shall govern.

**Article 2**
**LOANS**

**2.1**    **Loan**.

Subject to the terms of this Agreement, each of the Senior Lenders severally agrees to make available to the Borrower:

(a)    Upon entry of the Interim Order, a term loan in an aggregate amount equal to the Interim Commitments of such Senior Lender; and

(b)    Upon entry of the Final Order, a term loan in an aggregate amount equal to the Final Commitments of such Senior Lender.

**2.2**    **Finance Parties' Rights and Obligations**.

(a)    The obligations of each Finance Party under the Finance Documents are several.  Each Senior Lender is severally liable for its Commitment and the Senior Lenders are not jointly liable or jointly and severally liable.  No Senior Lender shall be responsible for the failure of any other Senior Lender to so make its Loans.

(b)    Failure by a Finance Party to perform its obligations under the Finance Documents does not affect the obligations of any other Finance Party under the Finance Documents.

(c)    No Finance Party is responsible for the obligations of any other Finance Party under the Finance Documents.

(d)    The rights of each Finance Party under, or in connection with, the Finance Documents are separate and independent rights.

(e)    Any debt arising under the Finance Documents to a Finance Party from the Borrower is a separate and independent debt in respect of which a Finance Party shall be entitled to enforce its rights in accordance with this paragraph (e).  The rights of each Finance Party include any debt owing to that Finance Party under the Finance Documents and, for the avoidance of doubt, any part of a Loan or any other amount owed by the Borrower which relates to a Finance Party's participation in a

Loan or its role under a Finance Document (including any such amount payable to an Agent on its behalf) is a debt owing to that Finance Party by the Borrower.

**2.3    Purpose and Use of Proceeds**.

The Borrower shall use the proceeds of the Loans in accordance with this Agreement and the Approved Budget for (a) working capital costs and general corporate purposes, (b) costs and expenses in connection with the Chapter 11 Cases (including costs and expenses incurred in connection with the Recognition Proceedings), (c) amounts owing under or in connection with the Finance Documents and (d) other purposes permitted by the Approved Budget. The  proceeds of the Loans shall not be applied to (i) any amounts owing under any other Debt, except to the extent permitted by the Approved Budget or (ii) investigating, challenging, objecting to or contesting the validity, security, perfection, priority, extent or enforceability of any amount due under, or the liens or claims granted under or in connection with, this Agreement or any of the Prepetition Debt Documents; provided that, the official committee of unsecured creditors (the "**Creditors' Committee**") appointed in the Chapter 11 Cases, if any, may use up to $50,000 to investigate (but not seek formal discovery in connection with or commence any challenge or objection to or prosecution of) any such claims or causes of action; provided further that the foregoing shall not affect the ability of the Information Officer to conduct an ordinary course security review, as appropriate. The proceeds of the Loans shall not be distributed to, or used for the benefit of, any non-Debtor affiliates or subsidiaries of the Debtors, or applied toward (directly or indirectly) their administration without the prior written approval of the Majority Lenders.

**2.4    Monitoring**.

No Finance Party is bound to monitor or verify the application of any amount borrowed pursuant to any Finance Document.

**2.5    Evidence of Debt**.

(a)    Each Senior Lender may maintain in accordance with its usual practice an account or accounts evidencing the Debt of the Borrower to such Senior Lender resulting from each Loan made by such Senior Lender, including the amounts of principal and interest payable and paid to such Senior Lender from time to time hereunder.  In the case of a Senior Lender that does not request, pursuant to <u>clause (b)</u> below, execution and delivery of a Note evidencing the Loans made by such Senior Lender to the Borrower, such account or accounts shall, to the extent not inconsistent with the notations made by the Administrative Agent in the Register, be prima facie evidence of such Debt of the Borrower absent manifest error; <u>provided</u>, that the failure of any Senior Lender to maintain such account or accounts or any error in any such account shall not limit or otherwise affect any repayment obligations of the Borrower hereunder.

(b)    The Borrower agrees that, upon the request by any Senior Lender, the Borrower will execute and deliver to such Senior Lender a promissory note substantially in the form of Schedule O (*Form of Note*) (each, a "**Note**") payable to such Senior Lender in an amount equal to such Senior Lender's Loans evidencing the Loans made by such Senior Lender.  The Borrower hereby irrevocably authorizes each Senior Lender to make (or cause to be made) appropriate notations on the grid attached to such Senior Lender's Notes (or on any continuation of such grid), which notations, if made, shall evidence, inter alia, the date of, the outstanding principal amount of, and the interest rate and Interest Period applicable to the Loans evidenced thereby.  Such notations shall, to the extent not inconsistent with the notations made by the Administrative Agent in the Register, be prima facie evidence of the applicable Debt of the Borrower absent manifest error; <u>provided</u>, that the failure of any Senior Lender to make any such notations or any error in any such notations shall

not limit or otherwise affect any obligations of the Borrower. A Note and the obligation evidenced thereby may be assigned or otherwise transferred in whole or in part only in accordance with Section 14.1(b) (*Assignment by Senior Lenders*). Any Note issued under this Agreement need not be presented or surrendered for any payment made by the Agents.

**Article 3**
**UTILIZATION OF LOANS**

**3.1    Delivery of a Utilization Request**.

(a)    Subject to the conditions referred to in Article 12 (*Conditions Precedent*) having been satisfied in accordance with the provisions of this Agreement, the Borrower may utilize the Loans by delivering to the Administrative Agent a duly completed Utilization Request not later than 12:00 noon New York time (x) one (1) Business Day prior to the proposed Utilization Date for the Interim Loan and (y) two (2) Business Days prior to the proposed Utilization Date for the Final Loans (in each case, or such later time approved by the Majority Lenders in their reasonable discretion).

(b)    Each Utilization Request shall be substantially in the form of Schedule N (*Utilization Request*) and shall include all certifications and documentation required therein.

**3.2    Completion of a Utilization Request**.

Each Utilization Request is irrevocable and shall not be regarded as having been duly completed unless:

(a)    the Utilization Request includes a certification by the Borrower that the Utilization will be used for the purposes set out in Section 2.3 (*Purpose and Use of Proceeds*);

(b)    the proposed Utilization Date is a Business Day;

(c)    the currency and amount of the Utilization shall be Dollars;

(d)    the Utilization Request specifies the wire instructions for transfer of the proceeds of the Loan;

(e)    the proposed Interest Period specified therein complies with Article 5 (*Interest, Interest Periods and Fees*); and

(f)    the Utilization Request is executed by a Person duly authorized to do so on behalf of the Borrower.

**3.3    [Reserved]**.

**3.4    Notification of Utilization of the Loan**.

Following the delivery of a duly completed Utilization Request by the Borrower, the Administrative Agent shall promptly notify each Senior Lender of the proposed Utilization Date, Interest Period and the amount of such Senior Lender's share of the proposed Loan.

**3.5    Senior Lenders' Participation**.

(a)    If the conditions set out in this Agreement have been met, and subject to Article 4 (*Repayment, Prepayment and Cancellation*), each Senior Lender shall make its participation in each Loan available on or prior to 10:00 a.m. New York time on the applicable Utilization Date through its lending office.

(b)  The amount of each Senior Lender's participation in each Loan shall be pro rata to its Unused Commitment immediately prior to making the Loan.

**3.6**  **Partial Payments**.

(a)  Subject to Section 13.4, if the Administrative Agent receives a payment for application against amounts due in respect of this Agreement that is insufficient to discharge all the amounts then due and payable by the Borrower under this Agreement, the Administrative Agent, subject to the terms of the DIP Order, shall apply such payment towards the obligations of the Borrower under this Agreement in the following order:

(i)  **first**, in or towards payment of any unpaid fees, expenses, indemnities, losses or other amounts owing to the Agents under the Finance Documents;

(ii)  **secondly**, in or towards payment *pro rata* of any accrued interest, fee (including, without limitation, the Unused Commitment Fee and the Exit Fee) or commission of the Loans due but unpaid under this Agreement;

(iii)  **thirdly**, in or towards payment *pro rata* of any principal of the Loans due but unpaid under this Agreement; and

(iv)  **fourthly**, in or towards payment *pro rata* of any other sum due but unpaid under this Agreement.

**Article 4**
**REPAYMENT, PREPAYMENT AND CANCELLATION**

**4.1**  **Repayments**.

(a)  The Borrower shall repay the Utilizations made to it in accordance with the terms of this Agreement and the DIP Order.

(b)  [Reserved].

(c)  The Borrower shall not reborrow any part of the Loans which are repaid or prepaid.

(d)  The Borrower shall repay the aggregate Loans (whether principal, interest, fees or otherwise) in full to the extent they are outstanding under or in respect of the Loans on the Maturity Date.

**4.2**  **Mandatory Prepayments**.

The Borrower shall apply each of the following to a mandatory prepayment in accordance with Section 4.9 (*Application*) and the terms of the DIP Order:

(a)  **Net Insurance Proceeds**.  Net Insurance Proceeds received (other than any insurance proceeds in respect of third-party liability insurance where such proceeds are to be paid to third parties or for losses with respect to WCF Collateral prior to the repayment in full of all obligations under the Working Capital Facility Documents) by any Obligor shall be applied to prepay the Loans within five (5) Business Days after receipt thereof, other than any Net Insurance Proceeds received by any Obligor of up to $10,000,000 in any Fiscal Year that are used by the Obligors to repair and/or replace the property that is the subject of such Net Insurance Proceeds.

(b)    **Liquidated Damages**.  If the Borrower receives or is entitled to offset any liquidated or delay damages for any reason under any Material Project Document, 100% of such proceeds in excess of such amounts certified by an authorized officer of the Borrower as necessary to perform such construction or repair that is reasonably related to cure the events or circumstances that gave rise to the payment of such liquidated damages, shall be applied to prepay the Loans within five (5) Business Days of the receipt of such liquidated damages.

(c)    **Expropriation Net Disposition Proceeds**.  If any Obligor receives any Net Disposition Proceeds from one or more Expropriation Events, 100% of such proceeds shall be applied to prepay the Loans within five (5) Business Days after receipt thereof.

(d)    **Other Net Disposition Proceeds**. If any Obligor receives any Net Disposition Proceeds from any disposition of Collateral other than the sale of inventory in the ordinary course of business, 100% of such Net Disposition Proceeds shall be applied within five (5) Business Days of receipt by any Obligor and/or any of its Subsidiaries to prepay the Loans; provided that for purposes of this clause (d), Net Disposition Proceeds shall not include, solely to the extent such disposition includes WCF Collateral, any amounts received in respect of the disposition of such WCF Collateral not to exceed the amount necessary to repay in full the obligations due under the Working Capital Facility Documents.

(e)    **Extraordinary Receipts**. If any Obligor receives any Extraordinary Receipts, 100% of such Extraordinary Receipts shall be applied within five (5) Business Days of receipt by any Obligor and/or any of its Subsidiaries to prepay the Loans.

(f)    **Equity Issuances**. If any Obligor receives any Net Cash Proceeds from any sale of, or any dividend, distribution, return of capital or other return on investment in respect of, the equity interests of any non-Debtor Subsidiary of any Obligor, 100% of such Net Cash Proceeds shall be applied within five (5) Business Days of receipt by such Obligor to prepay the Loans.

**4.3**    **[Reserved]**.

**4.4**    **[Reserved]**.

**4.5**    **Voluntary Cancellation**.

Subject to the other terms of this Agreement, the Borrower may at any time cancel all or any part of the Commitments; <u>provided</u>, that:

(a)    it has given not less than ten (10) Business Days' prior written notice to the Administrative Agent; and

(b)    if such cancellation is for part only of total outstanding Commitments:

    (i)    such cancellation shall be in a minimum amount of $2,000,000 and an integral multiple of $1,000,000; and

    (ii)    such cancellation will reduce the Commitment of each Senior Lender pro rata.

41

**4.6**     **Voluntary Prepayment**.

Subject to the other terms of this Agreement, the Borrower may prepay all or any part of the Loans; <u>provided</u>, that:

(a)     the Borrower has given not less than three (3) Business Days' notice to the Administrative Agent (or such later time as the Majority Lenders may agree to);

(b)     subject to Section 4.10(b) (*Miscellaneous*), the Borrower simultaneously pays all accrued interest on the amount prepaid, together with all costs and expenses, fees and all other amounts then due and payable under the Finance Documents, including Break Costs (if any) and the Exit Fee;

(c)     if such a prepayment is of all of the Loans then outstanding, they are all repaid or prepaid simultaneously in full;

(d)     if such a prepayment is a partial prepayment of the Loans then outstanding:

(i)     such prepayment shall be in a minimum amount of $5,000,000 (or, if less, the remaining outstanding amount) and an integral multiple of $1,000,000;

(ii)     such prepayment will be applied as provided in Section 4.9 (*Application*), and the Borrower shall ensure that such amounts are repaid or prepaid simultaneously; and

(e)     such a prepayment shall not cause or result in a Default or Event of Default immediately prior to and immediately following such a prepayment.

**4.7**     **Automatic Cancellation**.

Each Senior Lender's Unused Commitment will be automatically cancelled on the Maturity Date unless previously cancelled.

**4.8**     **Right of Cancellation and Repayment in Relation to a Single Senior Lender**.

(a)     The Borrower may at any time, cancel any available Commitments of any Senior Lender or repay the Loans held by an individual Senior Lender (together with any other accrued and unpaid amounts owing to such Senior Lender under the Finance Documents) if such Senior Lender claims indemnification from the Borrower under Section 7.5 (*Indemnities*) or any amount under Section 7.3 (*Change in Circumstances*). The Borrower may, while the circumstances giving rise to the requirement for that increase or indemnification continue, give notice to the Administrative Agent, as applicable of cancellation of the Commitment(s) of such Senior Lender and its intention to procure the repayment of the Loans held by such Senior Lender.

(b)     On receipt of a notice referred to in Section 4.8(a) (*Right of Cancellation and Repayment in Relation to a Single Senior Lender*) in relation to a Senior Lender, the Commitments of such Senior Lender will immediately be reduced to zero.

(c)     On the last day of the Interest Period in which the Borrower has given notice under Section 4.8(a) (*Right of Cancellation and Repayment in Relation to a Single Senior Lender*) in relation to a Senior Lender (or, if earlier, the date specified by the Borrower in the notice under Section 4.8(a) (*Right of Cancellation and Repayment in Relation to a Single Senior Lender*)), the Borrower will repay

such Senior Lender's participation in the Utilizations, together with all interest and other amounts accrued under the Finance Documents (if any).

**4.9     Application**.

(a)     Except in the case of a prepayment or repayment under Section 7.2 (*Illegality*) or Section 4.8 (*Right of Cancellation and Repayment in Relation to a Single Senior Lender*):

    (i)     any cancellation pursuant to this Article 4 (*Repayment, Prepayment and Cancellation*) shall:

        (A)     be applied *pro rata* between each Senior Lender; and

        (B)     if in part, reduce the Commitment of each Senior Lender pro rata;

    (ii)     any prepayment pursuant to this Article 4 (*Repayment, Prepayment and Cancellation*) shall be applied *pro rata* among each Loan.

**4.10     Miscellaneous**.

(a)     Any notice of cancellation or prepayment under this Article 4 (*Repayment, Prepayment and Cancellation*):

    (i)     is irrevocable; and

    (ii)     unless a contrary indication appears in this Agreement, shall specify:

        (A)     the date upon which the relevant cancellation or prepayment is to be made; and

        (B)     the amount of that cancellation or prepayment.

(b)     Subject to the requirements of the other provisions of this Article 4 (*Repayment, Prepayment and Cancellation*), any prepayment under this Agreement is without premium or penalty other than:

    (i)     the Exit Fee payable in respect of, and on, any amounts applied in prepayment in accordance with Sections 4.2 (*Mandatory Prepayments*) and 4.6 (*Voluntary Prepayment*);

    (ii)     Break Costs to the extent that the prepayment is made on a date other than an Interest Payment Date.

(c)     Any prepayment under this Agreement shall be made together with accrued and unpaid interest as of such date.

(d)     [Reserved].

(e)     No prepayment, repayment or cancellation is allowed except at the times and in the manner expressly provided for in this Agreement.

(f)     No amount of the Commitments cancelled under this Agreement may be subsequently reinstated.

(g)     If the Administrative Agent receives a notice under this Article 4 (*Repayment, Prepayment and Cancellation*), it shall promptly forward a copy of that notice to each Senior Lender.

43

**Article 5**
**INTEREST, INTEREST PERIODS AND FEES**

**5.1     Payment of Interest and Interest Payment Dates**.

Interest shall accrue on each Loan at a *per annum* rate during each Interest Period equal to the Interest Rate as determined in accordance with either Section 5.2 (*Interest Rate*) or Section 5.7 (*Market Disruption*).  The Borrower shall pay accrued interest on the Loans on each Interest Payment Date.  Accrued interest shall be calculated on the basis of (i) the Interest Rate determined in accordance with either Section 5.2 (*Interest Rate*) or Section 5.7 (*Market Disruption*) which shall be applicable for each day of an Interest Period for which interest accrues and (ii) a 360-day year and shall be payable in arrears at the end of each Interest Period.  Accrued interest shall be paid on the basis of actual days elapsed and shall include the first day of the Interest Period but exclude the last day of such Interest Period.

**5.2     Interest Rate**

The Interest Rate applicable to a Loan for a certain Interest Period shall be determined as a variable interest rate in accordance with the following provisions:

(a)      *[Reserved]*.

(b)      *Term SOFR*.  The Interest Rate for the relevant Interest Period shall be determined as the aggregate of:

      (i)      the Term SOFR for such Interest Period; and

      (ii)     the Credit Spread Adjustment; and

      (iii)    the Applicable Margin;

unless a Reference Rate Non-Utilisation Event has occurred and is continuing in relation to Term SOFR on the applicable Reference Rate Determination Date.

The Administrative Agent shall promptly, after the relevant Reference Rate Determination Date, notify the Borrower of the relevant Term SOFR and the aggregate Interest Rate determined on this basis under this paragraph (b) (*Term SOFR*).

(c)      *Compounded SOFR Primary Screen Rate*.  If a Reference Rate Non-Utilisation Event has occurred and is continuing in relation to Term SOFR on the applicable Reference Rate Determination Date, the Interest Rate for the relevant Interest Period shall be determined as the aggregate of:

      (i)      the Compounded SOFR Primary Screen Rate for such Interest Period; and

      (ii)     the Credit Spread Adjustment; and

      (iii)    the Applicable Margin;

unless a Reference Rate Non-Utilisation Event has occurred and is continuing in relation to the relevant Compounded SOFR Primary Screen Rate on the applicable Reference Rate Determination Date.

44

*Lag Time*.  When determining the Interest Rate under this paragraph (c), a Lag Time of five (5) US SOFR Banking Days shall apply.

(d)     *Compounded SOFR Calculated Index Rate*.  If both a Reference Rate Non-Utilisation Event has occurred and is continuing in relation to Term SOFR and a Reference Rate Non-Utilisation Event has occurred and is continuing in relation to the relevant Compounded SOFR Primary Screen Rate on the applicable Reference Rate Determination Date, the Interest Rate for the relevant Interest Period shall be determined as the aggregate of:

(i)     the Compounded SOFR Calculated Index Rate for such Interest Period; and

(ii)     the Credit Spread Adjustment; and

(iii)     the Applicable Margin;

unless a Reference Rate Non-Utilisation Event has occurred and is continuing in relation to the relevant Compounded SOFR Calculated Index Rate on the applicable Reference Rate Determination Date.

When determining the Interest Rate under this paragraph (d) (*Compounded SOFR Calculated Index Rate*), the provisions with respect to the Lag Time as stipulated under paragraph (c) (*Compounded SOFR Primary Screen Rate*) above shall apply equally.

(e)     *Compounded SOFR Calculated Daily Rate*.  If a Reference Rate Non-Utilisation Event has occurred and is continuing in relation to Term SOFR,  a Reference Rate Non-Utilisation Event has occurred and is continuing in relation to the relevant Compounded SOFR Primary Screen Rate and a Reference Rate Non-Utilisation Event has occurred and is continuing in relation to the relevant Compounded SOFR Calculated Index Rate on the applicable Reference Rate Determination Date, the Interest Rate for the relevant Interest Period shall be determined as the aggregate of:

(i)     the Compounded SOFR Calculated Daily Rate for such Interest Period; and

(ii)     the Credit Spread Adjustment; and

(iii)     the Applicable Margin.

When determining the Interest Rate under this paragraph (e) (*Compounded SOFR Calculated Daily Rate*), the provisions with respect to the Lag Time as stipulated under paragraph (c) (*Compounded SOFR Primary Screen Rate*) above shall apply equally.

(f)     *Floor*.  If the Reference Rate would be less than 0.00% per annum, such Reference Rate shall be deemed to be 0.00% per annum for purposes of this Agreement.

(g)     *Conforming Adjustments*.  Further to the provisions of this Section 5.2, the Majority Lenders may make such further technical, administrative, operational and other conforming changes and adjustments to these provisions as are required to permit the administration, calculation or determination of the relevant Reference Rate in a manner substantially consistent with market practice or as are required to make the interest provisions, in particular the timing and frequency of determining rates, the calculation rules, the notification periods and similar technical, administrative or operational measures, administratively feasible.  To this effect, the Administrative Agent (acting at the direction of the Majority Lenders) may send the Borrower a notification (a

"**Technical Adjustment Notification**") which shall supplement and adjust this Agreement and which shall, upon receipt by the Borrower, form an integral part of this Agreement.

(h)      *Administrative Agent*.   Notwithstanding anything to the contrary herein or in any other Finance Document, (A) the Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability in respect of, (a) the monitoring, determination or verification of the unavailability or cessation of any Interest Rate, including the giving of any notices related thereto, (b) the continuation of, administration of, submission of, calculation of or any other matter related to any Interest Rate, any component definition thereof or rates referenced in the definition thereof or any alternative, comparable, replacement or successor rate or adjustment thereto, including whether the composition or characteristics of any such alternative, comparable, replacement or successor rate or adjustment will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Interest Rate or any other rate, or (c) the effect, implementation or composition of any changes in any Technical Adjustment Notification; and (B) no amendments or other changes (including in any Technical Adjustment Notification) shall, unless agreed by the Administrative Agent, affect the rights, indemnities or obligations of the Administrative Agent.   The Administrative Agent may select information sources or services to ascertain any Interest Rate, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Senior Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

**5.3**      **Default Interest**.

(a)      If any Event of Default has occurred and is continuing, the principal amount of the Loans (whether or not accelerated) and all other Obligations that are due and unpaid shall automatically bear interest at a rate per annum that is the rate that would otherwise be applicable thereto plus two percent (2%) per annum, in each case, from the date of written demand from the Administrative Agent (acting at the direction of the Majority Lenders) following the occurrence of such Event of Default to the date on which such Event of Default ceases to exist or is otherwise cured. Any interest accruing under this Section 5.3 (*Default Interest*) shall be immediately payable by the Borrower on demand by the relevant Agent or Senior Lender;

(b)      If any overdue amount consists of all or part of a Loan which became due on a day which was not the last day of an Interest Period relating to that Loan;

  (i)      the first Interest Period for that overdue amount shall have a duration equal to the unexpired portion of the current Interest Period relating to that Loan; and

  (ii)      the rate of interest applying to the overdue amount during that first Interest Period shall be two (2) percent per annum higher than the rate which would have applied if the overdue amount had not become due; and

(c)      default interest (if unpaid) arising on an overdue amount will be compounded with the overdue amount at the end of each Interest Period applicable to that overdue amount but will remain immediately due and payable.

(d)      No accrued interest shall become due and payable other than in accordance with the provisions of Section 5.1 (*Payment of Interest and Interest Payment Dates*) or this Section 5.3 (*Default Interest*).

**5.4    Limitation on Interest**.

If at any time the interest rate applicable to any Loan, together with all other amounts that are treated as interest on such Loan under Applicable Law, exceeds the maximum lawful rate under the laws of New York, the interest payable in respect of such Loan, together with all other amounts treated as interest on such Loan, shall be limited to interest calculated at the maximum lawful rate under the laws of New York.

**5.5    Determination of Interest Periods**.

(a)    Subject to paragraph (b) below, each Interest Period for any Loan shall be of a duration of one (1) month.

(b)    Each Interest Period for a Loan shall start on an Interest Payment Date (except in the case of the first Interest Period applicable to the Loan, which shall start on its Utilization Date) and end on the day immediately before the Interest Payment Date that corresponds to the last day of the Interest Period or, if earlier, the Maturity Date.

**5.6    Non-Business Days**.

If an Interest Period would otherwise end on a day which is not a Business Day, such Interest Period shall instead end on the next Business Day in that calendar month (if there is one) or the immediately preceding Business Day (if there is not).

**5.7    Market Disruption**.

If the Administrative Agent notifies the Borrower prior to the end of an Interest Period (the "**Affected Interest Period**") that:

(a)    the Administrative Agent determines that the interest rate for such Loan in relation to the Affected Interest Period cannot be determined by the Administrative Agent in accordance with Section 5.2 (*Interest Rate*); or

(b)    the Administrative Agent has received notifications from a Senior Lender or Senior Lenders (whose participations in such Loan exceed thirty percent (30%) of that Loan) that the difference between

    (i)    the interest rate determined in accordance with Section 5.2 (*Interest Rate*); minus

    (ii)    the Funding Rate of such Senior Lender or Senior Lenders in relation to such Affected Interest Period

        is below the Applicable Margin,

(each of (a) and (b) above, a "**Market Disruption Event**"),

then the Borrower shall pay interest on the respective Loan for the Affected Interest Period with respect to each participation of an affected Lender at a rate equal to the aggregate of:

    (i)    the Funding Rate of such Lender in relation to the Affected Interest Period, as determined by such Lender and notified by such Lender to the Administrative Agent (provided that if any such rate is less than zero, the Funding Rate shall be deemed to be zero); and

    (ii)    the Applicable Margin.

In the notification to the Borrower that a Market Disruption Event has occurred, the Administrative Agent will also notify the Borrower about the Interest Rate determined in accordance with this Section 5.7 (*Market Disruption*) and the interest amount payable by the Borrower in respect of the Affected Interest Period.

If this Section 5.7 (*Market Disruption*) applies and the Majority Lenders or the Borrower so requires, the Majority Lenders and the Borrower shall enter into negotiations (for a period of not more than thirty (30) days) with a view to agreeing a substitute basis for determining the rate of interest.  Any alternative basis thus agreed shall, with the prior consent of all the Senior Lenders and the Borrower, be binding on all parties hereto.

If within such period of thirty (30) days the parties to this Agreement do not reach any agreement, the Interest Rate notified to the Borrower in accordance with this Section 5.7 (*Market Disruption*) will continue to apply for the Affected Interest Period.

**5.8    Break Costs**.

The Borrower shall indemnify, compensate and reimburse each Senior Lender for all Break Costs which such Senior Lender may sustain:

(a)    if the Borrower withdraws or reduces the amount specified for a utilization in a Utilization Request or fails to satisfy any of the conditions precedent specified in Article 12 (*Conditions Precedent*) after delivering a Utilization Request and as a result a Utilization of a Loan does not occur on the Utilization Date; <u>provided</u>, that if the Borrower withdraws or reduces the amount specified for any Utilization Request, then the Applicable Margin shall be included in the calculation of Break Costs but in all other cases (including clauses (b) and (c) of this Section 5.8 (*Break Costs*), the Applicable Margin should not be included in the calculation of Break Costs).

(b)    if the Borrower fails to pay any amount of principal of the Loans due and payable under a Finance Document on its due date; or

(c)    if any repayment or prepayment (whether mandatory or voluntary) of its Loan occurs on a date that is not an Interest Payment Date for the Loan, in accordance with Article 4 (*Repayment, Prepayment and Cancellation*) of this Agreement.

Each Senior Lender shall furnish to the Borrower a certificate setting forth the basis and amount of each request by such Senior Lender for compensation under this Section 5.8 (*Break Costs*) which certificate shall be conclusive and binding on the Borrower in the absence of manifest error.  The Borrower shall pay such Senior Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

**5.9    Fees**.

(a)    **Unused Commitment Fee**.  The Borrower shall pay to the Administrative Agent (for the account of each Senior Lender) an unused commitment fee (the "**Unused Commitment Fee**") on the average daily Unused Commitment of such Senior Lender for the period from and including the Entry Date to the Maturity Date, in each case at a rate per annum equal to 1.00%.  Accrued Unused Commitment Fees shall be payable monthly, in arrears and in cash, on each Interest Payment Date or, in the case of the last installment of the Unused Commitment Fee payable hereunder, on the date of termination or cancellation of the Unused Commitment.

(b)    **Upfront Fee**.  The Borrower shall pay an upfront fee (the "**Upfront Fee**") to each Senior Lender (for its own account) in an amount equal to 5.00% multiplied by the aggregate principal amount of each Senior Lender's Commitment under this Agreement, which shall be payable in cash (x) on the Utilization Date of the Interim Loan with respect to the portion of the Upfront Fee allocable to the Interim Loan that, at the option of the Borrower, may be net funded in whole or in part from the proceeds of the Interim Loan borrowing on the Utilization Date of the Interim Loan and (y) on the Utilization Date of the Final Loan with respect to the portion of the Upfront Fee allocable to the Final Loan that, at the option of the Borrower, may be net funded in whole or in part from the proceeds of the Final Loan on the Utilization Date of the Final Loan.

(c)    **Exit Fee**. Upon any prepayment or repayment of any portion or all of the Loans, whether at maturity, as a prepayment, repayment, acceleration or termination of the Loans (including, but not limited to, any prepayment or repayment after the occurrence of an Event of Default or after acceleration of the Loans) or upon the occurrence of the Maturity Date or upon the acceleration of the Loans (the occurrence of any such events, an "**Exit Fee Event**"), the Borrower shall pay to the Administrative Agent (for the account of each Senior Lender) an exit fee (the "**Exit Fee**") in cash equal to (a) the principal amount of the Loans being prepaid, repaid or accelerated multiplied by (b) 1.00%. The Exit Fee shall be fully earned, due and payable on the date such Exit Fee Event occurs and non-refundable when made. The parties acknowledge and agree that (i) the Senior Lenders forwent receiving additional compensation, fees and pricing on the Entry Date in return for the parties agreeing to the Exit Fee, (ii) the Agents and the Senior Lenders would not have entered into this Agreement and the Senior Lenders would not have provided the Loans without the Obligors agreeing to pay the Exit Fee in the aforementioned instances and (iii) the Exit Fee set forth in this Section 5.9(c) (*Fees*) is not intended to act as a penalty or to punish the Borrower or any other Obligor for any such payment, repayment, redemption, prepayment or termination.

(d)    **Agent's Fee**.  The Borrower shall pay to the Agent (for its own account) agency fees in the amounts and manner agreed in the Agency Fee Letter.

**Article 6**
**TAXES**

**6.1**    **Taxes**.

(a)    **Defined Terms**.  For purposes of this section, the term "Applicable Law" includes FATCA.

(b)    **Payments Free of Taxes**.  Any and all payments by or on account of any obligation of the Borrower under any Finance Document shall be made without deduction or withholding for any Taxes, except as required by Applicable Law.  If any Applicable Law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Body in accordance with Applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 6.1. (Taxes)), the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding for Indemnified Taxes been made. The Administrative Agent shall act as a Withholding Agent under this Agreement with respect to U.S. withholding only.

49

(c)     **Payment of Other Taxes by Borrower**.  The Borrower shall timely pay to the relevant Governmental Body in accordance with Applicable Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)     **Indemnification by Borrower**.  The Borrower shall indemnify each Recipient, within ten (10) days after written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 6.1 (*Taxes*)) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, other than any penalties and interest resulting from the willful misconduct or gross negligence (as determined in the final and non-appealable judgment of a court of competent jurisdiction) of the Administrative Agent or such Senior Lender, and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Body.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Senior Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Senior Lender, shall be conclusive absent manifest error.

(e)     **Indemnification by the Senior Lenders**.  Each Senior Lender shall severally indemnify the Administrative Agent within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Senior Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Senior Lender's failure to comply with the provisions of Section 14.1(i) (*Assignment by Senior Lenders*) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Senior Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Finance Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Body. A certificate as to the amount of such payment or liability delivered to any Senior Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Senior Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Senior Lender under any Finance Document or otherwise payable by the Administrative Agent to the Senior Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)     **Evidence of Payments**.  As soon as practicable after any payment of Taxes by the Borrower to a Governmental Body pursuant to this section, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Body evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(g)     **Status of Senior Lenders**.  (i) Any Senior Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Finance Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Senior Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Senior Lender is subject to backup withholding or information reporting

50

requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraphs (g)(ii)(A), (ii)(B) and (ii)(D) of this section) shall not be required if in the Senior Lender's reasonable judgment such completion, execution or submission would subject such Senior Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Senior Lender.

(ii)     Without limiting the generality of the foregoing,

(A)     any Senior Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or about the date on which such Senior Lender becomes a Senior Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Senior Lender is exempt from U.S. federal backup withholding tax;

(B)     any Foreign Senior Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Senior Lender becomes a Senior Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)     in the case of a Foreign Senior Lender claiming the benefits of an income tax treaty to which the United States of America is a party (x) with respect to payments of interest under any Finance Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Finance Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     executed copies of IRS Form W-8ECI;

(3)     in the case of a Foreign Senior Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the IRC, (x) a certificate substantially in the form of Exhibit A-1 to the effect that such Foreign Senior Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the IRC, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the IRC, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the IRC (a "**U.S. Tax Compliance Certificate**") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E; or

(4)     to the extent a Foreign Senior Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit A-2 or Exhibit A-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as

51

applicable; <u>provided</u>, that if the Foreign Senior Lender is a partnership and one or more direct or indirect partners of such Foreign Senior Lender are claiming the portfolio interest exemption, such Foreign Senior Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit A-4 on behalf of each such direct and indirect partner;

(C)     any Foreign Senior Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Senior Lender becomes a Senior Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by Applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by Applicable Law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     each Senior Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the IRC) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Senior Lender has complied with such Senior Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Senior Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(h)     **Treatment of Certain Refunds**.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes (including any tax credit in lieu of a refund) as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section 6.1 (*Taxes*)) and which is immediately allocable to the Taxes, it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Body with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Body) in the event that such indemnified party is required to repay such refund to such Governmental Body.  Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph (h) shall not be construed to require any

indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)    **Survival**.  Each party's obligations under this Section shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Senior Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Finance Document.

## Article 7
## OTHER PROVISIONS RELATING TO THE LOANS

**7.1    Payments Generally**.

(a)    The Borrower shall make each payment required to be made by it under this Agreement on the date when due, in immediately available funds, without defense, deduction, recoupment, set-off or counterclaim not later than a time determined by the Administrative Agent in its sole discretion and communicated to the Borrower.

(b)    Any amounts received after such time on any date may, in the discretion of the Majority Lenders, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.

(c)    All such payments shall be made to the account designated by the Administrative Agent from time to time, except that payments pursuant to Sections 7.3 (*Change in Circumstances*), 7.4 (Payment of Costs and Expenses) and 7.5 (*Indemnities*) shall be made directly to the Persons entitled thereto.

(d)    The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.

(e)    All payments under this Agreement shall be made in Dollars.

**7.2    Illegality**.

If any Applicable Law comes into force after the Entry Date, or if any change in any existing Applicable Law or in the interpretation or application thereof by any court or Governmental Body now or hereafter makes it unlawful for a Senior Lender to have advanced or acquired an interest in any of the Loans or to fund or otherwise maintain any of the Loans or to give effect to its obligations in respect thereof, such Senior Lender may, by written notice thereof to the Borrower, declare its obligations under this Agreement to be terminated, and the Borrower shall immediately cancel any available Commitments of such Senior Lender and prepay, within the time required by such law, the Loans and any other amounts owing under this Agreement (including accrued and unpaid interest) as may be applicable to the date of such payment. If any such event shall, in the opinion of such Senior Lender, only affect part of its obligations under this Agreement, the remainder of this Agreement shall be unaffected and the obligations of the Borrower and the other Obligors under the Finance Documents shall continue.  Each Senior Lender agrees to use commercially reasonable efforts to designate a different lending office if such designation will avoid the need for such notice and will not, in the judgment of such Senior Lender, acting reasonably, otherwise be materially disadvantageous to such Senior Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Senior Lender in connection with any such designation or assignment.

**7.3**    **Change in Circumstances**.

(a)    If the introduction of or any change in any Applicable Law relating to a Senior Lender or any change in the interpretation or application thereof by any Governmental Body or compliance by a Senior Lender with any request or direction of any Governmental Body:

    (i)    subjects such Senior Lender to any Taxes (other than Indemnified Taxes and Excluded Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

    (ii)    imposes, modifies or deems applicable any reserve, liquidity, cash margin, capital, special deposit, deposit insurance or assessment, or any other regulatory or similar requirement against assets held by, or deposits in or for the account of, or loans by, or any other acquisition of funds for loans by, such Senior Lender or any direct or indirect holding company of such Senior Lender;

    (iii)    imposes on such Senior Lender or any direct or indirect holding company of such Senior Lender or requires there to be maintained by such Senior Lender any capital adequacy, liquidity or additional liquidity capital requirement (including, without limitation, a requirement which affects such Senior Lender's or such holding company's allocation of capital resources to its obligations) in respect of such Senior Lender's obligations hereunder; or

    (iv)    imposes on such Senior Lender any other condition or requirement with respect to this Agreement (other than Excluded Taxes);

(b)    and subject to paragraph (c) below, such occurrence has the effect of:

    (i)    increasing the cost to such Senior Lender of agreeing to make or making, maintaining or funding the Loan or any portion thereof;

    (ii)    reducing the amount of the Obligations owing to such Senior Lender;

    (iii)    directly or indirectly reducing the effective return to such Senior Lender under this Agreement or on its overall capital as a result of entering into this Agreement or as a result of any of the transactions or obligations contemplated by this Agreement; or

    (iv)    causing such Senior Lender to make any payment or to forgo any interest, fees or other return on or calculated by reference to any sum received or receivable by such Senior Lender under this Agreement;

then, upon written request of such Senior Lender, the Borrower will pay to such Senior Lender such additional amount or amounts as will compensate such Senior Lender for such additional costs incurred or reduction suffered. A certificate of a Senior Lender setting forth the amount or amounts necessary to compensate such Senior Lender and delivered to the Borrower shall be conclusive absent manifest error. The Borrower shall pay such Senior Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

For purposes of the foregoing, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, regulations, guidelines, requirements and directives thereunder, issued in connection therewith or in implementation thereof and (ii) all requests, rules, regulations,

guidelines or directives whether concerning capital adequacy or liquidity promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States of America or foreign regulatory authorities, in each case pursuant to Basel III, shall, in each case, be deemed a "change in Applicable Law" regardless of the date enacted, adopted, applied or issued.

**7.4    Payment of Costs and Expenses**.

The Borrower shall pay to the Agents and the Senior Lenders on demand all reasonable costs and expenses (other than in the case of Section 7.4(f) (*Payment of Costs and Expenses*) below, in which case, subject to the terms of the DIP Order and DIP Recognition Order, the Borrower shall pay the Agents and the Senior Lenders on demand all costs and expenses) of the Agents and the Senior Lenders and their agents, counsel, advisors (including a technical advisor) and any receiver or receiver-manager appointed by them or by a court (including, without limitation, all reasonable fees, properly invoiced and documented expenses and disbursements of legal counsel) in connection with this Agreement and the other Finance Documents, the Chapter 11 Cases and the Recognition Proceedings, including, without limitation:

(a)    the preparation, negotiation, and completion of the Finance Documents, or any actual or proposed amendment or modification thereof or any waiver thereunder and all instruments supplemental or ancillary thereto, and, in the case of the Agents, the administration of the Finance Documents;

(b)    [reserved];

(c)    the reasonable and properly invoiced and documented fees and expenses of the Senior Lenders incurred as part of the Senior Lenders' due diligence or, subject to Section 11.1(d) (*Affirmative Covenants*), for the ongoing monitoring, investigation or information gathering in respect of the Borrower and the Project;

(d)    the registration, maintenance and/or discharge of any of the Security in any public record office;

(e)    obtaining advice as any Agent's or the Senior Lenders' rights and responsibilities under this Agreement or the other Finance Documents; and

(f)    the defense, establishment, protection or enforcement of any of the rights or remedies of the Agents or the Senior Lenders under this Agreement or any of the other Finance Documents, including all costs and expenses of establishing the validity and enforceability of, or of collection of amounts owing under, any of the Finance Documents or any enforcement of the Security, or otherwise due from the Borrower or any Guarantor under this Agreement.

**7.5    Indemnities**.

(a)    The Borrower shall indemnify and hold harmless each Agent, each Senior Lender and their Affiliates, officers, directors and employees (each, an "**Indemnified Party**") from all Claims (including the reasonable and properly invoiced and documented fees, expenses and disbursements of outside legal counsel to the Senior Lenders and outside legal counsel to the Agents in each applicable jurisdiction), which may be incurred by any Indemnified Party as a consequence of or in respect of:

(i)    default by the Borrower in the payment when due of any Obligation or any other Default or Event of Default hereunder which is continuing;

(ii)    the entering into by the relevant Agents and the Senior Lenders of the Finance Documents and any amendment, waiver or consent relating thereto, and the performance by such Agents and the Senior Lenders of their obligations under this Agreement and the other Finance Documents;

(iii)    failure of the Borrower to comply with any Applicable Law, including, without limitation, any Environmental Law or applicable Anti-Corruption Laws, AML Laws or Sanctions, with respect to the Project;

(iv)    any E&S Event, Environmental or Social Matter and Environmental Claim with respect to the Project;

(v)    the application by the Borrower of the proceeds of the Loan; or

(vi)    any material Claim arising in connection with the development, construction, procurement, engineering and operation of the Project, except for any such Claim that a court of competent jurisdiction determined in a final and non-appealable order arose primarily on account of the relevant Indemnified Party's gross negligence or willful misconduct.

(b)    In connection with any Claim described in Section 7.5(a) (*Indemnities*) above, the applicable Indemnified Party shall deliver a certificate of an officer of the Administrative Agent or the applicable Senior Lender as to:

(i)    any such Claim; and

(ii)    reasonable details of the calculation of the amount of such Claim (which calculation shall be, absent manifest error, *prima facie* evidence of the calculation of the amount of such Claim).

**Article 8**
**REPRESENTATIONS AND WARRANTIES**

**8.1**    **Representations and Warranties of the Borrower**.

To induce each Senior Lender to enter into this Agreement and the other Finance Documents to which each such Senior Lender is a party, and to induce each Senior Lender to make available the Loans under this Agreement and the other Finance Documents to which it is a party, the Borrower makes the representations and warranties set forth below to each Senior Lender as of the Entry Date and each Utilization Date.

(a)    **Organization and Powers**.  Subject to any restriction arising on account of the Borrower's and its Subsidiaries' status as a "debtor" under the Bankruptcy Code and entry of the DIP Order or any restriction on the Borrower and its Subsidiaries as a result of the Recognition Proceedings and any required approvals of the Bankruptcy Court, the Borrower and each of its Subsidiaries:

(i)    has been duly incorporated or formed and is validly existing under the laws of its incorporation or formation, as applicable;

(ii)    has all requisite corporate power and authority to own and lease its property and assets and to carry on its business;

56

    (iii)     has all requisite corporate power and authority to enter into and deliver each of the Finance Documents, and the transactions contemplated thereby, to which it is or will become a party, and to take all necessary action to perform its obligations thereunder (including the power and authority to grant the Security pursuant to the Finance Documents and to perform the obligations set forth therein); and

    (iv)     is duly qualified, licensed or registered to do business in each jurisdiction in which the nature of its business or the property or assets owned or leased by it make such qualification, licensing or registration necessary.  No proceeding has been instituted or, to the knowledge of the Borrower, threatened in any such jurisdiction revoking, limiting or curtailing, or seeking to revoke, limit or curtail, such power and authority or qualification, licensing or registration.  The Borrower is up-to-date in all of its corporate filings in all material respects and is (if applicable) in good standing under Applicable Laws.

(b)    **Authorization; No Conflict**.  Subject to the entry of the DIP Order and the DIP Recognition Order, the execution and delivery by the Borrower and each of its Subsidiaries of the Finance Documents to which each is a party, and the performance by it of its obligations hereunder and thereunder, have been duly authorized by all necessary corporate or other action on its part and do not and will not:

    (i)     contravene any provision of its constitutional documents (or the constitutional documents of any of its Subsidiaries), including, without limitation, any shareholder agreements or declarations, as applicable, or any resolution of its shareholders, partners or directors (or any committee thereof);

    (ii)     conflict with, result in a breach of, or constitute a default or an event creating rights of acceleration, termination, modification or cancellation or a loss of rights under (with or without the giving of notice or lapse of time or both), the Streaming Agreement or any material contract to which any of its Subsidiaries is a party, in each case, to the extent not subject to the automatic stay under the Chapter 11 Cases or executed after the Petition Date;

    (iii)    violate any Applicable Law; or

    (iv)    other than as contemplated by the Finance Documents, result in, or require, the creation or imposition of any Encumbrance on any property or assets of the Borrower.

(c)    **Execution; Binding Obligation**.  Subject to entry of the DIP Order and the DIP Recognition Order, each Finance Document to which the Borrower is or will become a party:

    (i)     has been, or when delivered under or in connection with this Agreement will be, duly executed and delivered by the Borrower; and

    (ii)     constitutes, or when delivered under or in connection with this Agreement will constitute, a legal, valid and binding agreement of the Borrower, in full force and effect and enforceable against the Borrower in accordance with its terms and admissible into evidence in the courts of New York, except to the extent enforcement may be affected by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar Applicable Laws affecting creditors' rights generally and subject to generally applicable principles of equity.

(d)    **Consents**.  The Borrower and its Subsidiaries are not required to give any notice to, make any filing with or obtain any Authorization, Order or other consent or approval of any Person in connection with the execution or delivery of or performance of its obligations under any Finance Document to which they are a party, or the consummation of the transactions contemplated herein and therein, other than:

    (i)    the entry of the DIP Order and the DIP Recognition Order;

    (ii)    consents and approvals required under contracts or other agreements stayed by the Automatic Stay;

    (iii)    with respect to the grant of the priming lien, Trisura Guarantee Insurance Company; and

    (iv)    those that have already been obtained and copies of which have been provided to the Senior Lenders or those consents that are reflected in the DIP Order.

(e)    **Corporate Structure; Subsidiaries**.

    (i)    Part A of Schedule Q (*Corporate Organization Chart*) sets forth the true and complete list of all Subsidiaries of the Borrower, including the type and number of issued and outstanding shares or other equity interests of each such Subsidiary and the Person in whose name such shares or equity interests are registered.

    (ii)    Except as set out in Part A of Schedule Q (*Corporate Organization Chart*) no Person has any option, warrant, right (pre-emptive, contractual or otherwise) or other security or conversion privilege of any kind that is exercisable or convertible into, or exchangeable for, or otherwise carries the right of the holder to purchase or otherwise acquire (whether or not subject to conditions) common shares or other equity interests of the Borrower or its Subsidiaries.

    (iii)    The Borrower is not engaged in any joint purchasing arrangement, joint venture, partnership and other joint enterprise with any other Person.

    (iv)    No Person has a direct or indirect ownership interest in the Borrower, except as set out in Part A of Schedule Q (*Corporate Organization Chart*), or the Project Property or is otherwise involved in any manner in the operation of the Project.

    (v)    To the Borrower's knowledge and belief, no funds invested in the shares of the Borrower are of illicit origin.

(f)    **Principal Place of Business and Other Locations**.  The jurisdiction of incorporation, principal place of business, location of corporate records, and location of tangible assets (except for inventory which is in transit) of the Borrower as of the date hereof is Nevada.

(g)    **Residence for Tax Purposes**.  For tax purposes, the Borrower is resident of Nevada and the United States of America (and no other state or non-U.S. jurisdiction).

(h)    **[Reserved]**.

(i)    **No Expropriation**.  No Expropriation Event has occurred nor has any notice been given or proceeding commenced by a Governmental Body or Person in respect thereof nor, to the knowledge

of the Borrower, is there any intent or proposal to give any such notice or commence with respect to an Expropriation Event.

(j)     **[Reserved]**.

(k)     **Title to Project Real Property**.  Schedule J (*Project Real Property*) (or if such Schedule is replaced in accordance with this Agreement, such replacement Schedule) sets out a complete and accurate list of the Project Real Property in which the Borrower and its Subsidiaries have a right, title or interest.  The Borrower, subject to Permitted Encumbrances:

    (i)     has valid and subsisting leasehold title to all leases of real property and mineral interests included within the Project Real Property;

    (ii)    has valid possessory and record title to all mineral interests included within the Project Real Property, except such mineral interests that are leased to the Borrower and are covered under paragraph (k)(i) above; and

    (iii)   has good and marketable title to such other real property interests included within the Project Real Property and not otherwise included under paragraphs (k)(i) and (k)(ii).

Such Project Real Property is free and clear of all Encumbrances other than Permitted Encumbrances.  The Borrower and its Subsidiaries do not hold any other freehold, leasehold or other real property interests or rights (including licenses from landholders permitting the use of land, leases, rights of way, occupancy rights, surface rights and easements).

(l)     **Other Collateral**.  The Borrower has good and valid title to, or leasehold interest in, all other Collateral that is not Project Real Property, free and clear of all Encumbrances other than Permitted Encumbrances.

(m)     **Project Property**.  Without limiting the generality of Section 8.1(j) (*Representations and Warranties of the Borrower*) and Section 8.1(k) (*Representations and Warranties of the Borrower*):

    (i)     the Borrower owns or otherwise has valid rights to use all of, and does not own any material properties or assets other than, the Project Property, and no Person other than the Borrower has any rights to participate in the Project Real Property or operate the Project;

    (ii)    the Borrower's Subsidiaries do not own or otherwise have valid rights to use any of the Project Property;

    (iii)   the Project Real Property constitutes all real property, unpatented mining claims, mineral, surface interests and ancillary rights (including rights of access) necessary for the development and mining operations of the Project;

    (iv)    other than the Royalties, the Offtake Agreements, the Working Capital Facility, the Streaming Agreement, the First Lien Facility and this Agreement, none of the Project Real Property or any Minerals produced therefrom are subject to an option, right of first refusal or right, title, interest, reservation, claim, rent, royalty, or payment in the nature of rent or royalty, or right capable of becoming an agreement, option, right of first refusal or right, title, interest, reservation, claim, rent, royalty, or payment in the nature of rent or royalty; and

(v)       other than pursuant to Applicable Laws, there are no restrictions on the ability of the Borrower to exploit the Project Real Property.

(n)       **Maintenance of Project Property**.  All mining concession, maintenance fees, recording fees, preservation patents and Taxes (other than the Tax Encumbrances) and all other amounts have been paid when due and payable and all other actions and all other obligations as are required to maintain the Project Property in good standing, have been taken and complied with in all material respects. All water permits and certificates have been perfected and maintained in good standing and all proofs of beneficial use have been duly and properly filed in compliance with all applicable regulations of the State of Nevada, Division of Water Resources.

(o)       **Insurance**.  The Collateral and the businesses and operations of the Borrower are insured in accordance with Section 11.1(e) (*Affirmative Covenants*).  The Borrower has not breached the terms and conditions of any insurance policies it is required to obtain and maintain in accordance with Section 11.1(e) (*Affirmative Covenants*) in any material respect nor failed to promptly give any notice or present any material claim thereunder.  There are no material claims under any such policy as to which any insurer is denying liability or defending under a reservation of rights clause.

(p)       **Status of Authorizations**. The Borrower has the Authorizations needed for the care and maintenance of the Project. Except the non-validity of which would not reasonably be expected to have a Material Adverse Effect, each Material Project Authorization necessary for the current stage of the Project is valid and in full force and effect.

(q)       **Project Documents**.  Other than to the extent affected by the filing of the Chapter 11 Cases, the Recognition Proceedings, the entry of the DIP Order or the Automatic Stay or as would not reasonably be expected to have a Material Adverse Effect, each Material Project Document and each other Project Document necessary for the current stage of the Project is valid and in full force and effect.

(r)       **Applicable Laws; Conduct of Operations**.  Each of the Borrower and its Subsidiaries, including in the conduct of operations at the Project, is in compliance in all material respects with all Applicable Laws and, without limiting the generality of the foregoing, all exploration, development and mining operations in respect of the Project Real Property have been conducted in accordance with Good Industry Practice and all material workers' compensation and health and safety regulations have been complied with.  There is no pending or, to the knowledge of the Borrower, proposed changes to Applicable Laws that would render illegal or materially restrict the development of the Project or the conduct of operations at the Project, or that could otherwise reasonably be expected to result in a Material Adverse Effect.

(s)       **Sanctions**.

(i)       None of the Obligors nor any of their respective directors or officers or, to the knowledge of the Borrower, employees, agents or Affiliates:  (A) is a Sanctions Target; (B) has engaged in the past five (5) years, or intends to engage in the future in any dealings, with, involving or for the benefit of a Sanctions Target; or (C) is or has been, in the past five (5) years, subject to any action, litigation, claim, investigation or proceeding with regard to any actual or alleged violation of Sanctions;

(ii)      The Obligors have implemented and maintain policies and procedures designed to promote and achieve compliance with applicable Sanctions; and

(iii)     The Borrower will not, directly or indirectly, use any part of any proceeds of the Loans (A) to fund or facilitate any activities or business of, with or involving any Sanctions Target or (B) in any manner that would constitute or give rise to a violation of Sanctions by any Person, including any Senior Lender.

(t)     **Anti-Corruption Laws**.

(i)     None of the Obligors nor any of their respective directors or officers or, to the knowledge of the Borrower, employees, agents or Affiliates:  (A) have, in the past five (5) years, taken any action, directly or indirectly, that would constitute or give rise to a violation of applicable Anti-Corruption Laws; or (B) is or has been, in the past five (5) years, subject to any action, litigation, claim, investigation or proceeding with regard to any actual or alleged violation of Anti-Corruption Laws.

(ii)     The Obligors have implemented and maintain policies and procedures designed to promote and achieve compliance with applicable Anti-Corruption Laws; and

(iii)     The Borrower will not, directly or indirectly, use any part of any proceeds of the Loans in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money or anything else of value to any Person in a manner that would constitute or give to a violation of applicable Anti-Corruption Laws.

(u)     **AML Laws; FinCen Regulations**.

(i)     None of the Obligors nor any of their respective directors or officers or, to the knowledge of the Borrower, employees, agents or Affiliates: (A) has, in the past five (5) years, taken any action, directly or indirectly, that would constitute or give rise to a violation of applicable AML Laws;

(ii)     The Obligors have implemented and maintain policies and procedures designed to promote and achieve compliance with applicable AML Laws;

(iii)     The Borrower will not, directly or indirectly, use any part of any proceeds of the Loans for any activity that would constitute or give rise to violation of applicable AML Laws; and

(iv)     The information included in the Beneficial Ownership Certification is true and correct in all respects.

(v)     **Environmental Compliance**.  Without limiting the generality of Sections 8.1(p) (*Representations and Warranties of the Borrower*) and 8.1(r) (*Representations and Warranties of the Borrower*):

(i)     the Borrower and its Subsidiaries, and, to the knowledge of the Borrower and its Subsidiaries, the conduct of the care and maintenance of the Project, is in compliance with all Environmental and Social Requirements in each case and, as applicable, in accordance with the actions and time schedules established in any Corrective Action Plan;

(ii)     the Borrower and its Subsidiaries have obtained, and maintained in full force and effect, all material Environmental Licenses any of them are currently required to hold and that are necessary to maintain and operate the Project;

      (iii)     no Hazardous Substances have been generated, used, treated, recycled, stored on or transported to or from, or Released on, or to the knowledge of the Borrower, are migrating from or are present on all or any portion of the Project Real Property or the Project, except to the extent any such Hazardous Substance would not reasonably be expected to result in a material Environmental Claim (save where any Environmental Claim has been notified in accordance with Sections 11.3(a) (*Notifications to the Senior Lenders*) and 11.3(b) (*Notifications to the Senior Lenders*)) against the Borrower, any of its Subsidiaries or with respect to the Project; and

      (iv)     none of the Borrower, its Subsidiaries nor the Project is subject to any pending or, to the knowledge of the Borrower, threatened Environmental Claim (save where any Environmental Claim has been notified in accordance with Sections 11.3(a) (*Notifications to the Senior Lenders*) and 11.3(b) (*Notifications to the Senior Lenders*)), (and, to the knowledge of the Borrower or its Subsidiaries, there is no basis for any such Environmental Claim), (save where any Environmental Claim has been notified in accordance with Sections 11.3(a) (*Notifications to the Senior Lenders*) and 11.3(b) (*Notifications to the Senior Lenders*)).

(w)    **Community Matters**.  Neither the Borrower nor its Subsidiaries have received notice that the Project Real Property or the Project is subject to any material actions, suits and proceedings (including arbitral and administrative proceedings) by indigenous peoples that are individually, or in the aggregate, material, and, to the knowledge of the Borrower or its Subsidiaries, there are no such current, pending or threatened (in writing) actions, suits or proceedings materially affecting the Project Real Property or the Project.  Neither the Borrower nor its Subsidiaries have received notice of any claim or assertion, written or oral, whether proven or unproven, from any other such affected persons or groups, or Persons acting on their behalf, with respect to any title (including collective title), rights or other interests which could reasonably be expected to conflict with the Project if such claim or assertion were valid.

(x)    **Employee and Labor Matters**.  The Borrower, and each of its Subsidiaries, is in material compliance with all Applicable Laws and Performance Standards in respect of employment and employment practices, terms and conditions of employment, pay equity and wages; there is not currently any labor disruption or conflict involving the Borrower, its Subsidiaries or directly affecting the Project.  Neither the Borrower nor its Subsidiaries are a party to a collective bargaining agreement.  None of the Borrower's Subsidiaries have any employees.

(y)    **Security**.  The Borrower has implemented security practices and procedures at the Project in accordance with Applicable Laws and consistent with the Good Industry Practice.

(z)    **Employee Benefit Plans**.  Each Employee Benefit Plan mandated by a Governmental Body that is intended to qualify for special tax treatment meets all of the requirements for such treatment and has obtained all necessary approvals of all relevant Governmental Bodies.  No Employee Benefit Plan has any unfunded liabilities, determined in accordance with IFRS, that have not been fully accrued on the Financial Statements or that will not be fully offset by insurance.  All Employee Benefit Plans are registered where required by, and are in good standing under, all Applicable Laws.  For purposes of this Section 8.1(z) (*Representations and Warranties of the Borrower*), "**Employee Benefit Plan**" means any employee benefit plan, pension plan, program, policy or arrangement sponsored, maintained or contributed to by the Borrower or with respect to which the Borrower has any liability or obligation.  No event has occurred and no condition exists that could subject Borrower or its Subsidiaries, either directly or by reason of its affiliation with any member of their Controlled Group, to any liability imposed by Title IV of ERISA, or to any lien imposed

by Section 430 of the IRC or Section 303 or Title IV of ERISA. "Controlled Group" means any trade or business (whether or not incorporated) (i) which is or has at any relevant time been under common control within the meaning of Section 4001(b)(1) of ERISA with Borrower or its Subsidiaries or (ii) which together with Borrower or its Subsidiaries is or was at any relevant time treated as a single employer under Section 414(b), (c), (m) or (o) of the IRC.

(aa)    **Taxes**.  The Borrower and its Subsidiaries have filed all material federal, state and other tax returns and reports required to be filed, have paid all material federal, state and other taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except (i) to the extent prohibited by the automatic stay of the Bankruptcy Code (or the applicable provision of the CCAA), (ii) for the Tax Encumbrances, and (iii) for Taxes that are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves are being maintained in accordance with IFRS.

(bb)    **Intellectual Property**.  The Borrower owns, licenses or otherwise has the right to use all material licenses, Authorizations, patents, patent applications, trademarks, trademark applications, service marks, trade names, copyrights, copyright applications, franchises, authorizations and other intellectual property rights that are necessary for the operation of its business, without infringement upon or conflict with the rights of any other Person with respect thereto (other than any intellectual property the absence of which or any such infringement upon or conflict with respect to which would not have a material impact on the Borrower's ability to maintain or operate the Project and carry on the Business).

(cc)    **Books and Records**.  The minute books and corporate records of the Borrower and each of its Subsidiaries are true and correct in all material respects and contain all minutes of all meetings and all resolutions of the shareholders or directors (or any committee thereof), as applicable, of the Borrower.

(dd)    **Financial Statements**.

(i)     The Borrower's Financial Statements have been prepared in accordance with IFRS applied on a consistent basis throughout and complied, as of their date of filing, and such Financial Statements present fairly, in all material respects, the financial condition of the Borrower and its Subsidiaries (on a consolidated basis), as at the date specified therein and for the period then ended.  The Borrower does not intend to correct or restate, nor, to the knowledge of the Borrower, is there any basis for any correction or restatement of, any aspect of its Financial Statements.

(ii)    There are no off-balance sheet transactions, arrangements, obligations (including contingent obligations) or other relationships of the Borrower or any of its Subsidiaries with unconsolidated entities or other Persons.

(iii)   PricewaterhouseCoopers (PwC) has been the auditor of the Borrower since April 10, 2018.

(ee)    **Absence of Change**.  Except for the Chapter 11 Cases and the Recognition Proceedings and the facts disclosed in the filings made in connection therewith (including any filing with the SEC prior to the Petition Date) and for the transition of the operations of the Project to care and maintenance, since the Petition Date, there has been no event, change or effect which, individually or in the aggregate, has had a Material Adverse Effect.

(ff)    **Related-Party Transactions**.  Except as disclosed on Schedule T (*Related-Party Transactions*) or as permitted by this Agreement after the date hereof, neither Borrower nor any of its Subsidiaries have:  (i) made any payment or loan to, or borrowed any moneys from or otherwise been indebted to, any Related Party thereof; or (ii) been a party to any contract with any Related Party thereof, other than independent contractor or indemnification agreements entered into with officers or directors of the Borrower which, in the case of clause (i) or (ii) hereof, remains in effect on the date hereof.

(gg)    **Other Contracts**.  No Obligor has entered in any material contracts relating to the Project (other than the Project Documents, Finance Documents, the First Lien Facility, the WCF Capital Facility and the Fourth Lien Facility) that have not been disclosed in writing to the Finance Parties.

(hh)    **No Liabilities**.  Neither the Borrower nor any of its Subsidiaries has any material liabilities, contingent or otherwise, that would be required to be reflected in the Borrower's Financial Statements in accordance with IFRS, other than those (i) reflected in the most recently delivered Financial Statements and the Finance Documents or (ii) arising in the ordinary course of business since the date of the most recently delivered Financial Statements.

(ii)    **Litigation**.  Subject to any restrictions arising on account of the Borrower's status as a "debtor" under the Bankruptcy Code and other than the Chapter 11 Cases, the right of the relevant parties to investigate and challenge this Agreement and the facilities provided hereunder during the applicable Challenge Periods (as provided and defined in the DIP Order), and as disclosed in Schedule W (*Litigation Disclosure*), there are no Orders which remain unsatisfied against the Borrower or its Subsidiaries or consent decrees or injunctions to which the Borrower or its Subsidiaries are subject which would have a Material Adverse Effect on the Borrower and its Subsidiaries taken as a whole.  There are no material investigations, actions, suits or proceedings at law or in equity or by any Person by or before any Governmental Body pending or, to the knowledge of the Borrower, threatened against or directly affecting the Borrower (or any of its properties or assets) or otherwise having a material impact on the ability of the Borrower to develop or operate the Project and, to the knowledge of the Borrower, there is no ground on which any such action, suit or proceeding might be commenced.

(jj)    **Debt Instruments**.  The Borrower and its Subsidiaries do not have any Debt other than Permitted Debt.

(kk)    **No Subordination**.  There is no contract to which the Borrower is a party or by which it or any of its properties or assets may be bound that requires the subordination in right of payment of any of the Obligations under the Finance Documents to any other obligation of it.

(ll)    **[Reserved]**.

(mm)    **No Default**.  No Default or Event of Default has occurred and is continuing.

(nn)    **Disclosure**.  All information which has been prepared by or on behalf of the Borrower relating to the Obligors and their Subsidiaries and/or in connection with the Project or its financing (including in connection with the Streaming Agreement) and disclosed in writing to the Finance Parties or any one of them, is, as of the date of such information, true, complete and accurate in all material respects.

(oo)    **[Reserved]**.

(pp)    **[Reserved]**.

(qq)    **Senior Obligations**. After the entry of the DIP Order, and pursuant to and to the extent permitted in the DIP Order, as provided in Section 364(c)(1) of the Bankruptcy Code, the Obligations of the Obligors constitute allowed senior administrative expenses against each of the Obligors in the Chapter 11 Cases (without the need to file any proof of claim or request for payment of administrative expense), with priority, subject only to the Carve-Out, the Administration Charge and as otherwise set forth in the DIP Order or the DIP Recognition Order, over any and all other administrative expenses, adequate protection claims, diminution claims and all other claims against the Obligors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expense claims arising under Sections 105, 326, 328, 330, 331, 361, 362, 363, 503, 506, 507(a), 507(b), 546, 552, 726, 1113 and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other nonconsensual Lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which shall be payable from and have recourse to all pre- and post-petition property of the Obligors and their estates and all proceeds thereof, including, without limitation, and subject to entry of the Final Order, any proceeds of Avoidance Actions.

(rr)    **Valid Security Interests**.  This Agreement and the other Finance Documents, upon execution and delivery thereof by the parties thereto and entry of the DIP Order and the DIP Recognition Order (and subject to the terms therein), will create in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described herein and therein and the proceeds thereof, which security interest shall be deemed valid and perfected upon entry of the DIP Order and the DIP Recognition Order with respect to each Obligor and which shall constitute continuing Encumbrances on the Collateral having priority on the Collateral as set forth in the DIP Order, securing all the Obligations.  The Senior Lenders shall not be required to file or record (but shall have the option and authority to file or record) any financing statements, mortgages, notices of Lien or similar instruments, in any jurisdiction or filing office or to take any other action in order to validate, perfect or establish the priority of the Encumbrances and security interest granted by or pursuant to this Agreement, any other Finance Document, the DIP Order and the DIP Recognition Order.

(ss)    **Investment Company Act of 1940**.  The Borrower is not, and after giving effect to the transactions contemplated hereby, will not be, subject to registration as an "investment company" or "controlled" by a company subject to registration as an "investment company," within the meaning of the United States Investment Company Act of 1940, as amended.

(tt)    **Margin Regulations**.  The Borrower is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying any "margin stock" (as defined in Regulation U of the Board of Governors of the Federal Reserve System of the United States) or to extend credit to others for such purpose and no part of the proceeds of any Loan will be used for the purpose whether immediate, incidental or ultimate, of buying or carrying any "margin stock" (as defined in Regulation U of the Board of Governors of the Federal Reserve System of the United States) or to extend credit to others for such purpose.  No part of the proceeds of any Loan will be used, whether directly or indirectly and whether immediately, incidentally or ultimately, for any purpose which entails a violation of or which is inconsistent with Regulation G, T, U or X promulgated by the Board of Governors of the

Federal Reserve System of the United States (12 C.F.R. Sections 207, 220, 221 and 224, respectively).

(uu)    **Use of Proceeds**.  The proceeds of all Utilizations have been and will be used in accordance with the terms and conditions of this Agreement and all applicable Finance Documents.

(vv)    **Streaming Agreement**.  Except as a result of the Chapter 11 Cases or the Recognition Proceedings or to the extent arising prior to the Petition Date, no event has occurred or circumstance exists that (with or without the giving of notice or lapse of time or both) has contravened, conflicted with or resulted in or given any Person the right to declare a default and exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate or modify, the Streaming Documents and, to the knowledge of the Borrower, each other Person that is party thereto is in compliance in all material respects with the terms and requirements thereof.  Without limiting the generality of the foregoing, except as a result of the Chapter 11 Cases or the Recognition Proceedings or arising prior to the Petition Date:

    (i)    neither the Borrower, nor, to the knowledge of the Borrower, any other Person, is in default or breach in the observance or performance of any material term, covenant or obligation to be performed by the Borrower or such Person under the Streaming Documents and the Streaming Documents are in good standing, constitutes a valid and binding agreement of each of the parties thereto, is in full force and effect and is enforceable in accordance with its terms, except to the extent enforcement may be affected by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar Applicable Laws affecting creditors' rights generally and subject to generally applicable principles of equity; and

    (ii)    the Borrower has no knowledge of the invalidity of or grounds for rescission, avoidance or repudiation of any such Streaming Document and the Borrower has not received notice of any sanctioning procedure by a Governmental Body or notice of any intention to terminate any such Streaming Document or repudiate or disclaim any transaction contemplated thereby.

**8.2**    **Survival of Representations and Warranties**.

(a)    The representations and warranties made in this Agreement are made by the Borrower as of the date hereof.

(b)    The representations and warranties made in this Agreement are deemed to be made to each Finance Party by reference to the fact and circumstances then existing on each applicable date on which the representations and warranties are made notwithstanding any investigation made at any time by or on behalf of the Administrative Agent or the Senior Lenders.

<div align="center">

**Article 9**
**SECURITY**

</div>

**9.1**    **Grant of Security Interest**.

Each of the Obligors, to secure the timely payment (whether at stated maturity, by acceleration or otherwise) of the Obligations, hereby assigns, grants and pledges to the Collateral Agent for the equal and ratable benefit of the Secured Parties a first priority perfected lien (subject to the Carve-Out and Administration Charge and as otherwise set forth in the DIP Order or DIP Recognition Order) on and continuing security interest in and to the following (in each case, as to each type of property described

below, whether now owned or hereafter acquired by the Obligors, and whether now or hereafter existing or arising) (collectively, the "**Collateral**"):

(a)       all mine inventory including any coarse ore in stockpile, crushed ore in stockpile, ore in process, or copper in inventory from time to time (other than any WCF Collateral);

(b)       all right, title and interest of the Borrower and the Subsidiaries to any proceeds arising from, in connection with or under any Expropriation Event, together with, if an Event of Default has occurred and is continuing, full power and authority, in its name or otherwise, to institute proceedings (whether before a court or judge or by way of arbitration or otherwise) to enforce such claims, execute judgments or awards made pursuant thereto and collect and receive all proceeds arising from, in connection with or under any Expropriation Event;

(c)       all equipment in all of its forms, including all machinery, tools, motor vehicles, vessels, aircraft, furniture and fixtures, and all parts thereof and all accessions thereto, including computer programs and supporting information that constitute equipment within the meaning of the UCC;

(d)       all accounts, chattel paper (including, without limitation, tangible chattel paper and electronic chattel paper), instruments (including, without limitation, promissory notes), letter-of-credit rights, general intangibles and other obligations of any kind, whether or not arising out of or in connection with the sale or lease of goods or the rendering of services and whether or not earned by performance, and all rights now or hereafter existing in and to all supporting obligations and in and to all security agreements, mortgages, liens, leases, letters of credit and other contracts securing or otherwise relating to the foregoing property (any and all of such accounts, chattel paper, instruments, letter-of-credit rights, general intangibles and other obligations, to the extent not referred to in clause (e) or (f) below, being the "**Receivables**", and any and all such supporting obligations, security agreements, mortgages, liens, leases, letters of credit and other contracts being the "**Related Contracts**");

(e)       the following (the "**Account and Investment Property**"):

(i)       all indebtedness from time to time owed to the Obligors, including Subordinated Intercompany Debt and other intercompany debt permitted by the Cash Management Order and all promissory notes, checks or other instruments, if any, evidencing such indebtedness, and all interest, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for or all of such indebtedness;

(ii)       the Capital Stock held by the Obligors and identified on Schedule C (*Pledged Interests*) hereto, including the Obligor's Capital Stock in each of the Issuers, and (A) the Obligor's status as an equity holder of each Issuer and the Obligor's right to vote, nominate members of the board or otherwise participate in the management of the business and affairs of such Issuer and any other right of the Obligor as an equity holder of such Issuer (the "**Initial Pledged Interests**") and the certificates, if any, representing the Initial Pledged Interests, and all equity dividends, cash dividends, cash, instruments, chattel paper and other rights, property or proceeds and products (including all other payments due or to become due to the Obligor as an equity holder in respect of the Initial Pledged Interests, including all rights of the Obligor to receive proceeds of any insurance, indemnity, warranty or guaranty with respect to the Initial Pledged Interests), from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Initial Pledged Interests and (B) all claims of the Obligor for damages arising out of or for breach of or default under any right of the Obligor as an equity holder;

67

(iii)    all additional Capital Stock of each Issuer at any time acquired by the Obligor in any manner, and (A) the certificates representing such additional Capital Stock (and any such additional Capital Stock, along with the Initial Pledged Interests shall constitute "**Pledged Interests**"), and all equity dividends, cash dividends, distributions, cash, instruments, chattel paper and other rights, property or proceeds and products from time to time received, receivable or otherwise distributed in respect of or in exchange for any additional Pledged Interests, (B) all other payments due or to become due to the Obligor as an equity holder in respect of the additional Pledged Interests, including all rights of the Obligor to receive proceeds of any insurance, indemnity, warranty or guaranty with respect to additional Pledged Interests, (C) all claims of the Obligor for damages arising out of or for breach of or default under any right of the Obligor as an equity holder of additional Pledged Interests and (D) all the Obligor's ownership interests as an equity holder in respect of the additional Pledged Interests in the property of each Issuer;

(iv)    all deposit accounts and all funds from time to time credited thereto and all certificates and instruments, if any, from time to time, representing or evidencing such deposit accounts;

(v)    all other investment property (including, without limitation, all (A) securities, whether certificated or uncertificated; (B) security entitlements; (C) securities accounts; (D) commodity contracts; (E) financial assets; and (F) commodity accounts) from time to time in which the Obligors have now, or acquire from time to time hereafter, any right, title or interest in any manner, and the certificates or instruments, if any, representing or evidencing such investment property; and

(vi)    all dividends, distributions, return of capital, interest, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the types of property referred to in clauses (i) through (v) above and all warrants, rights or options issued thereon or with respect thereto;

(f)    all of the Obligors' rights, title and interest in and to the Contract Rights and all other Contractual Obligations to which any of the Obligors are now or may hereafter become a party, in each case as such Contractual Obligations may be amended, amended and restated, supplemented or otherwise modified from time to time (collectively, the "**Assigned Agreements**"), including (i) all rights of the Obligors to receive monies due and to become due under or pursuant to the Assigned Agreements, (ii) all rights of the Obligors to receive proceeds of any insurance, indemnity, warranty or guaranty with respect to the Assigned Agreements or any other instrument, agreement or other document delivered pursuant thereto, (iii) claims of the Obligors for damages arising out of or for breach of or default under the Assigned Agreements, and (iv) the right of the Obligors to terminate the Assigned Agreements, to perform thereunder and to compel performance and otherwise exercise all remedies thereunder (all such Collateral referred to in this clause (f) being the "**Agreement Collateral**");

(g)    the following:

(i)    all patents, patent applications, utility models and statutory invention registrations, all inventions claimed or disclosed therein and all improvements thereto;

(ii)    all trademarks, service marks, domain names, trade dress, logos, designs, slogans, trade names, business names, corporate names and other source identifiers, whether registered or unregistered (provided, that no security interest shall be granted in United States intent-to-use trademark applications to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark

68

applications under applicable federal law), together, in each case, with the goodwill symbolized thereby;

(iii)    all copyrights, including copyrights in Computer Software (as hereinafter defined), internet web sites and the content thereof, whether registered or unregistered;

(iv)    all computer software, programs and databases (including source code, object code and all related applications and data files), firmware and documentation and materials relating thereto, together with any and all maintenance rights, service rights, programming rights, hosting rights, test rights, improvement rights, renewal rights and indemnification rights and any substitutions, replacements, improvements, error corrections, updates and new versions of any of the foregoing ("**Computer Software**");

(v)    all confidential and proprietary information, including, without limitation, know-how, trade secrets, manufacturing and production processes and techniques, inventions, research and development information, databases and data, including, without limitation, technical data, financial, marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and information, and all other intellectual, industrial and intangible property of any type, including, without limitation, industrial designs and mask works, and all tangible embodiments of the foregoing, all rights in the foregoing provided by international treaties or conventions, all rights corresponding thereto throughout the world and all other rights of any kind whatsoever of the Obligors accruing thereunder or pertaining thereto;

(vi)    all registrations and applications for registration for any of the foregoing;

(vii)    any and all claims for damages and injunctive relief for past, present and future infringement, dilution, misappropriation, violation, misuse or breach with respect to any of the foregoing, with the right, but not the obligation, to sue for and collect, or otherwise recover, such damages;

(h)    any tort, indemnity, warranty or guarantee claims under commercial contracts (the "**Commercial Tort Claims Collateral**");

(i)    any and all of the Obligors' interest under any and all policies of insurance (including any substitutions therefor or conversions thereof, and any supplementary contracts issued in connection therewith on certain property of the Obligors', collectively the "**Assigned Insurance Policies**"), including, without limitation, (i) all rights of the Obligors to receive monies due and to become due under or pursuant to the Assigned Insurance Policies, including, without limitation, all insurance proceeds paid or payable upon the occurrence of an Event of Loss together with all dividends, benefits and advantages at any time appertaining thereto or derived therefrom, (ii) all claims of the Obligors for damages arising out of or for breach of or default under the Assigned Insurance Policies and (iii) all other rights, remedies, options, benefits and privileges of the Obligors under the Assigned Insurance Policies, including, without limitation, all title and interest in and to the Assigned Insurance Policies and all rights to terminate, amend, supplement, modify or waive performance under the Assigned Insurance Policies and to compel performance and otherwise to exercise all rights and remedies thereunder;

(j)    all claims in respect of intercompany transfers of proceeds of the Loans or of cash and cash equivalents from any Debtor to Parent;

(k)    all books and records (including, without limitation, customer lists, credit files, printouts and other computer output materials and records) of the Obligors pertaining to any of the Collateral;

(l)      all proceeds of, collateral for, income, royalties and other payments now or hereafter due and payable with respect to, and supporting obligations relating to, any and all of the Collateral (including, without limitation, proceeds, collateral and supporting obligations that constitute property of the types described in clauses (a) through (h) of this Section 9.1 (*Grant of Security Interest*)) and, to the extent not otherwise included, all (i) payments under insurance (whether or not the Collateral Agent is the loss payee thereof), or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing Collateral, and (ii) cash; and

(m)      all other tangible and intangible personal property whatsoever.

Upon the repayment in full and discharge of all obligations under the Working Capital Facility, each of the Obligors, to secure the timely payment (whether at stated maturity, by acceleration or otherwise) of the Obligations, shall automatically, without further action from any party, assign, grant and pledge to the Collateral Agent for the equal and ratable benefit of the Secured Parties in accordance with the DIP Order and DIP Recognition Order, a first priority perfected lien(subject to the Carve-Out and Administration Charge and as otherwise set forth in the DIP Order or DIP Recognition Order) on and continuing security interest in and to the WCF Collateral.

## 9.2      Security for Obligations.

The grant of security interests under Section 9.1 (*Grant of Security Interest*) secures the payment of all Obligations now or hereafter existing under the Finance Documents, and with respect to the WCF Collateral in accordance with the DIP Order and DIP Recognition Order, whether direct or indirect, absolute or contingent, and whether for principal, reimbursement obligations, interest, fees, premiums, penalties, indemnifications, contract causes of action, costs, expenses or otherwise.  Without limiting the generality of the foregoing, the grant of security interests under Section 9.1 (*Grant of Security Interest*) secures the payment of all amounts that constitute part of the Obligations and would be owed by the Obligors to any Secured Party under the Finance Documents, and with respect to the WCF Collateral in accordance with the DIP Order and DIP Recognition Order, but for the fact that they are unenforceable or not allowable due to the existence of any bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar Applicable Laws affecting creditors' rights generally and subject to generally applicable principles of equity involving the Obligors.

## 9.3      Obligors Remain Liable.

Anything herein to the contrary notwithstanding, (a) the applicable Obligor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by any Secured Party of any of is respective rights hereunder shall not release the applicable Obligor from any of its duties or obligations under the contracts and agreements included in the Collateral, and (c) no Secured Party shall have any obligation or liability under the contracts and agreements included in the Security solely by reason of this Agreement or any other Finance Document, except as set forth in section 9-207 of the UCC or the receipt by the Collateral Agent of any payment relating to any Collateral, nor shall any Secured Party be obligated to perform any of the obligations or duties of the applicable Obligor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

## 9.4      Delivery and Control of Account and Investment Property.

(a)      Upon request of the Collateral Agent (acting at the direction of the Majority Lenders) and subject to any order of the Bankruptcy Court (including the DIP Order) or Canadian Court (including the DIP Recognition Order), the Obligors shall ensure that all certificates or instruments representing

or evidencing Account and Investment Property shall be delivered to and held by or on behalf of the Collateral Agent pursuant hereto and shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance satisfactory to the Collateral Agent. The Collateral Agent (acting at the direction of the Majority Lenders) shall have the right at any time after an Event of Default has occurred and is continuing to (i) exchange certificates or instruments representing or evidencing Account and Investment Property for certificates or instruments of smaller or larger denominations and (ii) to exercise the voting rights attributable to the Account and Investment Property. The Obligors hereby make, constitute, and appoint the Collateral Agent and its officers as the proxies and attorneys-in-fact of and for the Obligors, with full power to exercise or to refrain from exercising any and all voting rights attributable to the Account and Investment Property upon the occurrence and during the continuance of any Event of Default. Upon the occurrence and during the continuance of an Event of Default, all rights of the Obligors to receive and retain cash dividends and other distributions upon the Account and Investment Property shall cease and shall thereupon be vested in the Collateral Agent, and the Obligors shall promptly deliver, or shall cause to be promptly delivered, all such cash dividends and other distributions with respect to the Account and Investment Property to the Collateral Agent (together with all necessary endorsements and negotiable documents or instruments so distributed) to be held as additional collateral or applied to the Obligations.

(b)     With respect to any Account and Investment Property that constitutes an uncertificated security, upon request of the Collateral Agent (acting at the direction of the Majority Lenders) and subject to any order of the Bankruptcy Court (including the DIP Order) or Canadian Court (including the DIP Recognition Order), the Obligors will cause the issuer thereof either (i) to register the Collateral Agent as the registered owner of such security or (ii) to agree with the Borrower and the Collateral Agent that such issuer will comply with instructions with respect to such security originated by the Collateral Agent without further consent of the Obligors, such agreement to be in form and substance reasonably satisfactory to the Collateral Agent (acting at the direction of the Majority Lenders).

(c)     With respect to any Account and Investment Property that is located in the United States and constitutes a security entitlement, upon request of the Collateral Agent (acting at the direction of the Majority Lenders) and subject to any order of the Bankruptcy Court (including the DIP Order), the Obligors will cause such financial institution with respect to such security entitlement either to (i) identify in its records the Collateral Agent as the entitlement holder thereof or (ii) agree with the Borrower and the Collateral Agent that such financial institution will comply with entitlement orders originated by the Collateral Agent without further consent of the Borrower, such agreement to be in form and substance reasonably satisfactory to the Collateral Agent (acting at the direction of the Majority Lenders).

(d)     Upon the request of the Collateral Agent (acting at the direction of the Majority Lenders), and subject to any order of the Bankruptcy Court (including the DIP Order) or Canadian Court (including the DIP Recognition Order), at any time after the occurrence of and during the continuance of an Event of Default, the Obligors will notify each issuer of Account and Investment Property granted by them hereunder that such Account and Investment Property is subject to the security interest granted hereunder.

**9.5     Further Assurances – Security**.

At any time and from time to time, the Obligors shall give, execute, file and/or record any notice, financing statement, continuation statement, public deed, instrument, document or agreement and shall take, or cause

to be taken, such action, in each case as is necessary or as any Senior Lender may consider necessary or reasonably desirable to create, preserve, continue, perfect or validate any security interest granted hereunder or pursuant hereto or to enable the Collateral Agent to exercise or enforce its rights hereunder with respect to such security interest.  Without limiting the generality of the foregoing, the Majority Lenders, on behalf of the Collateral Agent, shall be authorized (a) to file or cause the filing under the laws of the State of New York or other applicable law financing statements, continuation statements or other documents in connection with such security interest, and (b) to execute and file or cause the execution and filing of public deeds or other instruments or documents under the laws of Canada necessary to preserve such security interest, in each case without the signature of the Obligors (to the extent permitted by law).

**9.6**    **Remedies**.

(a)    Each Obligor recognizes that the Collateral Agent may be unable to effect a public sale of any or all of the Collateral that constitutes securities to be sold by reason of certain prohibitions contained in the laws of any jurisdiction outside the United States or in applicable federal, provincial, territorial or state securities laws but may be compelled to resort to one or more private sales thereof to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such Collateral to be sold for their own account for investment and not with a view to the distribution or resale thereof.  Each Obligor acknowledges and agrees that any such private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall, to the extent permitted by law, be deemed to have been made in a commercially reasonable manner.  Unless required by applicable law, the Collateral Agent shall not be under any obligation to delay a sale of any of such Collateral to be sold for the period of time necessary to permit the issuer of such securities to register such securities under the laws of any jurisdiction outside the United States or under any applicable federal, provincial, territorial or state securities laws, even if such issuer would agree to do so.  Each Obligor further agrees to do or cause to be done, to the extent that such Obligor may do so under applicable law, all such other acts and things as may be necessary to make such sales or resales of any portion or all of such Collateral or other property to be sold valid and binding and in compliance with any and all applicable laws at the Obligors' expense.  Each Obligor further agrees that a breach of any of the covenants contained in this Section 9.6(a) (*Remedies*) will cause irreparable injury to the Secured Parties for which there is no adequate remedy at law and, as a consequence, agrees that each covenant contained in this Section 9.6(a) (*Remedies*) shall be specifically enforceable against such Obligor, and each Obligor hereby waives and agrees, to the fullest extent permitted by law, not to assert as a defense against an action for specific performance of such covenants that (i) such Obligor's failure to perform such covenants will not cause irreparable injury to the Secured Parties or (ii) the Secured Parties have an adequate remedy at law in respect of such breach.  Each Obligor further acknowledges the impossibility of ascertaining the amount of damages which would be suffered by the Secured Parties by reason of a breach of any of the covenants contained in this Section 9.6(a) (*Remedies*) and, consequently, agrees that, if such Obligor shall breach any of such covenants and the Secured Parties shall sue for damages for such breach, such Obligor shall pay to the Collateral Agent, for the benefit of the Secured Parties, as liquidated damages and not as a penalty, an aggregate amount equal to the value of the Collateral or other property to be sold on the date the Collateral Agent shall demand compliance with this Section 9.6(a) (*Remedies*) .

(b)    Subject to the terms of the DIP Order and the DIP Recognition Order and the passing of the Remedies Notice Period, if an Event of Default has occurred and is continuing, the Collateral Agent shall have for the benefit of the Secured Parties, in addition to all other rights of the Secured Parties, the rights and remedies of a secured party under the UCC and the PPSA, and without limiting the generality of the foregoing, the Collateral Agent(acting at the direction of the Majority Lenders)

shall be empowered and entitled to: (i) take possession of, foreclose on and/or request a receiver of the Collateral and keep it on any Obligor's premises at any time, at no cost to the Secured Parties, or remove any part of it to such other place or places as the Collateral Agent may determine, or the Obligors shall, upon the Majority Lender's demand, at the Obligors' cost, assemble the Collateral and make it available to the Collateral Agent at a place reasonably convenient to the Collateral Agent; (ii) exercise of set-off rights on cash collateral or deposits; (iii) sell and deliver any Collateral at public or private sales, for cash, upon credit or otherwise, at such prices and upon such terms as the Majority Lenders deem advisable, in their sole discretion, and may postpone or adjourn any sale of the Collateral by an announcement at the time and place of sale or of such postponed or adjourned sale; (iv) hold, lease, develop, manage, operate, control and otherwise use the Collateral upon such terms and conditions as may be reasonable under the circumstances (making such repairs, alterations, additions and improvements and taking other actions, from time to time, as may be reasonably necessary or desirable), exercise all such rights and powers of each Obligor with respect to the Collateral, whether in the name of such Obligor or otherwise, including without limitation the right to make, cancel, enforce or modify leases, obtain and evict tenants, and demand, sue for, collect and receive all rents, in each case, in accordance with the standards applicable to the Collateral Agent under the Finance Documents, and (v) take any other reasonable actions, as may be reasonably necessary or desirable, in connection with the Collateral (including preparing for the disposition thereof), and all actual, reasonable, out-of-pocket fees and expenses incurred in connection therewith shall be borne by the Obligors.  Promptly following written demand from the Collateral Agent (acting at the direction of the Majority Lenders), the applicable Obligor shall direct the grantor or licensor of, or the contracting party to, any property agreement with respect to any property to recognize and accept the Collateral Agent, for the benefit of and on behalf of the Secured Parties, as the party to such agreement for any and all purposes as fully as it would recognize and accept such Obligor and the performance of such Obligor thereunder and, in such event, without further notice or demand and at such Obligor's sole cost and expense, the Collateral Agent, for the benefit of and on behalf of the Secured Parties, may exercise all rights of such Obligor arising under such agreements.  Without in any way requiring notice to be given in the following manner, each Obligor agrees that any notice by the Collateral Agent of sale, disposition or other intended action hereunder or in connection herewith, whether required by the UCC and the PPSA or otherwise, shall constitute reasonable notice to such Obligor if such notice is mailed by registered or certified mail, return receipt requested, postage prepaid, or is delivered personally against receipt, at least five (5) Business Days prior to such action to the Obligors' address specified in or pursuant to Article 24 (*Notices*).  If any Collateral is sold on terms other than payment in full at the time of sale, no credit shall be given against the Obligations until the Collateral Agent or the Senior Lenders receive payment, and if the buyer defaults in payment, the Collateral Agent may resell the Collateral.  In the event the Collateral Agent seeks to take possession of all or any portion of the Collateral by judicial process, each Obligor irrevocably waives (to the extent permitted by applicable law):  (A) the posting of any bond, surety or security with respect thereto which might otherwise be required; (B) any demand for possession prior to the commencement of any suit or action to recover the Collateral; and (C) any requirement that the Collateral Agent retain possession and not dispose of any Collateral until after trial or final judgment.  Each Obligor agrees that the Collateral Agent has no obligation to preserve rights to the Collateral or marshal any Collateral for the benefit of any Person.  The Collateral Agent is hereby granted a license or other right to use, without charge, each Obligor's labels, patents, copyrights, name, trade secrets, trade names, trademarks and advertising matter, or any similar property, in completing production of, advertising or selling any Collateral, and each such Obligor's rights under all licenses and all franchise agreements shall inure to the Collateral Agent's benefit for such purpose.  The Collateral Agent will return any excess to the applicable Obligor and the Obligors shall remain liable for any deficiency.  The proceeds of sale shall be applied as required pursuant to Section 13.4 (*Application of Proceeds*) hereof.

73

**9.7**     **Security Effective Notwithstanding Date of the Loans**.

The Security shall be effective and the undertakings in this Agreement and the other Finance Documents with respect thereto shall be continuing, whether the monies hereby or thereby secured or any part thereof shall be advanced before or after or at the same time as the creation of any such Security or before or after or upon the date of execution of this Agreement.  The Security shall not be affected by any payments under this Agreement or any of the other Finance Documents but shall constitute continuing security interests to and in favor of the Collateral Agent for the benefit of the Secured Parties for the Obligations from time to time.

**9.8**     **No Merger**.

The Security shall not merge in any other security interests.  No judgment obtained by or on behalf of the Senior Lenders shall in any way affect any of the provisions of this Agreement, the other Finance Documents or the Security.  For greater certainty, no judgment obtained by or on behalf of the Senior Lenders shall in any way affect the obligation of the Borrower to pay interest or to pay other amounts at the rates, times and in the manner provided in this Agreement.

**9.9**     **Stockpiling**.

If the Borrower intends to stockpile, store, warehouse or otherwise place Minerals or other minerals forming part of the Collateral with a value in excess of $10,000,000 of the Project Real Property, before doing so, the Borrower shall obtain from the property owner, operator or both, as applicable, where such stockpiling, storage, warehousing or other placement occurs, to provide in favor of the Collateral Agent a written acknowledgment in form and substance satisfactory to the Majority Lenders, acting reasonably, which provides that the Borrower's and/or its Affiliates', as applicable, rights to the Minerals or other minerals forming part of the Collateral shall be preserved and which acknowledges the Senior Lenders' Encumbrances thereon and provides the Collateral Agent with a right of access in the event of enforcement by the Collateral Agent of the Security.

**Article 10**
**GUARANTY**

**10.1**     **Guaranty; Limitation of Liability**.

(a)     Each Guarantor, jointly and severally, hereby absolutely, unconditionally and irrevocably guarantees the performance and punctual payment when due, whether at scheduled maturity or on any date of a required prepayment or by acceleration, demand or otherwise, of all Obligations of each other Obligor now or hereafter existing under or in respect of the Finance Documents, whether direct or indirect, absolute or contingent, and whether for principal, interest, premiums, fees, indemnities, contract causes of action, costs, expenses or otherwise (such Obligations being the "**Guaranteed Obligations**"), and agrees to pay any and all reasonable out-of-pocket expenses (including reasonable out-of-pocket fees and expenses of counsel to the extent reimbursable pursuant to Sections 7.4 (*Payment of Costs and Expenses*) and 7.5 (*Indemnities*) but excluding allocated costs of in-house counsel) incurred by the Agents in enforcing any rights under the guarantee provided under this Article 10 (*Guaranty*) (the "**Guaranty**") or any other Finance Document.  Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by any other Obligor to any Agent or any Senior Lender under or in respect of the Finance Documents but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization, winding-up or similar proceeding involving such other Obligor.

(b)     Each Guarantor hereby unconditionally and irrevocably agrees that in the event any payment shall be required to be made to any Agent or any Senior Lender under this Guaranty, such Guarantor will contribute, to the maximum extent permitted by law, such amounts to each other Guarantor so as to maximize the aggregate amount paid to the Agents and the Senior Lenders under or in respect of the Finance Documents.

**10.2    Guaranty Absolute**.  Each Guarantor guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Finance Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Collateral Agent or any Senior Lender with respect thereto.  The Obligations of each Guarantor under or in respect of this Guaranty are independent of the Guaranteed Obligations or any other Obligations of any other Obligor under or in respect of the Finance Documents, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce this Guaranty, irrespective of whether any action is brought against the Borrower or any other Obligor or whether the Borrower or any other Obligor is joined in any such action or actions.  The liability of each Guarantor under this Guaranty shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to, any or all of the following:

(a)     any lack of validity or enforceability of any provision under this Agreement, any Finance Document or any agreement or instrument relating thereto;

(b)     any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations or any other Obligations of any other Obligor under or in respect of the Finance Documents, or any other amendment or waiver of or any consent to departure from any Finance Document, including any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Obligor or otherwise;

(c)     any taking, exchange, release or non-perfection of any Collateral, or any taking, release or amendment or waiver of, or consent to departure from, any other guaranty, for all or any of the Guaranteed Obligations;

(d)     any manner of application of Collateral, or proceeds thereof, to all or any of the Guaranteed Obligations, or any manner of sale or other disposition of any Collateral for all or any of the Guaranteed Obligations or any other Obligations of any Obligor under the Finance Documents or any other assets of any Obligor;

(e)     any change, restructuring or termination of the corporate structure or existence of any Obligor;

(f)     any failure of the Agents or any Senior Lender to disclose to any Obligor any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Obligor now or hereafter known to the Agents or such Senior Lender, as the case may be (each Guarantor waiving any duty on the part of the Agents and the Senior Lenders to disclose such information);

(g)     the failure of any other Person to execute or deliver this Guaranty or the release or reduction of liability of any Guarantor or surety with respect to the Guaranteed Obligations; or

(h)     any other circumstance (including any statute of limitations) or any existence of or reliance on any representation by the Agents or any Senior Lender that might otherwise constitute a defense

available to, or a discharge of, any Obligor or any other guarantor or surety, in its capacity as a guarantor or surety (other than payment or performance).

This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by the Collateral Agent or any Senior Lender or any other Person, for whatever reason, all as though such payment had not been made.

**10.3    Waivers and Acknowledgments**

(a)    Each Guarantor hereby unconditionally and irrevocably waives (to the extent permitted by applicable law) any right to revoke this Guaranty and acknowledges that this Guaranty is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

(b)    Each Guarantor hereby unconditionally and irrevocably waives (to the extent permitted by applicable law) (i) any defense arising by reason of any claim or defense based upon an election of remedies by any Agent or any Senior Lender that in any manner impairs, reduces, releases or otherwise adversely affects the subrogation, reimbursement, exoneration, contribution or indemnification rights of such Guarantor or other rights of such Guarantor to proceed against any of the other Obligors, any other guarantor or any other Person or any Collateral and (ii) any defense based on any right of set-off or counterclaim against or in respect of the Obligations of such Guarantor hereunder.

(c)    Each Guarantor acknowledges that the Collateral Agent may, to the extent permitted by applicable law and the DIP Order and the DIP Recognition Order, without notice to or demand upon such Guarantor and without affecting the liability of such Guarantor under this Guaranty, foreclose under any Finance Document by non-judicial sale, and each Guarantor hereby waives (to the extent permitted by applicable law) any defense to the recovery by the Collateral Agent and the Senior Lenders against such Guarantor of any deficiency after such non-judicial sale and any defense or benefits that may be afforded by applicable law.

(d)    Each Guarantor hereby unconditionally and irrevocably waives any duty on the part of any Agent or any Senior Lender to disclose to such Guarantor any matter, fact or thing relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Obligor or any of its Subsidiaries now or hereafter known by such Agent or such Senior Lender, as the case may be.

(e)    Each Guarantor acknowledges that it will receive substantial direct and indirect benefits from the financing arrangements contemplated by the Finance Documents and that the waivers set forth in Section 10.2 (*Guaranty Absolute*) and this Section 10.3 (*Waivers and Acknowledgments*) are knowingly made in contemplation of such benefits.

**10.4    Subrogation**

Each Guarantor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or hereafter acquire against the Borrower or any other Obligor that arise from the existence, payment, performance or enforcement of such Guarantor's Obligations under or in respect of this Guaranty or any other Finance Document, including any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Collateral Agent or any Senior Lender against the Borrower or any other Obligor, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including the right to take or receive from the Borrower or any other Obligor, directly or indirectly, in cash or other property or by set-off or in any other manner,

payment or security on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations (other than inchoate indemnity obligations and similar obligations that survive the termination of this Agreement) and all other amounts payable under this Guaranty (other than inchoate indemnity obligations and similar obligations that survive the termination of this Agreement) shall have been paid in full in cash and the Commitments shall have expired or been terminated.  If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the later of (a) the payment in full in cash of the Guaranteed Obligations and all other amounts payable under this Guaranty (other than inchoate indemnity obligations and similar obligations that survive the termination of this Agreement) and (b) the Maturity Date, such amount shall be received and held in trust for the benefit of the Collateral Agent and the Senior Lenders, shall be segregated from other property and funds of such Guarantor and shall forthwith be paid or delivered to the Collateral Agent in the same form as so received (with any necessary endorsement or assignment) to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Guaranty, whether matured or unmatured, in accordance with the terms of the Finance Documents, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Guaranty thereafter arising.  If (i) any Guarantor shall make payment to the Administrative Agent of all or any part of the Guaranteed Obligations, (ii) all of the Guaranteed Obligations and all other amounts payable under this Guaranty (other than inchoate indemnity obligations and similar obligations that survive the termination of this Agreement) shall have been paid in full in cash and (iii) the Maturity Date shall have occurred, the Collateral Agent and the Senior Lenders will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment made by such Guarantor pursuant to this Guaranty.

**10.5    Continuing Guaranty; Assignments**

This Guaranty is a continuing guaranty and shall (a) remain in full force and effect until the payment in full in cash of the Guaranteed Obligations (other than inchoate indemnity obligations and similar obligations that survive the termination of this Agreement) and all other amounts payable under this Guaranty (other than inchoate indemnity obligations and similar obligations that survive the termination of this Agreement) and the termination or expiration of all Commitments, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Administrative Agent and the Senior Lenders and their respective successors, transferees and assigns.   Without limiting the generality of clause (c) of the immediately preceding sentence, any Permitted Transferee that has been assigned or transferred all or any portion of a Senior Lender's Loans, Commitments or rights and obligations under this Agreement in accordance with Section 14.1 (*Assignment by Senior Lenders*), shall thereupon become vested with all the benefits granted to such transferring Senior Lender under this Guaranty.  No Guarantor shall have the right to assign its rights hereunder or any interest herein or delegate any of its duties, liabilities or obligations hereunder or under any other Finance Document without the prior written consent of the Majority Lenders, except as otherwise permitted hereby.

**10.6    Release**

(a)      An Obligor shall automatically be released from its obligations hereunder and the security interest in the Collateral of such Obligor shall be automatically released as it relates to the Obligations, upon the consummation of any transaction permitted under this Agreement as a result of which such Obligor ceases to be an Obligor.

(b)      The security interest granted hereby in any Collateral shall automatically and without further action be released upon the effectiveness of any written consent to the release of the security interest granted hereby in such Collateral pursuant to this Agreement.  Any such release in connection with

any sale, transfer or other disposition of such Collateral shall result in such Collateral being sold, transferred or disposed of, as applicable, free and clear of the Lien and security interest created hereby.

(c)     In connection with any termination or release pursuant to paragraph (a) or (b) above, so long as the Borrower shall have provided the Agents and Senior Lenders such certifications or documents as the Majority Lenders shall reasonably request, the Administrative Agent or the Collateral Agent (in each case, acting at the direction of the Majority Lenders) shall execute and deliver to any Obligor, at such Obligor's expense, all documents that such Obligor shall reasonably request to evidence such termination or release.

**Article 11**
**COVENANTS**

**11.1    Affirmative Covenants**.

The Borrower shall:

(a)     duly and punctually pay the Obligations at the times and places and in the manner required by the terms of the Finance Documents;

(b)     except to the extent excused by the Automatic Stay, applicable provision of the Bankruptcy Code or order of the Bankruptcy Court, maintain its corporate existence; keep proper books of account and records; maintain its good standing status (if applicable) at all times in all jurisdictions where it carries on business; and operate its business and maintain and operate the Project in accordance with Good Industry Practice, Applicable Law, Project Authorizations, Other Rights, Material Project Documents and solely with respect to Applicable Law, comply with Applicable Law in all material respects unless the Borrower has Contested the applicability of any Applicable Law or the Borrower's necessity to comply with it;

(c)     except as otherwise permitted by this Agreement or otherwise stayed by the Automatic Stay, maintain the Project Real Property in good standing, performing or causing to be performed all required assessment work thereon, paying or causing to be paid all concession, permit and license maintenances fees in respect thereof, paying or causing to be paid all rents and other payments in respect of leased properties forming a part thereof, paying all fees in connection with the unpatented mining claims (including fees payable to the United States Bureau of Land Management) and otherwise maintaining the Project Real Property in compliance, in all material respects, with Applicable Law and Good Industry Practice, except where the failure to make such payment (or cause such payment to be made) or to so own or maintain such Project Real Property would not reasonably be expected to materially and adversely affect the ownership, operation or safety of the Project;

(d)     subject to applicable health and safety procedures maintained by the Borrower in accordance with Applicable Law, Good Industry Practice and the Environmental and Social Requirements:

   (i)      the Borrower shall permit a monthly visit by two persons designated by the Senior Lenders at the cost and expense of the Borrower; and

   (ii)     at all times if an Event of Default shall have occurred and be continuing,

permit representatives from among the Administrative Agent, the Collateral Agent and, the Senior Lenders (including their consultants and/or the assignees) to enter into or onto its property to conduct inspections and testing, to inspect any of the Collateral and to examine its financial books, accounts and records and to discuss its financial condition with its senior officers and its auditors at the cost and expense of the Borrower (x) in the case of paragraph (d)(i), at a time agreed with the Borrower and (y) in the case of paragraph (d)(ii), at any time and upon reasonable advance notice in writing; provided, that in all cases (x) visits should be during normal business hours, in a manner that does not unreasonably disrupt the operation of the Project, and (y) the Administrative Agent, the Collateral Agent and the Senior Lenders, shall coordinate their visits to the Project site to the extent reasonably practicable to do so;

(e)     keep insured with Acceptable Insurers all of its Collateral (including the Project Property) in amounts and against losses or damages on a basis consistent with Good Industry Practice and Applicable Law;

(f)     provide the Administrative Agent as soon as reasonably practicable with such evidence of insurance as the Administrative Agent (acting at the direction of the Majority Lenders) may from time to time reasonably require;

(g)     subject to Section 11.1(s) (*Affirmative Covenants*), obtain, as and when required, and preserve, maintain, and comply with, all Material Project Authorizations which are required to permit the Borrower to maintain and care for the Project as contemplated by the Approved Budget and the DIP Order, it being understood that the Borrower will maintain minimal operations for the purpose of preserving its assets and nothing herein shall obligate the Borrower to maintain or operate its Business or assets or perform any obligations under any agreement (other than this Agreement) in a manner that requires funding that is not provided for in the Approved Budget;

(h)     except to the extent such payment is excused by, or is otherwise prohibited by, the provisions of the Bankruptcy Code or order of the Bankruptcy Court, timely file, or cause to be timely filed, all Tax Returns required to be filed by it and pay, or cause to be paid (other than the Tax Encumbrances), all Taxes due and payable by it, whether shown to be due and payable on such Tax Returns or on any assessment received by it or otherwise, except to the extent any such Taxes are being Contested;

(i)     conduct any environmental remedial activities required of it pursuant to any Environmental and Social Requirement, any Governmental Body and Good Industry Practice;

(j)     promptly conduct any action required pursuant to, and comply with any Corrective Action Plan required in accordance with Section 11.9(d) (*Corporate Policies*);

(k)     maintain in effect environmental and social monitoring arrangements, including arrangements to provide reasonable access to any material documents related to the development and operation of the Project that are in the Borrower's custody or control;

(l)     (i) ensure that the only mining activities taking place on the Project Real Property are those under the control and direction of the Borrower and (ii) maintain and operate the Project in material compliance with the requirements of any Environmental License, Order or other Authorization in respect of the Project;

(m)     warrant and defend the right, title and interest of the Borrower in and to any of the Collateral, and every part thereof, against the claims of any Person, subject only to Permitted Encumbrances;

(n)     cause the care and maintenance of the Project (including any work not currently contemplated by the Approved Budget but approved in accordance with this Agreement) to be carried out and completed with diligence and continuity and in all material respects in accordance with Applicable Law, the Environmental and Social Requirements and Good Industry Practice;

(o)     maintain at all times the necessary power supply required for the Project;

(p)     perform all such acts and execute all such documents as are reasonably required by the Senior Lenders to perfect and maintain the Security in the Collateral created pursuant to the Finance Documents;

(q)     maintain all of its and its Subsidiaries' ownership, lease, use, license and other interests in the Project assets as are necessary for it to be able to operate the Project in accordance with Good Industry Practice;

(r)     comply with all applicable Sanctions, Anti-Corruption Laws, and AML Laws, and maintain and enforce policies and procedures designed to promote and achieve compliance with applicable Sanctions, Anti-Corruption Laws and AML Laws;

(s)     use the proceeds of the Loans solely in accordance with Section 2.3 (*Purpose and Use of Proceeds*);

(t)     [reserved];

(u)     refrain from amending, suspending, waiving or repudiating any portion of, an Environmental License or a Material Project Authorization that would result in a Material Adverse Effect, without prior written consent of the Majority Lenders;

(v)     (i) cooperate, consult with, and provide to the Administrative Agent and the Senior Lenders all such information as required or as reasonably requested by the Administrative Agent and the Senior Lenders and (ii) participate in meetings (which shall be telephonic or virtual unless otherwise agreed and for which two (2) days' prior notice will be provided) with the Senior Lenders and their respective management teams and advisors, on not less than a weekly basis, at which the Borrower shall provide to the Senior Lenders access to all information reasonably requested upon prior reasonable notice;

(w)     maintain the Environmental Bonds in full force and effect other than to the extent unable to do so as a result of the Chapter 11 Cases;

(x)     comply with the Approved Budget (subject to the Permitted Variances) and with the provisions of the DIP Order;

(y)     take or cause to be taken all reasonably appropriate action to do or cause to be done all things necessary proper or advisable under applicable law, and to execute and deliver such documents as may be required or reasonably requested by the Senior Lenders to carry out the provisions of this Agreement and the DIP Order;

(z)     [reserved];

(aa)    take or cause to be taken all appropriate action to remain the sole owner of the Collateral, free of Encumbrances other than Permitted Encumbrances;

80

(bb)     except to the extent excused by the Automatic Stay, applicable provision of the Bankruptcy Code or order of the Bankruptcy Court, take or cause to be taken all appropriate action to comply with all material applicable laws applicable to the Obligors or the Collateral unless failure to comply could not reasonably be expected to result in a Material Adverse Effect;

(cc)     subject to the Approved Budget and the Tax Encumbrances, pay when due all taxes prior to the date on which penalties attach, except where such tax is being contested in good faith and adequate reserves have been established in accordance with GAAP or to the extent payment and/or enforcement thereof is stayed as a result of the Chapter 11 Cases;

(dd)     provide copies of all pleadings, motions applications, judicial information, financial information and other documents intended to be filed by or on behalf of any Obligor with the Bankruptcy Court in the Chapter 11 Cases or the Canadian Court in the Recognition Proceedings to the Administrative Agent and the Senior Lenders (and their advisors) at least two (2) calendar days in advance of such filing or as promptly as reasonably practicable;

(ee)     promptly provide such additional information concerning the Obligors or the Collateral as the Administrative Agent or any Senior Lender may reasonably request;

(ff)     maintain its cash management system in a manner acceptable to the Majority Lenders (which shall be deemed satisfied if the cash management system is substantially the same as the cash management system in existence on the Petition Date, with such modifications as permitted under the Cash Management Order, as entered);

(gg)     deposit all distributions, dividends and other payments  (other than payments of intercompany trade payables in the ordinary course of business) made by or on account of non-Debtor subsidiaries of the Obligors in a segregated account established by the Obligors (or in another account after receiving the prior written consent of the Administrative Agent (acting at the direction of the Majority Lenders, in their sole discretion)) at or prior to the time of receipt thereof, and maintain all such funds in such account unless otherwise approved in writing by the Administrative Agent (acting at the direction of the Majority Lenders, in their sole discretion) unless such distributions, dividends and other payments are remitted directly to the Administrative Agent for application to the Loans;

(hh)     within fourteen (14) calendar days of the entry Interim Order by the Bankruptcy Court, obtain the Initial Recognition Order and Interim DIP Recognition Order;

(ii)     within fourteen (14) calendar days of the entry of the Final Order by the Bankruptcy Court, obtain the Final DIP Recognition Order;

(jj)     to the extent practicable under the circumstances, provide each Senior Lender (and their respective advisors) with advance notice (verbal notice or notice by email is sufficient) prior to any transfer of $100,000 or more on account of a prepetition critical vendor claim in accordance with the prepetition critical vendor order(s) in form and substance acceptable to the Senior Lenders and approved by the Bankruptcy Court;

(kk)     on each Weekly Reporting Date, provide each Senior Lender (and their respective advisors) with a report scheduling the payments made by the Obligors to their critical vendors during the previous calendar week; and

(ll)    deliver or cause to be delivered to the Senior Lenders, copies of all monthly reports or projections in respect of each of the Obligors' business or financial condition as well as all pleadings, motions, applications and judicial information filed by or on behalf of the Borrower with the Bankruptcy Court or the Canadian Court or any Creditors' Committee or the Information Officer in the Recognition Proceedings, in each case, at the time such document is filed with the Bankruptcy Court, the Canadian Court or provided by or to the Information Officer, as applicable. The parties hereto agree that filing such papers through PACER shall satisfy the foregoing requirement to deliver such as filed in the Bankruptcy Court.

Notwithstanding anything to the contrary in this Section 11.1 (*Affirmative Covenants*), the Borrower shall not be required to comply with any provision of this Section 11.1 (*Affirmative Covenants*) to the extent it would conflict with or cause a breach of Section 11.12(u) (*Negative Covenants*).

**11.2    Approved Budget and Variance Reporting** .

The Borrower shall:

(a)    *Budget Reporting*. By no later than  12:00 p.m. (Pacific Time) on the third Thursday after the Petition Date (commencing from June 27, 2024), and continuing at 12:00 p.m. (Pacific Time) on the Thursday of every second week thereafter, the Obligors shall deliver to the Administrative Agent and the Senior Lenders, a Proposed Budget for the next thirteen weeks, commencing with the calendar week in which such Proposed Budget is delivered (such period, the "**Budgeted Period**"); provided that, (i) in no event shall the Budgeted Period extend past four weeks after the Maturity Date and (ii) if the Budgeted Period is anticipated to extend beyond the Maturity Date, the projected receipts, disbursements, intercompany transfers and all other line items set forth in the Proposed Budget for all weeks following the Maturity Date shall assume that the Debtors continue to operate in the ordinary course consistent with prior postpetition practices and that no sale of the Debtors' business will occur during such portion of the Budgeted Period. The Proposed Budget shall become the Approved Budget for the Budget Period covered thereby unless the Obligors receive a written objection from the Majority Lenders (with e-mail from professionals acting on behalf of the Majority Lenders to the Obligors' counsel being sufficient) prior to 5:00 p.m. (Pacific Time) on the fifth Business Day following delivery of the Proposed Budget to the Administrative Agent and the Senior Lenders.  If the Majority Lenders do not object, in writing, to a Proposed Budget, or an amendment, supplement or modification to the Approved Budget or Approved Variance Report by 5:00 p.m. (Pacific Time) on the fifth Business Day following delivery of the Proposed Budget to the Administrative Agent and Senior Lenders, then such Proposed Budget, amendment, supplement or modification shall be deemed acceptable to and approved by the Majority Lenders and shall become the Approved Budget.  In the event the Majority Lenders timely object to a Proposed Budget, the prior Approved Budget shall remain in full force and effect until any such Proposed Budget is approved by the Majority Lenders (with e-mail from the advisors acting on behalf of the Majority Lenders to the Debtors' counsel being sufficient).  Until any Proposed Budget, or any amendment, supplement or modification to the Approved Budget has been approved (or is deemed approved in accordance with this paragraph (a)) by the Majority Lenders, the Debtors shall be subject to and be governed by the terms of the Approved Budget then in effect.

(b)    *Weekly Variance Reporting*. By no later than 12:00 p.m. (Pacific Time) on the second Thursday after the Petition Date (the "**First Reporting Date**", which, for the avoidance of doubt, shall be June 20, 2024), and no later than 12:00 p.m. (Pacific Time) on each Thursday thereafter (together with the First Reporting Date, each a "**Weekly Reporting Date**"), the Obligors shall deliver to the Administrative Agent and the Senior Lenders, a variance report (each, a "**Weekly Variance**

**Report**") setting forth, in reasonable detail, (i) the actual receipts of the Obligors on a line-by-line and aggregate basis; (ii) the actual disbursements of the Obligors on a line-by-line and aggregate basis; and (iii) the aggregate actual intercompany transfers from Debtor entities to Parent on a Debtor-by-Debtor basis, in each case, during the applicable week ending on the Sunday preceding each such Weekly Reporting Date (each such week, a "**Reporting Week**") and (iv) a comparison (whether positive or negative, expressed as a percentage) for the Reporting Week between (A) the actual receipts in clause (i) above (and each line item thereof) for such Reporting Week to the amount of the Debtors' projected receipts (and each line item thereof) set forth in the Approved Budget for such Reporting Week, (B) the actual disbursements in clause (ii) above (and each line item thereof) for such Reporting Week to the amount of the Debtors' projected disbursements (and each line item thereof) set forth in the Approved Budget for such Reporting Week and (C) the actual intercompany transfers from each Debtor entity to Parent to the amount of each such Debtor's aggregate projected intercompany transfers to Parent set forth in the Approved Budget for such Reporting Week.

(c)    *Monthly Variance Reporting*.   By no later than 12:00 p.m. (Pacific Time) on each Weekly Reporting Date that occurs on and after the three-week anniversary of the First Reporting Date (each such date, a "**Rolling Four-Week Testing Date**" (which such initial Rolling Four-Week Testing Date shall be July 11, 2024) and each such subsequent four-week period ending on the Sunday preceding each such Rolling Four-Week Testing Date, a "**Rolling Four-Week Testing Period**"), the Obligors shall deliver to the Administrative Agent and the Senior Lenders, a report reasonably detailing (i) the aggregate actual receipts and aggregate actual disbursements of the Obligors and aggregate intercompany transfers from Debtor entities to Parent, in each case, during the applicable Rolling Four-Week Testing Period; and (ii) any variance (whether positive or negative, expressed as a percentage) between (A) the aggregate actual receipts received by the Obligors during such Rolling Four-Week Testing Period against the projected receipts for such Rolling Four-Week Testing Period as set forth in the Approved Budget, (B) the aggregate actual disbursements made by the Obligors during such Rolling Four-Week Testing Period against the aggregate projected disbursements for such Rolling Four-Week Testing Period as set forth in the applicable Approved Budget and (C) the aggregate actual intercompany transfers from Debtor entities to Parent made by such Debtors during such Rolling Four-Week Testing Period against the aggregate projected intercompany transfers from Debtor entities to Parent for such Rolling Four-Week Testing Period as set forth in the applicable Approved Budget (a "**Rolling Four-Week Variance Report**," together with the Weekly Variance Report, the "**Approved Variance Reports**"), in each case, broken down by each line item.

**11.3    Notifications to the Senior Lenders**.

The Borrower shall:

(a)    Promptly notify the Administrative Agent of any of the following (but in any event no later than (x) solely with respect to clause (a)(i), two (2) Business Days from the Borrower's discovery thereof and (y) otherwise, five (5) days from the Borrower's discovery thereof), and only to the extent:

(i)    any Default or Event of Default upon becoming aware of its occurrence;

(ii)    any Change of Control upon becoming aware of its occurrence;

(iii)    any material damage to the Project, and whether the Borrower has made, or plans to make, any insurance claims with respect thereto with respect to such damage;

83

(iv)     any material disputes or disturbances pertaining to the Project involving local communities, including, without limitation and any indigenous peoples;

(v)      other than to the extent subject to the Automatic Stay or otherwise stayed by an applicable provision of the Bankruptcy Code, or order of the Bankruptcy Court:

    (A)     any material default by any party under or termination or threatened termination or termination right arising under any Material Project Document, of which it becomes aware;

    (B)     the loss of or material non-compliance with the terms of, or any threat (whether or not in writing) by a Governmental Body to revoke or suspend or modify, any Material Project Authorization, including, without limitation, any enforcement action brought by the Nevada Division of Environmental Protection, any code enforcement action by the county in which the Project Real Property is located affecting construction or alteration of any work of construction, and any notice of deficiency in the payment of Nevada Net Proceeds of Minerals Tax;

    (C)     all material actions, suits and proceedings (including arbitral and administrative proceedings) for damages in excess of in aggregate $2,000,000, or which, if adversely determined, would be likely to have a Material Adverse Effect, before any Governmental Body or arbitrator pending, or to the knowledge of the Borrower, threatened, against or directly affecting the Borrower, the Project or any Material Project Documents, including any actions, suits, claims, notices of violation, hearings, investigations or proceedings pending, or to the knowledge of the Borrower threatened, against or affecting the Borrower or in any material respect, in relation to the ownership, development, construction, use, maintenance and operation of the Project;

    (D)     any violation of any Applicable Law by the Borrower or any of its Subsidiaries in any material respect;

(vi)     [Reserved];

(vii)    [Reserved];

(viii)   any material labor disruption involving the workforce at the Project;

(ix)     other than any "Default" or "Event of Default" under and as defined in the Streaming Agreement or a default under the First Lien Facility, the Working Capital Facility or any Offtake Agreements arising solely arising from the entry of the DIP Order, the commencement of the Chapter 11 Case and the application of the Automatic Stay (A) any event, circumstance or fact that could reasonably be expected to give rise to a "Default" or an "Event of Default" under and as defined in, the Streaming Agreement or a default under the Working Capital Facility or any Offtake Agreement, or (B) any event or condition which, upon notice, lapse of time, or both, would constitute a "Default" or an "Event of Default" as defined under the Streaming Agreement or a default under the Working Capital Facility or any Offtake Agreement, or (C) a "Default" or an "Event of Default" as defined in any other agreement in respect of Debt of the Borrower in a principal amount of $5,000,000 or more without giving effect to any amendments or waivers from the creditor party thereunder;

(x) any material change in operational planning that requires additional Authorizations (and all relevant information related thereto) pursuant to any Applicable Law or Good Industry Practice; and

(xi) any rejection or request for additional information from any public registry or Governmental Body in respect of the actions being taken to perfect the security interest in the Collateral pursuant to Article 9 (*Security*),

in each case, accompanied by an Officer's Certificate of the Borrower setting forth details of the occurrence referred to therein.

(b) Promptly notify the Administrative Agent, including in the notification the intended action to be taken by them, upon:

(i) any written threat of any action or public announcement of any intended action or series of actions that would reasonably be construed or expected to result in an Expropriation Event or a Material Adverse Effect;

(ii) any notice of cancellation of any of the Borrower's water rights and any diminution of the rights available for lease from the City of Yerington;

(iii) any material claim, complaint, notice or order under, or any violations of, any Environmental Laws, Sanctions, Anti-Corruption Laws, labor organizing activity, or AML Laws, affecting any of the Borrower, its Subsidiaries or the Project;

(iv) becoming aware of the presence of any Hazardous Substances located on, above or below the surface of any land which the Borrower occupies or controls, except those being stored, used or otherwise handled in compliance with Environmental Laws, in each case which could reasonably be expected to have a material cost or material impact on the Borrower's ability to carry on the Business and to develop or operate the Project;

(v) the occurrence of any Release of Hazardous Substances that has occurred on or from such land or otherwise with respect to the Project which could reasonably be expected to have a material cost or material impact on the Borrower's ability to carry on the Business and to develop or operate the Project or which could reasonably be expected to have a Material Adverse Environmental and Social Effect;

(vi) any E&S Event;

(vii) any proposed change in the use or occupation of the Project Real Property which may have a material cost or material impact on the Borrower's ability to carry on the Business or develop and operate the Project; and

(viii) any other notice given or received by the Borrower with respect to the occurrence of any force majeure or delay event (howsoever described) under any Project Document;

<u>provided</u>, that, in the event any action set forth in Section 11.3(b)(i) (*Notifications to the Senior Lenders*) is notified to the Senior Lenders, the Borrower shall promptly consult with the Senior Lenders to determine appropriate steps to mitigate against or otherwise negotiate the resolution of the action or series of actions that may otherwise result in an Expropriation Event.

(c)     Promptly (but in any event no less than thirty (30) days prior to such change) notify the Senior Lenders upon becoming aware of any proposed change or change in name or jurisdiction of incorporation or principal place of business of the Borrower or any of its Subsidiaries.

(d)     The Borrower shall promptly notify the Senior Lenders of (and shall provide a true and complete copy, where applicable):

  (i)     the acquisition by the Borrower or its Subsidiaries of any Project Real Property (including mineral rights) with a value, individually or in the aggregate, of more than $5,000,000 or which is material to the Project, whether owned or leased;

  (ii)     any new locations of tangible assets of the Borrower or its Subsidiaries (other than inventory in transit);

  (iii)     any new Material Project Document or any amendment or revision to any existing Material Project Document (provided, that any amendment or revision to any existing Material Project Document and any new Material Project Document shall be subject to Section 11.12(j) (*Negative Covenants*));

  (iv)     any amendment or revision to the Working Capital Facility or Streaming Documents (provided, that any amendment or revision the Working Capital Facility shall be subject to Section 11.12(j) (*Negative Covenants*)); and

  (v)     any new Material Project Authorization or any amendment, revision, reissuance or replacement of any existing Material Project Authorization.

(e)     [Reserved].

(f)     On the first Business Day of each calendar quarter, the Borrower shall notify the Administrative Agent of:

  (i)     the acquisition by the Borrower and its Subsidiaries of all real property (including mineral rights) during the immediately prior calendar quarter (or a certification that no such acquisition was made);

  (ii)     evidence, satisfactory to the Administrative Agent (acting at the direction of the Majority Lenders), that a valid and fully perfected Encumbrance granting a security interest over such after-acquired real property has been created in accordance with Section 9.1(b) (*Grant of* Security *Interest*); and

  (iii)     the proposed amended and restated Schedule J (*Project Real Property*) to reflect the acquisition of such real property which, upon to the approval of the Administrative Agent (acting at the direction of the Majority Lenders), shall be and shall be deemed to constitute Schedule J (*Project Real Property*) hereunder.

(g)     [Reserved].

(h)     The Borrower shall provide details of any other information reasonably requested with reasonable notice by the Majority Lenders in respect of the financial condition, business and/or operations of the Borrower or the Project.

**11.4**    **Other Reports**.

The Borrower shall promptly deliver or furnish, or cause to be delivered or furnished, to the Senior Lenders a copy of any material reports, certificates and notices relating to the Project which are delivered by or to the Borrower under the Material Project Documents, the First Lien Facility, the Working Capital Facility and the Streaming Agreement to the extent not already delivered to the Senior Lenders under the Finance Documents.

**11.5**    **Project Reporting**.

The Borrower shall promptly deliver or furnish, or cause to be delivered or furnished, to the Administrative Agent, for prompt delivery to each Senior Lender, a copy or copies of:

(a)    **[Reserved]**.

(b)    **[Reserved]**.

(c)    **Monthly Operations Reports**.  Monthly Operations Reports on or before 5th calendar day after each calendar month (including material variations from the prior month) in a form reasonably satisfactory to the Majority Lenders.

(d)    **Emissions Report**.  If disclosure is required under Annex A of the Equator Principles due to the amount of emissions from the Project, the Borrower will publish and maintain on its website at www.nevadacopper.com all times information with respect to greenhouse gas emissions in the substance and form required by Annex A of the Equator Principles.  The Senior Lenders will have the right to publish information required under Annex B of the Equator Principles and Borrower hereby consents to the publishing thereof.

**11.6**    **[Reserved]**.

**11.7**    **Quarterly Financial Reporting**.

(a)    The Borrower shall provide to the Administrative Agent, for prompt delivery to each Senior Lender, for each bank account of the Borrower copies of the relevant bank statements.

(b)    As soon as available and in any event within forty-five (45) days after the end of each of the first three Fiscal Quarters of each Fiscal Year, the Borrower shall deliver to the Administrative Agent, for prompt delivery to each Senior Lender, a copy of each Obligors' quarterly unaudited financial statements for such Fiscal Quarter.

**11.8**    **[Reserved]**.

**11.9**    **Corporate Policies**.

The Borrower shall:

(a)    [Reserved];

(b)    ensure that all operations in respect of the Project comply in all material respects with Environmental Law;

(c)     keep, or cause its Subsidiaries to keep, all relevant documentation in order for the Senior Lenders to verify such compliance;

(d)     If an E&S Event occurs or is identified by the Borrower:

  (i)     the Borrower shall promptly notify the Senior Lenders in accordance with Section 11.3(a) (*Notifications to the Senior Lenders*); and

  (ii)    the Borrower shall, and shall cause its Subsidiaries to, (A) prepare, and provide the Administrative Agent with a copy of, a Corrective Action Plan to set forth the proposed actions to correct or to remedy any damage and adverse consequences that has been or would reasonably be expected to be caused by such E&S Event, including timeframes for the implementation of such actions, (B) conduct all such actions within such timeframes and (C) where relevant, upon the request of the Administrative Agent (acting at the direction of the Majority Lenders, acting reasonably), provide the Administrative Agent with any information relating to measures or monitoring undertaken by or on behalf of its Subsidiary consistent with the Environmental and Social Requirements or under any Corrective Action Plan; and

(e)     If an E&S Event occurs that has had or could potentially have a Material Adverse Environmental and Social Effect, the Borrower and its Subsidiaries shall take such immediate action as is necessary to rectify such E&S Event prior to the development and implementation of any Corrective Action Plan.

**11.10   Changes to Accounting Policies**.

If there is any material change in a period to the accounting policies, practices and calculation methods used by the Borrower in preparing its Financial Statements or components thereof as compared to any previous period, the Borrower shall provide the Senior Lenders reasonable advance notice of the proposed material change including with it, all information which the Senior Lenders may reasonably require relating to the impact of any such material change on the comparability of the reports provided to the Senior Lenders after any such material change to previous reports.  Until the Administrative Agent has approved such material change in writing, the Borrower shall continue to prepare and provide any reports to the Senior Lenders hereunder in accordance with the accounting policies, practices and calculation methods in effect prior to such material change.

**11.11   Know Your Customer Documentation; Beneficial Ownership Certification**.

(a)     The Borrower shall promptly, upon the request of any Senior Lender, supply to such Senior Lender any documentation or evidence that is reasonably required by such Senior Lender (whether for itself or on behalf of any person to whom such Senior Lender may, or may intend to, transfer any of its rights or obligations under this Agreement) to enable such Senior Lender to carry out and be satisfied that it has complied with all necessary "know your customer" requirements that such Senior Lender is obliged to carry out under applicable AML Laws.

(b)     The Borrower shall promptly notify the Administrative Agent and each Senior Lender of any change in the information provided in the Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified in parts (c) or (d) of such certification.

(c)     The Borrower shall promptly notify the relevant Senior Lenders of any changes in any information supplied by it relating to any matter referred to in paragraph (a) above of such as:

      (i)      a change in the Borrower's board of directors;

      (ii)     a change in the legal or beneficial ownership of 25% or more of the Borrower's issued share capital, as well as information about a Person acquiring a legal or beneficial interest in 25% or more of the Borrower's issued share capital; and

      (iii)    a change in the nature of the Borrower's business from the Entry Date, as well as information about the Borrower starting or ceasing business operations in a state of the United States other than Nevada or a country other than the United States.

**11.12  Negative Covenants**.

(a)      Neither the Borrower nor its Subsidiaries shall:

      (i)      use, directly or indirectly, any part of the proceeds of the Loans (A) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money or anything else of value to any Person in a manner that would constitute or give to a violation of applicable Anti-Corruption Laws (B) to fund or facilitate any activities or business of, with or involving any Sanctions Target or in any manner that would constitute or give rise to a violation of Sanctions by any Person, including any Senior Lender; or (C) in any manner that would constitute or give rise to a violation of applicable AML Laws;

      (ii)     other than in connection with the Sale Transaction, sell, transfer or otherwise dispose of all or any part of the (A) Borrower or its Subsidiaries', as applicable, present or future assets except on arm's-length terms in the ordinary course of trade or the Project Property including any portion of any mining concessions (or other mineral interest) or the Collateral, except pursuant to a Permitted Asset Disposition or (B) Borrower's present or future assets to its Subsidiaries;

      (iii)    make any payment of royalties in respect of Minerals from the Project Real Property other than the amounts required by the Royalties, or enter into any royalty, stream financing or similar agreement with any other Person in relation to the Project Real Property other than the Royalties, the Streaming Agreement, any Offtake Agreement and the RGGS Lease and the Royalty Agreements;

      (iv)    create, incur, assume or suffer to exist any Encumbrance upon all or any part of the Collateral, whether now owned or hereafter acquired, other than Permitted Encumbrances;

      (v)     permit to occur any event or condition that could subject Borrower or its Subsidiaries, either directly or by reason of its affiliation with any member of their Controlled Group, to any liability imposed by Title IV of ERISA, or to any lien imposed by Section 430 of the IRC or Section 303 or Title IV of ERISA;

(b)      The Borrower shall not be entitled to incur or make any expenditure, Restricted Payment, Investment, loan or other payment without the prior written consent of the Majority Lenders other than in accordance with the Approved Budget, subject to the Permitted Variances; provided that any distributions made by the Obligors' foreign non-Debtor affiliates to the Obligors shall be placed in a segregated account to be established by the Obligors, and no funds shall be withdrawn from such account without the prior written consent of the Majority Lenders, unless such distributions are remitted directly to the Administrative Agent for application to the Loans;

89

(c)    Neither the Borrower nor its Subsidiaries, other than as resulting from the commencement of the Chapter 11 Cases or as provided in the DIP Order, shall (i) except for the Finance Documents, the First Lien Facility, Working Capital Facility, the Fourth Lien Facility and the Streaming Agreement, enter into any agreement or arrangement or take any action which restricts or purports to restrict the ability of the Borrower, its Subsidiaries, the Borrower's shareholders or any of their Affiliates to pay dividends, or make any other distributions to, or repay Debt, in each case, owing to the Borrower, its Subsidiaries, the Borrower's shareholders or any of their Affiliates, or (ii) enter into any agreement or arrangement or take any action which restricts or purports to restrict the ability of the Borrower or any of its Affiliates to deliver Minerals or perform its other obligations under the Finance Documents, Working Capital Facility, the First Lien Facility, the Fourth Lien Facility, the Aurubis Offtake Agreements or the Streaming Agreement;

(d)    Neither the Borrower nor its Subsidiaries shall create, incur, assume, or otherwise become directly or indirectly liable upon or in respect of, or suffer to exist, any Debt other than Permitted Debt;

(e)    Neither the Borrower nor its Subsidiaries shall enter into any hedge instrument or incur any hedge obligations;

(f)    Neither the Borrower nor its Subsidiaries shall change its jurisdiction of incorporation or any material respect of the nature of its business or operations from the Business, or engage directly or indirectly in any material business activity, or purchase or otherwise acquire any material property, in either case, not related to or in furtherance of the conduct of the Business, or as reasonably required to perform its obligations under the Finance Documents;

(g)    Neither the Borrower nor its Subsidiaries shall have any material liabilities, contingent or otherwise, that would be required to be reflected in the Borrower's Financial Statements in accordance with IFRS, other than those (i) reflected in the most recently delivered Financial Statements and the Finance Documents or (ii) arising in the ordinary course of business since the date of the most recently delivered Financial Statements.

(h)    Neither the Borrower nor its Subsidiaries shall issue any guarantees or indemnities, other than to the extent permitted in the Finance Documents, including by the endorsement of negotiable instruments for deposit or collection (or similar) in the ordinary course of business, guarantees of obligations of employees, guarantees of obligations of suppliers in the ordinary course of business and guarantees provided in connection with the granting of performance bonds in favor of contractors/Governmental Bodies in the ordinary course of business.

(i)    Neither the Borrower nor its Subsidiaries shall make any Accretive Investment, except, in respect of the Borrower:

        (i)    Short-term Investments in money market instruments with remaining maturities of twelve (12) months or less at the date of purchase including securities issued by government agencies, and term deposits and bank accounts with financial institutions; <u>provided</u>, that such short-term Investments are readily convertible to cash; and

        (ii)    Accretive Investment with a value up to $5,000,000 in the aggregate.

(j)    The Borrower shall not:

        (i)    enter into any Additional Material Project Documents without the approval of the Majority Lenders; or

        (ii)      amend in any material respect or waive any material provision of or suspend, terminate or assign or transfer or give notice of suspension, termination or assignment or transfer of:

             (A)     any Material Project Document or the Working Capital Facility without Majority Lender consent;

             (B)     [Reserved];

             (C)     the Aurubis Offtake Agreement without Majority Lender consent; or

             (D)     any other Offtake Agreement that constitutes a Material Project Document without Majority Lender consent;

        (iii)     settle any dispute or claim under a Material Project Document or compromise or settle any liability, in either case that results in payments in excess of $10,000,000 becoming due from the Borrower;

        (iv)     [reserved]; or

        (v)     permit its Subsidiaries to enter into any material contract.

(k)     Neither the Borrower nor its Subsidiaries shall make any Capital Expenditures other than Permitted Capital Expenditures;

(l)     The Borrower shall not, subject to Section 11.12(j) (*Negative Covenants*), directly or indirectly, enter into, or amend, any transaction or agreement with or for the benefit of any Affiliate of the Borrower (other than as listed on Schedule T (*Related-Party Transactions*) or to the extent constituting a Permitted Asset Disposition) except in the ordinary course of business and upon terms and conditions at least as favorable to the Borrower as would be obtainable by the Borrower at the time in a comparable arm's-length transaction with a Person that is not an Affiliate of the Borrower;

(m)    The Borrower shall not transfer or assign any Debt owed to it or consent to the assignment of any Debt owed by it to any Obligor;

(n)     [Reserved];

(o)     Neither the Borrower nor its Subsidiaries shall, other than as permitted under the Finance Documents, directly or indirectly purchase, acquire or lease any property from, or sell, transfer or otherwise Dispose of any property to, or otherwise deal or enter into any agreement with, any Related Party, unless such transaction is undertaken on fair and commercially reasonable terms and conditions no less favorable to the Borrower than would have been obtained in a comparable fair market transaction with a person who is not an Affiliate of the Borrower;

(p)     Except as otherwise contemplated by the DIP Order and the Chapter 11 Cases, neither the Borrower nor its Subsidiaries shall enter into any transaction to change or reorganize its capital structure or amend its articles, by laws or any other corporate documents;

(q)     Except in connection with the Sale Transaction or as otherwise contemplated by the DIP Order, neither the Borrower nor its Subsidiaries shall undertake or permit any merger, spin-off, consolidation, reorganization or other fundamental corporate transaction;

91

(r)     Neither the Borrower nor its Subsidiaries shall establish or acquire any subsidiary, other than the Borrower's Subsidiaries disclosed to the Senior Lenders prior to the Petition Date, without the prior consent of the Senior Lenders (such consent not to be unreasonably withheld or delayed);

(s)     Except as required by order of the Bankruptcy Court, neither the Borrower nor any of its Subsidiaries shall maintain any deposit or security accounts other than the accounts listed on Schedule R (*Bank Accounts*);

(t)     [Reserved];

(u)     Neither the Borrower nor its Subsidiaries shall conduct activities, or incur any costs, in relation to the Project other than activities (and incurred costs) related to (i) health and safety measures for persons and property at or affected by the Project, (ii) security measures for persons and property at the Project, (iii) actions necessary or advisable to protect persons and property in the event of emergency conditions at the Project, (iv) actions and activities necessary or advisable to comply with all applicable laws and permitting requirements and any inspections of the Project, (v) actions and activities necessary or advisable to (x) preserve the value of the Project and its assets and (y) transition the Project to a state appropriate for care and maintenance (including maintaining appropriate ventilation systems, pumping systems, access to the Project and any inventory mined prior to the Petition Date), (vi) maintaining and caring for the Project in accordance with Good Industry Practice and (vii) actions, activities or other measures permitted by the Approved Budget. Other than as may be incidental to their transition to care and maintenance mode, in no circumstances shall the Borrower or its Subsidiaries conduct, or incur costs, in connection with development and mining and processing activities designed to produce additional inventory after the Petition Date; it being understood that the Debtors may process and sell inventory mined prior to the Petition Date or in the transition to care and maintenance of the Project;

(v)     Neither the Borrower nor its Subsidiaries shall create or permit to exist any other superpriority claim which is *pari passu* with or senior to the Obligations, except for claims in respect of the Carve-Out or the Administration Charge;

(w)     Unless authorized by the Administrative Agent in writing, no materials, fixtures, or articles of personal property incorporated into the Project may be installed under any security agreement or other agreement whereby the seller reserves or purports to reserve (i) title or the right of removal or repossession, (ii) the right to consider such items as personal property after their incorporation into the Project, or (iii) a security interest, in each case after such material, fixture or article of personal property is incorporated into the Project;

(x)     The Obligors shall not transfer any cash or cash equivalents that constitute Collateral to a Subsidiary of Parent that is not an Obligor without the prior written approval of the Majority Lenders;

(y)     The Borrower and its Subsidiaries shall not make any payment or prepayment or redemption or acquisition for value or any cancellation or other retirement of any Prepetition Indebtedness or other obligations arising prior to the Petition Date, except the obligations in respect of the Working Capital Facility, solely to the extent paid from proceeds of WCF Collateral and obligations paid pursuant to authority granted under a First Day Order; provided that the Obligors shall be permitted to make adequate protection payments in respect of certain interest, professional fees and expenses incurred by the Prepetition Secured Parties, as set forth in the DIP Order; and

(z)     During any Rolling Four-Week Testing Period, the Obligors shall not allow the (1) total aggregate disbursements, minus (2) disbursements in respect of (i) interest, fees and expenses in relation to this Agreement and any of the Obligors' other funded debt obligations; (ii) Adequate Protection Obligations; (iii) DIP Professional Fees (as defined in the Interim Order); and (iv) professional fees paid by the Obligors on behalf of themselves or any other parties (the "**Total Tested Disbursements**")  to exceed 120% of such Total Tested Disbursements set forth in the Approved Budget for such Rolling Four-Week Testing Period. Additional disbursement variances, if any, from an Approved Budget, and any proposed amendments, supplements or modifications to an Approved Budget, shall be subject to the prior written approval of the Majority Lenders (the foregoing, collectively, the "**Permitted Variances**").

**11.13    Milestones**.

The Borrower shall, and shall cause each of its Subsidiaries and any other Obligor to comply with the following milestones (each of which may be extended or waived with the prior written consent of the Majority Lenders in their sole discretion, without further order of the Bankruptcy Court or the Canadian Court):

(a)     No later than one (1) calendar day following the Petition Date, the Debtors shall have filed a motion in the Bankruptcy Court seeking approval of this Agreement and the Loans, in form and substance acceptable to the Majority Lenders.

(b)     No later than five (5) Business Days following the Petition Date, the Bankruptcy Court shall have entered the Interim Order.

(c)     No later than fourteen (14) calendar days following the entry of the Interim Order by the Bankruptcy Court, the Canadian Court shall have granted the Initial Recognition Order and Interim DIP Recognition Order.

(d)     No later than fourteen (14) calendar days following entry of the Final DIP Order by the Bankruptcy Court, the Canadian Court shall have entered the Final DIP Recognition Order.

(e)     No later than fourteen (14) calendar days following entry of the Sale Approval Order by the Bankruptcy Court, the Canadian Court shall have granted an order, in form and substance satisfactory to the Administrative Agent and Senior Lenders in their sole discretion, recognizing and enforcing the Sale Approval Order in Canada.

(f)     No later than fourteen (14) calendar days following the entry of the Bidding Procedures Order by the Bankruptcy Court, the Canadian Court shall have granted an order, in form and substance satisfactory to the Administrative Agent and Senior Lenders in their sole discretion, recognizing and enforcing the Bidding Procedures Order in Canada.

(g)     No later than ten (10) calendar days following the Petition Date, the Debtors shall have filed a motion (the "**Bidding Procedures Motion**") in form and substance acceptable to the Majority Lenders, for entry of an order (the "**Bidding Procedures Order**") (i) approving the procedures to be used and bid protections to be provided in connection with the Sale Transaction (as may be amended from time to time in accordance with their terms, the "**Bidding Procedures**"), (ii) setting the dates for the submission of bids, the auction (if any) and the hearing on the approval of the Sale Transaction and approving all notices related thereto and (iii) authorizing certain procedures related to the assumption and assignment of executory contracts and unexpired leases in connection with the Sale Transaction.

(h)     No later than forty-five (45) calendar days following the Petition Date, the Bankruptcy Court shall have entered a Bidding Procedures Order approving the Bidding Procedures Motion, which shall be in form and substance acceptable to the Majority Lenders.

(i)     No later than forty-five (45) calendar days following the Petition Date, the Bankruptcy Court shall have entered the Final Order.

(j)     No later than one hundred eight (108) calendar days following the Petition Date, the Bankruptcy Court shall have entered an order (the "**Sale Approval Order**") approving a sale (or sales) of all or substantially all of the business of the Debtors (the "**Sale Transaction**"), in form and substance acceptable to the Majority Lenders.

(k)     No later than one hundred twenty (120) calendar days following the Petition Date, the Sale Transaction shall be consummated.

**Article 12**
**CONDITIONS PRECEDENT**

Notwithstanding the following requirements in Sections 12.1, 12.2 and 12.3 of this Agreement, each Senior Lender's commitment to lend (subject to the terms and conditions of this Agreement, including, without limitation, Article 12 of this Agreement) shall be effective upon the Senior Lenders' receipt of the Obligors' duly executed signatures pages to this Agreement and the Senior Lenders' deliver of duly executed signature pages to the Obligors.

**12.1    Conditions Precedent to the Interim Loan**.

No Senior Lender will be obligated to make available the Interim Loan (or any part thereof) or make the first Utilization under the Interim Loan unless each of the following conditions has been fulfilled, in each case in form and substance satisfactory to each Senior Lender (unless waived in accordance with Section 25.4 (*Amendment and Waiver*)).

(a)     **[Reserved].**

(b)     **Corporate Documentation**.

        The Administrative Agent and the Senior Lenders shall have received all of the following (in each case in form and substance satisfactory to each Senior Lender):

        (i)     Certified copies of the constitutional documents (including, without limitation, any shareholder agreements or declarations, as applicable) of each Obligor, attached in each case to an Officer's Certificate of each Obligor, as applicable;

        (ii)    A copy of the resolutions of the board of directors and shareholders meeting (as applicable) of each Obligor approving the terms of, and the transactions contemplated by, the Finance Documents to which it is a party and resolving that it execute, deliver and perform the Finance Documents to which it is a party and authorizing a specified person or persons to execute the Finance Documents to which it is a party on its behalf, attached in each case to the Officer's Certificate of such Obligor;

        (iii)   Specimen signatures of each person from each Obligor authorized by the resolutions to sign the Finance Documents to which it is a party, a copy of the duly registered powers of

attorney and any other notices or documents under or in connection with the Finance Documents to which it is a party, attached in each case to the Officer's Certificate of such Obligor;

(iv)    A certificate of each of the Obligors (signed by an authorized representative) confirming that (i) borrowing or guaranteeing or securing, as appropriate, the total commitments would not cause any borrowing, guarantee, security or similar limit binding on such Obligor to be exceeded; (ii) each copy document relating to it specified in this section is correct, complete and in full force and effect and has not been amended or superseded as at a date no earlier than the date of this Agreement; and (iii) all representations and warranties contained in Article 8 (*Representations and Warranties*) are true, accurate and complete; and (iv) other than the Chapter 11 Cases, no event has occurred and is continuing or would result from the Finance Documents as at the date of this Agreement which constitutes an Event of Default; and

(v)    A certificate of status, compliance, good standing or like certificate with respect to each Obligor issued by the appropriate government official in the jurisdiction of its incorporation.

(c)    **Finance Documents**.

The Administrative Agent and the Senior Lenders shall have received a copy of each Finance Document (other than any Note and any Transfer Certificate).

(d)    **Fees**.

All invoiced and documented fees, premiums, expenses (including reasonable fees and expenses of counsel to the Agents and the Senior Lenders) and other out-of-pocket transaction costs incurred in connection with the transactions contemplated hereby and fees and expenses required to be paid under the Agency Fee Letter on the Entry Date to the Agents shall have been paid in full in accordance with the terms of the Interim Order.

(e)    **Know Your Customer Information**.

Each of the Obligors shall have provided all information necessary to comply with any AML Laws, know your customer checks and other out-of-pocket identification procedures as may be requested by the Administrative Agent.  If the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, each Senior Lender shall have received, or had access to, at least one (1) Business Days prior to the date hereof, a Beneficial Ownership Certification in relation to the Borrower.

(f)    **Interim Order**.

 The Administrative Agent and the Senior Lenders shall have received a copy of the Interim Order which Interim Order (x) shall have been entered on the docket of the Bankruptcy Court no later than five (5) Business Days after the Petition Date and (y) shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any respect without the written consent of the Senior Lenders.

(g)     **First Day Orders**.

The "first day" orders (including, without limitation, any motions related to the Finance Documents, cash management and any critical vendor or supplier motions), in form, scope and substance satisfactory to the Senior Lenders and their counsel shall have been entered in the Chapter 11 Cases (the "**First Day Orders**").

(h)     **Security**.

(i)     All Obligations shall be secured by a perfected lien and security interest on the Collateral of the Obligors, and such Lien and security interests shall have the priorities set forth in the Interim Order, subject only to the Permitted Encumbrances and the Carve-Out and all filings and recordings as reasonably required by the Senior Lenders in respect thereof shall have been made and filing and recording fees and taxes with respect to such Encumbrances and security interests that are due and payable as of the Entry Date shall have been duly paid.

(ii)    [Reserved].

(iii)   The Senior Lenders shall have received evidence that no liens or encumbrances are recorded or registered against the Obligors (other than Permitted Encumbrances).

(i)     **[Reserved]**.

(j)     **Approved Budget**.

The Senior Lenders shall have received a copy of the Initial Approved Budget.

(k)     **Officer's Certificate**.

The Administrative Agent and the Senior Lenders shall have received an Officer's Certificate substantially in the form of Schedule F hereto.

**12.2    Conditions Precedent to the Final Loans**.

No Senior Lender will be obligated to make available the Final Loan (or any part thereof) or make the first Utilization under the Final Loan unless each of the following conditions has been fulfilled, in each case in form and substance satisfactory to each Senior Lender (unless waived in accordance with Section 25.4 (*Amendment and Waiver*)):

(a)     **[Reserved]**.

(b)     **Officer's Certificate**.

The Administrative Agent and the Senior Lenders shall have received an Officer's Certificate substantially in the form of Schedule G hereto.

(c)     **Approved Budget**.

The Senior Lenders shall have received a copy of the Approved Budget.

(d)     **Security**.

The Encumbrances in favor of the Collateral Agent for the benefit of the Secured Parties have been perfected by the Final Order, and without the necessity of the execution of mortgages, security agreements, pledge agreement, financing statements or other agreements, and shall constitute first priority Encumbrances (subject only to the Carve-Out, the Administration Charge, the Lien securing the Working Capital Facility (solely with respect to WCF Collateral) and Encumbrances senior by operation of law, and otherwise as set forth in the Final Order).

(e)    **Fees**.

All fees, premiums, expenses (including reasonable fees and expenses of counsel to the Agents and the Senior Lenders) and other out-of-pocket transaction costs incurred in connection with the transactions contemplated hereby shall have been paid in full in accordance with the terms of the Final Order.

(f)    **Final Order**.

The Final Order (x) shall have been entered on the docket of the Bankruptcy Court no later than forty-five (45) days after the Petition Date and (y) shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any respect without the written consent of the Senior Lenders.

**12.3    Conditions Precedent to All Utilizations**.

No Senior Lender will be obligated to make available any Loan, including the Interim Loans and the Final Loans, (or any part thereof) unless each of the conditions applicable to the proposed Utilization under the Loan and each of the following conditions has been fulfilled, in each case in form and substance satisfactory to the Majority Lenders (or have been waived in accordance with Section 25.4 (*Amendment and Waiver*)):

(a)    **No Default**.

An Officer's Certificate of the Borrower confirming that no Default or Event of Default shall have occurred and be continuing or would result from the making of the proposed Loan.

(b)    **Representations**.

An Officer's Certificate of the Borrower shall have been delivered to the Administrative Agent and the Senior Lenders confirming that the representations and warranties in the Finance Documents to be made by each Obligor are true, accurate and complete in all material respects.

(c)    **No Change of Control**.

No Change of Control shall have occurred.

(d)    **Purpose**.

The Administrative Agent and the Senior Lenders shall have received an Officer's Certificate of the Borrower confirming that the proposed loan will be used for the purpose specified in Section 2.3 (*Use of Proceeds*).

(e)    **No MAE**.

The Administrative Agent and the Senior Lenders shall have received an Officer's Certificate of the Borrower confirming that since the Petition Date, no Material Adverse Effect has occurred and is continuing.

(f)    **Payment of Fees**.

To the extent invoiced and documented at least two (2) days prior to the requested Utilizations, all fees payable in accordance with the Finance Documents, and all costs and expenses due at such time have been paid, or irrevocable instructions, satisfactory to the Senior Lenders, shall be in place to pay such amounts and fees simultaneously with such requested Utilization.

(g)    **Utilization Request**.

The Borrower shall have delivered a Utilization Request to the Administrative Agent no later than 12:00 noon New York time (x) one (1) Business Day prior to the proposed Utilization Date for the Interim Loans and (y) two (2) Business Days prior to the proposed Utilization Date for the Final Loans (in each case, or such later date approved by the Majority Lenders at their reasonable discretion).


**Article 13**
**EVENTS OF DEFAULT AND REMEDIES**

**13.1    Events of Default**.

Subject to the provisions of Section 362 of the Bankruptcy Code to the extent provided in the DIP Order, with respect to the Debtor and without notice, application or motion, hearing before, or order of the Bankruptcy Court or any notice to any Debtor, the occurrence of any of the following events, following the lapse of the applicable cure period (if any) set forth below, or the issuance of notice (if any) in respect thereof, shall constitute an "**Event of Default**":

(a)    If the Borrower fails to pay on or before the due date, (x) any principal amount due to the Senior Lenders or (y) any other amount payable by it to any Finance Party (unless the failure to pay is remedied within two (2) Business Days);

(b)    [reserved];

(c)    Any Obligor shall default in the due performance or observance of any term, condition or provision of a Finance Document to which they are a party, not otherwise specified in this Section 13.1 (*Events of Default*) and, other than in the case of any breach of Section 11.2 (*DIP Budget and Variance Reporting*), Section 11.12 (*Negative Covenants*), Section 11.13 (*Milestones*) and Section 11.3(a)(i) (*Notifications to the Senior Lenders*) (in each case for which no cure period shall apply), such breach remains unremedied for a period of ten (10) Business Days after the earlier of: (i) written notice by the Administrative Agent to the Borrower (acting at the direction of the Majority Lenders), and (ii) any Obligor becoming aware of such breach;

(d)    the Borrower makes any representation or warranty under any Finance Document to which it is a party, or in any certificate, Financial Statement or other document furnished by it to any Secured Party, which is incorrect or incomplete when made or deemed to be made (except to the extent any such representation or warranty expressly relates to an earlier date, and in such case, shall be true and correct on and as of such earlier date) and, to the extent such representation or warranty is not already qualified by materiality, such representation or warranty is incorrect or incomplete in a material respect when made or deemed to be made and in each case the circumstances so misrepresented are (i) susceptible to cure and (ii) not corrected within ten (10) Business Days after

the earlier of (A) written notice by the Administrative Agent to the Borrower (acting at the direction of the Majority Lenders), and (B) any Obligor becoming aware of such breach;

(e)    [reserved];

(f)    the Borrower (i) fails to make any payment when such payment is due and payable to any Person in relation to any Debt (other than Debt subject to the Automatic Stay) having a principal amount in excess of $1,000,000, and any applicable grace period in relation thereto as provided for under the applicable instrument or agreement evidencing such Debt has expired; (ii) defaults in the observance or performance of any other agreement or condition in relation to any such Debt or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs or condition exists, the effect of which is to cause, or to permit the holder of such Debt to declare such Debt to become due prior to its stated maturity date, in each case to the extent not subject to the Automatic Stay; or (iii) fails to pay any Adequate Protection Obligations when due and payable in accordance with the DIP Order;

(g)    [reserved];

(h)    [reserved];

(i)    an order is made or a resolution is passed for the winding up, liquidation or dissolution of the Borrower;

(j)    [reserved];

(k)    any Finance Document is repudiated, contested or disaffirmed by any Obligor in whole or in part, ceases to be in full force and effect, or is invalidated, becomes unlawful, or rendered unenforceable by any act, regulation or governmental action or is determined to be invalid or unenforceable by a court or other judicial entity or if any Obligor has ceased to perform its obligations under any Finance Document;

(l)    security interests intended to be granted by or pursuant to this Agreement or any other Finance Document over the Collateral, shall not be valid, perfected, first priority security interests (subject, in the case of the Collateral, to the existence of any Permitted Encumbrances) in favor of the Collateral Agent for the benefit of the Secured Parties and enforceable thereby;

(m)    an adverse final judgment, order, writ of execution, garnishment, attachment, arbitral award or similar process that is not capable of further appeal, for an amount in excess of $1,500,000, is issued or levied against the Borrower, the Collateral, in each case, to the extent not subject to the automatic stay under the Chapter 11 Cases; provided that, to the extent that any such action or process is appealable or contestable, such judgment, order, writ of execution, garnishment, attachment, arbitral award or similar process remains unpaid, unstayed on appeal, undischarged, unbonded or undismissed for a period of thirty (30) days after the right of appeal or contest arises;

(n)    all or any material portion of the Collateral is attached, sold, transferred, Encumbered or assigned by a Person other than the Secured Parties or without the consent of the Senior Lenders (other than pursuant to a Permitted Asset Disposition or Permitted Encumbrance, as applicable) and in the case of such attachment shall remain unlifted, unstayed or undischarged for a period of thirty (30) days;

(o)    an Encumbrancer, or any other Person, other than the Secured Parties, legally takes possession of (i) any Collateral Account (other than by the collateral agent under the First Lien Facility), or (ii)

any portion of the Collateral with a value in excess of $1,500,000 by appointment of a receiver, receiver and manager, or otherwise but excluding the legal possession of any cash collateral held as security by third parties;

(p)     the Borrower abandons all or any material portion of the Collateral other than in regard to its transition into care and maintenance operations;

(q)     [Reserved];

(r)     the Borrower fails to obtain, or loses the right to, or benefit of, a Material Project Authorization, or any Material Project Authorization in respect of the transactions contemplated by the Finance Documents is modified in a manner that has a Material Adverse Effect; provided, that the foregoing shall not constitute the occurrence of an Event of Default if such circumstance is capable of being remedied and the Borrower is diligently pursuing and obtains a replacement of such Material Project Authorization within forty-five (45) days after failing to obtain or losing the right to, or benefit of, a Material Project Authorization;

(s)     a Change of Control occurs;

(t)     any Material Project Document is terminated (other than at scheduled maturity, with the prior written consent of the Majority Lenders) or otherwise becomes invalid, illegal or otherwise ceases to be in full force and effect; provided, that the foregoing shall not constitute the occurrence of an Event of Default in the case of the NV Energy Power Supply Contract, if the Majority Lenders have, acting reasonably, determined that the NV Energy Power Supply Contract is capable of replacement;

(u)     (i) the Borrower or any director or officer thereof has violated, any AML Laws, Anti-Corruption Laws or Sanctions, or (ii) any employee or agent of the Borrower has violated any AML Laws, Anti-Corruption Laws or Sanctions, unless such Obligor takes action to remedy such violation as may be reasonably acceptable to the Administrative Agent within ten (10) days of acquiring actual knowledge of such violation and thereafter continues to take such action as may be reasonably acceptable to the Administrative Agent;

(v)     the occurrence of an Expropriation Event which is continuing for thirty (30) days or more; provided, that such cure period shall apply only if the Obligors are actively and diligently pursuing a resolution to regain ownership and control over the Project substantially as held prior to such event;

(w)     failure by any Obligor to be in compliance in all material respects with the applicable provisions of any Finance Document, the DIP Order or DIP Recognition Order, after giving effect to applicable cure periods set forth herein or therein;

(x)     any request made by any Obligor for, or the reversal, modification, amendment, stay, reconsideration or vacatur of any DIP Order, as entered by the Bankruptcy Court, or any DIP Recognition Order, as granted by the Canadian Court, in each case, without the prior written consent of the Majority Lenders;

(y)     the filing of any application by any Obligor (other than the application for financing provided by a third party which seeks authority to pay all of the Obligations in full in cash upon the closing of such financing) for the approval of (or an order is entered by the Bankruptcy Court approving) any claim arising under section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy

Code or any security, mortgage, collateral interest or other Encumbrance in any of the Chapter 11 Cases which is *pari passu* with or senior to the Encumbrances securing the Obligations, excluding (i) the Carve-Out, (ii) the Administration Charge, (iii) solely with respect to the WCF Collateral, the Encumbrances securing the Working Capital Facility, (iv) prior to the entry of the Final Order, any Prepetition Trisura Lien, (v) Encumbrances arising under the DIP Order or pursuant to any other financing agreement made with the prior written consent of the Majority Lenders or (vi) as provided in the First Day Orders with the prior written consent of the Majority Lenders;

(z)     any Obligor (or any direct or indirect non-Debtor affiliate or Subsidiary of an Obligor) commences (or supports) any action (other than an action permitted by the DIP Order and the DIP Recognition Order) seeking or consenting to, or any order is entered granting, (i) the invalidation, subordination or other challenge to the Prepetition Secured Obligations, the Prepetition Funded Debt Liens, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, the Encumbrances securing the Obligations or the DIP Superpriority Claims (as defined in the DIP Order) or (ii) any relief under sections 506(c) or 552(b) of the Bankruptcy Code with respect to any Prepetition Collateral (as defined in the DIP Order) (including cash collateral), any Collateral or against any of the Prepetition Secured Parties, the Agent or the Senior Lenders;

(aa)    (i) any Obligor files a pleading in any court seeking or supporting an order to revoke, reverse, stay, vacate, amend, supplement or otherwise modify any Finance Document or any DIP Order or DIP Recognition Order, or to disallow any Obligations, in whole or in part, or (ii) any material provision of any Finance Document, the DIP Order, any DIP Recognition Order or any other order of the Bankruptcy Court or Canadian Court approving the Obligors' use of Cash Collateral (as defined in the DIP Order), shall for any reason cease to be valid and binding (without the prior written consent of the Majority Lenders);

(bb)    the entry of an order by the Bankruptcy Court in favor of the Creditors' Committee (if any), any ad hoc committee or any other party in interest, (i) granting such party standing to pursue any claims against the Senior Lenders or the Prepetition Secured Parties, (ii) sustaining an objection to claims of the Senior Lenders or the Prepetition Secured Parties or (iii) avoiding any liens held by the Senior Lenders or the Prepetition Secured Parties, *provided*, that the foregoing shall not be deemed to prohibit the investigation by any such committee of any such claims or liens in respect of the Prepetition Secured Obligations in accordance with the terms of the DIP Order;

(cc)    without the prior written consent of the Majority Lenders, the filing with the Bankruptcy Court of a motion seeking approval of a sale under section 363 of the Bankruptcy Code or a plan of reorganization or liquidation in any of the Chapter 11 Cases that, in either case, does not provide for indefeasible payment in full in cash of all Obligations upon closing of such sale or the effective date of such plan;

(dd)    the appointment in any of the Chapter 11 Cases of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of any Debtor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code);

(ee)    without the prior written consent of the Majority Lenders, the granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Chapter 11 Cases with respect to any portion of the Collateral with an aggregate value of at least $1,500,000;

(ff)    the conversion of any Chapter 11 Case into a case pursuant to Chapter 7 of the Bankruptcy Code;

(gg)  the termination of any of the Debtors' exclusive right to propose a plan of reorganization under Chapter 11 of the Bankruptcy Code;

(hh)  a dismissal of any of the Chapter 11 Cases or Recognition Proceedings;

(ii)  without the prior written consent of the Majority Lenders, a request by the Debtors to use cash collateral or to obtain financing under section 364 of the Bankruptcy Code (other than pursuant to this Agreement), unless such financing would repay in full in cash all Obligations upon consummation thereof;

(jj)  without the consent of the Majority Lenders, the filing of any motion seeking approval of a sale of any Collateral;

(kk)  a Material Adverse Effect has arisen after the Petition Date and is continuing;

(ll)  the failure to meet any Milestone; or

(mm)  the entry of an Interim Order or Final Order in form or substance that is not acceptable to the Majority Lenders in their sole discretion.

**13.2  Remedies Upon Default**.

(a)  Upon the occurrence, and during the continuance, of any Event of Default, subject to the terms of the DIP Order and the Remedies Notice Period, the Majority Lenders or the Administrative Agent as directed by the Majority Lenders may, by notice given to the Borrower, take any of the following actions:

(i)  declare all Obligations to be immediately due and payable; and/or

(ii)  terminate this Agreement and any other Finance Documents as to any future liability or obligation of the Agent and the Senior Lenders, but without affecting any of the Encumbrances securing the Obligations, the Loans or any other Obligation;

(iii)  terminate, reduce or restrict the ability of the Obligors to use any cash collateral and the proceeds of the Loans (other than during the Remedies Notice Period referenced below, cash collateral for payroll and other expenses critical to keep operating the business of the Obligors, subject to the Approved Budget) (any such declaration made by the Administrative Agent (acting at the direction of the Majority Lenders) to the Obligors, a "**Termination Declaration**" and the date which is the earliest to occur of any such Termination Declaration and the Maturity Date being herein referred to as the "**Termination Declaration Date**"); provided that, (i) the Termination Declaration shall not be effective until notice has been provided by electronic mail to counsel to the Debtors, counsel to the Creditors' Committee (if any), and the U.S. Trustee (the "**Termination Declaration Notice**") and (ii) four (4) Business Days following the receipt of the Termination Declaration Notice by the parties listed in clause (i) of this proviso (the "**Remedies Notice Period**"), the Agent shall have relief from the automatic stay without any further action in the Chapter 11 Cases or the Recognition Proceedings and may set off against deposits and financial assets of the Obligors and foreclose on all or any portion of the Collateral other than the WCF Collateral, and during the Remedies Notice Period, the Obligors and the Creditors' Committee (if any) shall be entitled to seek an emergency hearing before the Bankruptcy Court for the sole purpose of contesting whether an Event

of Default has occurred; and, unless during such period the Bankruptcy Court determines that an Event of Default has not occurred and/or is not continuing or the Bankruptcy Court orders otherwise, the automatic stay, as to all of the Senior Lenders and the Agents, shall automatically be terminated at the end of the Remedies Notice Period and without further notice or order;

(iv)    to the extent permitted by Applicable Law and by the DIP Order:

(A)    direct the Collateral Agent to realize upon all or any part of the Security;

(B)    take such actions and commence such proceedings (or direct the Collateral Agent to take such actions or commence such proceedings) as may be permitted at law or in equity (whether or not provided for herein or in the Finance Documents) including, but not limited to, delaying, postponing or waiving any such proceedings, as the Majority Lenders may determine is admissible, in their sole and absolute discretion at such times and in such manner as the Majority Lenders, in their sole discretion, may consider expedient;

(C)    take possession of the Project; and

(D)    cancel any or all Unused Commitments,

and all of the foregoing without any additional notice, presentment, demand, protest, notice of protest, dishonor or any other action except as required by law.  The rights and remedies of the Administrative Agent, the Senior Lenders and the Collateral Agent hereunder are cumulative and are in addition to and not in substitution for any other rights or remedies provided by Applicable Law or by any of the other Finance Documents.

(b)    It is understood and agreed that if the Loans are accelerated or otherwise become due prior to the Maturity Date (including the acceleration of claims by operation of law), the Exit Fee will also automatically be due and payable and shall constitute part of the Obligations with respect to the Loans, in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each Senior Lender's lost profits as a result thereof. Any such Exit Fee payable shall be presumed to be the liquidated damages sustained by each Senior Lender as the result of the early prepayment and each of the Obligors agrees that it is reasonable under the circumstances currently existing. Each of the Obligors expressly waives (to the fullest extent it may lawfully do so) the provisions of any present or future statute or law that prohibits or may prohibit the collection of the foregoing amounts in connection with any such acceleration, any rescission of such acceleration. Each of the Obligors expressly agrees (to the fullest extent it may lawfully do so) that: (A) the Exit Fee is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (B) the Exit Fee shall be payable notwithstanding the then prevailing market rates at the time payment is made; (C) there has been a course of conduct between the Senior Lenders and the Obligors giving specific consideration in this transaction for such agreement to pay the Exit Fee; and (D) the Obligors shall be estopped hereafter from claiming differently than as agreed to in this paragraph.

(c)    The Administrative Agent (acting at the direction of the Majority Lenders) shall promptly notify the Borrower, the Collateral Agent and each Senior Lender upon the cessation of an Event of Default.

103

**13.3**    **Set-Off upon Event of Default**.

Upon the occurrence and during the continuance of an Event of Default, the Senior Lenders may, without notice to the Borrower or to any other Person, and subject to the terms of the DIP Order, combine, consolidate and merge all or any of the Borrower's accounts with, and liabilities to, the Senior Lenders and set off, any indebtedness and liability of the Senior Lenders to the Borrower, matured or unmatured, against and on account of the Obligations when due.

**13.4**    **Application of Proceeds**.

The proceeds received by any Agent in respect of any sale of, collection from or other realization upon all or any part of the Collateral pursuant to the exercise by the Agents of their remedies, and any other funds realized by any Agent during the continuance of an Event of Default, shall be applied, subject in all respects to the terms of the DIP Order and to Applicable Law, in full or in part, together with any other sums then held by the Agents pursuant to this Agreement, promptly by the Administrative Agent as follows:

(a)    *first*, (x) to the payment of all fees, expenses, losses, indemnities and other amounts payable to the Agents under the Finance Documents and then (y) to the payment of all  reasonable costs and expenses, fees, commissions and taxes of such sale, collection or other realization including compensation to the Agents (acting on behalf of the Senior Lenders) and its agents and counsel, and all expenses, liabilities and advances made or incurred by the Agents in connection therewith and all amounts for which the relevant Agent is entitled to indemnification pursuant to the provisions of any Finance Document, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

(b)    *second*, to the payment in full in cash of all amounts owing in respect of interest and fees (including, but not limited to, the Exit Fee) under this Agreement;

(c)    *third*, to the payment in full in cash, *pro rata*, of the principal and other remaining obligations hereunder and all other Obligations, in each case equally and ratably in accordance with the respective amounts thereof then due and owing; and

(d)    *fourth*, the balance, if any, to the Person lawfully entitled thereto (including the Obligors) or as a final and non-appealable judgment of a court may direct.

**Article 14**
**CHANGES TO PARTIES**

**14.1**    **Assignment by Senior Lenders**.

(a)    This Agreement and the other Finance Documents shall enure to the benefit of and be binding upon the parties hereto and thereto, their respective successors and any permitted assignee of some or all of the parties' rights or obligations under this Agreement and the other Finance Documents as permitted under this Section 14.1 (*Assignment by Senior Lenders*).

(b)    A Senior Lender (the "**Existing Lender**") may assign or transfer all or any part of its rights in respect of the Obligations, this Agreement and the other Finance Documents to or in favor of any Permitted Transferee without the consent of the Borrower and have its corresponding obligations hereunder and thereunder assumed by such Person; provided, that:

104

(i)     except with respect to an assignment or transfer to any Senior Lender or Affiliate of any Senior Lender, no Senior Lender shall be permitted to make a partial assignment or transfer of Loans in a principal amount of less than $5,000,000;

(ii)    the Borrower's consent to assignment shall be required (which consent shall not be unreasonably withheld, delayed or conditioned) for any assignment to a Person other than an existing Senior Lender or an Affiliate thereof, unless an Event of Default has occurred and is continuing and in such case a Senior Lender may make an assignment or transfer to any Person and such transfer or assignment shall not require the consent of the Borrower and shall not be subject to any restriction (including those set forth in this Section 14.1 (*Assignment by Senior Lenders*)); and

(iii)   a Note, if applicable, and all or any part of the Senior Lenders' rights in respect of the Obligations, this Agreement and any of the other Finance Documents shall be assigned or transferred together.

(c)    Any assignment made hereunder shall become effective when the Borrower has been notified thereof by the Administrative Agent and the Administrative Agent receives:

(i)     a duly completed and executed Transfer Certificate which is delivered by the Existing Lender and the Permitted Transferee; and

(ii)    any documents required by local counsel and requested by the Majority Lender to ensure the assignee Senior Lender receives the benefit of the Security, and

any such assignee shall be treated as a party to this Agreement for all purposes of this Agreement and the other Finance Documents and shall be entitled to the full benefit hereof and thereof and shall be subject to the obligations of the Senior Lenders to the same extent as if it were an initial party in respect of the rights assigned to it and obligations assumed by it and the Senior Lender making such assignment shall be released and discharged accordingly.

(d)    If the consent of the Borrower is required for any assignment, the Administrative Agent shall not be obligated to accept a Transfer Certificate if the Borrower withholds its consent.

(e)    The Senior Lenders may provide to any permitted assignee or transferee such information, including Confidential Information, concerning this Agreement, the other Finance Documents, and the financial position and the operations of the Obligors as, in the reasonable opinion of the Senior Lenders, may be relevant or useful in connection with this Agreement, the other Finance Documents or any portion thereof proposed to be acquired by such assignee or transferee; provided, that each recipient of such information agrees not to disclose such information to any other Person except as permitted pursuant to Section 23.1(d) (*Confidential Information*).

(f)    The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain a copy of each assignment delivered to it and a register for the recordation of the names and addresses of the Senior Lenders, and the Commitments of, and principal amounts of (and stated interest on) the Loans owing to, each Senior Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Senior Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Senior Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrower and any Senior Lender, at any reasonable time and from time to time upon reasonable prior notice.

(g)     [Reserved].

(h)     Any Senior Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural Person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person, or the Obligors or any of the Obligors' Affiliates or Subsidiaries) (each, a "**Participant**") in all or a portion of such Senior Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided, that (i) such Senior Lender's obligations under this Agreement shall remain unchanged, (ii) such Senior Lender shall remain solely responsible to the other parties hereto for the performance of such obligations; and (iii) the Borrower, the Administrative Agent and Senior Lenders shall continue to deal solely and directly with such Senior Lender in connection with such Senior Lender's rights and obligations under this Agreement.

(i)     Any agreement or instrument pursuant to which a Senior Lender sells such a participation shall provide that such Senior Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided, that such agreement or instrument may provide that such Senior Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver of Section 25.4 (*Amendment and Waiver*) that affects such Participant and that requires the consent of each Senior Lender.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 13.3 (*Set-Off upon Event of Default*) as though it were a Senior Lender; provided, that such Participant agrees to be subject to Section 15.25 (*Payments*) as though it were a Senior Lender.  Each Senior Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts of (and stated interest on) each Participant's interest in the Loans or other obligations under the Finance Documents (the "**Participant Register**"); provided, that no Senior Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Finance Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations and Section 1.163-5(b) of the proposed United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Senior Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.   For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(j)     Any Senior Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Senior Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any other central bank; provided, that no such pledge or assignment shall release such Senior Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Senior Lender as a party hereto.

(k)     The Borrower agrees that each Participant shall be entitled to the benefits of Sections 6.1 and 7.3 (subject to the requirements and limitations therein, including the requirements under Section 6.1(g) (it being understood that the documentation required under Section 6.1(g) shall be delivered to the participating Senior Lender)) to the same extent as if it were a Senior Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant shall not be entitled to receive any greater payment under Section 6.1 or 7.3, with respect to any

participation, than its participating Senior Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a change in Applicable Law that occurs after the Participant acquired the applicable participation.

(l)     In connection with any assignment, participation or pledge made pursuant to this Section 14.1 (*Assignment by Senior Lenders*), the Borrower agrees to enter into such documents as may reasonably be required by a Senior Lender to evidence such assignment, participation or pledge.

## 14.2    Assignment by Borrower.

The Borrower shall not assign all or any part of its rights, benefits or obligations under this Agreement or any of the other Finance Documents to which it is a party without the prior written consent of the Senior Lenders.

## Article 15
## ADMINISTRATIVE PARTIES

### 15.1    Appointment of the Administrative Agent and the Collateral Agent.

(a)     Each Senior Lender hereby irrevocably appoints and authorizes each of the Administrative Agent and the Collateral Agent to act on its behalf as its agent under and in connection with the Finance Documents.  By its signature below, each of the Administrative Agent and the Collateral Agent (or any successor thereto pursuant to this Article 15) accepts such appointment.

(b)     Each Senior Lender irrevocably authorizes each of the Administrative Agent and the Collateral Agent in such respective capacity to:

(i)     take such actions, perform the duties and to exercise the rights, powers and authorities that are specifically delegated to the Administrative Agent or the Collateral Agent, as applicable, under the Finance Documents, together with any other incidental rights, powers and authorities as are reasonably incidental thereto; and

(ii)     enter into, deliver and perform each Finance Document expressed to be entered into by the Administrative Agent or the Collateral Agent, as applicable.

(c)     The provisions of this Article 15 (*Administrative Parties*) are solely for the benefit of the Finance Parties and the Borrower shall not have rights as a third-party beneficiary of any such provision. Whether or not so expressly stated therein, in entering into, or taking (or forbearing from) any action under pursuant to, the Finance Documents, each Agent shall have all of the rights, immunities, indemnities and other protections granted to it under this Agreement (in addition to those that may be granted to it under the terms of such other agreement or agreements).

### 15.2    Instructions to the Agents.

(a)     Notwithstanding any provision of this Agreement or the other Finance Documents to the contrary, before taking or omitting any action to be taken or omitted by any Agent under the terms of this Agreement and the other Finance Documents, such Agent may seek the written direction of the Majority Lenders (which written direction may be in the form of an email), and such Agent is entitled to rely (and is fully protected in so relying) upon such direction. No Agent shall be liable with respect to any action taken or omitted to be taken by it in accordance with such direction. If any Agent requests such direction with respect to any action, such Agent is entitled to refrain from

such action unless and until such Agent has received such direction, and such Agent does not incur liability to any Person by reason of so refraining. In the absence of an express statement in the Finance Documents regarding which Senior Lenders shall direct in any circumstance, the direction of the Majority Lenders shall apply and be sufficient for all purposes.  The instructions of the Majority Lenders shall be binding on all Senior Lenders.

(b)     Notwithstanding anything else to the contrary herein or in the other Finance Documents, whenever reference is made in this Agreement or any other Finance Document to any discretionary action by, consent, designation, specification, requirement or approval of, notice, request or other communication from, or other direction given or action to be undertaken or to be (or not to be) suffered or omitted by any Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by any Agent, it is understood that such Agent shall be acting at the direction of the Majority Lenders and shall be fully protected in acting pursuant to such directions.

**15.3     Duties of the Agents**.

(a)     The Agents' duties under the Finance Documents are solely mechanical and administrative in nature.

(b)     The Administrative Agent shall forward promptly to the Senior Lenders any document which it receives under this Agreement and the other Finance Documents, including notices, certificates, reports, opinions and agreements, which are delivered to the Administrative Agent for the Senior Lenders.

(c)     No Agent shall have any responsibility for the accuracy or completeness of any information supplied by any Person in connection with the Project or the Finance Documents or for the legality, validity, effectiveness, adequacy or enforceability of any Finance Document or any other document referred to herein or therein or <u>provided</u> for herein or therein or for any recitals, statements, representations or warranties made by the Borrower or any other Person contained in this Agreement or any other Finance Document or in any certificate or other document referred to or <u>provided</u> for in or received by such Agent, hereunder or thereunder.  No Agent shall be liable as a result of any failure by the Borrower or its Affiliates or any Person party hereto or to any other Finance Document to perform their respective obligations hereunder or under any other Finance Document or any document referred to or <u>provided</u> for herein or therein or as a result of taking or omitting to take any action hereunder or thereunder or in relation to any Finance Document, except to the extent set forth in this Agreement.  No Agent shall be liable for the satisfaction of any condition set forth in this Agreement, other than to confirm receipt of items expressly required to be delivered to such Agent.

(d)     No Agent shall be obligated to monitor or enquire whether a Default or Event of Default has occurred.  No Agent shall be deemed to have knowledge of or notice of the occurrence of a Default or Event of Default unless such Agent has received a written notice from a Senior Lender or the Borrower, referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "Notice of Default."  If any Agent has received such a "Notice of Default," such Agent shall deliver a copy thereof to each Senior Lender.  Each Agent shall take such action with respect to such Default or Event of Default as is provided in Article 13 (*Events of Default and Remedies*).

(e)     No Agent shall be bound to inquire as to (A) whether or not any representation made by any other Person in connection with any Finance Document is true, (B) the occurrence or otherwise of any

Default or Event of Default, (C) the performance by any other Person of its obligations under any of the Finance Documents or (D) any breach or default by any other Person of its obligations under any of the Finance Documents.

(f)     Each Agent shall have only those duties, obligations and responsibilities expressly specified in the Finance Documents to which it is a party (and no others shall be implied).

(g)     It is understood and agreed by each Senior Lender (for itself and any Person claiming through it) that it has itself been and will continue to be, solely responsible for making its own independent appraisal of and investigations into, the financial condition, creditworthiness, condition, affairs, status and nature of each Person and, accordingly, each such Senior Lender warrants to the Agents that such Senior Lender has not relied on and will not hereafter rely on any Agent:

    (i)     in making its decision to enter into this Agreement, any other Finance Document or any amendment, waiver or other modification hereto or thereto;

    (ii)     to check or inquire on its behalf into the adequacy, accuracy or completeness or any information provided by any Person in connection with any of the Finance Documents or the transactions therein contemplated (whether or not such information has been or is hereafter circulated to such Person by any Agent);

    (iii)     to assess or keep under review on its behalf the financial condition, creditworthiness, condition, affairs, status or nature of any Person.

(h)     No Agent shall be responsible for or have any obligation whatsoever to assure (i) that the Collateral exists or is owned (whether in fee or by leasehold) by the Person purporting to own it, or is cared for, protected, or insured or has been encumbered, (ii) the genuineness or value of any Collateral or the validity or sufficiency of any agreement contained therein or the validity of the title of any Obligor to the Collateral, or (iii) that the liens granted to the Collateral Agent have been properly or sufficiently or lawfully created, perfected, protected, or enforced, or are entitled to any particular priority.   Notwithstanding anything contained in the Finance Documents or otherwise to the contrary, no Agent shall have any duty to (i) file or prepare any financing or continuation statements or record any documents or instruments in any public office for purposes of creating, perfecting or maintaining any lien or security interest created under the Finance Documents or otherwise; (ii) take any steps to preserve rights against any Person with respect to any Collateral; (iii) insure, monitor or maintain the Collateral; (iv) pay any taxes, charges, assessments or liens upon the Collateral; or (v) take any action to protect against any diminution in value of the Collateral.

**15.4     Rights of the Agents**.

(a)     Notwithstanding any other provision of the Finance Documents, no Agent shall be liable for any action taken or not taken by it (i) with the consent or at the request, instruction or direction of the Majority Lenders (or such other number or percentage of the Senior Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment.

(b)     No Agent shall have any duty to take any discretionary actions or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the Finance Documents to which it is a party that such Agent is required to exercise at the direction of the Majority Lenders (or such other number or percentage of Senior Lenders as shall be expressly provided for herein or

in the other Finance Document); provided that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Finance Document , the DIP Order or Applicable Law.  No direction given to any Agent (whether given by the Senior Lenders or the Borrower, as the case may be, or otherwise by any other Person) which imposes, or purports to impose, upon such Agent any obligation not set forth in or arising under any Finance Document shall be binding upon such Agent unless such Agent elects, at its sole option, to accept such direction.

(c)     Notwithstanding anything to the contrary in any Finance Document, no Agent shall be required to exercise any rights or remedies under any Finance Document or give any consent under any Finance Document or enter into any agreement amending, modifying, supplementing or waiving any provision of any Finance Document, including this Agreement.

(d)     No provision of this Agreement or any Finance Document shall require any Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or under any Finance Document or in the exercise of any of its rights or powers.

**15.5     No Fiduciary Duties**.

(a)     Nothing in the Finance Documents makes an Agent a trustee or fiduciary of any other Person;

(b)     no Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing; and

(c)     no Agent shall be bound to account to any Senior Lender for any sum or the profit element of any sum received by it for its own account.

**15.6     Business with the Borrower**.

(a)     Each Agent may accept deposits from, lend money to and generally engage in any kind of banking or other business with the Borrower.

(b)     If it is also a Senior Lender, each Agent has the same rights and powers under the Finance Documents, as applicable, as any other Senior Lender and may exercise those rights and powers as though it were not an Agent.

(c)     Each Agent may carry on any business with the Borrower or its related entities (including acting as an agent or a trustee in connection with any other financing).

**15.7     Responsibility for Documentation**.

No Agent is responsible or liable for:

(a)     the adequacy, accuracy or completeness of any statement or information (whether oral or written) made, given or supplied by any Person in or in connection with any Finance Document, as applicable;

(b)     the legality, validity, effectiveness, adequacy, completeness or enforceability of any Finance Document or the Security or any other agreement, arrangement or document entered into, made or executed in anticipation of or in connection with any Finance Document or the Security; or

(c)      any determination as to whether any information provided or to be provided to any Finance Party is non-public information the use of which may be regulated or prohibited by applicable law or regulation relating to insider dealing or otherwise.

No Agent shall, except as expressly set forth herein and in the other Finance Documents to which such Agent is a party, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as such Agent or any of its Affiliates in any capacity.

**15.8    Exclusion of Liability**.

(a)      Nothing in this Agreement shall obligate any Agent to carry out:

    (i)      any "know your customer" or other checks in relation to any Person; or

    (ii)      any check on the extent to which any transaction contemplated by the Finance Documents might be unlawful for any Senior Lender,

on behalf of any Senior Lender and each Senior Lender confirms to each Agent that such Senior Lender is solely responsible for any such checks it is required to carry out and that it may not rely on any statement in relation to such checks made by any Agent.

(b)      Without prejudice to any provision of any Finance Document excluding or limiting an Agent's liability, any liability of an Agent arising under or in connection with any Finance Document or the Security shall be limited to the amount of actual loss which has been finally judicially determined to have been suffered but without reference to any special conditions or circumstances known to such Agent at any time which increase the amount of such loss. In no event shall any Agent be liable for any loss of profits, goodwill, reputation, business opportunity or anticipated saving, or for special, punitive, indirect or consequential damages, whether or not foreseeable, whether or not such Agent has been advised of the possibility of such loss or damages and regardless of whether the claim for loss or damage is made in negligence, breach of contract, duty or otherwise.

(c)      No Agent shall be responsible for delays or failures to perform any act or fulfill any duty, obligation or responsibility as a result of any occurrence beyond its control. Such acts shall include, but not be limited to, any act of God, riots, wars, fires, earthquakes or other natural disasters, terrorism, provision of any present or future law or regulation or act of any governmental authority, civil unrest, labor dispute, disease, epidemic or pandemic, quarantine, national emergency, utility failure, computer hardware or software failure, malware or ransomware attack, communications system failure, unavailability of the Federal Reserve Bank wire or telex system or other applicable wire or funds transfer system, or unavailability of any securities clearing system.

**15.9    Senior Lender's Indemnity**.

(a)      Without limiting the liability of the Borrower under the Finance Documents, each Senior Lender shall indemnify (in proportion to such Senior Lender's share of total outstanding Loans or, if no Loans are then outstanding, its share of the Total Commitments), each Agent, within three (3) Business Days of demand, against any cost, loss or liability incurred by such Agent, except to the extent that the cost, loss or liability is caused by such Agent's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction. Each Senior Lender's obligations under this Section 15.9 shall survive the termination of this Agreement, payment of the

obligations hereunder, the resignation or removal of any Agent or any assignment of rights by, or the replacement of, a Senior Lender.

(b)    The Borrower shall immediately on demand reimburse any Senior Lender for any payment such Senior Lender makes to an Agent under this Section 15.9 (*Senior Lender's Indemnity*).

**15.10    Reliance by Agents**.

The Agents shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Agents also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Senior Lender, the Agents may presume that such condition is satisfactory to such Senior Lender unless such Agent shall have received notice to the contrary from such Senior Lender prior to the making of such Loan.  The Agents may consult with legal counsel (who may be counsel for the Borrower or any Senior Lender), independent accountants and other experts selected by any such Agent, and shall not be liable for any action taken or not taken by the Agents in accordance with the advice of any such counsel, accountants or experts.

**15.11    Delegation of Duties**.

Each Agent may perform any and all of its respective duties and exercise its rights and powers hereunder or under any other Finance Document by or through any one or more sub agents appointed by such Agent.  The exculpatory provisions of this Article shall apply to any such sub agent of any Agent.  The Agents shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Agents acted with gross negligence or willful misconduct in the selection of such sub agents.

**15.12    Resignation and Replacement of the Agents**.

(a)    Any Agent may resign by giving thirty (30) days' written notice to the Senior Lenders and the Borrower, in which case the Majority Lenders (with the consent of the Borrower so long as no Event of Default has occurred and is continuing) may appoint a successor Agent.

(b)    The Majority Lenders may remove any Agent from its appointment hereunder with or without cause by giving thirty (30) days' prior written notice to that effect to such Agent and the Borrower.

(c)    If the Majority Lenders have not appointed a successor Agent in accordance with paragraph (b) above within twenty (20) days after notice of resignation or removal was given, the retiring e Agent (with the consent of the Borrower so long as no Event of Default has occurred and is continuing) may (but shall not be obligated to) appoint a successor Agent.  If no successor Agent shall have been so appointed by the Majority Lenders and shall have accepted such appointment within thirty (30) days after the notice of resignation or removal was given (or such earlier day as shall be agreed by the Majority Lenders) (the "Resignation Effective Date"), then whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(d)     Any successor Agent that has accepted such appointment shall succeed to the position of the applicable Agent and the term "**Administrative Agent**" or "Collateral Agent", as applicable, shall mean the successor Agent.

(e)     Upon its resignation or removal becoming effective, the retiring Agent shall be discharged from any further obligation in respect of the Finance Documents but shall remain entitled to the benefit of this Article 15 and Section 7.5 of this Agreement.  The provisions of this Agreement shall inure to the retiring Agent's benefit as to any actions taken or omitted to be taken by it under this Agreement and the other Finance Documents while it was such Agent.  Any successor and each of the other Finance Parties shall have the same rights and obligations amongst themselves as they would have had if such successor had been an initial Finance Party.

**15.13**   **[Reserved]**.

**15.14**   **[Reserved]**.

**15.15**   **General Provisions Relating to the Collateral Agent**.

(a)     Except for the safe custody of any Collateral in its possession and the accounting for monies actually received by it hereunder, the Collateral Agent shall not have any duty as to any Collateral, as to ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Collateral, whether or not any Secured Party has or is deemed to have knowledge of such matters, or as to the taking of any necessary steps to preserve rights against any parties or any other rights pertaining to any Collateral.  The Collateral Agent will be deemed to have exercised reasonable care in the custody of the Collateral in its possession if such Collateral is accorded treatment substantially equal to that which it accords similar property of other customers in similar transactions, and the Collateral Agent will not be liable or responsible for any loss or diminution in the value of any of the Collateral by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Collateral Agent in good faith.

(b)     In the event that the Collateral Agent is required to acquire title to an asset for any reason, or take any managerial action of any kind in regard thereto which in the Collateral Agent's sole discretion may cause the Collateral Agent to be considered an "owner or operator" under any Environmental Laws or otherwise cause the Collateral Agent to incur, or be exposed to, any environmental liability or any liability under any other federal, state or local law, the Collateral Agent reserves the right, instead of taking such action, either to resign as Collateral Agent or to arrange for the transfer of the title or control of the asset to the Senior Lenders or, if the Majority Lenders so direct, to a court appointed receiver.  The Collateral Agent shall not be liable to any Person for any environmental liability or any environmental claims or contribution actions under any Federal, state or local law, rule or regulation by reason of the Collateral Agent's actions and conduct as authorized, empowered and directed hereunder or relating to any kind of discharge or release or threatened discharge or release of any hazardous materials into the environment.

(c)     In the event of any conflict between any terms and provisions set forth in this Agreement and those set forth in any other Finance Document with respect to the matters addressed in this Agreement, the terms and provisions of this Agreement shall supersede and control the terms and provisions of such other Finance Document.  In the event there is any bona fide, good faith disagreement between the other parties to this Agreement or any of the other Finance Documents resulting in adverse claims being made in connection with Collateral held by the Collateral Agent and the terms of this Agreement or any of the other Finance Documents do not unambiguously mandate the action the Collateral Agent is to take or not to take in connection therewith under the circumstances then

existing, or the Collateral Agent is in doubt as to what action it is required to take or not to take hereunder or under the other Finance Documents, the Collateral Agent will be entitled to refrain from taking any action (and will incur no liability for doing so) until directed otherwise in writing by order of a court of competent jurisdiction.

**15.16    Agents Appointed Attorneys-in-Fact**.

Each Obligor hereby irrevocably appoints each of the Agents as such Obligor's attorney in fact, with full authority in the place and stead of such Obligor and in the name of such Obligor or otherwise, from time to time after the occurrence and during the continuance of an Event of Default, in each Agent's determination (in each case acting at the direction of the Majority Lenders), to take any action and to execute any instrument that the Majority Lenders may deem necessary under Applicable Law to accomplish the purposes of this Agreement, including, without limitation:

(a)     to obtain and adjust insurance required to be paid to the Agents pursuant to the terms of the Finance Documents;

(b)     to ask for, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for monies due and to become due under or in respect of any of the Collateral;

(c)     to receive, indorse and collect any drafts or other instruments, documents and chattel paper;

(d)     to file any claims or take any action or institute any proceedings that the Majority Lenders may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce compliance with the terms and conditions of any Assigned Agreement or the rights of the Agents with respect to any of the Collateral;

(e)     to sell, transfer, assign or otherwise deal in or with the Collateral or any part thereof pursuant to the terms and conditions hereunder and under the other Finance Documents;

(f)     to defend, settle, compromise or adjust any suit, action or proceeding relating to the Collateral and, in connection therewith, to give such discharges or releases as the Majority Lenders may reasonably deem appropriate;

(g)     to pay or discharge adverse claims levied or placed on or threatened against the Collateral;

(h)     to direct any parties liable for any payment under the Collateral to make payment of any and all monies due and to become due thereunder directly to the Agents or as the Agents shall direct;

(i)     to sign and indorse any drafts, assignments, proxies, verifications, notices and other documents relating to the Collateral;

(j)     to execute and deliver all assignments, conveyances, statements, affidavits, notices and other agreements, instruments and documents that the Majority Lenders may determine necessary in order to perfect and maintain the security interests and liens granted in this Agreement and in order to fully consummate all of the transactions contemplated herein; and

(k)     to sign any instrument sanctioning the transfer of any or all of the Collateral into the name of any transferee to whom the Agents or any part thereof may be sold pursuant to this Agreement.

**15.17    [Reserved]**.

114

**15.18**    **[Reserved]**.

**15.19**    **[Reserved]**.

**15.20**    **[Reserved]**.

**15.21**    **Agent's Confidentiality**.

(a)    In acting as an agent for the Senior Lenders, each Agent shall be regarded as acting through its agency division which shall be treated as a separate entity from any other of its divisions and departments.

(b)    If information is received by another division or department of any Agent, it may be treated as confidential to such division or department and such Agent shall not be deemed to have notice of it.

**15.22**    **[Reserved]**.

**15.23**    **Credit Appraisal by the Senior Lenders**.

Without affecting the responsibility of the Borrower for information supplied by it or on its behalf in connection with any Finance Document, each Senior Lender confirms to each Agent that it has been, and shall continue to be, solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with any Finance Document, including but not limited to:

(a)    the financial condition, creditworthiness, status and nature of the Borrower;

(b)    the legality, validity, effectiveness, adequacy or enforceability of any Finance Document, the Security and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document or the Security;

(c)    whether such Senior Lender has recourse, and the nature and extent of such recourse, against any Finance Party or any of its respective assets under or in connection with any Finance Document, the Security, the transactions contemplated by the Finance Documents, or any other agreement, arrangement or document entered into made or executed in anticipation of, under or in connection with any Finance Document or the Security;

(d)    the adequacy, accuracy and/or completeness of any reports and any other information provided by any Agent, by any Finance Party or by any other person under or in connection with any Finance Document, the transactions contemplated by the Finance Documents, or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document; and

(e)    the right or title of any person in or to, or the value or sufficiency of any part of, the Security, the priority of any of the Security or the existence of any security interest affecting the Collateral.

**15.24**    **Deduction from Amounts Payable by Agents**.

If any Senior Lender owes an amount to any Agent under the Finance Documents, such Agent may, after giving notice to such Senior Lender, deduct an amount not exceeding such amount from any payment to such Senior Lender which such Agent would otherwise be obligated to make under the Finance Documents,

and apply the amount deducted in or towards satisfaction of the amount owed.  For the purposes of the Finance Documents, such Senior Lender shall be regarded as having received the amount so deducted.

**15.25  Notice Period**.

Where a Finance Document specifies a minimum period of notice to be given to any Agent, such Agent may, at its discretion, accept a shorter notice period.

**15.26  [Reserved]**.

**15.27  Payments**.

(a)  While no Event of Default is continuing, the Borrower shall make all payments in accordance with Article 19 (*Payment Mechanics*).

(b)  Following an Event of Default that is continuing, provided the Administrative Agent has declared all Obligations immediately due and payable, all payments shall be made to the Administrative Agent for distribution to the Senior Lenders in accordance with Section 13.4 of this Agreement, such that the benefit of all such payments shall be shared by the Senior Lenders ratably in accordance with the Applicable Percentage owing to them; provided, that the provisions of this Section 15.27 (*Payments*) shall not be construed to apply to:

(i)  any payment made in respect of an obligation that is secured by a Permitted Encumbrance or that is otherwise entitled to priority over the Borrower's obligations under or in connection with the Finance Documents;

(ii)  any payment to which such Senior Lender is entitled as a result of any form of credit protection obtained by such Senior Lender; or

(iii)  any payment to which such Senior Lender is entitled in its capacity as a party to any Finance Document separate than in its capacity as a Senior Lender.

**15.28  Agents as Senior Lender**.

With respect to its Commitment and the Loans made by it, any Person serving as an Agent hereunder shall have the same rights and powers under the Finance Documents as any other Senior Lender and may exercise the same as though it were not such Agent.  The term "Senior Lender", "Finance Party" or "Secured Party", when used with respect to each Agent, shall unless otherwise expressly indicated, include such Agent in its individual capacity (if applicable).  Each Agent and its Affiliates may accept deposits from, lend money to, act as trustee under, act as financial advisor or in any other advisory capacity for and generally engage in any kind of business with, any Person as if such Agent were not the applicable Agent hereunder, without any duty to account therefor to any other Person.

**15.29  Erroneous Payments**.

(a)  If an Agent notifies a Senior Lender or any Person who has received funds on behalf of a Senior Lender (any such Senior Lender (and each of their respective successors and assigns) a "**Payment Recipient**") that the such Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds (as set forth in such notice from such Agent) received by such Payment Recipient from such Agent of any of its Affiliates were erroneously or mistakenly transmitted, to, or otherwise erroneously or mistakenly received

by, such Payment Recipient (whether or not known to such Senior Lender or other Payment Recipient on its behalf) (any such funds, whether transmitted or received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "**Erroneous Payment**" and (y) demands in writing the return of such Erroneous Payment (or a portion thereof) (provided that, without limiting any other rights or remedies (whether at law or in equity), the Administrative Agent may not make any such demand under this clause (a) with respect to an Erroneous Payment unless such demand is made within fifteen (15) calendar days of the date of receipt of such Erroneous Payment by the applicable Payment Recipient), such Erroneous Payment shall at all times remain the property of such Agent pending its return or repayment as contemplated below in this Section 15.29 (*Erroneous Payments*) and held in trust for the benefit of such Agent, and such Senior Lender shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two Business Days thereafter (or such later date as such Agent may, in its sole discretion, specify in writing), return to such Agent the amount of any such Erroneous Payment (or portion thereof) as to which such demand was made, in same day funds (in the currency so received), together with interest thereon (except to the extent waived in writing by the such Agent) in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to such Agent in same day funds at the rate determined by such Agent in accordance with banking industry rules on interbank compensation from time to time in effect. A notice of such Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

(b)      Without limiting immediately preceding clause (a), each Senior Lender or any Person who has received funds on behalf of a Senior Lender (and each of their respective successors and assigns), agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the such Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in this Agreement or in a notice of payment, prepayment or repayment sent by such Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment sent by such Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by such Agent (or any of its Affiliates), or (z) that such Senior Lender or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each such case.

(i)       it acknowledges and agrees that (A) in the case of immediately preceding clauses (x) or (y), an error and mistake shall be presumed to have been made (absent written confirmation from such Agent to the contrary) or (B) an error and mistake has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(ii)      such Senior Lender shall cause promptly (and, in all events, within one Business Day of its knowledge of the occurrence of any of the circumstances described in immediately preceding clauses (x), (y) and (z)) notify such Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that is so notifying such Agent pursuant to this Section 15.29(b) (*Erroneous Payments*).

For the avoidance of doubt, the failure to deliver a notice to such Agent pursuant to this Section 15.29(b) (*Erroneous Payments*) shall not have any effect on a Payment Recipient's obligations pursuant to Section 15.29(a) (*Erroneous Payments*) or on whether or not an Erroneous Payment has been made.

(c)        Each Senior Lender hereby authorizes such Agent to set off, net and apply any and all amounts at any time owing to such Senior Lender under any Finance Document, or otherwise payable or distributable by such Agent to such Senior Lender under any Finance Document with respect to any payment of principal, interest, fees or other amounts, against any amount that such Agent has demanded to be returned under immediately preceding clause (a).

(d)        The parties hereto agree that (x) irrespective of whether such Agent may be equitably subrogated, in the event that an Erroneous Payment (or portion thereof) is not received from any Payment Recipient that has received such Erroneous Payment (or portion thereof) for any reason such Agent shall be subrogated to all the rights and interests of such Payment Recipient (and, in the case of any Payment Recipient who has received funds on behalf of a Senior Lender, to the rights and interests of such Senior Lender, as the case may be) under the Finance Documents with respect to such amount and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower; provided that this Section 15.29 (*Erroneous Payments*) shall not be interpreted to increase (or accelerate the due date for), or have the effect of increasing (or accelerating the due date for), the Obligations of the Borrower relative to the amount (or timing for payment) of the Obligations that would have been payable had such Erroneous Payment not been made by such Agent; provided, further, that for the avoidance of doubt, immediately preceding clauses (x) and (y) shall not apply to the extent any such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by such Agent from, or on behalf of (including through the exercise of remedies under any Finance Document), the Borrower for the purpose of a payment on the Obligations.

(e)        To the extent permitted by Applicable Law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by such Agent for the return of any Erroneous Payment received, including, without limitation, any defense based on "discharge for value" or any similar doctrine.

Each party's obligations, agreements and waivers under this Section 15.29 (*Erroneous Payments*) shall survive the resignation or replacement of any Agent, any transfer of rights or obligations by, or the replacement of a Senior Lender, the termination of the applicable Commitments or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Finance Document.

**Article 16**
**[RESERVED]**

**Article 17**
**CONDUCT OF BUSINESS BY THE FINANCE PARTIES**

**17.1    Conduct of Business by the Finance Parties**.

No provision of any Finance Document will:

(a)        interfere with the right of any Finance Party to arrange its affairs (tax or otherwise) in whatever manner it deems appropriate;

(b)        obligate any Finance Party to investigate or claim any credit, relief, remission or repayment available to it or the extent, order and manner of any claim; or

(c)     obligate any Finance Party to disclose any information relating to its affairs (tax or otherwise) or any computations in respect of Tax.

## Article 18
## SHARING AMONG THE FINANCE PARTIES

**18.1     Payments to Senior Lenders**.

If a Senior Lender (a "**Recovering Finance Party**") receives or recovers any amount from the Borrower other than in accordance with Article 19 (*Payment Mechanics*) (a "**Recovered Amount**") and applies that amount to a payment due under a Finance Document then:

(a)     the Recovering Finance Party shall, within three (3) Business Days, notify details of the receipt or recovery to the Administrative Agent;

(b)     the Administrative Agent shall determine whether the receipt or recovery is in excess of the amount the Recovering Finance Party would have been paid had the receipt or recovery been received or made by the Administrative Agent and distributed in accordance with Article 19 (*Payment Mechanics*) without taking account of any Tax which would be imposed on the Administrative Agent in relation to the receipt, recovery or distribution; and

(c)     the Recovering Finance Party shall, within three (3) Business Days of demand by the Administrative Agent, pay to the Administrative Agent an amount (the "**Sharing Payment**") equal to that receipt or recovery less any amount which the Administrative Agent determines may be retained by the Recovering Finance Party as its share of any payment to be made under this Agreement.

**18.2     Redistribution of Payments**.

The Administrative Agent shall treat the Sharing Payment as if it had been paid by the Borrower and distribute it to the Senior Lenders (other than the Recovering Finance Party) (the "**Sharing Finance Parties**") in accordance with this Agreement towards the obligations of the Borrower to the Sharing Finance Parties.

**18.3     Recovering Finance Party's Rights**.

On a distribution by the Administrative Agent under Section 18.2 (*Redistribution of Payments*) of a payment received by a Recovering Finance Party from the Borrower, as between the Borrower and the Recovering Finance Party, an amount of the Recovered Amount equal to the Sharing Payment will be treated as not having been paid by the Borrower.

**18.4     Reversal of Redistribution**.

If any part of the Sharing Payment received or recovered by a Recovering Finance Party becomes repayable and is repaid by that Recovering Finance Party, then:

(a)     each Sharing Finance Party shall, on request of the Administrative Agent, pay to the Administrative Agent for the account of that Recovering Finance Party an amount equal to the appropriate part of its share of the Sharing Payment (the "**Redistributed Amount**"); and

(b)     as between the Borrower and each relevant Sharing Finance Party, an amount equal to the relevant Redistributed Amount will be treated as not having been paid by the Borrower.

**18.5    Exceptions**.

(a)     This Article 18 will not apply to the extent that the Recovering Finance Party would not, after making any payment pursuant to this Article 18, have a valid and enforceable claim against the Borrower.

(b)     A Recovering Finance Party is not obligated to share with any other Senior Lender any amount which the Recovering Finance Party has received or recovered as a result of taking legal or arbitration proceedings, if:

    (i)     it notified that Senior Lender of the legal or arbitration proceedings; and

    (ii)    that Senior Lender had an opportunity to participate in those legal or arbitration proceedings but did not do so as soon as reasonably practicable having received notice and did not take separate legal or arbitration proceedings.

**Article 19**
**PAYMENT MECHANICS**

**19.1    Payments to the Agents**.

(a)     On each date on which the Borrower or a Senior Lender is required to make a payment under a Finance Document, the Borrower or such Senior Lender shall make the same available to the Administrative Agent in Dollars.

(b)     Payment shall be made to such account as the Administrative Agent specifies.

**19.2    Distributions by the Agents**.

Each payment received by an Agent under the Finance Documents for the Borrower or a Senior Lender shall, subject to Section 19.3 (*Distributions to the Borrower*) and Section 19.4 (*Clawback*), be made available by that Agent as soon as practicable after receipt to the Person entitled to receive payment in accordance with the Finance Documents, and:

(a)     in the case of payment for the Borrower, to an account of the Borrower designated by the Borrower; and

(b)     in the case of payment for a Senior Lender, for the account of its lending office as designated by such Senior Lender.

**19.3    Distributions to the Borrower**.

Each Agent may (with the consent of the Borrower or in accordance with Section 20.1 (*Set-Off*)) apply any amount received by it for the Borrower in or towards payment (as soon as practicable after receipt) of any amount due from the Borrower under the Finance Documents.

**19.4    Clawback**.

(a)    Where a sum is to be paid to an Agent under the Finance Documents for another party, such Agent is not obligated to pay that sum to that other party until such Agent has been able to establish to its satisfaction that it has actually received that sum.

(b)    If an Agent pays an amount to another party and it proves to be the case that such Agent has not actually received such amount, then the party to whom such amount was paid by such Agent shall on demand refund such amount to such Agent.

**19.5    [Reserved]**.

**19.6    [Reserved]**.

**19.7    No Set-Off by the Borrower**.

(a)    All payments to be made by the Borrower under the Finance Documents will be calculated and be made without (and free and clear of any deduction for) set-off or counterclaim.

(b)    Paragraph (a) above does not apply to any payment netting provision contained in a Hedge Agreement entered into in accordance with this Agreement.

**19.8    Business Days**.

(a)    Any payment which is due to be made on a day that is not a Business Day will be made on the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not).

(b)    During any extension of the due date for payment of any principal or Unpaid Sum approved by the Finance Parties under a Finance Document, interest is payable on the principal or Unpaid Sum at the rate payable on the original due date.

**19.9    Currency of Account**.

(a)    Subject to paragraph (b) below, Dollars is the currency of account and payment for any sum due from the Borrower under any Finance Document.

(b)    Each payment in respect of costs, expenses or Taxes shall be made in the currency in which the costs, expenses or Taxes are incurred.

**19.10    Change of Currency**.

(a)    Unless otherwise prohibited by law, if more than one currency or currency unit are at the same time recognized by the central bank of any country as the lawful currency of that country, then:

(i)    any reference in the Finance Documents to, and any obligations arising under the Finance Documents in, the currency of that country will be translated into, or paid in, the currency or currency unit of that country designated by the Administrative Agent (after consultation with the Borrower); and

(ii)    any translation from one currency or currency unit to another will be at the official rate of exchange recognized by the central bank for the conversion of that currency or currency unit into the other, rounded up or down by the Administrative Agent (acting reasonably).

(b)    If a change in any currency of a country occurs (including where there is more than one currency or currency unit recognized at the same time as the lawful currency of a country), the Finance Documents will, to the extent the Administrative Agent (acting reasonably and after consultation with the Borrower) specifies to be necessary, be amended to comply with any generally accepted conventions and market practice in the relevant interbank market and otherwise reflect the change in currency.

**Article 20**
**SET-OFF**

**20.1    Set-Off**.

A Finance Party may set off any matured obligation due from the Borrower under the Finance Documents (to the extent beneficially owned by that Finance Party) against any matured obligation owed by that Finance Party to the Borrower, regardless of the place of payment, booking branch or currency of either obligation.  If the obligations are in different currencies, the Finance Party may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.

**Article 21**
**BAIL-IN PROVISIONS**

**21.1    Contractual Recognition of Bail-In**.

Notwithstanding anything to the contrary in any Finance Document or in any other agreement, arrangement or understanding among any such Finance Parties, each Finance Party hereto acknowledges and accepts that any liability of any Finance Party to any other Finance Party under or in connection with the Finance Documents, to the extent such liability is unsecured, may be subject to Bail-In Action by the relevant Resolution Authority and acknowledges and accepts to be bound by the effect of:

(a)    The application of any Bail-In Action to any such liabilities arising hereunder which may be payable to it by any Finance Party hereto; and

(b)    The effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction, in full or in part, or cancellation in the principal amount, or outstanding amount due (including any accrued but unpaid interest) in respect of any such liability; and

(ii)    a conversion of all, or a portion of, any such liability into shares or other instruments of ownership that may be issued to, or conferred on, it; and

(c)    The variation of any term of any Finance Document to the extent necessary to give effect to any Bail-In Action in relation to any such liability.

**Article 22**
**CALCULATIONS AND CERTIFICATES**

**22.1    Day Count Conventions**.

Except as otherwise expressly provided in a Finance Document, any interest, commission or fee accruing under a Finance Document will accrue from day to day and is calculated on the basis of the actual number of days elapsed and a year of three hundred sixty (360) days or, in any case where the practice in the relevant interbank market differs, in accordance with that market practice.

**22.2    Financial Calculations**.

All financial calculations to be made under, or for the purposes of, this Agreement and any other Finance Document shall be made in accordance with IFRS, except as otherwise required to conform to any provision of this Agreement, shall be calculated from the then-most-recently issued quarterly financial statements which the Borrower is obligated to furnish to the Finance Parties under Section 11.7 (*Quarterly Financial Reporting*).

**Article 23**
**CONFIDENTIAL INFORMATION**

**23.1    Confidential Information**.

The Borrower and the Finance Parties each agree that it shall maintain as confidential and, without the prior written consent of the relevant party(ies), shall not disclose the terms of this Agreement and any non-public information concerning the other party or its business and operations (the "**Confidential Information**"); provided, that a party may disclose such information:

(a)     where such information becomes publicly available or widely known by the public other than by a breach of this Agreement, or is known by the receiving party prior to the entry of this Agreement or obtained independently of this Agreement, and the disclosure of such information would not breach any other confidentiality obligations;

(b)     if required by Applicable Law, or the Bankruptcy Court as part of the Chapter 11 Cases or requested by any Governmental Body having jurisdiction over such party;

(c)     to its Affiliates and those of its and its Affiliates' directors, officers, employees, advisors, insurers, insurance brokers and representatives who need to have knowledge of such information;

(d)     to any Person to whom such party, in good faith, anticipates assigning an interest in this Agreement as contemplated by Section 14.1 (*Assignment by Senior Lenders*) and such Person's Affiliates and the representatives, consultants and advisors of such Person or its Affiliates who have a legitimate need to know such information; and

(e)     in connection with the exercise of any duties or remedies hereunder or any suit, action or proceeding relating to this Agreement.

In the case of disclosure pursuant to paragraph (c), (d) or (e) above, the disclosing party shall be responsible to ensure that the recipient of such Confidential Information does not disclose such information to the same extent as if it were bound by the same non-disclosure obligations of the disclosing party under this

Agreement, and shall be liable to the disclosing party for any improper use or disclosure of such information by such recipient.

**23.2    Entire Agreement Regarding Confidentiality**.

(a)    This Article 23 (*Confidential Information*) constitutes the entire agreement between the Borrower and the Finance Parties in relation to the obligations under the Finance Documents regarding Confidential Information and supersedes any previous agreement, whether express or implied, regarding Confidential Information.

(b)    No Finance Party will be liable for any loss, cost, liability or other claim in connection with the Confidential Information beyond reasonably foreseeable losses and will not be liable for lost profits or consequential or punitive damages.

**23.3    Inside Information**.

Each of the Finance Parties acknowledges that some or all of the Confidential Information is or may be price-sensitive information and that the use of such information may be regulated or prohibited by applicable legislation including securities law relating to insider dealing and market abuse and each of the Finance Parties undertakes not to use any Confidential Information for any unlawful purpose.

**23.4    [Reserved]**.

**23.5    Continuing Obligations**.

The obligations in this Section 23.5 (*Continuing Obligations*) are continuing and, in particular, will survive and remain binding on each Finance Party for a period of twelve (12) months from the earlier of:

(a)    the date on which all amounts payable by the Borrower under or in connection with the Finance Documents have been paid in full and all Commitments have been cancelled or otherwise cease to be available; and

(b)    the date on which such Finance Party otherwise ceases to be a Finance Party.

**23.6    Equator Principles**.

Each of the Finance Parties and the Borrower consent to the reporting of the Project name pursuant to Annex B of the Equator Principles on any publicly available Internet website maintained by any Finance Party.  The Borrower shall publish and maintain a non-technical summary of the Underground Project on its website at https://nevadacopper.com in the substance and form required by Principle 10 of the Equator Principles.

<div align="center">

**Article 24**
**NOTICES**

</div>

Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be given by facsimile or other means of electronic communication or by hand-delivery as hereinafter underlined(provided).  Any such notice, if sent by facsimile or other means of electronic communication, shall be deemed to have been received on the day of sending, or if delivered by hand shall be deemed to have been received at the time it is delivered to the applicable address noted below.  Notices of change of address shall

also be governed by this Article 24 (*Notices*).  Notices and other communications shall be addressed as follows:

(a)       if to the Borrower:

          Nevada Copper, Inc.
          61 E. Pursel Lane
          P.O. Box 1640
          Yerington, Nevada, USA
          89447
          Attention:  Greg Martin
          Email:  gmartin@nevadacopper.com

          Copy to:
          Attention:  Matthew Anderson
          Email:  manderson@nevadacopper.com

          or at such other address, facsimile number or email address as the Borrower from time to time directs in writing to the other parties hereto.

(b)       if to the Administrative Agent:

          U.S. Bank Trust Company, National Association, as Administrative Agent
          214 N. Tryon Street
          Charlotte, NC 28202
          Attention:  James Hanley
          Email:  James.hanley1@usbank.com, Loan.Agency@usbank.com
          Telephone number:  302-545-9778

          or at such other address, facsimile number or email address as the Administrative Agent from time to time directs in writing to the other parties hereto.

(c)       if to the Collateral Agent:

          U.S. Bank Trust Company, National Association, as Collateral Agent
          214 N. Tryon Street
          Charlotte, NC 28202
          Attention:  James Hanley
          Email:  James.hanley1@usbank.com, Loan.Agency@usbank.com
          Telephone number:  302-545-9778

          or at such other address, facsimile number or email address as the Collateral Agent from time to time directs in writing to the other parties hereto.

(d)       if to the Senior Lenders, at the addresses noted on Schedule A (*Commitments*) or at such other address, facsimile number or email address as a Senior Lender from time to time directs in writing to the other parties hereto or as set forth in connection with any Transfer Certificate; and

(e)       in accordance with Section 25.5 (*English Language*), any notices and communications given in respect of this Agreement shall be given in the English language, or if given in any other language,

that notice or communication shall be accompanied by an English translation of it, which shall be certified as being a true and correct translation of the notice or communication.

**24.2    Notification of Address and Fax Number**.

Each party shall promptly notify the other parties of a change of address pursuant to this Article 24 (*Notices*).

**24.3    Electronic Communication**.

(a)    Any communication to be made between any of the parties under or in connection with the Finance Documents, may be made by electronic mail or other electronic means (including, without limitation, by way of posting to a secure website) if the relevant parties:

    (i)    agree that, unless and until notified to the contrary, this is to be an accepted form of communication;

    (ii)    notify each other in writing of their electronic mail address and/or any other information required to enable the sending and receipt of information by that means; and

    (iii)    notify each other of any change to their electronic mail address or any other such information supplied by them by not less than five (5) Business Days' notice.

Each Senior Lender hereby agrees that any communication to be made to the Senior Lenders under or in connection with the Finance Documents may be made by electronic mail or other electronic means.

(b)    Any such electronic communication as specified in paragraph (a) above made between any two parties will be effective only when actually received (or made available) in readable form and in the case of any electronic communication made by party to any Agent only if it is addressed in such a manner as such Agent may specify for this purpose.

(c)    Any electronic communication which would otherwise become effective on a non-working day or after business hours in the place of receipt will be deemed only to become effective on the next working day in that place.

(d)    Any reference in a Finance Document to a communication being sent or received will be construed to include that communication being made available in accordance with this Section 24.3 (*Electronic Communication*).

**24.4    Communications to the Agents**.

If pursuant to this Article 24 (*Notices*) any Agent is to act on instructions or directions delivered by fax, electronic mail, other electronic means or any other unsecured method of communication, such Agent shall have:

(a)    no duty or obligation to verify or confirm that the person who sent such instructions or directions is, in fact, a person authorized to give instructions or directions on behalf of any Person, and

(b)    no liability for any losses, liabilities, costs or expenses incurred or sustained by any Person as a result of such reliance upon or compliance with such instructions or directions.

126

**Article 25**
**GENERAL**

**25.1    Partial Invalidity**.

If, at any time, any provision of a Finance Document is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, that will not affect or impair:

(a)    the legality, validity or enforceability in that jurisdiction of any other provision of the Finance Documents; or

(b)    the legality, validity or enforceability in other jurisdictions of that or any other provision of the Finance Documents.

**25.2    Reliance and Non-Merger**.

All covenants, agreements, representations and warranties of the Borrower made herein or in any other Finance Document or in any certificate or other document signed by any of its directors or officers and delivered by or on behalf of the Borrower pursuant hereto or thereto are material, shall be deemed to have been relied upon by the Administrative Agent and each Senior Lender notwithstanding any investigation heretofore or hereafter made by the Administrative Agent, the Senior Lenders or Senior Lenders' counsel or any employee or other representative of any of them and shall survive the execution and delivery of this Agreement and the other Finance Documents until all Obligations owed to the Administrative Agent or the Senior Lenders under this Agreement and the other Finance Documents shall have been satisfied and performed and the Senior Lenders shall have no further obligation to make the Loan hereunder.

**25.3    Remedies and Waivers**.

(a)    No investigation by or on behalf of any Finance Party, into the affairs of the Borrower will prejudice any rights or remedies held by or on behalf of a Finance Party under the Finance Documents.

(b)    No failure to exercise, nor any delay in exercising, on the part of or on behalf of any Finance Party, any right or remedy under a Finance Document will operate as a waiver of any such right or remedy or constitute an election to affirm any Finance Document. No election to affirm any Finance Document on the part of or on behalf of any Finance Party will be effective unless it is in writing. No single or partial exercise of any right or remedy will prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in each Finance Document are cumulative and not exclusive of any rights or remedies provided by law and may be waived only in writing and specifically.

**25.4    Amendment and Waiver**.

(a)    Required Consents.

(i)    Except as otherwise expressly provided in this Agreement and subject to paragraph (a)(ii) and paragraph (b) below, any term of the Finance Documents may be amended, modified, waived or supplemented only with the consent of the Majority Lenders, the Borrower, to the extent they are a party, the Obligors and the Administrative Agent (acting at the direction of the Majority Lenders), and any such amendment, waiver, modification or supplement shall be binding on all parties.

(ii) Except as otherwise expressly <u>provided</u> in the relevant agreement or document, no waiver, consent, annulment, modification or supplement of any term or condition of any Finance Document may be given or granted by the Borrower or the Senior Lenders except in accordance with the DIP Order.

(b) Notwithstanding paragraph (a) above, an amendment, modification, supplement or waiver which relates to the rights, duties, protections or obligations of the Agents (each in their capacity as such) may not be effected without the consent of the Agents (as the case may be).

(c) Notwithstanding paragraph (a) above, each Senior Lender shall be required to consent to any amendment, modification, supplement or waiver of:

(i) the definitions of "Majority Lenders" or any other provision in the Finance Documents specifying the number or percentage of Senior Lenders required to waive, amend or modify any rights thereunder or make any determination or grant thereunder;

(ii) the definition of "Permitted Transferee";

(iii) Sections 12.1 (*Conditions Precedent to the Interim Loan*) and 12.2 (*Conditions Precedent to the Final Loans*);

(iv) a reduction in the Applicable Margin, or a reduction in the amount of any payment of principal, interest, fees or other amounts payable to a Senior Lender under the Finance Documents;

(v) an increase in, or an extension of, a Commitment or the Total Commitments;

(vi) a release of the Borrower, any other Obligor or any other party (other than a Secured Party) from a Finance Document (other than pursuant to the terms of such Finance Document), or the release of all or a material part of the Collateral from the Encumbrance of the Finance Documents;

(vii) a change to the order of application of any reduction in the Commitments or any prepayment of Loans from the application thereof set forth in the applicable provisions of Section 4.2 (*Mandatory Prepayments*), Section 4.5 (*Voluntary Cancellation*), and Section 4.6 (*Voluntary Prepayment*);

(viii) a term or provision of a Finance Document that expressly requires the consent, approval or instructions of each Senior Lender;

(ix) the right of a Senior Lender to assign or transfer its rights or obligations under the Finance Documents in accordance with Section 14.1 (*Assignment by Senior Lenders*);

(A) this Section 25.4 (*Amendment and Waiver*);

(B) Section 25.9 (*Remedies Cumulative*);

(x) the DIP Order; or

128

(xi)     change the order of priority of payments set forth in Section 13.4 (Application of Proceeds) or any provision in the Finance Documents relating to the pro rata nature of the Utilizations or any amount.

provided, however, that notwithstanding anything in this paragraph (c) or in any other Section or paragraph of this Agreement or any other Finance Document to the contrary, any amendment, waiver or other modification required to permit the Borrower or any other Obligor to enter into any Hedge Agreement secured by any or all of the Collateral (including to modify the application of payments or proceeds of Collateral and the granting of a Lien on the Collateral) shall require only Majority Lenders approval.

**25.5     English Language**.

(a)     Any communication made under or in connection with any Finance Document shall be in English.

(b)     All other documents provided under or in connection with any Finance Document shall be:

(i)     in English; or

(ii)     if not in English, accompanied by an English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

**25.6     Further Assurances**.

Whether before or after the happening of an Event of Default, the Borrower shall at its own expense do, make, execute or deliver, or cause to be done, made, executed or delivered, all such further acts, things, agreements, documents and instruments in connection with this Agreement, the other Finance Documents as the Administrative Agent (acting at the direction of the Majority Lenders) may reasonably request from time to time for the purpose of giving effect to the terms of this Agreement, the other Finance Documents including, for the purpose of facilitating the enforcement of the Security, all promptly upon the request of the Administrative Agent.

**25.7     [Reserved]**.

**25.8     Judgment Currency**.

If for the purpose of obtaining or enforcing judgment in any court it is necessary to convert a sum due hereunder or under any other Finance Document in Dollars into another currency (the "**Judgment Currency**"), the rate of exchange which shall be applied shall be that at which in accordance with normal banking procedures a Secured Party, as applicable, could purchase such Dollars in the United States of America with the Judgment Currency on the Business Day next preceding the day on which such judgment is rendered.  The obligation of the Borrower in respect of any such sum due from it to such Secured Party hereunder or under any other Finance Document (an "**Entitled Person**") shall, notwithstanding the rate of exchange actually applied in rendering such judgment, be discharged only to the extent that on the Business Day following the receipt by such Entitled Person of any sum adjudged to be due hereunder or under any other Finance Document in the Judgment Currency, such Entitled Person may in accordance with normal banking procedures purchase and transfer Dollars to the United States of America with the amount of the Judgment Currency so adjudged to be due; and the Borrower hereby, as a separate obligation and notwithstanding any such judgment, agrees to indemnify such Entitled Person on demand, in Dollars, for

the amount (if any) by which the sum originally due to such Entitled Person in Dollars hereunder or under any other Finance Document exceeds the amount of the Dollars so purchased and transferred.

**25.9    Remedies Cumulative**.

Subject to Applicable Law, no failure or delay on the part of any Secured Party in exercising any right, power or privilege hereunder or under any other Finance Document and no course of dealing between the Borrower or any its Affiliates, on the one hand and any Secured Party, on the other hand, shall impair any such right, power or privilege or operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Finance Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder.  The rights, powers and remedies herein or in any other Finance Document expressly provided are cumulative and not exclusive of any rights, powers or remedies which any party thereto would otherwise have.  No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of any Secured Party to any other or further action in any circumstances without notice or demand.

**25.10    Entire Agreement**.

This Agreement and the other Finance Documents constitute the entire agreement between the parties pertaining to the subject matter described herein and therein.  There are no warranties, conditions or representations (including any that may be implied by statute) and there are no agreements in connection with such subject matter except as specifically set forth or referred to in this Agreement and the other Finance Documents.  No reliance is placed on any warranty, representation, opinion, advice or assertion of fact made either prior to, contemporaneously with, or after the entering into of this Agreement, the other Finance Documents, or any amendment or supplement thereto, by any party to this Agreement or any of the other Finance Documents or its directors, officers, partners, employees or agents, where applicable, to any other party to this Agreement or any of the other Finance Documents or its directors, officers, partners, employees or agents, where applicable, except to the extent that the same has been reduced to writing and included as a term of this Agreement or any of the other Finance Documents.

**25.11    Governing Law; Jurisdiction**.

(a)     THIS AGREEMENT AND EACH OF THE OTHER FINANCE DOCUMENTS (UNLESS SUCH DOCUMENT EXPRESSLY STATES OTHERWISE THEREIN), THE RELATIONSHIP BETWEEN THE PARTIES HERETO AND ANY CLAIM OR DISPUTE (WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE) RELATING TO THIS AGREEMENT OR SUCH OTHER FINANCE DOCUMENT OR SUCH RELATIONSHIP SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK (EXCEPT AS GOVERNED BY THE BANKRUPTCY CODE).

(b)     Any legal action or proceeding with respect to this Agreement or any other Finance Document shall, except as provided below, be brought in the Bankruptcy Court and/or, solely with respect to the Parent's assets in Canada, the Canadian Court and if the Bankruptcy Court and/or Canadian Court does not have (or abstain from) jurisdiction, courts of the State of New York in the County of New York or of the United States for the Southern District of New York and any appellate court from any thereof and, by execution and delivery of this Agreement, each party hereto hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts.  Each party hereto agrees that a judgment, after exhaustion of all available appeals, in any such action or proceeding shall be conclusive and binding upon it, and

may be enforced in any other jurisdiction, including by a suit upon such judgment, a certified copy of which shall be conclusive evidence of the judgment.

(c)      Each party hereto hereby irrevocably waives any objection that it may now have or hereafter have to the laying of the venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Finance Document brought in the Bankruptcy Court and/or, solely with respect to the Parent's assets in Canada, the Canadian Court, and if the Bankruptcy Court and/or Canadian Court does not have (or abstain from) jurisdiction, the Supreme Court of the State of New York, County of New York or in the United States District Court for the Southern District of New York, and hereby further irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

(d)      Nothing in this Section 25.11 (*Governing Law; Jurisdiction*) shall limit the right of the Secured Parties to refer any claim against the Borrower to any court of competent jurisdiction outside of the State of New York, nor shall the taking of proceedings by any Secured Party before the courts in one or more jurisdictions preclude the taking of proceedings in any other jurisdiction whether concurrently or not.

**25.12    Service of Process**.

(a)      The Borrower irrevocably acknowledges and agree that service of process in any such action or proceeding may be effected by mailing a copy thereof by first class mail, postage prepaid, together with two copies of a statement of service by mail and acknowledgment of receipt, with a postage-prepaid return envelope addressed to the sender, to the Borrower at their address set forth in Article 24 (*Notices*) or at such other address of which the Administrative Agent shall have been notified pursuant to Article 24 (*Notices*).

(b)      This Section 25.12 (*Service of Process*) does not affect any other method of service allowed by Applicable Law.

(c)      To the extent that the Borrower may, in any action or proceeding arising out of or relating to any of the Finance Documents, be entitled under any Applicable Law to require or claim that any Secured Party post security for costs or take similar action, the Borrower hereby irrevocably waives and agrees not to claim the benefit of such entitlement.

**25.13    Waiver of Jury Trial**.

EACH OF THE PARTIES HERETO HEREBY EXPRESSLY, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT ANY OF THEM MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER FINANCE DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY RELATING HERETO OR THERETO.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES TO ENTER INTO THIS AGREEMENT.

**25.14    USA PATRIOT Act**.

To the extent that it is subject to the requirements of the USA PATRIOT ACT or any other anti- money laundering rules and regulations applicable to such Secured Party, each Secured Party hereby notifies the Borrower that, pursuant to the requirements of the USA PATRIOT ACT or any other anti-money laundering rules and regulations applicable to such Secured Party and the customer due diligence requirements for

financial institutions of the Financial Crimes Enforcement Network (as published at 81 FR 29397, 31 CFR 1010, 1020, 1023, 1024, and 1026), it is required to obtain, verify and record information that identifies the Borrower and its direct and indirect beneficial owners, which information includes the name and address of such Persons and other information that will allow such Secured Party, as the case may be, to identify the Borrower and its direct and indirect beneficial owners in accordance with the USA PATRIOT ACT or any other anti-money laundering rules and regulations applicable to such Secured Party and the customer due diligence requirements for financial institutions of the Financial Crimes Enforcement Network.  The Borrower agrees that it will promptly provide each Secured Party with such information as it may request in order for such Secured Party, respectively, to satisfy the requirements of the USA PATRIOT ACT or any other anti-money laundering rules and regulations applicable to such Secured Party.

**25.15    Counterparts**.

This Agreement and all documents contemplated by or delivered under or in connection with this Agreement may be executed and delivered in any number of counterparts (including facsimile), with the same effect as if all parties had signed and delivered the same document, and all counterparts shall be construed together to be an original and will constitute one and the same agreement.

**25.16    No Third-Party Beneficiaries**.

The agreement of the Senior Lenders to make the Loans to the Borrower, on the terms and conditions set forth in this Agreement, is solely for the benefit of the Borrower and the Secured Parties, and no other Person (including any contractor, subcontractor, supplier, workman, carrier, warehouseman or materialman furnishing labor, supplies, goods or services to or for the benefit of the Project) shall have any rights under this Agreement or under any other Finance Document or with respect to any extension of credit contemplated by this Agreement.

**25.17    Severability**.

Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated in this Agreement are fulfilled to the extent possible.

**25.18    Survival**.

All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loans.  The provisions of Sections 7.3 (*Change in Circumstances*), 7.4 (*Payment of Costs and Expenses*) and 7.5 (*Indemnities*) and Article 15 (*Administrative Parties*) and Article 23 (*Confidential Information*) shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the resignation or removal of any Agent, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

**25.19    Reinstatement**.

The obligations of the Borrower under this Agreement shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower in respect of the Obligations is rescinded or shall be otherwise restored by any holder of any of the Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, and the Borrower agrees that it will indemnify each Secured Party on demand for all reasonable and documented costs and expenses (including fees of counsel) incurred by such Secured Party in connection with such rescission or restoration, including any such reasonable and documented costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law.

**25.20    Incorporation of DIP Order by Reference**.

Each of the Obligors, the Administrative Agent, the Collateral Agent and the Senior Lenders agrees that any reference contained herein to (i) the Interim Order and the Interim DIP Recognition Order shall include all terms, conditions and provisions of such Interim Order and Interim DIP Recognition Order and that the Interim Order and Interim DIP Recognition Order are incorporated herein for all purposes and (ii) the Final Order and the Final DIP Recognition Order shall include all terms, conditions and provisions of such Final Order and the Final DIP Recognition Order and that the Final Order and the Final DIP Recognition Order are incorporated herein for all purposes.  To the extent there is any inconsistency between the terms of this Agreement and the terms of either the Interim Order, the Final Order, the Interim DIP Recognition Order or the Final DIP Recognition Order, the terms of the Interim Order, the Final Order, the Interim DIP Recognition Order or the Final DIP Recognition Order, as applicable, shall govern.

[*signature pages to follow*]

IN WITNESS WHEREOF this Agreement has been executed by the parties as of the date first written above.

**NEVADA COPPER, INC.,**
as Borrower

By: _____
      Name:  Gregory J. Martin
      Title:    Chief Financial Officer

**NEVADA COPPER CORP.,**
as Guarantor

By: _____
     Name:  Gregory  J.  Martin
     Title: Chief Financial Officer

[*Signature Page to DIP Credit Agreement*]

**0607792 B.C. LTD.,**
as Guarantor

By: _____
    Name:  Gregory  J.  Martin
    Title:  Chief Financial Officer

**NC DITCH COMPANY LLC,**
as Guarantor

By: _____
    Name:  Gregory J. Martin
    Title:   Chief Financial Officer

**NC FARMS LLC,**
as Guarantor

By: _____
    Name:  Gregory J. Martin
    Title:   Chief Financial Officer

[*Signature Page to DIP Credit Agreement*]

**LION IRON CORP.,**
as Guarantor

By: _____

Name:  Gregory J. Martin
Title: Chief Financial Officer

**U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION**,
as Administrative Agent and Collateral Agent

By: _____
     Name:
     Title:

**MANCHESTER SECURITIES CORP.**,
as Senior Lender

By: _____
    Name:  Elliot Greenberg
    Title:   Vice President

**ZIWA INVESTMENTS LIMITED**,
as Senior Lender

By: _____
    Name:  Elliot Greenberg
    Title:   Vice President

**SCHEDULE A**

**COMMITMENTS**

| Lender | Interim Commitment | Final Commitment | Total | Address for Notices |
|---|---|---|---|---|
| Manchester Securities Corp. | $6,400,000 | $12,800,000 | $19,200,000 | Elliott Investment Management L.P.<br><br>360 S. Rosemary Ave, 18th Floor<br><br>West Palm Beach FL 33401 |
| Ziwa Investments Limited | $13,600,000 | $27,200,000 | $40,800,000 | Elliott Investment Management L.P.<br><br>360 S. Rosemary Ave, 18th Floor<br><br>West Palm Beach FL 33401 |

A-1

**SCHEDULE B**

**PREPETITION ENCUMBRANCES**

| <u>Name</u> | <u>Category</u> | <u>Potential Lienholder</u> | <u>A/P 6.7.34</u> ('000s) | <u>Total</u> ('000s) |
|---|---|---|---|---|
| Catepillar Financial SARL | Equipment Leases | Potential exposure to repossess equipment | $1,132.9 | $1,132.9 |
| Epiroc Financial Solutions USA LLC | Equipment Leases | Potential exposure to repossess equipment | $816.5 | $816.5 |

C-1

## SCHEDULE C

## PLEDGED INTERESTS

| Name, Jurisdiction of Formation and Type of Entity | Class or Type of Pledged Interest | Total Amount of Class or Type of Collateral Authorized | Total Amount of Class or Type Outstanding | Total Amount Pledged | Number of Securities | Certificated (Y/N) | Certificate Number |
|---|---|---|---|---|---|---|---|
| Nevada Copper, Inc., a Nevada corporation | Common Stock | 100% | 100% | 100% | 100 | Y | 2 |
| 0607792 B.C. Ltd, A British Columbia limited company | Common Stock | 100% | 100% | 100% | 21,980,000 | Y | 38 |
| Lion Iron Corp., a Nevada corporation | Common Stock | 100% | 100% | 100% | 100 | Y | 1 |
| NC Farms LLC, a Nevada limited liability company | Membership Interests | 100% | 100% | 100% | 0 | N | N/A |
| NC Ditch Company LLC, a Nevada limited liability company | Membership Interests | 100% | 100% | 100% | 0 | N | N/A |

C-1

**SCHEDULE D**

**[RESERVED]**

**SCHEDULE E**

**INTERIM ORDER**

1

2

3

4

5

6

7

8

9

10

11

12

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

In re:

☒    NEVADA COPPER, INC.
☒    NEVADA COPPER CORP.
☒    NC DITCH COMPANY LLC
☒    NC FARMS LLC
☒    LION IRON CORP.
☒    0607792 B.C. LTD.

        Debtors.[1]

Lead Case No.:  [BK-24-_____-____]
Chapter 11

Jointly Administered with:
Case No. [BK-24-_____-____]
Case No. [BK-24-_____-____]
Case No. [BK-24-_____-____]
Case No. [BK-24-_____-____]
Case No. [BK-24-_____-____]

13

14

15

16

**INTERIM ORDER (I) AUTHORIZING THE**
**DEBTORS TO (A) OBTAIN POSTPETITION FINANCING, (B) GRANT LIENS,**
**INCLUDING SENIOR SECURED PRIMING LIENS AND SUPERPRIORITY**
**ADMINISTRATIVE EXPENSE CLAIMS, AND (C) UTILIZE CASH COLLATERAL;**
**(II) GRANTING ADEQUATE PROTECTION TO CERTAIN**
**PREPETITION SECURED PARTIES; (III) MODIFYING THE AUTOMATIC STAY;**
**(IV) SCHEDULING FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

17

18

19

20

Upon the motion (the "***Motion***"),[2] of the Debtors for entry of an interim order (this "***Interim Order***") and Final Order (defined below) pursuant to sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of the Bankruptcy Code, and Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014 of, and Local Rules 4001 and 9006 seeking, among other things:

21

22

23

    (a)    authorization for Nevada Copper, Inc. (the "***Borrower***") to obtain a senior secured postpetition financing on terms and conditions consistent with the terms and conditions set forth in the Senior Secured Superpriority Term Loan Debtor in Possession Credit Agreement by and among the Borrower, each of the Debtors other than the Borrower, (collectively, the "***Guarantors***," and together with

24

25

26

---

[1]   The Debtors in these chapter 11 cases and the last four digits of their registration numbers in the jurisdiction in which they are organized are:  Nevada Copper, Inc. (1157) (Nevada); Nevada Copper Corp. (5323) (British Columbia); 0607792 B.C. Ltd. (2524) (British Columbia); Lion Iron Corp. (2904) (Nevada); NC Farms LLC (0264) (Nevada); and NC Ditch Company LLC (4396) (Nevada).

27

[2]   Capitalized term used but not defined herein have the meanings ascribed to such terms in the Motion.

28

1

Borrower, the "**_DIP Loan Parties_**"), U.S Bank Trust Company, National Association, as administrative agent and collateral agent (the "**_DIP Agent_**"), one or more affiliates of Elliott Investment Management L.P., as lenders (collectively, the "**_DIP Lenders_**" and, together with the DIP Agent, the "**_DIP Secured Parties_**") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**_DIP Credit Agreement_**") attached to this Interim Order at **<u>Exhibit A</u>**, and for the Guarantors to unconditionally guaranty, on a joint and several basis, the Borrower's obligations in connection with such postpetition financing, consisting of: (i) a new money term loan in an aggregate principal amount not to exceed at any time outstanding aggregate principal commitments of $20,000,000 (the "**_Interim DIP Loan_**"), which will be funded as a single disbursement on the date upon which all conditions set forth in Sections 12.1 and 12.3 of the DIP Credit Agreement have been satisfied (the "**_Interim Closing Date_**"); (ii) subject to entry of the Final Order, a new money delayed-draw term loan to be made in an aggregate principal amount not to exceed at any time outstanding aggregate principal commitments of $40,000,000 (the "**_Final DIP Loan_**" and, together with the Interim DIP Loan, the "**_DIP Facility_**"), which will be funded as a single disbursement on the date upon which all conditions set forth in Sections 12.2 and 12.3 of the DIP Credit Agreement have been satisfied;

(b)     authorization for the DIP Loan Parties to enter into any agreements, documents and instruments in connection with the DIP Facility, including the DIP Credit Agreement and all notices, guarantees, security agreements, ancillary documents and agreements executed in connection therewith, (collectively, the "**_DIP Documents_**") on terms and conditions consistent with the DIP Credit Agreement and this Interim Order, and to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate or desirable in connection with the DIP Documents;

(c)     authorization for the Debtors to grant to the DIP Agent, for the benefit of itself and the DIP Lenders, and authorizing the Debtors to incur, the DIP Liens (as defined below) in all DIP Collateral (as defined below), to secure the DIP Obligations (as defined below), which liens and security interests shall be automatically perfected and be subject to the lien priorities set forth in the DIP Credit Agreement, on the terms and conditions set forth herein, in the DIP Credit Agreement and in the DIP Documents;

(d)     authorization for the Debtors to grant to the DIP Agent, for the benefit of itself and the DIP Lenders, allowed superpriority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all DIP Obligations (as defined below), with priority over any and all administrative expenses of any kind or nature, subject and subordinate only to the Carve-Out and the Administration Charge (as defined below), on the terms and conditions set forth herein and in the DIP Documents;

(e)     authorization for the Debtors to use the proceeds of the DIP Facility and the Prepetition Collateral (as defined below), including Cash Collateral (as defined below), in accordance with the terms hereof, including pursuant to the Approved Budget (as defined below) as further described herein, to: (i) pay fees and interest under the DIP Facility; (ii) provide working capital for, and for other general corporate purposes of, the Debtors, including for funding the Carve-Out (as defined below); (iii) pay for bankruptcy-related costs and expenses, including costs and expenses incurred in connection with the Recognition Proceedings (as defined below); and (iv) pay Adequate Protection Payments (as defined below);

(f)     authorization for the Debtors to pay, on a final and irrevocable basis, the principal, interest, expenses, fees, premiums and other amounts payable under the DIP Documents as such become earned, due and payable, including, without limitation, (i) the Upfront Fee, (ii) the Unused Commitment Fee, (iii) the Exit Fee, (iv) the Agency Fee (each as defined in the DIP Credit Agreement), and (iv) the reasonable fees and disbursements of the DIP Secured Parties' attorneys, advisors, accountants, appraisers, bankers, and other consultants, all to the extent provided in, and in accordance with the DIP Documents (collectively, the "***DIP Obligations***");

(g)     authorization to grant adequate protection to the Prepetition Secured Parties (as defined below) on the terms set forth in the DIP Documents and this Interim Order on account of any Diminution in Value (as defined below) of the Prepetition Secured Parties' interests in the Prepetition Collateral, including Cash Collateral;

(h)     waivers of (i) the Debtors' and the estates' rights to surcharge against the DIP Collateral or the Prepetition Collateral pursuant to the Bankruptcy Code section 506(c), (ii) the "equities of the case" exception under Bankruptcy Code section 552(b) and (iii) the equitable doctrine of marshalling with respect to the DIP Collateral, including all Prepetition Collateral, in each case, subject to entry of the Final Order (but retroactive to the Petition Date);

(i)     subject to the terms of this Interim Order, authorization for the DIP Secured Parties to exercise remedies under the DIP Documents on the terms described herein upon the occurrence and during the continuance of a Termination Event (as defined below);

(j)     the modification of the automatic stay imposed pursuant to Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms of this Interim Order; and

(k)     that this Court schedule a final hearing (the "***Final Hearing***") to consider entry of a final order (the "***Final Order***") authorizing and approving, on a final basis, among other things, the Debtors' entry into the DIP Facility, the borrowings under the DIP Facility, the continued use of Cash Collateral and the granting of adequate protection, in each case, as described in the Motion and as set forth in the DIP Documents.

The Court having held a hearing to consider entry of this Interim Order (the "***Interim Hearing***"); and the Court having considered the Motion and the exhibits thereto, the *Declaration of Zul Jamal in support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Liens, Including Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* (the "***DIP Declaration***"), the evidence submitted or proffered and the arguments of counsel made at the Interim Hearing; and proper and sufficient notice of the Motion and the Interim Hearing having been given in

3

accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and 9014; and all objections, if any, to the relief requested in the Motion and to the entry of this Interim Order having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the relief requested in necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, creditors and parties in interest; and after due deliberation and consideration, and for good and sufficient cause appearing therefor; IT IS FOUND AND DETERMINED THAT:[3]

A.    **Petition Date**.  On June 9, 2024 (the "***Petition Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

B.    **Debtors in Possession**.  The Debtors have continued in the management and operation of their business and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.    **Jurisdiction and Venue**.  This Court has jurisdiction over the Chapter 11 Cases commenced on the Petition Date, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

D.    **Committee Formation**.  As of the date hereof, the United States Trustee for Region 17 (the "***U.S. Trustee***") has not yet appointed an official committee of unsecured creditors in these Chapter 11 Cases (a "***Creditors' Committee***") pursuant to section 1102 of the Bankruptcy Code.

E.    **Notice**.  Under the circumstances, the notice given by the Debtors of, and described in the Motion, the relief requested therein, and the Interim Hearing constitutes due and sufficient notice thereof and complies with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

F.    **Debtors' Stipulations**.  Without prejudice to the rights of any other party, but subject to the limitations thereon contained in paragraphs 21 and 22 of this Interim Order, the Debtors represent, admit, stipulate and agree as follows:

1.    **Prepetition Senior Secured Term Loan Facility.**

(a)    Under that certain Second Amended and Restated Credit Agreement, dated as of October 28, 2022 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "***Prepetition Senior Secured Term Loan Credit Agreement***" and together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other documents delivered or executed in connection therewith, the "***Prepetition Senior Secured Term Loan Documents***") by and among Borrower, as borrower, the financial institutions party thereto from time to time, as lenders (the "***Prepetition Senior Secured Term Loan Lenders***"), KfW IPEX-Bank GmbH ("***KfW***"), as sole lead arranger, UFK agent, as administrative agent and collateral agent (in such capacities, the "***Prepetition Senior Secured Term Loan Agent***" and together with the Prepetition Senior Secured Term Loan Lenders, the "***Prepetition Senior Secured Term Loan Parties***") the Borrower was provided with a first-lien secured term loan facility (the loans borrowed thereunder, the "***Prepetition First Lien Loans***") consisting of:

(a)    Tranche A Loans (as defined in the Prepetition Senior Secured Term Loan Credit Agreement) provided by KfW, which, as of the Petition Date, amount to an aggregate principal amount of approximately $129,191,475.89 million (together with all accrued interest, premiums (if any), costs, fees, expenses and other obligations in respect thereof, the "***Prepetition Senior Secured Term Loan A Obligations***");

(b)    Tranche A-2 Loans (as defined in the Prepetition Senior Secured Term Loan Credit Agreement) provided by Pala Investments Limited ("***Pala***"), Mercuria Investments US, Inc. ("***Mercuria***") and TF R&S Canada Ltd. ("***TF Canada***," and collectively with Pala and Mercuria, the "***Prepetition Senior Secured Term Loan A-2 Parties***"), which, as of the Petition Date, amount to an aggregate principal amount of approximately $40,919,608.57 million (together with all accrued interest, premiums (if any), costs, fees, expenses and other obligations in respect thereof, the "***Prepetition Senior Secured Term Loan A-2 Obligations***"); and

(c)    Tranche B Loans (as defined in the Prepetition Senior Secured Term Loan Credit Agreement) provided by KfW, which, as of the Petition Date, amount to an aggregate principal amount of approximately $17,973,301.40 million (together

with all accrued interest, premiums (if any), costs, fees, expenses and other obligations in respect thereof, the "***Prepetition Senior Secured Term Loan B Obligations***" and, together with the Prepetition Senior Secured Term Loan A Obligations, the "***Prepetition Senior Secured KfW Term Loan Obligations***").

(b)    *Prepetition Senior Secured Term Loan Obligations*.    As of the Petition Date, the Debtors, without defense, counterclaim or offset of any kind, were jointly and severally indebted and liable to the Prepetition Senior Secured Term Loan Parties under the Prepetition Senior Secured Term Loan Documents in the principal aggregate amount of not less than $188,084,385.86 million, *plus* accrued and unpaid interest thereon as of the Petition Date, plus all other fees, costs, expenses, indemnification obligations, reimbursement obligations, charges, premiums, if any, additional interest, any other "Obligations" (as defined in the Prepetition Senior Secured Term Loan Documents) and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition Senior Secured Term Loan Documents (collectively, the "***Prepetition Senior Secured Term Loan Obligations***").    The Prepetition Senior Secured Term Loan Obligations constitute legal, valid, binding and non-avoidable obligations against each of the Debtors and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claims, cause of action or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.    No payments or transfer made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition Senior Secured Term Loan Parties by or on behalf of any of the Debtors prior to the Petition Date under or in connection with any of the Prepetition Senior Secured Term Loan Documents are subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

(c)    *Prepetition Senior Secured Term Loan Liens*.    Pursuant to the Prepetition Senior Secured Term Loan Documents, the Prepetition Senior Secured Term Loan Obligations are secured by valid, binding, perfected and enforceable liens on and security interests in (the "***Prepetition Senior Secured Term Loan Liens***") the "Collateral" (as defined in the

Prepetition Senior Secured Term Loan Documents) (the "*Prepetition Collateral*"), subject to certain permitted liens as permitted under the Prepetition Senior Secured Term Loan Documents. The Prepetition Senior Secured Term Loan Liens are (i) senior to all other Prepetition Funded Debt Liens (as defined below) with respect to Prepetition Collateral constituting "Project Collateral" (as defined in the WCF Intercreditor Agreement (as defined below)) (the "*Non-WCF Collateral*"), and (ii) subject to the Prepetition Working Capital Lien (as defined below) with respect to Prepetition Collateral constituting "APA Collateral" (as defined in the WCF Intercreditor Agreement) (the "*WCF Collateral*"), in each case, in accordance with the terms and conditions of the WCF Intercreditor Agreement, the TF Intercreditor Agreement and the Fourth Lien Intercreditor Agreement (as defined below).  Each of the Debtors acknowledges and agrees that, in each case as of the Petition Date, the Prepetition Senior Secured Term Loan Liens: (i)  are valid, binding, perfected and enforceable liens and security interests in the Prepetition Collateral, with the priority set forth in the Prepetition Senior Secured Term Loan Documents and the Prepetition Intercreditor Agreements; (ii) are not subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as defined in the Bankruptcy Code) of any kind; and (iii) as of the Petition Date are subject and/or subordinate only to Prepetition Prior Liens (defined below), and solely with respect to the WCF Collateral, the Prepetition Working Capital Lien. In this Interim Order the term "*Prepetition Prior Liens*" shall mean, in relation to any Prepetition Funded Debt Facility (defined below), liens that are senior in relation to the liens securing such facility and are (1) valid, enforceable, perfected, non-avoidable and in existence immediately prior to the Petition Date or (2) valid, enforceable, non-avoidable and in existence immediately prior to the Petition Date, that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (the liens described in items (1) and (2), the "*Petition Date Perfected Liens*"), and in relation to the DIP Facility, shall mean, the Petition Date Perfected Liens not to exceed a total aggregate amount of $12 million.

2.    **Prepetition Working Capital Facility**.

(a)    Under that certain Advance Payment Agreement, dated as of May 6, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "***Prepetition Working Capital Agreement***" and, together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other documents, the "***Prepetition Working Capital Documents***") by and among the Borrower, as seller, and Concord Resources Limited ("***Concord***"), as purchaser (the "***Prepetition Working Capital Purchaser***") the Borrower received certain Advance Payments (as defined in the Prepetition Working Capital Agreement) from the Prepetition Working Capital Purchaser in exchange for the sale and delivery of certain Material (as defined in the Prepetition Working Capital Documents).

(b)    *Prepetition Working Capital Obligations*.  As of the Petition Date, the Borrower, without defense, counterclaim or offset of any kind, was indebted and liable to the Prepetition Working Capital Purchaser under the Prepetition Working Capital Documents in the aggregate principal amount of not less than $3.0 million under the Prepetition Working Capital Agreement, *plus* accrued and unpaid interest thereon as of the Petition Date, plus all other fees, costs, expenses, charges, additional interest, any other "Advance Payment Obligations" as defined in the WCF Intercreditor Agreement and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition Working Capital Documents (collectively, the "***Prepetition Working Capital Obligations***").  The Prepetition Working Capital Obligations constitute legal, valid, binding and non-avoidable obligations against the Borrower and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  No payments or transfers made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition Working Capital Purchaser by or on behalf of any of the Debtors prior to the Petition Date under or in connection with any of the Prepetition Working Capital

Documents are subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

(c)    *Prepetition Working Capital Lien*.    Pursuant to the Prepetition Working Capital Documents, the Prepetition Working Capital Obligations are secured by a valid, binding, perfected and enforceable lien on and security interest in (the "***Prepetition Working Capital Lien***") the Prepetition Collateral, subject to certain permitted liens as permitted under the Prepetition Working Capital Agreement.  The Prepetition Working Capital Lien is (i) subject to the Prepetition Senior Secured Term Loan Liens and the Prepetition TF Stream Lien (as defined below) with respect to all Prepetition Collateral constituting Non-WCF Collateral and (ii) senior to all other Prepetition Funded Debt Liens with respect to Prepetition Collateral constituting WCF Collateral, in each case, in accordance with the terms and conditions of the WCF Intercreditor Agreement, the TF Intercreditor Agreement and the Fourth Lien Intercreditor Agreement.  Each of the Debtors acknowledges and agrees that, in each case as of the Petition Date, the Prepetition Working Capital Lien: (i) is a valid, binding, perfected and enforceable lien and security interest in the Prepetition Collateral, with the priorities set forth in the Prepetition Working Capital Documents; (ii) is not subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as defined in the Bankruptcy Code) of any kind; and (iii) as of the Petition Date, is subject and/or subordinate only to (1) the Prepetition Prior Liens, in relation to the Working Capital Facility, and, (2) solely with respect to the Non-WCF Collateral, the Prepetition Senior Secured Term Loan Liens and the Prepetition TF Stream Lien.

3.    <u>**Prepetition TF Stream Obligations**</u>.

(a)    Under that certain Metals Purchase and Sale Agreement, dated as of December 21, 2017 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "***Prepetition TF Stream Agreement***" and, together with all related security agreements, collateral agreements, pledge agreements, control

agreements, guarantees and other documents, the "***Prepetition TF Stream Documents***") by and among Borrower, as seller, NCU and its subsidiaries, as guarantor and Triple Flag International Ltd. ("***Triple Flag***") (as successor by name change to Triple Flag Mining Finance Bermuda Ltd.), as purchaser (the "***Prepetition TF Stream Purchaser***"), the Prepetition TF Stream Purchaser paid certain deposits to the Borrower and Borrower committed to make specified deliveries of Refined Gold and Refined Silver (each as defined in the Prepetition TF Stream Agreement) to the Prepetition TF Stream Purchaser.

(b)      *Prepetition TF Stream Obligations*.  As of the Petition Date, the Debtors, without defense, counterclaim or offset of any kind, were jointly and severally indebted and liable to the Prepetition TF Stream Purchaser under the Prepetition TF Stream Documents in the aggregate principal amount of not less than $78,269,229.75 under the Prepetition TF Stream Agreement, *plus* accrued and unpaid interest thereon as of the Petition Date, plus all other fees, costs, expenses, charges, additional interest, any other "Obligations" (as defined in the Prepetition TF Stream Agreement) and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition TF Stream Documents (collectively, the "***Prepetition TF Stream Obligations***").  The Prepetition TF Stream Obligations constitute legal, valid, binding and non-avoidable obligations against each of the Debtors and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  No payments or transfers made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition TF Stream Purchaser by or on behalf of any of the Debtors prior to the Petition Date under or in connection with any of the Prepetition TF Stream Documents are subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

(c)    *Prepetition TF Stream Lien*.  Pursuant to the Prepetition TF Stream Documents, the Prepetition TF Stream Obligations is secured by a valid, binding, perfected and enforceable lien on and security interest in (the "***Prepetition TF Stream Lien***") the Prepetition Collateral, subject to certain permitted liens as permitted under the Prepetition TF Stream Agreement.  The Prepetition TF Stream Lien is (i) subject to the Prepetition Senior Secured Term Loan Liens with respect to all Prepetition Collateral constituting Non-WCF Collateral, (ii) subject to the Prepetition Working Capital Lien and Prepetition Senior Secured Term Loan Liens with respect to Prepetition Collateral constituting WCF Collateral, and (iii) senior to the Prepetition Junior Secured Term Loan Liens, in each case, in accordance with the terms and conditions of the WCF Intercreditor Agreement, the TF Intercreditor Agreement and the Fourth Lien Intercreditor Agreement.  Each of the Debtors acknowledges and agrees that, in each case as of the Petition Date, the Prepetition TF Stream Lien:  (i) is a valid, binding, perfected and enforceable lien and security interest in the Prepetition Collateral, with the priority set forth in the Prepetition TF Stream Documents and the Prepetition Intercreditor Agreements; (ii) is not subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as defined in the Bankruptcy Code) of any kind; and (iii) as of the Petition Date is subject and/or subordinate only to (1) the Prepetition Prior Liens, in relation to the Prepetition TF Stream Obligations, (2) with respect to the Non-WCF Collateral, the Prepetition Senior Secured Term Loan Liens and (3) with respect to the WCF Collateral, the Prepetition Working Capital Lien and the Prepetition Senior Secured Term Loan Liens.

4.    **Prepetition Junior Secured Term Loan Obligations**.

(a)    Under that certain Third Amended and Restated Loan Agreement, dated as of December 21, 2023 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "***Prepetition Junior Secured Term Loan Agreement***," together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other documents, the "***Prepetition Junior***

11

*Secured Term Loan Documents*," and, together with the Prepetition Senior Secured Term Loan Documents, the Prepetition Working Capital Documents and the Prepetition TF Stream Documents, the "*Prepetition Debt Documents*"), by and among NCU, as borrower, Borrower, 0607792 B.C. Ltd., Lion Iron Corp., NC Farms LLC and NC Ditch Company LLC, as guarantors, the lenders party thereto from time to time (the "*Prepetition Junior Secured Term Loan Lenders*"), and Pala, as lead arranger and collateral agent (the "*Prepetition Junior Secured Term Loan Agent*," together with the Prepetition Junior Secured Term Loan Lenders, the "*Prepetition Junior Secured Term Loan Parties*" and, together with the Prepetition Senior Secured Term Loan Parties, the Prepetition Working Capital Purchaser and the Prepetition TF Stream Purchaser the "*Prepetition Secured Parties*"), NCU was provided with a junior secured term loan facility.

(b)    *Prepetition Junior Secured Term Loan Obligations.*  As of the Petition Date, the Debtors, without defense, counterclaim or offset of any kind, were jointly and severally indebted and liable to the Prepetition Junior Secured Term Loan Parties under the Prepetition Junior Secured Term Loan Documents in the aggregate principal amount of not less than $10 million under the Prepetition Junior Secured Term Loan Agreement, *plus* accrued and unpaid interest thereon as of the Petition Date, plus all other fees, costs, expenses, charges, additional interest, any other "Obligations" (as defined in the Prepetition Junior Secured Term Loan Agreement) and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition Junior Secured Term Loan Documents (collectively, the "*Prepetition Junior Secured Term Loan Obligations*" and, together with the Prepetition Senior Secured Term Loan Obligations, the Prepetition Working Capital Obligations and the Prepetition TF Stream Obligations, the "*Prepetition Secured Obligations*").  The Prepetition Junior Secured Term Loan Obligations constitute legal, valid, binding and non-avoidable obligations against each of the Debtors and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  No payments or transfers made to or

for the benefit of (or obligations incurred to or for the benefit of) the Prepetition Junior Secured Term Loan Parties by or on behalf of any of the Debtors prior to the Petition Date under or in connection with any of the Prepetition Junior Secured Term Loan Documents are subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

(c)    *Prepetition Junior Secured Term Loan Liens*.    Pursuant to the Prepetition Junior Secured Term Loan Documents, the Prepetition Junior Secured Term Loan Obligations are secured by valid, binding, perfected and enforceable liens on and security interests in (the "***Prepetition Junior Secured Term Loan Liens***" and, together with the Prepetition Senior Secured Term Loan Liens, the Prepetition Working Capital Lien and the Prepetition TF Stream Lien, the "***Prepetition Funded Debt Liens***") the Prepetition Collateral, subject to certain permitted liens as permitted under the Prepetition Junior Secured Term Loan Agreement.  The Prepetition Junior Secured Term Loan Liens are subject to the Prepetition Senior Secured Term Loan Liens, the Prepetition Working Capital Lien and the Prepetition TF Stream Lien with respect to all Prepetition Collateral, in each case, in accordance with the terms and conditions of the Fourth Lien Intercreditor Agreement (as defined below).  Each of the Debtors acknowledges and agrees that, in each case as of the Petition Date, the Prepetition Junior Secured Term Loan Liens:  (i) are valid, binding, perfected and enforceable liens and security interests in the Prepetition Collateral, with the priority set forth in the Prepetition Junior Secured Term Loan Documents and the Prepetition Intercreditor Agreements; (ii) are not subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as defined in the Bankruptcy Code) of any kind; and (iii) as of the Petition Date are subject and/or subordinate only to the (1) Prepetition Prior Liens, in relation to the Prepetition Junior Secured Term Loan Obligations, (2) the Prepetition Senior Secured Term Loan Liens, (3) the Prepetition Working Capital Lien, and (4) the Prepetition TF Stream Lien.

5.    **Prepetition Intercreditor Agreements**.

(a)    *WCF Intercreditor Agreement*.  KfW, Triple Flag, Concord and the Borrower are parties to that certain Working Capital Facility Intercreditor Agreement, dated as of May 22, 2019, (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "***WCF Intercreditor Agreement***"), which governs, among other things, the rights, interests, obligations, priority and positions of the Prepetition Senior Secured Term Loan Parties, the Prepetition Working Capital Purchaser and the Prepetition TF Stream Purchaser.

(b)    *TF Intercreditor Agreement*.  KfW, Triple Flag, the Borrower,  NCU and NCU's subsidiaries are party to that certain Intercreditor Agreement, dated as of May 22, 2019, (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "***TF Intercreditor Agreement***"), which governs the rights, interests, obligations, priority and positions of the Prepetition Senior Secured Term Loan Parties and the Prepetition TF Stream Purchaser.

(c)    *Fourth Lien Intercreditor Agreement*.  KfW, Triple Flag, Concord, Pala, the Borrower, NCU and NCU's subsidiaries are party to that certain Intercreditor Agreement, dated as of October 28, 2022 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "***Fourth Lien Intercreditor Agreement***" and, together with the WCF Intercreditor Agreement and the TF Intercreditor Agreement, the "***Prepetition Intercreditor Agreements***"), which governs the rights, interests, obligations, priority and positions of the Prepetition Senior Secured Term Loan Parties, the Prepetition Working Capital Purchaser, the Prepetition TF Stream Purchaser and the Prepetition Junior Secured Term Loan Parties.

(d)    Each of the Debtors either is party to or otherwise acknowledged and agreed to, and are bound by, the Prepetition Intercreditor Agreements.  Pursuant to Bankruptcy Code section 510, the Prepetition Intercreditor Agreements, and any other applicable intercreditor or subordination provisions contained in any of the Prepetition Debt Documents shall (i) remain

in full force and effect, (ii) continue to govern the relative obligations, priorities, rights, and remedies of the applicable Prepetition Secured Parties, and (iii) not be deemed to be amended, altered or modified by the terms of this Interim Order unless expressly set forth herein or therein.

6.    **Cash Collateral**.  Any and all of the Debtors' cash, including any amounts generated by the collection of accounts receivable, all cash proceeds of the Prepetition Collateral, and the cash in the Debtors' banking, checking or other deposit accounts with financial institutions as of the Petition Date (excluding cash deposits that secure any outstanding letters of credit) or deposited into the Debtors' banking, checking or other deposit accounts with financial institutions after the Petition Date constitutes cash collateral of the Prepetition Secured Parties within the meaning of Bankruptcy Code section 363(a) (the "*Cash Collateral*").

7.    **Adequate Protection**.  Pursuant to Bankruptcy Code sections 105, 361, 362 and 363(e), the Prepetition Secured Parties are entitled to adequate protection of their interests in the Prepetition Collateral, including the Cash Collateral, to the extent of any postpetition diminution in value of their interests in the Prepetition Collateral resulting from, among other things, and without limitation, (i) subordination of the Prepetition Secured Parties' interests in the Prepetition Collateral, (ii) the use of Cash Collateral during the Chapter 11 Cases, (iii) the use, sale or lease of any of the Prepetition Collateral, (iv) the imposition of the automatic stay pursuant to Bankruptcy Code section 362(a), and/or (v) for any other reason for which adequate protection may be granted under the Bankruptcy Code ("*Diminution in Value*").  Based on the Motion, the DIP Declaration, and the record presented to the Court at the Interim Hearing, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral, including the Cash Collateral, are fair and reasonable and reflect the Debtors' prudent business judgment.

G.    **Findings Regarding the DIP Facility and Use of Cash Collateral**.  Based on the record established and evidence presented at the Interim Hearing, including the DIP Declaration, and the representations of the parties, the Court makes the following findings:

1.    **Need for Postpetition Financing and Use of Cash Collateral**.  The Debtors have a need to use Cash Collateral on an interim basis and obtain credit in the form of the

15

Interim DIP Loans pursuant to the DIP Facility in order to, among other things, (a) permit the orderly continuation of their business, (b) maintain business relationships with their vendors, suppliers, customers and other parties, (c) make payroll, (d) pay Adequate Protection Payments and (e) pay the costs of administering the Chapter 11 Cases, in each case, in compliance with, and subject in all respects to, the Approved Budget, the terms hereof and the DIP Documents.  The ability of the Debtors to maintain business relationships with their vendors, suppliers, and customers, to pay their employees, and otherwise finance their operations requires the availability of working capital from the DIP Facility and the use of Cash Collateral, the absence of either of which, on an interim basis as contemplated hereunder, would immediately and irreparably harm the Debtors, their estates, and parties-in-interest.  The Debtors do not have sufficient available sources of working capital and financing to operate their business, maintain their properties in the ordinary course of business, and fund the Chapter 11 Cases without the authorization to use Cash Collateral and to borrow the Interim Amount.  Without the ability to access the DIP Facility and the authority to use Cash Collateral, the Debtors' chances for a successful chapter 11 restructuring would be jeopardized.

2.      **Priming of Prepetition Liens**.  The priming of the Prepetition Funded Debt Liens on the Prepetition Collateral, to the extent set forth herein, under Bankruptcy Code section 364(d)(1), as contemplated by this Interim Order and the DIP Facility, and as further described below, will enable the Debtors to obtain the DIP Facility and, among other benefits, to continue to operate their businesses for the benefit of their estates and stakeholders.

3.      **No Credit Available on More Favorable Terms**.  As set forth in the DIP Declaration, the Debtors have been unable to obtain financing from sources other than the DIP Lenders on terms more favorable than those provided under the DIP Facility, as set forth in the DIP Documents.  The Debtors have been unable to obtain adequate unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense.  The Debtors also have been unable to obtain sufficient credit (i) on an unsecured basis having priority over all other administrative expenses, (ii) secured solely by a lien on property of the Debtors and their estates

that is not otherwise subject to a lien or (iii) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  Postpetition financing is not otherwise available without granting the DIP Agent, for the benefit of itself and the DIP Lenders, (x) the DIP Liens (as defined below) on all DIP Collateral (as defined below), as set forth herein, (y) the DIP Superpriority Claims (as defined below) and (z) the other protections set forth in this Interim Order. The terms of the DIP Documents and the use of Cash Collateral are fair and reasonable, reflect the Debtors' exercise of sound and prudent business judgment consistent with their fiduciary duties, constitute reasonably equivalent value and fair consideration and are in the best interest of the Debtors' estates and stakeholders.

4.    **Good Faith**.  The DIP Facility and the Adequate Protection Obligations have been negotiated in good faith and at arm's length among the Debtors, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties and all of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the DIP Documents including, without limitation, all loans made to and guarantees issued by the Debtors pursuant to the DIP Documents, and all other DIP Obligations shall be deemed to have been extended by the DIP Agent and the DIP Lenders in good faith as that term is used in Bankruptcy Code section 364(e) and in express reliance upon the protections offered by Bankruptcy Code section 364(e).  The DIP Obligations and the DIP Liens shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed or modified on appeal or otherwise, and any liens or claims granted to the DIP Agent or the DIP Lenders hereunder arising prior to the effective date of any such vacatur, reversal or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

H.    **Consent of the Prepetition Secured Parties**.  The Prepetition Secured Parties have consented to or are deemed to consent under the applicable Prepetition Intercreditor Agreements to the priming of the Prepetition Funded Debt Liens, as applicable, to the extent set forth herein, and the Debtors' use of Cash Collateral, in accordance with and subject to the terms and conditions

17

provided for in this Interim Order; *provided* that nothing in this Interim Order shall constitute the consent of the Prepetition Senior Secured Term Loan Agent to priming of the Prepetition Senior Secured Term Loan Liens by DIP Liens securing DIP Obligations in an amount greater than $51.4 million, and KfW reserves its rights with respect to the Final Order in all respects.

I.      **Sections 506(c) and 552(b)**.  As a material inducement to the DIP Lenders to agree to provide the DIP Facility and the Prepetition Secured Parties to agree to the use of Cash Collateral, and in exchange for (i) the DIP Agent's and DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out to the extent set forth herein and (ii) the Prepetition Secured Parties' agreement to (a) subordinate their Prepetition Funded Debt Liens and the Adequate Protection Liens to the Carve-Out and the DIP Liens, each to the extent provided herein, and (b) consent to the use of Cash Collateral in accordance with and subject to the Approved Budget (subject to the Permitted Variances (as defined below)), the DIP Documents and the terms of this Interim Order, each of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties is entitled to receive (1) a waiver of any "equities of the case" exceptions or claims under Bankruptcy Code section 552(b), (2) a waiver of the provisions of Bankruptcy Code section 506(c), and (3) a waiver of the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral (as applicable).

J.      **Immediate Entry**.  The Debtors have requested entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2), (c) and (d) and Local Rules 4001(c)(2) and 9006.  Absent granting the interim relief sought by this Interim Order, the Debtors' estates could be immediately and irreparably harmed.  Thus, sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2), (c), and (d) and Local Rules 4001(c)(2) and 9006.

Based upon the foregoing findings and conclusions, the Motion, the DIP Declaration, and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.    **Motion Granted**.  The relief sought by the Motion is granted, and the DIP Facility and the use of Cash Collateral are hereby authorized and approved, in each case, upon the terms and conditions of this Interim Order and the DIP Documents.

2.    **Objections Overruled**.    Any objections to the Motion that have not been withdrawn, waived or settled, and all reservations of rights or other statements inconsistent with this Interim Order, are hereby denied and overruled.  This Interim Order shall become effective and enforceable immediately upon its entry.

3.    **Approval and Authorization of DIP Facility**.

(a)    *Authorization of DIP Facility and DIP Documents*.    The DIP Facility is hereby approved on an interim basis on the terms and conditions set forth herein. The DIP Loan Parties are expressly and immediately authorized and empowered to: (i) (A) enter into and perform all of their obligations, (B) as required by the DIP Lenders, execute, deliver and perform under the DIP Documents and (C) pay all fees, costs, expenses, indemnities and other amounts contemplated under this Interim Order and the applicable DIP Documents; and (ii) perform all acts, to make, execute, deliver, enter into and perform under any and all other agreements, instruments, certificates and other documents (including, without limitation, the execution and/or recordation of any collateral, pledge and security documents, mortgages, deeds of trust, control agreements, financing statements or other documents), and to perform all such other and further acts, that may be necessary, required or desirable for the DIP Agent or the DIP Lenders to perform their obligations under the DIP Facility, this Interim Order and any applicable DIP Document and to implement the transactions contemplated thereunder and hereunder.

(b)    **Authorization to Borrow**.  The Debtors are hereby authorized to borrow under the DIP Facility, from the period between the date of entry of this Interim Order and the Final Hearing (the "***Interim Period***"), a principal amount of up to $20,000,000, subject to the terms and conditions (including any conditions precedent to such borrowing) set forth in this Interim Order and the DIP Documents.  The DIP Lenders shall have no obligation to make any loan or

advance under the DIP Documents, unless all of the conditions precedent to the making of such extension of credit under the DIP Documents and this Interim Order have been satisfied in full or waived in accordance with the DIP Documents and this Interim Order.

(c)    *Use of DIP Proceeds and Cash Collateral*.    The Debtors are hereby authorized to use the proceeds of the DIP Facility and all Cash Collateral solely in the manner and for the purposes expressly permitted in the Approved Budget (subject to the Permitted Variances), this Interim Order and the DIP Documents.

(d)    *DIP Interest, Fees and Expenses*.    The Debtors are authorized and directed to pay any and all (i) interest, fees, premiums or other amounts payable under the DIP Documents, including, without limitation, the Upfront Fee, the Unused Commitment Fee, the Exit Fee, the Agency Fee, (ii) amounts due (or that may become due) to any Indemnified Person (as defined below) in respect of the indemnification obligations under this Interim Order and the DIP Documents and (iii) any other amounts payable in connection with the DIP Facility, including all reasonable and documented pre- and postpetition fees, expenses and disbursements in connection with the DIP Facility and these Chapter 11 Cases of (A) Akin Gump Strauss Hauer & Feld LLP ("***Akin***"), as counsel to the DIP Lenders, (B) Blake, Cassels & Graydon LLP, as Canadian counsel to the DIP Lenders, (C) Shea Larson PC, as Nevada local counsel to the DIP Lenders, (D) Kelley Drye & Warren, LLP, as counsel to the DIP Agent ("***DIP Agent Counsel***"), and (E) any other attorneys, financial advisors, consultants or other professionals retained by the DIP Secured Parties (the professionals set forth in clauses (A) through (E), collectively, the "***DIP Professionals***"), in each case whether or not such payments, premiums, fees, costs, expenses and disbursements arose before or after the Interim Closing Date.    The payment of the fees, costs, expenses and disbursements of the DIP Professionals other than DIP Agent Counsel (the "***DIP Professional Fees***") shall be subject to the notice and review procedures set forth in paragraph 19 of this Interim Order.    For the avoidance of doubt, the Debtors shall be jointly and severally liable for the obligations to pay the DIP Professional Fees in accordance with this Interim Order.

(e)    *Indemnification*.  As set forth in the DIP Documents, the Debtors will jointly and severally indemnify the DIP Agent, the DIP Lenders, the DIP Professionals and their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each an "***Indemnified Person***"), and hold them harmless from and against any and all losses, claims, damages, costs, expenses (including, but not limited to reasonable and documented legal fees and expenses) and liabilities arising out of or relating to the execution or delivery of the DIP Documents, transactions contemplated hereby and thereby and any actual or proposed use of the proceeds of any loans made under the DIP Facility in accordance with the terms of the DIP Credit Agreement and the other DIP Documents; *provided* that no such Indemnified Person will be indemnified for costs, expenses or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the actual gross negligence or willful misconduct of such person (or their related persons).  No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's gross negligence or willful misconduct, and in no event shall any Indemnified Person be liable on any theory for any special indirect, consequential or punitive damages.

(f)    *Modification of DIP Documents*.  The DIP Agent (acting at the direction of the Required DIP Lenders)[4] and the Required DIP Lenders are hereby authorized to execute, deliver and perform under one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in accordance with the provisions of any applicable DIP Documents governing amendments thereto, each without further application to or order of the Court; *provided*, *however*, that any amendments, waivers, consents or other modifications to and

---

[4]    The term "***Required DIP Lenders***" as used in this Interim Order, shall have the same meaning ascribed to the term "Majority Lenders" in the DIP Credit Agreement.

under the DIP Documents that (i) modify the original stated maturity of the DIP Facility, (ii) increase the aggregate commitments thereunder or (iii) increase the rate of interest or fees payable with respect thereto shall require further Court approval; *provided further*, that any amendment that may affect the rights, obligations, protections, immunities or indemnities of the DIP Agent shall require the consent of the DIP Agent.

4.    **DIP Obligations**

(a)    Upon entry of this Interim Order, the obligations under any applicable DIP Documents shall constitute valid, binding, enforceable, and non-avoidable obligations of each Debtor, and shall be fully enforceable against each of the Debtors, their estates and any successors thereto, including, without limitation, any estate representative or trustee appointed in any of these Chapter 11 Cases or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or relating to any of the foregoing, and/or upon the dismissal of any of the Chapter 11 Cases or any such successor cases (collectively, the "***Successor Cases***"), in each case, in accordance with the terms of the DIP Documents and this Interim Order.

(b)    Upon entry of this Interim Order, the Debtors shall be jointly and severally liable for all DIP Obligations, including, without limitation, all loans, advances, indebtedness, obligations, extensions of credit, financial accommodations, principal, interest, payments or similar amounts, fees, costs, expenses, charges, indemnification and reimbursement obligations (whether contingent or absolute), and all other amounts, whether or not such obligations arose before or after the Petition Date, whenever the same shall become due and payable, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, to the DIP Lenders under the DIP Documents or this Interim Order.

(c)    All obligations incurred, payments made and transfers or grants of liens and security interests set forth in this Interim Order and/or the DIP Documents by the Debtors are granted to or for the benefit of the DIP Secured Parties for fair consideration and reasonably equivalent value and are granted contemporaneously with the making of the loans and

commitments and other financial accommodations secured thereby. No obligation, payment, transfer or grant of liens or security interests under this Interim Order or the DIP Documents to the DIP Secured Parties shall be limited, stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law, or subject to any challenge, objection, defense or claim, including, without limitation, avoidance (whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge, recovery or other cause of action of any kind or nature whatsoever, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise (subject, solely in the case of the DIP Professional Fees, only to the procedures set forth in paragraph 19 of this Interim Order).

5.      **DIP Superpriority Claims**. Pursuant to Bankruptcy Code section 364(c)(1), all of the DIP Obligations shall constitute allowed senior administrative expense claims of the DIP Secured Parties, against each of the Debtors' estates (the "***DIP Superpriority Claims***"), without the need to file any proof of claim or request for payment of administrative expenses, with priority over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b), and over any and all administrative expenses or other claims arising under Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 726, 1113 or 1114 or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for the purposes of Bankruptcy Code section 1129(a)(9)(A) be considered administrative expenses allowed under Bankruptcy Code section 503(b) and 507(b), and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including actions to recover property transferred pursuant to

Bankruptcy Code section 549, and subject to the entry of the Final Order, the proceeds of, and property that is recovered from or becomes unencumbered as a result of (whether by judgment, settlement or otherwise), all claims and causes of action arising under chapter 5 of the Bankruptcy Code or under any applicable state law of a similar nature (such claims and causes of action, "***Avoidance Actions***" and the proceeds thereof, "***Avoidance Action Proceeds***"), subordinate only to the Carve-Out and the administrative charge granted by the Ontario Superior Court of Justice (Commercial List) (the "***Canadian Court***") in the proceedings (the "***Recognition Proceedings***") under Part IV of the Companies' Creditors Arrangement Act (Canada) (the "***CCAA***") commenced by the Debtors in Canada in respect of certain Canadian-related professional fees, in an aggregate amount not to exceed CAD$500,000 (the "***Administration Charge***").  Except as set forth in, or permitted by, this Interim Order, or otherwise permitted pursuant to an order of this Court, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases.

6.    **DIP Liens**.

(a)    As security for the DIP Obligations, effective and automatically perfected upon the date of this Interim Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Agent or any DIP Lender of, or over, any DIP Collateral (as defined below), the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted by the DIP Loan Parties continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens (collectively, the "***DIP Liens***") upon all DIP Collateral as security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of all of the DIP Obligations.

(b)    The term "***DIP Collateral***" means all assets and properties of each of the Debtors and their estates, of any kind or nature whatsoever, wherever located, whether tangible or intangible, real, personal or mixed, whether now owned or consigned by or to, or leased from or to, or hereafter acquired by, or arising in favor of, each of the Debtors (including under any trade

names, styles or derivations thereof), whether prior to or after the Petition Date, including, without limitation: (i) all Prepetition Collateral (including Cash Collateral); (ii) all intercompany claims, including, but not limited to, all Intercompany Superpriority Claims (as defined below); (iii) all money, cash and cash equivalents; (iii) all funds in any deposit accounts (excluding cash deposits that secure any outstanding letters of credit), securities accounts, commodities accounts, or other accounts (together with and all money, cash and cash equivalents, instruments and other property deposited therein or credited thereto from time to time); (iv) all accounts and other receivables (including those generated by intercompany transactions); (v) all contracts and contract rights; (vi) all instruments, documents and chattel paper; (vii) all securities (whether or not marketable); (viii) all goods, as-extracted collateral, furniture, machinery, equipment, inventory and fixtures; (ix) all real property interests; (x) all interests in leaseholds; (xi) all franchise rights; (xii) all patents, tradenames, trademarks, copyrights, licenses and all other intellectual property; (xiii) all general intangibles, tax or other refunds or insurance proceeds; (xiv) all equity interests, capital stock, limited liability company interests, partnership interests and financial assets; (xv) all investment property; (xvi) all supporting obligations; (xvii) all letters of credit and letter of credit rights; (xviii) all commercial tort claims; (xix) subject to the entry of the Final Order, all Avoidance Action Proceeds (but not avoidance actions themselves), (xx) all books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials, and records); (xxi) to the extent not covered by the foregoing, all other goods, assets or properties of the Debtors, whether tangible, intangible, real, personal or mixed; and (xxii) all products, offspring, profits and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, including any and all proceeds of any insurance (including any business interruption and property insurance), indemnity, warranty or guaranty payable to such Debtor from time to time with respect to any of the foregoing.

   (c) Subject in all cases to the terms of this Interim Order and the DIP Documents, the DIP Secured Parties shall be granted the following DIP Liens in respect of the DIP Facility:

(1)     *First Priority Lien on Unencumbered Property*. Pursuant to Bankruptcy Code section 364(c)(2), a valid, binding, continuing, enforceable and fully-perfected first priority senior security interest in and lien upon all DIP Collateral that, as of the Petition Date, is unencumbered and not subject to any liens (including Petition Date Perfected Liens), which security interest and lien shall be junior and subordinate only to (A) the Carve-Out, and (B) the Administration Charge.

(2)     *Priming Lien on WCF Collateral*. Upon the payment in full of the obligations under the Prepetition Working Capital Facility, pursuant to Bankruptcy Code section 364(d)(1), a valid, binding, continuing, enforceable and fully-perfected first priority security interest in and lien upon all DIP Collateral that constitutes WCF Collateral, which security interest and lien shall be junior and subordinate only to (A) the Carve-Out, (B) the Administration Charge, (C) Petition Date Perfected Liens, and (D) prior to entry of the Final Order, any security interest in or lien on the assets of NCU that are in favor of Trisura Guarantee Insurance Company.

(3)     *Priming Lien on Non-WCF Collateral*. Pursuant to Bankruptcy Code section 364(d)(1), a valid, binding, continuing, enforceable and fully-perfected first priority security interest in and lien upon all DIP Collateral that constitutes Non-WCF Collateral, *provided* that such lien shall be junior and subordinate only to (A) the Carve-Out, (B) the Administration Charge and (C) Petition Date Perfected Liens, and (D) prior to entry of the Final Order, any security interest in or lien on the assets of NCU that are in favor of Trisura Guarantee Insurance Company.

(4)     *Lien on Intercompany Superpriority Claims*. Pursuant to Bankruptcy Code section 364(d)(1), a valid, binding, continuing, enforceable and fully-perfected first priority priming security interest in and lien on all claims in respect of intercompany transfers of proceeds from the DIP Facility or of Cash Collateral from any Debtor to NCU (the "***Intercompany Superpriority Claims***"), *provided* that such lien shall be junior and subordinate only to (A) the Carve-Out, (B) the Administration Charge, and (C) Petition Date Perfected Liens (excluding any Prepetition Trisura Lien).

(d)     To the fullest extent permitted by the Bankruptcy Code or applicable law, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document or other instrument or agreement that requires the consent or the payment of any fees or obligations to any governmental entity or non-governmental entity for the Debtors to pledge, grant, mortgage, sell, assign or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral, shall have no force or effect with respect to the DIP Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Secured Parties in accordance with the terms of the  DIP Documents and this Interim Order.

7.     **Use of DIP Collateral and Cash Collateral**

(a)    The Debtors are hereby authorized to use the proceeds of DIP Facility and all Cash Collateral solely to the extent expressly permitted under the Approved Budget (subject to the Permitted Variances) and subject to the terms and conditions set forth in this Interim Order and any applicable DIP Documents.  Except on the terms and conditions of this Interim Order, the Debtors shall be enjoined and prohibited from at any time using the Cash Collateral absent further order of the Court.

(b)    Without the prior written consent of the Required DIP Lenders, the Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral (or enter into any binding agreement to do so), except as may be expressly permitted by this Interim Order and any applicable DIP Documents.  All proceeds of DIP Collateral, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnation or otherwise, will be deposited and applied as required by this Interim Order and any applicable DIP Documents.  The Debtors shall not transfer any cash, assets, properties or other DIP Collateral to any affiliate of the Debtors that is not a Debtor in these Chapter 11 Cases without the prior written consent of the Required DIP Lenders, in their sole discretion.

(c)    Proceeds of the DIP Facility constitute postpetition assets of the Debtors, subject only to the Carve Out, Administrative Charge, DIP Liens, and adequate protection liens of the Prepetition Secured Parties, with the priorities set forth herein, and shall, for the avoidance of doubt, not be subject to any liens arising from prepetition claims against any of the Debtors, whether perfected prior to the Petition Date, after the Petition Date pursuant to section 546(b) of the Bankruptcy Code, or otherwise, regardless of where or how held.  The Debtors may deposit proceeds of the DIP Facility into their existing bank accounts, and such proceeds shall not be subject to any liens or claims arising prepetition, including pursuant to chapter 108 of the Nevada Revised Statutes, whether or not eligible for perfection after the Petition Date, except for junior liens or claims of the Prepetition Secured Parties, as set forth herein.  For the avoidance of doubt, to the extent of any proceeds of the DIP Facility deposited therein, no bank account of the Debtors

may be a "construction disbursement account" for purposes of chapter 108 of the Nevada Revised Statutes.

       8.    **<u>Budget</u>**

       (a)    *Initial Budget*.  The Debtors have prepared and delivered to the DIP Lenders and the DIP Professionals an itemized thirteen-week cash flow forecast attached hereto as **<u>Exhibit B</u>** (the "***Initial Budget***," as amended, replaced, supplemented or otherwise modified from time to time in accordance with the terms of this Interim Order and the DIP Documents, the "***Approved Budget***").  Except as otherwise provided herein or in the DIP Documents, the Debtors may only use Cash Collateral and the proceeds of the DIP Facility to fund payments benefitted by the Carve-Out and otherwise in accordance with the Approved Budget (subject to the Permitted Variances).

       (b)    *Proposed Budget; Budget Transition*.  By no later than 12:00 p.m. (Pacific Time) on the third Thursday after the Petition Date (commencing from June 27, 2024), and continuing at 12:00 p.m. (Pacific Time) on the Thursday of every second week thereafter, the Debtors shall deliver to the DIP Lenders, DIP Professionals, and KfW an updated and supplemented forecast (a "***Proposed Budget***") for the thirteen-week period commencing with the calendar week in which such Proposed Budget is delivered (the "***Budgeted Period***"); *provided*, *however*, that in no event shall the Budgeted Period extend past four weeks after the Maturity Date (as defined in the DIP Credit Agreement) of the DIP Facility.  For the avoidance of doubt, if the Budgeted Period is anticipated to extend beyond the Maturity Date, the projected receipts, disbursements, intercompany transfers and all other line items set forth in the Proposed Budget for all weeks following the Maturity Date shall assume that the Debtors continue to operate in the ordinary course consistent with prior postpetition practices and that no sale of the Debtors' business will occur during such portion of the Budgeted Period.  The Proposed Budget (including any subsequent revisions to any such Proposed Budget) shall become the Approved Budget effective five (5) business days after such submission (such date, the "***Budget Transition Date***") unless the Debtors receive a written objection from the Required DIP Lenders (with e-mail from professionals acting on behalf of the Required DIP Lenders to the Debtors' counsel being

sufficient) prior to 5:00 p.m. (Pacific Time) on the Budget Transition Date.  If the Required DIP Lenders do not object, in writing, to a Proposed Budget, or an amendment, supplement or modification to the Approved Budget or Approved Variance Report (defined below) within five (5) business days after the Required DIP Lenders' receipt thereof, then such Proposed Budget, amendment, supplement or modification shall be deemed acceptable to and approved by the DIP Lenders.  In the event the Required DIP Lenders timely object to a Proposed Budget, the prior Approved Budget shall remain in full force and effect until any such Proposed Budget is approved by the Required DIP Lenders (with e-mail from the advisors acting on behalf of the Required DIP Lenders to the Debtors' counsel being sufficient).  The consent of the Required DIP Lenders to any Proposed Budget or any Approved Budget shall not be construed as consent to the use of any Cash Collateral or proceeds of the DIP Facility after the occurrence of a Termination Event regardless of whether the aggregate funds shown on the Approved Budget have been expended.  Until any Proposed Budget, amendment, supplement or modification has been approved (or is deemed approved in accordance with this paragraph) by the Required DIP Lenders, the Debtors shall be subject to and be governed by the terms of the Approved DIP Budget then in effect.

(c)    *Budget Reporting*.  By no later than 12:00 p.m. (Pacific Time) on the second Thursday following the Petition Date (the "***First Reporting Date***", which, for the avoidance of doubt, shall be June 20, 2024), and no later than 12:00 p.m. (Pacific Time) on each Thursday thereafter (together with the First Reporting Date, each a "***Weekly Reporting Date***"), the Debtors shall provide to the DIP Lenders (and their advisors) and KfW (and its counsel) a report, in form and substance reasonably acceptable to the DIP Lenders (the "***Weekly Variance Report***"), setting forth in reasonable detail: (i)  the intercompany transfers from Debtor entities to NCU on a Debtor-by-Debtor and an aggregate basis; (ii) the actual receipts of the Debtors on a line-by-line and aggregate basis (the "***Actual Receipts***") and the actual disbursements of the Debtors on a line-by-line and aggregate basis (such aggregate actual disbursements, the "***Actual Disbursements***"), in each case, during the applicable week ending on the Sunday preceding each such Weekly

Reporting Date (each such week, the "***Reporting Week***"); (iii) a comparison (whether positive or negative, expressed as a percentage) for the Reporting Week between (A) the Actual Receipts (and each line item thereof) for such Reporting Week to the amount of the Debtors' projected receipts (and each line item thereof) set forth in the Approved Budget for such Reporting Week, (B) the Actual Disbursements (and each line item thereof) for such Reporting Week to the amount of the Debtors' projected disbursements (and each line item thereof) set forth in the Approved Budget for such Reporting Week and (C) the actual intercompany transfers from each Debtor entity to NCU to the amount of each such Debtor's projected intercompany transfers to NCU set forth in the Approved Budget for such Reporting Week.  In addition, by no later than 12:00 p.m. (Pacific Time) on each Weekly Reporting Date that occurs on and after the three-week anniversary of the First Reporting Date, (each such date, a "***Rolling Four-Week Testing Date***" (which such initial Rolling Four-Week Testing Date shall be July 11, 2024) and each subsequent four-week period commencing from the beginning of the week in which the Petition Date occurs and ending on the Sunday preceding each such Rolling Four-Week Testing Date, a "***Rolling Four-Week Testing Period***") the Debtors shall provide the DIP Lenders (and their advisors) and KfW (and its counsel) a report, in form and substance reasonably acceptable to the DIP Lenders (a "***Rolling Four-Week Variance Report***" and, together with the Weekly Variance Report, the "***Approved Variance Reports***"), setting forth in reasonable detail: (x) the aggregate Actual Receipts of the Debtors, aggregate Actual Disbursements of the Debtors, and aggregate intercompany transfers from each Debtor entity to NCU, in each case, during the applicable Rolling Four-Week Testing Period; and (y) a comparison (whether positive or negative, expressed as a percentage) detailing (1) the aggregate Actual Receipts (and each line item thereof) for such Rolling Four-Week Testing Period compared to the projected receipts (and each line item thereof) for such Rolling Four-Week Testing Period set forth in the Approved Budget for such Rolling Four-Week Testing Period; (2) the aggregate Actual Disbursements (and each line item thereof) for such Rolling Four-Week Testing Period compared to the projected disbursements (and each line item thereof) for such Rolling Four-Week Testing Period set forth in the Approved Budget for such Rolling Four-Week Testing Period;

and (3) the aggregate intercompany transfers from each Debtor entity to NCU made by each such Debtor during such Rolling Four-Week Testing Period compared to the aggregate projected intercompany transfers from each such Debtor entity to NCU for such Rolling Four-Week Testing Period set forth in the Approved Budget for such Rolling Four-Week Testing Period.

(d)    *Budget Testing; Permitted Variances*.    During any Rolling Four-Week Testing Period, the Debtors shall not permit (1) total disbursements, minus (2) disbursements in respect of (i) interest, fees, and expenses in relation to the DIP Facility; (ii) Adequate Protection Obligations; (iii) DIP Professional Fees; and (iv) professional fees paid by the Debtors on behalf of themselves or any other party (the disbursements remaining after such subtractions, the "***Total Tested Disbursements***") to be more than 120% of such Total Tested Disbursements set forth in the Approved Budget for such Rolling Four-Week Testing Period (collectively, the "***Permitted Variances***").    Additional disbursement variances, if any, from an Approved Budget, and any proposed amendments, supplements or modifications to an Approved Budget, shall be subject to the prior written approval of the Required DIP Lenders.    For the avoidance of doubt, any reference to "written consent" or "written approval" hereunder shall include consent or approval granted by e-mail, including email from counsel to the DIP Lenders on behalf of the DIP Lenders.

9.    **Reporting Requirements; Access to Records**.    The Debtors shall provide (i) Akin, as counsel to the DIP Lenders, (ii) Milbank LLP ("***Milbank***"), as counsel to KfW, (iii) White & Case LLP, as counsel to Concord, (iv) Davis, Graham & Stubbs LLP, as counsel to Triple Flag (v) Cleary, Gottlieb, Steen & Hamilton LLP, as counsel to Pala,  (vi) Bennett Jones LLP, as counsel to Mercuria, and (vii) Alvarez & Marsal Canada Inc., in its capacity as the Information Officer in the Recognition Proceedings, with all reporting and other information required to be provided to the DIP Agent under the DIP Documents.    In addition to, and without limitation, whatever rights to access the DIP Secured Parties or KfW have under the DIP Documents, upon reasonable notice, at reasonable times during normal business hours, the Debtors shall permit representatives, agents and employees of the DIP Secured Parties and KfW to (x) have access to and inspect the Debtors'

31

assets, (y) examine the Debtors' books and records and (z) discuss the Debtors' affairs, finances and condition with the Debtors' officers and financial advisors.

10.    **Adequate Protection for the Prepetition Secured Parties**.    Pursuant to Bankruptcy Code sections 361, 363, and 364, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), for and equal in amount to the aggregate postpetition Diminution in Value of such interests, the Prepetition Secured Parties are hereby granted the following (collectively, the "*Adequate Protection Obligations*"):

(a)    *Adequate Protection Liens*.  As security for and solely to the extent of any Diminution in Value, the Prepetition Secured Parties are hereby granted additional and replacement valid, binding, enforceable, non-avoidable and effective and automatically perfected postpetition security interests in, and liens on, as of the date of this Interim Order (the "*Adequate Protection Liens*"), subject in all cases to the priorities set forth on **Exhibit C** hereto, without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, all DIP Collateral.

(b)    *Adequate Protection Superpriority Claims*.  As further adequate protection, and to the extent provided by Bankruptcy Code sections 503(b) and 507(b), the Prepetition Secured Parties are hereby granted allowed administrative expense claims in the Chapter 11 Cases against each of the Debtors to the extent of any Diminution in Value (the "*Adequate Protection Superpriority Claims*").  The Adequate Protection Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding Avoidance Actions, but including, subject to entry of the Final Order, Avoidance Action Proceeds).  Subject to the terms of this Interim Order, the Adequate Protection Superpriority Claims shall have the same relative priorities as the Adequate Protection Liens (as set forth on **Exhibit C** hereto) and be subject to (i) the Carve-Out, (ii) the Administration Charge and (iii) the DIP Superpriority Claims.  Except as set forth in this Interim Order, the Adequate Protection

Superpriority Claims shall not be junior to any other claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(d), 726, 1113 and 1114.

(c)      *Fees and Expenses of the Prepetition Secured Parties*.  As further adequate protection, the Debtors are authorized and directed to pay, without further Court order, reasonable and documented fees and expenses (the "***Adequate Protection Fees***"), whether incurred before or after the Petition Date, of the Prepetition Senior Secured Term Loan Agent, consisting of the following: (i) Milbank, as counsel to KfW; (ii) one Canadian counsel to KfW;  (iii) one Nevada counsel to KfW; and (iv) one technical advisor to KfW; (collectively, the "***Prepetition Secured Parties' Professionals***") in accordance with the notice and review procedures set forth in paragraph 19 of this Interim Order.

(d)      *Monthly Payments*.  The Prepetition Senior Secured Term Loan Agent shall during the pendency of the Chapter 11 Cases, receive indefeasible payments in amounts equal to 100% of the accrued and unpaid interest, whether accruing prior to, on or after the Petition Date, due to the Prepetition Senior Secured Term Loan Agent under the Prepetition Senior Secured Term Loan Documents (calculated at the applicable non-default rates) (the "***Adequate Protection Monthly Payments***" and, together with the Adequate Protection Fees, the "***Adequate Protection Payments***"), which shall be payable (i) in respect of payments relating to the Prepetition Senior Secured KfW Term Loan Obligations, in cash and (ii) in respect of payments relating to the Prepetition Senior Secured Term Loan A-2 Obligations, in kind; *provided* that in the event of a final determination that the Prepetition Senior Secured Term Loan Lenders are undersecured as of the Petition Date, payments received by the applicable undersecured Prepetition Senior Secured Term Loan Lender pursuant to this paragraph 10(d) may be recharacterized and applied as payments of principal.

(e)    *Information Rights*.  The Debtors shall contemporaneously provide the Prepetition Secured Parties with all reporting and information that is required to be provided to the DIP Lenders under the DIP Documents (as currently in effect, or pursuant to any additional requirements that may be added after the date hereof).  The Debtors shall (a) provide the Prepetition Senior Secured Term Loan Agent and its advisors with copies of any material proposal, offer, indication of interest, or bid within two (2) business days of receipt, and (b) at the Prepetition Senior Secured Term Loan Agent's request, host a weekly call with the Prepetition Senior Secured Term Loan Agent and its advisors regarding the status of the Debtors' sale process.  The Debtors shall provide the Prepetition Senior Secured Term Loan Agent and its advisors with any information reasonably requested by the Prepetition Senior Secured Term Loan Agent or its advisors in connection with any Proposed Budget, Approved Budget, or Weekly Variance Report within three (3) business days of such request.  The Debtors shall conduct weekly status calls with KfW (and their technical advisor) on the status of the Underground Mine and shall respond timely to any reasonable request of KfW's technical advisor to provide information with respect to the status of the Underground Mine.

11.    **Perfection of DIP Liens and Adequate Protection Liens**.

(a)    This Interim Order shall be sufficient and conclusive evidence of the attachment, validity, perfection and priority of all liens and security interests granted under this Interim Order and the DIP Documents, including, without limitation, the DIP Liens and the Adequate Protection Liens, without the necessity of the execution, recordation or filing of any pledge, collateral or security agreements, mortgages, deeds of trust, lockbox or control agreements, financing statements, notations of certificates of title for titled goods, or any other document or instrument, or the taking of any other action (including, without limitation, entering into any deposit account control agreement or other act to take possession or control of any DIP Collateral, including Cash Collateral), to attach, validate, perfect or prioritize such liens and security interests, or to entitle the DIP Agent (acting at the direction of the Required DIP Lenders) and the Prepetition

Secured Parties to the priorities provided hereby and set forth on **Exhibit C** hereto (a "***Perfection Act***").

(b)        Without in any way limiting the automatically effective perfection of the liens granted under this Interim Order and the DIP Documents (including, without limitation, the DIP Liens and the Adequate Protection Liens), each of the Required DIP Lenders, the Prepetition Senior Secured Term Loan Agent, the Prepetition Working Capital Purchaser, the Prepetition TF Stream Purchaser and the Prepetition Junior Secured Term Loan Agent, without any further consent of any party, is hereby authorized on a final basis, to execute, file or record, and such parties, as applicable, may require the execution, filing or recording, as each, in its sole discretion deems necessary, of such financing statements, mortgages, notices of lien and other similar documents to enable the Required DIP Lenders, the Prepetition Senior Secured Term Loan Agent, the Prepetition Working Capital Purchaser, the Prepetition TF Stream Purchaser and the Prepetition Junior Secured Term Loan Agent, as applicable, to further validate, perfect, preserve and enforce the DIP Liens or Adequate Protection Liens granted hereunder, as applicable, perfect in accordance with applicable law or to otherwise evidence the DIP Liens and/or the Adequate Protection Liens, as applicable, and all such financing statements, mortgages, notices and other documents shall be deemed to have been executed, filed or recorded as of the Petition Date; *provided*, *however,* that, notwithstanding any otherwise applicable law or regulation to the contrary, whether or not the Required DIP Lenders, the Prepetition Senior Secured Term Loan Agent, the Prepetition Working Capital Purchaser, the Prepetition TF Stream Purchaser or the Prepetition Junior Secured Term Loan Agent, as applicable, determine, in their sole discretion, to execute, file, record or otherwise effectuate any Perfection Act with respect to any liens or security interests granted under this Interim Order and the DIP Documents, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to objection, challenge, dispute, avoidance, recharacterization or subordination.  The Debtors are hereby authorized and directed on a final basis to execute and deliver promptly upon demand to the Required DIP Lenders, the Prepetition Senior Secured Term Loan Agent, the Prepetition Working Capital Purchaser, the

Prepetition TF Stream Purchaser and the Prepetition Junior Secured Term Loan Agent, as applicable, all such financing statements, notices and other documents as such parties may reasonably request. The Required DIP Lenders, the Prepetition Senior Secured Term Loan Agent, the Prepetition Working Capital Purchaser, the Prepetition TF Stream Purchaser or the Prepetition Junior Secured Term Loan Agent, as applicable, each in its discretion, may file a copy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instruments, and in such event, the filing or recording office shall be authorized to file or record such copy of this Interim Order.

12. **Modification of Automatic Stay**. The automatic stay imposed by Bankruptcy Code section 362(a) is hereby modified, without application to or further order of this Court, to permit: (i) the Debtors to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Agent (acting at the direction of the Required DIP Lenders) and/or the Required DIP Lenders may request to assure the perfection and priority of the DIP Liens; (ii) the Debtors to incur all liabilities and obligations to the DIP Secured Parties as contemplated under this Interim Order and the DIP Documents; (iii) the Debtors to grant the Adequate Protection Liens and Adequate Protection Superpriority Claims and to perform such acts as the Prepetition Secured Parties may request to assure the perfection and priority of the Adequate Protection Liens; (iv) the Debtors to incur all liabilities and obligations to the Prepetition Secured Parties, including all Adequate Protection Superpriority Claims and other Adequate Protection Obligations, as contemplated under this Interim Order and the DIP Documents; (v) the Debtors to pay all amounts required under this Interim Order and the DIP Documents; (vi) the DIP Secured Parties and the Prepetition Secured Parties to retain and apply payments made in accordance with the terms of this Interim Order and the DIP Documents; (vii) subject in all respects to paragraph 18 of this Interim Order, the DIP Agent (acting at the direction of the Required DIP Lenders) and the applicable Prepetition Secured Parties to exercise, upon the occurrence of any Termination Event (as defined below), all rights and remedies provided for in this Interim Order, the DIP Documents or applicable

law; (viii) the Debtors to perform under this Interim Order and the DIP Documents and to take any and all other actions that may be necessary, required or desirable for the performance by the Debtors under this Interim Order and the DIP Documents and the implementation of the transactions contemplated hereunder and thereunder; and (ix) the implementation of all of the terms, rights, benefits, privileges, remedies and provisions of this Interim Order and the DIP Documents.

13.    **Carve-Out.**

(a)    *Carve-Out.*  As used in this Interim Order, the "***Carve-Out***" means the sum of: (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code, together with interest, if any, under section 3717 of title 31 of the United States Code (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under Bankruptcy Code section 726(b) (without regard to the notice set forth in (iii) below); (iii) to the extent allowed, whether by interim order, procedural order or otherwise, all unpaid fees and expenses (the "***Allowed Professional Fees***") incurred by persons or firms retained by the Debtors pursuant to Bankruptcy Code sections 327, 328 or 363 (the "***Debtor Professionals***") and the Creditors' Committee pursuant to Bankruptcy Code sections 328 or 1103 (the "***Committee Professionals***" and, together with the Debtor Professionals, the "***Estate-Retained Professionals***") at any time before or on the first calendar day following delivery of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) Allowed Professional Fees of Estate-Retained Professionals, in an aggregate amount not to exceed $750,000 incurred after the first calendar day following delivery of the Carve-Out Trigger Notice, to the extent allowed, whether by interim order, procedural order or otherwise (the amounts set forth in this clause (iv) being the "***Post-Carve-Out Trigger Notice Cap***").  For purposes of the foregoing, the "***Carve-Out Trigger Notice***" shall mean a written notice delivered by e-mail by the DIP Agent (acting at the direction of the Required DIP Lenders and in accordance with the terms of this Interim Order), to the Debtors' proposed bankruptcy counsel Allen Overy Shearman & Sterling

US LLP, 599 Lexington Avenue, New York, NY 10022 (Attn: Fredric Sosnick and Sara Coelho), the U.S. Trustee, the Creditors' Committee, if any, and the Prepetition Secured Parties, which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined in the DIP Credit Agreement) and acceleration of the obligations under the DIP Facility or the occurrence of a Maturity Date (as defined in the DIP Credit Agreement), stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

(b)    *Carve-Out Reserves*.  On the day on which a Carve-Out Trigger Notice is delivered (the "***Carve-Out Trigger Date***"), the Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date to fund a reserve in an amount equal to the then unpaid amounts of (i) the Allowed Professional Fees of Estate-Retained Professionals and (ii) the obligations accrued as of the Carve-Out Trigger Date with respect to clauses (i) and (ii) of the definition of Carve-Out set forth in paragraph 13(a) (the "***Additional Carve-Out Obligations***"). The Debtors shall deposit and hold such amounts in a segregated account in a manner reasonably acceptable to the DIP Agent (acting at the direction of the Required DIP Lenders) or the Required DIP Lenders, and, following the Discharge of DIP Obligations, the Prepetition Senior Secured Term Loan Agent, in trust to pay such unpaid Allowed Professional Fees of Estate-Retained Professionals and Additional Carve-Out Obligations (the "***Pre-Carve-Out Trigger Notice Reserve***") prior to the use of such reserve to pay any other claims.  On the Carve-Out Trigger Date, after funding the Pre-Carve-Out Trigger Notice Reserve, the Debtors shall utilize all remaining cash on hand as of such date to fund a reserve in an amount equal to the Post-Carve-Out Trigger Notice Cap (the "***Post-Carve-Out Trigger Notice Reserve***" and, together with the Pre-Carve-Out Trigger Notice Reserve, the "***Carve-Out Reserves***") prior to the use of such reserve to pay any other claims.  All funds in the Pre-Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve-Out set forth in paragraph 13(a) (the "***Pre-Carve-Out Amounts***"), but not, for the avoidance of doubt, the Post-Carve-Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve-Out Trigger Notice Reserve has not been reduced to zero, subject to the terms of this Interim Order, to pay any other

amounts (if owing) benefitted by the Carve-Out and then to the DIP Agent for the benefit of itself and the DIP Lenders in accordance with the terms of this Interim Order and the DIP Documents, unless the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) have been indefeasibly paid in full, in cash, and all commitments under the DIP Facility have been terminated (the "***Discharge of DIP Obligations***"), in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with the Prepetition Debt Documents and this Interim Order.  All funds in the Post-Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve-Out set forth above (the "***Post-Carve-Out Amounts***"), and then, to the extent the Post-Carve-Out Trigger Notice Reserve has not been reduced to zero, subject to the terms of this Interim Order, to pay the DIP Agent for the benefit of itself and the DIP Lenders in accordance with the terms of this Interim Order and the DIP Documents, unless the Discharge of DIP Obligations shall have occurred, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with the Prepetition Debt Documents and this Interim Order.  Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, if either of the Carve-Out Reserves are not funded in full in the amounts set forth in this paragraph 13(b), then, any excess funds in one of the Carve-Out Reserves following the payment of the Pre-Carve-Out Amounts and Post-Carve-Out Amounts, respectively, shall be used to fund the other Carve-Out Reserve, up to the applicable amount set forth in this paragraph 13(b), prior to making any payments to the DIP Agent or the Prepetition Secured Parties, as applicable.  Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, following delivery of a Carve-Out Trigger Notice, the DIP Agent (in accordance with the terms of this Interim Order and the DIP Documents) shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Reserves have been fully funded, but shall have a valid and perfected security interest in any residual interest in the Carve-Out Reserves, with any excess paid to the DIP Agent for the benefit of itself and the DIP Lenders in accordance with the terms of this Interim Order and the DIP Documents, unless the Discharge of DIP Obligations shall have occurred, in which case

any such excess shall be paid to the Prepetition Secured Parties in accordance with the Prepetition Debt Documents. Further, notwithstanding anything to the contrary in this Interim Order, (x) disbursements by the Debtors from the Carve-Out Reserves shall not increase or reduce the DIP Obligations or constitute additional loans under the DIP Facility and (y) the failure of the Carve-Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve-Out in respect of DIP Collateral or any recoveries thereon. For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Documents or in any Prepetition Debt Documents, the Carve-Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Obligations and the Prepetition Secured Obligations, and any and all other forms of adequate protection, liens or claims securing the DIP Obligations or the Prepetition Secured Obligations.

(c)    *Payment of Allowed Professional Fees Prior to the Carve-Out Trigger Date*. Any payment or reimbursement made prior to the occurrence of the Carve-Out Trigger Date in respect of any Allowed Professional Fees shall not reduce the Carve-Out.

(d)    *No Direct Obligation to Pay Allowed Professional Fees*. None of the DIP Secured Parties or Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Estate-Retained Professional incurred in connection with the Chapter 11 Cases or any Successor Cases. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Secured Parties or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Estate-Retained Professional or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)    *Payment of Carve-Out on or After the Carve-Out Trigger Date*. Any payment or reimbursement made on or after the occurrence of the Carve-Out Trigger Date in respect of any Allowed Professional Fees incurred after the first business day following delivery by the DIP Agent (acting at the direction of the Required DIP Lenders) of the Carve-Out Trigger Notice shall permanently reduce the Post-Carve-Out Trigger Notice Cap on a dollar-for-dollar basis. Any funding of the Carve-Out under the DIP Facility shall be added to, and made a part of,

40

the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code and applicable law.

14.   **Limitation on Charging Expenses Against Collateral**.  Subject to entry of the Final Order (but retroactive to the Petition Date), and subject to the Carve-Out and the Administration Charge, no costs or expenses of administration of the Chapter 11 Cases, the Recognition Proceedings or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code or the CCAA, shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral, the DIP Secured Parties or the Prepetition Secured Parties pursuant to Bankruptcy Code sections 506(c) and 105(a), or any similar principle of law or equity, without the prior written consent of the DIP Secured Parties and the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Secured Parties or the Prepetition Secured Parties.

15.   **No Marshaling/Application of Proceeds**.  Subject to entry of the Final Order, the DIP Agent and the Prepetition Secured Parties shall be entitled to apply the payments or proceeds of the DIP Collateral and the Prepetition Collateral, as applicable, in accordance with the provisions of the Interim Order or the Final Order, as applicable, the DIP Documents and the Prepetition Debt Documents, as applicable, and in no event shall the DIP Secured Parties or any of the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral.

16.   **Equities of the Case**.  Subject to entry of the Final Order (but retroactive to the Petition Date), (i) the Prepetition Secured Parties shall be entitled to all of the rights and benefits of Bankruptcy Code section 552(b) and (ii) the Debtors shall not invoke the "equities of the case" exception under Bankruptcy Code section 552(b) with respect to the proceeds, products, offspring or profits of any of the Prepetition Collateral.

17.   **Termination Events**.  The occurrence of any of the following shall constitute a "***Termination Event***": (i) the occurrence of an Event of Default (as defined in the DIP Documents) to the extent not waived by the Required DIP Lenders or subject to a forbearance or similar

agreement with the Required DIP Lenders; (ii) the Debtors' failure to comply in any material respect with any provision of this Interim Order unless waived by the applicable lenders; or (iii) the occurrence of the Maturity Date (as defined in the DIP Documents).

18.    **Remedies Upon a Termination Event**.

(a)    Upon the occurrence of the Termination Event, the DIP Agent (acting at the direction of the Required DIP Lenders) shall be entitled to declare (A) all DIP Obligations due and payable without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Debtors, (B) the termination, reduction or restriction of all future commitments to the Borrower under the DIP Facility to the extent any such commitment remains (including, for the avoidance of doubt, any commitment to fund the DIP Facility) but without affecting the DIP Liens and DIP Obligations, (C) the termination of the DIP Facility and any DIP Documents as to any future obligation of the DIP Secured Parties, but without affecting any of the DIP Liens or any DIP Obligation, (D) the termination, reduction or restriction on the ability of the Debtors to use any Cash Collateral and the proceeds of the DIP Facility (any such declaration made by the DIP Agent to counsel to the Debtors, counsel to the applicable Prepetition Secured Parties, the U.S. Trustee and counsel to the Creditors' Committee, if any, (which may be made by e-mail), a "*Termination Declaration*," and the date which is the earliest to occur of any such Termination Declaration and the Maturity Date being herein referred to as the "*Termination Declaration Date*"). The DIP Agent shall provide any Termination Declaration to the Debtors' lead restructuring counsel, the Creditors' Committee, if any, the U.S. Trustee, and Milbank, as counsel to KfW.

(b)    The Debtors, the Committee (if appointed), and/or any party in interest shall be entitled to seek an emergency hearing before the Court within four (4) business days after the delivery of a Termination Declaration (such period being the "*Remedies Notice Period*"), for the sole purpose of contesting whether a Termination Event (other than with respect to the Maturity Date) has occurred or is continuing or for the contested use of Cash Collateral (a "*Stay*

42

*Enforcement Motion*").[5]  The Debtors shall be entitled to continue to use Cash Collateral in accordance with the terms of this Interim Order and the DIP Documents during any Remedies Notice Period only to make payroll and fund critical expenses necessary to preserve the Prepetition Collateral, in each case, in accordance with the terms of the Approved Budget and this Interim Order, but shall not be permitted to use Cash Collateral following any Remedies Notice Period absent further order of the Court approving such use (and only to the extent so approved).  Unless the Court has determined that a Termination Event has not occurred and/or is not continuing, or the Court orders otherwise, the automatic stay, as to the DIP Secured Parties shall automatically be terminated at the end of the Remedies Notice Period without further notice, order, or any further action in the Chapter 11 Cases or the Recognition Proceedings and the DIP Agent (acting at the direction of the Required DIP Lenders) shall be permitted to exercise any rights and remedies against the DIP Collateral available to the DIP Secured Parties under this Interim Order, the DIP Documents and applicable non-bankruptcy law without any further order of or application or motion to the Court, including, but not limited to, any rights to setoff against deposits and financial assets of the Debtors and to foreclose on all or any portion of the DIP Collateral, in each case, subject to the Carve-Out, the Administration Charge and any Prepetition Permitted Liens; *provided, however*, that the Required DIP Lenders shall consult with the Prepetition Secured Term Loan Agent in advance of exercising any remedies or taking action in connection with any of the DIP Collateral and shall provide the Prepetition Senior Secured Term Loan Agent with five (5) Business Days' notice in advance of taking such actions; which period may be waived by the Prepetition Senior Secured Term Loan Agent, in its reasonable discretion.

---

[5]    If a hearing to consider a Stay Enforcement Motion is requested to be heard before the end of the Remedies Notice Period but is scheduled for a  later date by the Court, the Remedies Notice Period shall automatically be extended to the date of such hearing, but in no event later than ten (10) business days after delivery of the Termination Declaration or at such other date that may be agreed to by the parties after good faith negotiations.

19.     **Fees and Expenses of DIP Professionals and Prepetition Secured Parties' Professionals.**

(a)     The payment of all DIP Professional Fees and Adequate Protection Fees hereunder shall not be subject to (i) further application to or approval of the Court, (ii) allowance or review by the Court or (iii) the U.S. Trustee's fee guidelines, and no attorney or advisor to the DIP Secured Parties or the Prepetition Secured Parties shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court; *provided*, *however*, that any time the DIP Professionals (other than DIP Agent Counsel) seek payment of fees and expenses from the Debtors from and after the Petition Date but prior to the effective date of any chapter 11 plan,[6] each such party or professional shall provide summary copies of its invoices (which shall not be required to contain time entries, and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product or any other confidential information, and the provision of their invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine) to the Debtors' counsel, the U.S. Trustee, and lead counsel to the Creditors' Committee, if any (collectively, the "***Invoice Review Parties***").  Any objections raised by any Invoice Review Party with respect to such invoices must (x) be in writing (email from such party or their counsel being sufficient) (y) state with particularity the grounds for such objection and (z) be submitted to the affected professional(s) within ten (10) calendar days after delivery of such invoices to the Invoice Review Parties (such ten (10) calendar day period, the "***Invoice Review Period***").  If no written objection is received prior to the expiration of the Invoice Review Period from the Invoice Review Parties, the Debtors shall pay such invoices within two (2) calendar days following the expiration of the Invoice Review Period.  If an objection is received within the Invoice Review Period from the Invoice Review Parties, the Debtors shall

---

[6]     For the avoidance of doubt, nothing contained in this paragraph 19 shall prevent the DIP Secured Parties or KfW from seeking payment from the Debtors of professional fees and expenses incurred prior to the Petition Date in accordance with the terms of this Interim Order and the DIP Documents.

44

promptly pay the undisputed amount of the invoice, and the disputed portion of such invoice shall not be paid until such dispute is resolved by agreement between the affected party or professional(s) and the objecting party or by order of this Court.  Any hearing to consider such an objection to the payment of any fees, costs or expenses set forth in a professional fee invoice hereunder shall be limited to the reasonableness of the fees, costs and expenses that are the subject of such objection.

(b)    Notwithstanding anything contained in this Interim Order to the contrary, any and all payments, fees, costs, expenses and other amounts paid at any time by any of the Debtors to the DIP Secured Parties or the Prepetition Secured Parties (including such parties' respective professionals), as applicable, pursuant to the requirements of this Interim Order or the DIP Documents, whether prior to, on or after the Petition Date, shall be non-refundable and irrevocable, are hereby approved (and to the extent paid prior to entry of the Interim Order, ratified in full), and shall not be subject to any challenge, objection, defense, claim or cause of action of any kind or nature whatsoever, including, without limitation, avoidance (whether under Chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), reclassification, disgorgement, disallowance, impairment, marshaling, surcharge or recovery or any other cause of action, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, by any person or entity.

20.    **Limitation on Use of DIP Facility Proceeds, DIP Collateral and Cash Collateral**.

(a)    Notwithstanding anything to the contrary set forth in this Interim Order, none of the DIP Facility, the DIP Collateral, the Prepetition Collateral or the proceeds thereof, including Cash Collateral, or the Carve-Out may be used: (i) to investigate (except as expressly provided herein), initiate, prosecute, join or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense or other

litigation of any type (A) against any of the DIP Secured Parties or the Prepetition Secured Parties (in each case, in their capacities as such) and each of their respective affiliates, officers, directors, employees, agents, representatives, attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, any so-called "lender liability" claims and causes of action, or seeking relief that would impair the rights and remedies of the DIP Secured Parties or the Prepetition Secured Parties (in each case, in their capacities as such) under this Interim Order, the DIP Documents or the Prepetition Debt Documents, as applicable, to the extent permitted or provided hereunder, including, without limitation, for the payment of any services rendered by any Estate-Retained Professional in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration or similar relief that would impair the ability of any of the DIP Secured Parties or the Prepetition Secured Parties to recover on the DIP Collateral or the Prepetition Collateral (as applicable), as provided for herein, or seeking affirmative relief against any of the DIP Secured Parties or the Prepetition Secured Parties related to the DIP Obligations or the Prepetition Secured Obligations, as applicable, (B) seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Liens, DIP Superpriority Claims, the DIP Obligations, the Prepetition Funded Debt Liens or the Prepetition Secured Obligations or (C) for monetary, injunctive or other affirmative relief against the DIP Secured Parties or the Prepetition Secured Parties (in each case, in their capacities as such) that would impair the ability of any of the DIP Secured Parties or the Prepetition Secured Parties to assert or enforce any lien, claim, right or security interest or to realize or recover on the DIP Obligations or the Prepetition Secured Obligations to the extent permitted or provided hereunder; (ii) for objecting to or challenging in any way the legality, validity, priority, perfection or enforceability of the claims, liens or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Secured Obligations, or by or

on behalf of the DIP Secured Parties related to the DIP Obligations; (iii) for asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions related to the DIP Liens, the DIP Superpriority Claims, the DIP Obligations, the Prepetition Liens or the Prepetition Secured Obligations; or (iv) for prosecuting an objection to, contesting in any manner or raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of (A) any of the DIP Liens, the DIP Superpriority Claims, or any other rights or interests of the DIP Secured Parties related to the DIP Obligations or the DIP Liens or (B) any of the Prepetition Liens, Prepetition Secured Obligations or any other rights or interests of any of the Prepetition Secured Parties related to the Prepetition Secured Obligations; *provided* that no more than $50,000 of the proceeds of the DIP Facility, the DIP Collateral, or the Prepetition Collateral, including the Cash Collateral, in the aggregate, may be used by the Creditors' Committee (if any) solely to investigate (but not seek formal discovery or commence any challenge, objection or prosecute any claim or cause of action relating to) the foregoing matters with respect to the Prepetition Liens or the Prepetition Secured Obligations within the Challenge Period (as defined below) (the "***Investigation Budget***").

(b)    Any fees and expenses of the Committee Professionals in connection with the investigation of the matters described in paragraph 20(a) of this Interim Order in excess of the Investigation Budget shall not be entitled to administrative expense priority pursuant to section 503(b) of the Bankruptcy Code or otherwise.

21.    **Effect of Stipulations on Third Parties**.

(a)    The Debtors' acknowledgments, stipulations, admissions, agreements, waivers and releases set forth in this Interim Order shall be binding on the Debtors, their respective estates, representatives, successors and assigns upon entry of this Interim Order and the Debtors shall be deemed to have irrevocably waived and relinquished all Challenges (as defined below) as of the Petition Date.

(b)    The acknowledgments, stipulations, admissions, agreements, waivers and releases contained in this Interim Order shall also be binding upon all other parties in interest,

including the Creditors' Committee or non-statutory committees appointed or formed in these Chapter 11 Cases (if any) and any other person or entity seeking to act on behalf of the Debtors' estates, including any chapter 7, chapter 11 trustee or examiner appointed or elected for any of the Debtors in these Chapter 11 Cases or any Successor Cases, and each of their respective successors and assigns, in all circumstances and for all purposes, unless: (i) any such party, having obtained requisite standing, timely and properly commences and serves an adversary proceeding or contested matter (subject to the limitations contained herein) (A) objecting to or challenging the validity, perfection, priority, scope, extent or enforceability of the Prepetition Funded Debt Liens or the Prepetition Secured Obligations, (B) objecting to or alleging any basis to impair, restrict, deny or otherwise challenge the right of any of the Prepetition Secured Parties to credit bid, in whole or in part, the Prepetition Funded Debt Liens or the Prepetition Secured Obligations under Bankruptcy Code section 363(k) or otherwise or (C) otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "***Challenges***") against the Prepetition Secured Parties in connection with any matter related to the Prepetition Collateral, the Prepetition Funded Debt Liens or the Prepetition Secured Obligations by no later than (1) with respect to any Creditors' Committee, the date that is 45 days after the later of (a) its appointment in the Chapter 11 Cases and (b) entry of the Final Order and (2) with respect to all other parties in interest, no later than the date that is 45 days after the entry of this Interim Order (the time period established by the foregoing clauses (1) and (2) the "***Challenge Period***"); *provided* that in the event that, prior to the expiration of the Challenge Period, (x) these Chapter 11 Cases are converted to chapter 7 or (y) a chapter 11 trustee is appointed in these Chapter 11 Cases, then, in each such case, the Challenge Period shall be extended for a period of 10 days solely with respect to any Trustee, commencing on the occurrence of either of the events described in the foregoing clauses (x) and (y); and (ii) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such challenge in any such duly filed adversary proceeding or contested matter.

(c)     If no such adversary proceeding or contested matter is timely filed prior to the expiration of the Challenge Period, without further order of this Court: (i) the Prepetition Secured Obligations shall constitute allowed claims, not subject to any Claims and Defenses (whether characterized as a counterclaim, setoff, subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by Bankruptcy Code section 101(5)), impairment, subordination (whether equitable, contractual or otherwise) or other challenge of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law), for all purposes in these Chapter 11 Cases and any Successor Cases, if any; (ii) the Prepetition Funded Debt Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected and of the priority specified in paragraphs F.1(c), F.2(c), F.3(c), and F.4(c), not subject to setoff, subordination, defense, avoidance, impairment, disallowance, recharacterization, reduction, recoupment or recovery; and (iii) the Prepetition Secured Obligations, the Prepetition Funded Debt Liens on the Prepetition Collateral and the Prepetition Secured Parties (solely in their capacities as such) shall not be subject to any other or further challenge and all parties in interest shall be forever enjoined and barred from seeking to exercise the rights of the Debtors' estates or taking any such action, including any successor thereto (including any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period).

(d)     If any such adversary proceeding or contested matter is timely filed prior to the expiration of the Challenge Period, (i) the stipulations, admissions, agreements, waivers and releases contained in this Interim Order shall nonetheless remain binding and preclusive on the Creditors' Committee (if any) and any other party in these Chapter 11 Cases, including any Trustee, except as to the party (or parties) that timely initiated such adversary proceeding or contested matter and, with respect to such party (or parties), solely as to any stipulations, admissions, agreements, waivers and releases that are specifically and expressly challenged in such adversary proceeding or contested matter and (ii) any Claims and Defenses not brought in such adversary proceeding or contested matter shall be forever barred; *provided* that, if and to the extent any

challenges to a particular stipulation, admission, agreement, waiver or release are withdrawn, denied or overruled by a final non-appealable order, such stipulation, admission, agreement, waiver and/or release also shall be binding on the Debtors' estates and all parties in interest.

(e)    Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including any Creditors' Committee (if any), standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any challenge with respect to the Prepetition Debt Documents, the Prepetition Funded Debt Liens or the Prepetition Secured Obligations.

22.    **Release**.  Subject to the rights and limitations set forth in paragraphs 20 and 21 of this Interim Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors and assigns shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge each of the DIP Secured Parties, and subject to the entry of the Final Order, the Prepetition Secured Parties (in each case, in their capacities as such) and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, affiliated investment funds or investment vehicles, managed, advised or sub-advised accounts, funds or other entities, investment advisors, sub-advisors or managers, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates and predecessors in interest, each in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses or judgments of every type, whether known, unknown, asserted, unasserted, suspected unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof solely with respect to or relating to the DIP Liens, the DIP Superpriority Claims, the DIP Obligations, the Prepetition Funded Debt Liens and the Prepetition

Secured Obligations, as applicable, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection or avoidability of the liens or claims of the DIP Secured Parties and the Prepetition Secured Parties.

   23. **Credit Bidding**.

     (a) Consistent with Bankruptcy Code section 363(k) and applicable law, the DIP Agent (acting at the direction of the Required DIP Lenders) and each DIP Lender (in any case, either directly or through one or more acquisition vehicles), shall have the right to credit bid for all or any portion of the DIP Collateral, as applicable, up to the full amount of any DIP Superpriority Claims, as part of any sale of Debtors' assets (in whole or in part), including without limitation, sales occurring pursuant to (i) Bankruptcy Code section 363, (ii) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129 or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725 (each, a "*Sale Transaction*"), *provided*, that, until payment in full of the obligations under the Prepetition Working Capital Facility, the rights of the DIP Agent and each DIP Lender to credit bid on any DIP Collateral that constitutes WCF Collateral shall be subject to the right of the Prepetition Working Capital Purchaser to credit bid for all or any portion of the WCF Collateral, as applicable, up to the full amount of any Prepetition Working Capital Obligations as part of any Sale Transaction.  The DIP Agent shall have the absolute right to assign, sell or otherwise dispose of its right to credit bid in connection with any credit bid by or on behalf of the DIP Lenders to any acquisition entity or joint venture formed in connection with such bid.

     (b) The Prepetition Secured Parties' rights to credit bid for all or a portion of the Prepetition Collateral as part of any Sale Transaction are fully preserved, subject in all respects to (i) payment in full in cash of all DIP Obligations and (ii) the terms and conditions of this Interim Order and the applicable Prepetition Debt Documents, including the lien and claim priorities set forth herein and therein.

24.    **Interim Order Governs**.  In the event of any inconsistency between the provisions of this Interim Order and any DIP Documents, the provisions of this Interim Order shall govern.

25.    **Binding Effect; Successors and Assigns**.  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Secured Parties, the Prepetition Secured Parties, the Creditors' Committee (if any), the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to Bankruptcy Code section 1104 or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Secured Parties and the Prepetition Secured Parties; *provided*, that, except to the extent expressly set forth in this Interim Order, the Prepetition Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

26.    **Limitation of Liability**.  In determining to make any loan under the DIP Documents, permitting the use of Cash Collateral or exercising any rights or remedies as and when permitted pursuant to this Interim Order, the DIP Documents or the Prepetition Debt Documents, the DIP Secured Parties and the Prepetition Secured Parties (in each case, solely in their capacities as such) shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or their respective business (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq*. as amended, or any similar federal or state statute), nor shall they owe any fiduciary duty to any of the Debtors, their creditors or estates, or constitute or be deemed to constitute a joint venture or partnership with any of the Debtors.  Furthermore, nothing in this Interim Order, the DIP Documents or the Prepetition Debt Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or the Prepetition Secured Parties

of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their direct or indirect subsidiaries.

27.    **Proofs of Claim**. Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under Bankruptcy Code section 503(b), (i) the Prepetition Secured Parties shall not be required to file any proof of claim or request for payment of administrative expenses with respect to any of the Prepetition Secured Obligations or the Adequate Protection Obligations and (ii) the DIP Secured Parties shall not be required to file any proof of claim or request for payment of administrative expenses with respect to any DIP Obligations.  The failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority or enforceability of any of the Prepetition Debt Documents, the DIP Documents or of any other indebtedness, liabilities or obligations arising at any time thereunder or under this Interim Order, or prejudice or otherwise adversely affect the Prepetition Secured Parties' or the DIP Secured Parties' rights, remedies, powers or privileges under any of the Prepetition Debt Documents, the DIP Documents, this Interim Order or applicable law.  The applicable Prepetition Secured Parties and DIP Secured Parties may (but are not required to) in their discretion file (and amend and/or supplement) applicable proofs of claim and/or aggregate proofs of claim in each of the Chapter 11 Cases or any successor cases for any claim allowed herein, and any such proof of claim may (but is not required to) be filed in the Debtors' lead Chapter 11 Case *In re [__],* Case No. [__] ([__]) as one consolidated proof of claim against all of the Debtors, rather than as separate proofs of claim against each Debtor.  The provisions set forth in this paragraph 27 are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

28.    **Insurance**.  The Debtors shall continue to maintain all property, operational and other insurance as required and as specified in the DIP Documents (which shall be deemed satisfied if such insurance as required under the Prepetition Secured Term Loan Credit Agreement remains

in place).  The Debtors shall provide the DIP Agent (for distribution to the DIP Lenders) with commercially reasonable evidence of such insurance upon a request to counsel for the Debtors from the DIP Agent (acting at the direction of the Required DIP Lenders).  Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Agent (on behalf of itself and the DIP Lenders) is, and is deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral (including all property damage and business interruption insurance policies of the Debtors, whether expired, currently in place or to be put in place in the future), and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies.

29.  **Protection of Lenders' Rights**.

(a)  Except as expressly permitted in this Interim Order or the DIP Documents, in the event any person or entity that holds a lien on or security interest in DIP Collateral that is junior or otherwise subordinate to the DIP Liens receives any DIP Collateral or proceeds of DIP Collateral, in each case, that is subject to such junior lien, or receives any payment on account of such junior lien or security interest in the DIP Collateral on account of such junior lien (whether in connection with the exercise of any right or remedy (including setoff), any payment or distribution from the Debtors, mistake or otherwise) prior to the Payment in Full[7] of all DIP Obligations, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Secured Parties, and shall immediately turn over all such proceeds to the DIP Agent, for the benefit of itself and the DIP Lenders, in the same form as received, with any necessary endorsements, for application in accordance with this Interim Order and the DIP Documents; *provided, however,* that until the

---

[7]  For purposes hereof, the term "Paid in Full" or "Payment in Full" means, with respect to the DIP Obligations or any Prepetition Secured Obligations (as the case may be), the irrevocable and indefeasible payment in full in cash of all DIP Obligations or such Prepetition Secured Obligations (as the case may be), other than contingent indemnification and expense reimbursement obligations for which no claim or demand has been asserted, and all commitments thereunder shall have irrevocably, permanently and finally expired or shall have been terminated, cancelled and discharged.

54

Payment in Full of the Prepetition Working Capital Obligations, upon receipt by the DIP Agent or any DIP Lender of any such payment or proceeds from DIP Collateral that constitutes WCF Collateral, the DIP Agent or the applicable DIP Lender shall segregate and hold in trust such payment or proceeds for the benefit of, and turn over all such payments and proceeds to, the Prepetition Working Capital Purchaser in the same form as received, with any necessary endorsements, for application in accordance with this Interim Order, the DIP Documents and the Prepetition Debt Documents.

(b)     Other than with respect to the Carve Out, the Administration Charge and Petition Date Perfected Liens, and as otherwise expressly provided in this Interim Order and/or the DIP Documents (including **Exhibit C** hereto), no claim or lien having a priority senior to or *pari passu* with those granted to any of the DIP Secured Parties or the Prepetition Secured Parties by this Interim Order shall be granted or permitted while any of the DIP Obligations or the Prepetition Secured Obligations, respectively, remains outstanding.  Except as expressly provided in this Interim Order and the DIP Documents (including **Exhibit C** hereto), each of the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, the Prepetition Funded Debt Liens or the Prepetition Secured Obligations: (i) shall not be made junior or subordinated to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any Successor Cases, whether under Bankruptcy Code section 364(d) or otherwise, (B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code section 551 or otherwise, (C) any lien arising after the Petition Date including, without limitation, any lien or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors or (D) any intercompany or affiliate lien or claim; and (ii) shall not be subject to Bankruptcy Code sections 510, 549, 550 or 551 and, subject to entry of the Final Order, Bankruptcy Code section 506(c).

(c)     In the event this Interim Order or any provision hereof is vacated, reversed or modified on appeal or otherwise, any liens or claims granted to the DIP Secured Parties or Prepetition Secured Parties hereunder arising prior to the effective date of any such vacatur, reversal or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein, and the DIP Secured Parties and the Prepetition Secured Parties shall be entitled to the protections afforded in Bankruptcy Code sections 363(m) and 364(e), as applicable, with respect to all uses of the DIP Collateral (including all Cash Collateral and all Prepetition Collateral), all DIP Obligations and all Adequate Protection Obligations.

(d)     Subject to the Carve-Out, the Administration Charge and Petition Date Perfected Liens, unless and until all DIP Obligations and Prepetition Secured Obligations are Paid in Full and all commitments to extend credit under the DIP Facility are terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly: (i) except as permitted under the DIP Documents, and with the prior written consent of the Required DIP Lenders and the Prepetition Senior Secured Term Loan Agent, (A) any modification, stay, vacatur or amendment of this Interim Order, (B) a priority claim for any administrative expense, secured claim or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, without limitation, any administrative expense of the kind specified in Bankruptcy Code sections 503(b), 507(a) or 507(b)) in any of the Chapter 11 Cases, equal or superior to the DIP Superpriority Claims and the Adequate Protection Superpriority Claims or (C) any other order allowing the use of DIP Collateral; (ii) except as permitted under the DIP Documents, any lien on any of the DIP Collateral (including all Prepetition Collateral) with priority equal or superior to the DIP Liens, the Adequate Protection Liens or the Prepetition Funded Debt Liens; (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents and this Interim Order; (iv) except as set forth in the DIP Documents, the return of goods pursuant to Bankruptcy Code section 546(h) (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor; (v) an order converting or dismissing any of the

Chapter 11 Cases without the consent of the Required DIP Lenders; (vi) an order appointing a chapter 11 trustee in any of the Chapter 11 Cases; or (vii) an order appointing an examiner with enlarged powers in any of the Chapter 11 Cases.

(e)    Notwithstanding any order dismissing any of the Chapter 11 Cases under Bankruptcy Code section 1112 or otherwise entered at any time, (i) the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims and any other administrative claims granted pursuant to this Interim Order, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order and the DIP Documents until such time as all DIP Obligations and Adequate Protection Obligations are Paid in Full; and (ii) the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (i) above.

(f)    Except as expressly provided in this Interim Order and the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims and all other rights and remedies of the DIP Secured Parties and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall survive, shall maintain their priority as provided in this Interim Order, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases, terminating the joint administration of these Chapter 11 Cases or by any other act or omission, or (ii) the entry of an order approving the sale of any DIP Collateral (including any Prepetition Collateral) pursuant to Bankruptcy Code section 363(b), except to the extent that such order provides for the attachment of DIP Liens or prepetition liens to the proceeds of such sale) or (iii) the entry of an order confirming a plan of reorganization in any of the Chapter 11 Cases and, pursuant to Bankruptcy Code section 1141(d)(4), the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Interim Order and the DIP Documents shall continue in these Chapter 11 Cases and any Successor Cases.

30.    **Reservation of Rights of the DIP Secured Parties and Prepetition Secured Parties**.  Except as otherwise expressly set forth in this Interim Order, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, as applicable: (i) any of the rights of any of the Prepetition Secured Parties to seek any other or supplemental relief in respect of the Debtors including the right to seek additional adequate protection; (ii) any of the rights of the DIP Secured Parties or the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of any of the DIP Secured Parties or the Prepetition Secured Parties to (A) request modification of the automatic stay of Bankruptcy Code section 362, (B) request dismissal of any of the Chapter 11 Cases, conversion of any of the Chapter 11 Cases to cases under chapter 7 or appointment of a chapter 11 trustee or examiner with expanded powers in any of the Chapter 11 Cases or (C) seek to propose, subject to the provisions of Bankruptcy Code section 1121, a chapter 11 plan or plans; or (iii) any other rights, claims or privileges (whether legal, equitable or otherwise) of any of the DIP Secured Parties or the Prepetition Secured Parties.  The delay in or failure of the DIP Secured Parties and/or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the DIP Secured Parties' or the Prepetition Secured Parties' rights and remedies under this Interim Order, the DIP Documents, the Prepetition Debt Documents or applicable law, as applicable.

31.    **Effectiveness**.  Subject to the terms hereof, this Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024, any other Bankruptcy Rule or Rules 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

32.    **Final Hearing**.  The final hearing (the "***Final Hearing***") on the Motion shall be held on _____, 2024, at__:__ _.m. (Prevailing Pacific Time).  Any party in interest objecting to the relief sought at the Final Hearing or in the Final Order shall file and serve a written objection,

which objection shall be served upon:  (i) proposed counsel for the Debtors, (a) Allen Overy Shearman Sterling US LLP, 599 Lexington Avenue, New York, NY  10022, Attn:  Fredric Sosnick and Sara Coelho; (b) McDonald Carano LLP, 2300 West Sahara Avenue, Suite 1200, Las Vegas, Nevada 89102, Attn: Ryan J. Works; and (c) Torys LLP, 79 Wellington St. W., 30th Floor, Box 270, TD South Tower Toronto, Ontario  M5K 1N2 Canada, Attn:  Tony DeMarinis, Mike Noel, Hanna Singer and Jeremy Opolsky; (ii) the Office of the United States Trustee for Region 17, C. Clifton Young Federal Building, 300 Booth Street, Room 3009, Reno, Nevada  85909; (iii) counsel to the DIP Lenders, (a) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attn: Brad Kahn,; 2001 K Street NW, Washington D.C. 20006, Attn: Kate Doorley and (b) Shea Larsen PC, 1731 Village Center Circle, Suite 150, Las Vegas, Nevada 89134, Attn: James Patrick Shea and Bart Larsen; (iv) Milbank LLP, as counsel to KfW IPEX-Bank GmbH as administrative agent under the Debtors' prepetition credit agreement, 55 Hudson Yards, New York, NY  10001, Attn:  Tyson Lomazow; (v) Bennett Jones LLP, as counsel to Mercuria Investments US, Inc., 3400 One First Canadian Place, P.O. Box 130, Toronto, Ontario M5X 1A4, Canada, Attn:  Simon Grant; (vi) White & Case LLP, as counsel to Concord Resources Limited as buyer under the Debtors' prepetition advance payment agreement, 1221 6th Avenue, New York, NY  10020, Attn:  Philip Abelson; (vii) Davis, Graham & Stubbs LLP, as counsel to Triple Flag Mining Finance Bermuda Ltd. as purchaser under the Debtors' prepetition purchase and sale agreement; 1550 17th Street, Suite 500, Denver, CO 80202, Attn:  Kyler Burgi; (viii) Cleary Gottlieb Steen & Hamilton LLP, as counsel to Pala Investments Limited as prepetition lender, 2 London Wall Place, London, EC2Y 5AU, United Kingdom, Attn:  Solomon J. Noh; One Liberty Plaza, New York, NY  10006, Attn:  Lisa M. Schweitzer; (ix) Alvarez & Marsal Canada Inc., in its capacity as the Information Officer in the Recognition Proceedings, Royal Bank Plaza, South Tower 200 Bay Street, Suite 3501 Toronto ON M5J 2J1 Canada, Attn: Al Hutchens; (x) Kelley Drye & Warren, LLP, as counsel to the DIP Agent, 3 World Trade Center, 175 Greenwich Street, New York, NY 10007, Attn: James S. Carr, Esq.; and (xi) counsel to any statutory committee appointed in these Chapter 11 Cases, in each case so as to be received no later than

1    _____, 2024, at 11:59 p.m. (Prevailing Pacific Time). If no objections to the entry of

2    the Final Order are timely filed, this Court may enter the Final Order without further notice or a

3    hearing.

4        33.    **Headings**.  Section headings used herein are for convenience only and are not to

5    affect the construction of or to be taken into consideration in interpreting this Interim Order.

6        34.    **Retention of Jurisdiction**.  This Court retains exclusive jurisdiction to resolve any

7    dispute arising from or related to the interpretation or enforcement of this Interim Order.

8

9    Dated: \_\_, 2024

10

11                            _____
                             THE HONORABLE [____]
12                           UNITED STATES BANKRUPTCY JUDGE

13

14    Prepared and submitted by:

15    _/s/ Ryan Works_____
      **McDONALD CARANO LLP**
16    Ryan J. Works (Nevada Bar No. 9224)
      Amanda M. Perach (Nevada Bar No. 12399)
17    2300 West Sahara Avenue, Suite 1200
      Las Vegas, Nevada 89102
18

19    **ALLEN OVERY SHEARMAN STERLING US LLP**
      Fredric Sosnick (New York Bar No. 2472488) (*pro hac vice pending*)
20    Sara Coelho (New York Bar No. 4530267) (*pro hac vice pending*)
      599 Lexington Avenue
21    New York, New York 10022

22    *Proposed Counsel to the Debtors and*
23    *Debtors in Possession*

24    APPROVED/DISAPPROVED

25

26

27

28
                                          60

## **EXHIBIT A**

**DIP Credit Agreement**

**<u>EXHIBIT B</u>**

**Initial Budget**

## EXHIBIT C

### DIP / Adequate Protection Lien Priorities[8]

| Non-WCF Collateral | WCF Collateral Prior to Repayment of WCF Obligations | WCF Collateral After Repayment of WCF Obligations |
|---|---|---|
| DIP Liens | Working Capital Facility Adequate Protection Liens[9] | DIP Liens |
| Senior Secured Term Loan Adequate Protection Liens[10] | Senior Secured Term Loan Adequate Protection Liens | Senior Secured Term Loan Adequate Protection Liens |
| TF Adequate Protection Liens[11] | TF Adequate Protection Liens | TF Adequate Protection Liens |
| Working Capital Facility Adequate Protection Liens | Junior Secured Term Loan Adequate Protection Liens | Junior Secured Term Loan Adequate Protection Liens |
| Junior Secured Term Loan Adequate Protection Liens[12] | | |

---

[8]  For the avoidance of doubt, all DIP Liens and Adequate Protection Liens shall be subject to (i) the Carve-Out, (ii) the Administration Charge, (iii) the Prepetition Permitted Liens and (iv) the Prepetition Trisura Lien.

[9]  "**Working Capital Facility Adequate Protection Liens**" means the Adequate Protection Liens granted to the Working Capital Facility Lender in accordance with the terms hereof.

[10]  "**Senior Secured Term Loan Adequate Protection Liens**" means the Adequate Protection Liens granted to KfW and the Prepetition Senior Secured Term Loan A-2 Parties in accordance with the terms hereof.

[11]  "**TF Adequate Protection Liens**" means the Adequate Protection Liens granted to the Prepetition TF Stream Lender in accordance with the terms hereof.

[12]  "**Junior Secured Term Loan Adequate Protection Liens**" means the Adequate Protection Liens granted to the Prepetition Junior Secured Term Loan Parties in accordance with the terms hereof.

## SCHEDULE F

## [FORM OF] OFFICER'S CERTIFICATE

June __, 2024

This Officer's Certificate (this "<u>Certificate</u>") is being executed and delivered pursuant to Sections 12.1(k) and 12.3(a), 12.3(b), 12.3(d) and 12.3(e) of that certain Senior Secured Superpriority Debtor-In-Possession Credit Agreement dated as of June __, 2024 (as amended, restated, amended and restated, extended, supplemented and/or otherwise modified from time to time, the "<u>Credit Agreement</u>"), among Nevada Copper, Inc., a Nevada corporation (the "<u>Borrower</u>"), the Guarantors party thereto from time to time, U.S. Bank Trust Company, National Association as Administrative Agent (the "<u>Administrative Agent</u>") and each Senior Lender from time to time party thereto. Unless otherwise defined herein, capitalized terms used in this Certificate shall have the meanings specified in the Credit Agreement.

I, Gregory J. Martin, the duly appointed, qualified and acting Chief Financial Officer of the Borrower, solely in such capacity and not in my individual capacity (and without personal liability), as of the date of this Certificate, hereby certify on behalf of the Borrower that:

1. No Default or Event of Default has occurred and is continuing as of the date hereof, and no Default or Event of Default would result from the borrowing of the Interim Loan.

2. The representations and warranties contained in Article 8 of the Credit Agreement are true, accurate and complete in all material respects as of the date hereof.

3. Since the Petition Date, no Material Adverse Effect has occurred and is continuing.

4. The Interim Loan will be used for the purpose specified in Section 2.3.

5. True, correct and complete copies (where applicable) of the documents required to be delivered pursuant to Sections 12.1(b), 12.1(c), 12.1(f), 12.1(j), 12.1(k), and 12.3(g) of the Credit Agreement have been delivered to the Administrative Agent and/or Senior Lenders, as applicable.

*[signature page follows]*

IN WITNESS WHEREOF, I have executed this Certificate on behalf of Borrower on the date first written above.

**NEVADA COPPER, INC.**

By: _____

Name: Gregory J. Martin

Title:  Chief Financial Officer

## SCHEDULE G

## [FORM OF] OFFICER'S CERTIFICATE

[_], 2024

This Officer's Certificate (this "Certificate") is being executed and delivered pursuant to Sections 12.2(b) and 12.3(a), 12.3(b), 12.3(d) and 12.3(e) of that certain Senior Secured Superpriority Debtor-In-Possession Credit Agreement dated as of June __, 2024 (as amended, restated, amended and restated, extended, supplemented and/or otherwise modified from time to time, the "Credit Agreement"), among Nevada Copper, Inc., a Nevada corporation (the "Borrower"), the Guarantors party thereto from time to time, U.S. Bank Trust Company, National Association as Administrative Agent (the "Administrative Agent") and each Senior Lender from time to time party thereto. Unless otherwise defined herein, capitalized terms used in this Certificate shall have the meanings specified in the Credit Agreement.

I, Gregory J. Martin, the duly appointed, qualified and acting Chief Financial Officer of the Borrower, solely in such capacity and not in my individual capacity (and without personal liability), as of the date of this Certificate, hereby certify on behalf of the Borrower that:

1. No Default or Event of Default has occurred and is continuing as of the date hereof, and no Default or Event of Default would result from the borrowing of the Final Loan.

2. The representations and warranties contained in Article 8 of the Credit Agreement are true, accurate and complete in all material respects as of the date hereof.

3. Since the Petition Date, no Material Adverse Effect has occurred and is continuing.

4. The Final Loan will be used for the purpose specified in Section 2.3.

5. True, correct and complete copies (where applicable) of the documents required to be delivered pursuant to Sections 12.2(b), 12.2(c), 12.2(f), and 12.3(g) of the Credit Agreement have been delivered to the Administrative Agent and/or Senior Lenders, as applicable.

*[signature page follows]*

IN WITNESS WHEREOF, I have executed this Certificate on behalf of Borrower on the date first written above.

**NEVADA COPPER, INC.**

By:_____

Name: Gregory J. Martin

Title:   Chief Financial Officer

**SCHEDULE H**

**[RESERVED]**

H-1

**SCHEDULE I**
**[RESERVED]**

## SCHEDULE J

## PROJECT REAL PROPERTY

A.      RGGS Patented Mining Claims and Fee Lands

A Leasehold Interest in and to the following patented mining claims and fee lands pursuant to that certain Mining Lease, dated May 4, 2006, as amended (the "Mining Lease"), by and between RGGS Land & Minerals Ltd., L.P. (the "Landlord") and Nevada Copper, Inc.  A Memorandum of that Mining Lease is of record in Lyon County, Nevada, recorded May 11, 2006, at Document No. 381887.

Those certain Patented Mining Claims described as follows:

Land Patent Number 27-70-0037, BLM Serial No. NVN000105, granted October 14, 1969, granted pursuant to the general mining laws, R. S. 2325; as amended, 30 U. S. C. 29 (1964), for the lands embraced within the Lyon lode mining claims, Nos. 16, 17, 20, 21, 34, 35, 38, 52, 53, 56, 57, 70, 71, 72, 73, 74, 75, 85, 86, 87, 88, 89, 90, 91, 92, 101, 102, 145, 146, designated and described as:

Mineral Survey No. 4879, located within surveyed Sections 3, 4, 9, 10, T. 12 N., R. 26 E., Mount Diablo Meridian, Lyon County, Nevada, the said claims being more particularly described in the official field notes and depicted on the official plat which is expressly made a part of said patent, containing 585.308 acres;

Land Patent Number 27-82-0003, BLM Serial No. NVN005012, granted November 24, 1981, granted pursuant to the general mining laws, R. S. 2325; as amended, 30 U. S. C. 29 (1970), for the lands embraced within the Lyon lode mining claims, Nos.1, 2, 3, 4, 15, 18, 19 and 93, designated and described as:

Mineral Survey No. 4892, excepting the Lyon No. 22, 36, and 37 lode mining claims, located within surveyed Sections 3, 4, 10, and 11, T. 12 N., R. 26 E., Mount Diablo Meridian, Lyon County, Nevada, the said claims being more particularly described in the official field notes and depicted on the official plat which is expressly made a part of said patent, containing 161.037 acres.

Land Patent Number 27-82-0004, BLM Serial No. NVN006395, granted November 24, 1981, granted pursuant to the general mining laws, R. S. 2325; as amended, 30 U. S. C. 29 (1970), for the lands embraced within the Lyon lode mining claims, Nos.60, 62, 65, 66, 67, 79, 80, 82, 94, 95, 99, and 110, designated and described as:

Mineral Survey No. 4898, excepting the Lyon No. 78, 81, 83, 96, 97, 98, 100, 109, 111, 112, 113, 114, 123, 124, 166, 169, 170, and 171, lode mining claims, located within surveyed Sections 2 and 11, T. 12 N., R. 26 E., Mount Diablo Meridian, Lyon County, Nevada, the said claims being more particularly described in the official field notes and depicted on the official

plat which is expressly made a part of said patent, containing 242.392 acres;

J-2

**Land Patent Number 27-82-0005**, BLM Serial No. NVN005011, granted November 24, 1981, granted pursuant to the general mining laws, R. S. 2325; as amended, 30 U. S. C. 29 (1970), for the lands embraced within the Lyon lode mining claims, Nos. 6, 7, 8, 11, 12, 13, 24, 25, 26, 29, 30, 31, 42, 43, 44, 47, 48, 61, 135, and 136, designated and described as:

Mineral Survey No. 4893, excepting the Lyon No. 10, 27, 49 and 137, lode mining claims, located within surveyed Sections 1 and 2, T. 12 N., R. 26 E., and Section 35, T.13 N., R. 26 E Mount Diablo Meridian, Lyon County, Nevada, the said claims being more particularly described in the official field notes and depicted on the official plat which is expressly made a part of said patent, containing 401.203 acres;

**Those certain Fee lands described as follows:**

**Tract 1:**    159.57 acres more or less, being the same land as described in a deed from Robert L. Biedebach and Aleta L. Biedebach, his wife, to United States Steel Corporation, dated January 5, 1970, and recorded as instrument No. 00117, in the Official Records of Lyon County, Nevada more particularly described as, Lot 3 or (NE/4 of the NW/4), Lot 4 or (NW/4 of the NW/4), SW/4 of the NW/4, and NW/4 of the SW/4, all in Section 4, T. 12 N., R. 26 E., Mount Diablo Meridian, Lyon County, Nevada, sometimes identified as United States Patent Number 1221146, BLM Serial Number NVN 0051617;

4.

Unpatented Mining Claims

The following 616 unpatented lode mining claims situated in Sections 1, 2, 10-13, 15-18, 24, 35 and 36, T. 12 N., R. 26 E., MDBM, Sections 6, 7, 18, and 19, T. 12 N., R. 27 E., MDBM, Sections 16, 19, 20, 21 and 26-30, T. 13 N., R. 26 E., MDBM, and Sections 17-23, 26-35, T. 13 N., R. 27 E., MDBM, in Lyon and Mineral Counties, Nevada:

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|---|---|---|---|---|
| PMK | 67 | 924374 | 380258 | |
| PMK | 68 | 924375 | 380259 | |
| PMK | 85 | 924392 | 380276 | |
| PMK | 86 | 924393 | 380277 | |
| PMK | 95 | 924402 | 380286 | |
| PMK | 96 | 924403 | 380287 | |

J-3

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|---|---|---|---|---|
| PMK | 98 | 924405 | 380289 | |
| PMK | 110 | 924417 | 380218 | |
| PMK | 111 | 924418 | 380219 | |
| PMK | 112 | 924419 | 380220 | |
| PMK | 113 | 924420 | 380221 | |
| PMK | 114 | 924421 | 380222 | |
| PMK | 115 | 924422 | 380223 | |
| PMK | 116 | 924423 | 380224 | |
| PMK | 117 | 924424 | 380225 | |
| PMK | 118 | 924425 | 380226 | |
| PMK | 119 | 924426 | 380227 | |
| PMK | 120 | 924427 | 380228 | |
| PMK | 121 | 924428 | 380229 | |
| PMK | 123 | 924429 | 380230 | |
| PMK | 125 | 924430 | 380231 | |
| PMK | 127 | 924431 | 380232 | |
| PMK | 129 | 924432 | 380233 | |
| PMK | 131 | 924433 | 380195 | |
| PMK | 132 | 924434 | 380196 | |
| PMK | 133 | 924435 | 380197 | |
| PMK | 134 | 924436 | 380198 | |
| PMK | 135 | 924437 | 380199 | |

J-4

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|---|---|---|---|---|
| PMK | 137 | 924438 | 380200 | |
| PMK | 170 | 933023 | 389088 | |
| PMK | 172 | 933025 | 389090 | |
| PMK | 174 | 933027 | 389092 | |
| PMK | 176 | 933029 | 389094 | |
| PMK | 178 | 933031 | 389096 | |
| PMK | 179 | 933032 | 389097 | |
| PMK | 180 | 933033 | 389098 | |
| PMK | 181 | 933034 | 389099 | |
| PMK | 182 | 933035 | 389100 | |
| PMK | 183 | 933036 | 389101 | |
| PMK | 184 | 933037 | 389102 | |
| PMK | 185 | 933038 | 389103 | |
| PMK | 186 | 933039 | 389104 | |
| PMK | 194 | 933047 | 389112 | |
| PMK | 195 | 933048 | 389113 | |
| PMK | 196 | 933049 | 389114 | |
| PMK | 197 | 933050 | 389115 | |
| PMK | 198 | 933051 | 389116 | |
| PMK | 199 | 933052 | 389117 | |
| PMK | 200 | 933053 | 389118 | |
| PMK | 235 | 933079 | 389144 | |

J-5

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|---|---|---|---|---|
| PMK | 236 | 933080 | 389145 | |
| PMK | 237 | 933081 | 389146 | |
| PMK | 238 | 933082 | 389147 | |
| PMK | 239 | 933083 | 389148 | |
| PMK | 240 | 933084 | 389149 | |
| PMK | 261 | 935753 | 393008 | |
| PMK | 262 | 935754 | 393009 | |
| PMK | 263 | 935755 | 393010 | |
| PMK | 280 | 956443 | 407822 | |
| PMK | 285 | 956448 | 407827 | |
| PMK | 286 | 956449 | 407828 | |
| PMK | 287 | 956450 | 407829 | |
| PMK | 288 | 956451 | 407830 | |
| PMK | 289 | 956452 | 407831 | |
| PMK | 290 | 956453 | 407832 | |
| PMK | 291 | 956454 | 407833 | |
| PMK | 292 | 956455 | 407834 | |
| PMK | 293 | 956456 | 407835 | |
| PMK | 294 | 956457 | 407836 | |
| PMK | 295 | 956458 | 407837 | |
| PMK | 296 | 956459 | 407838 | |
| PMK | 297 | 956460 | 407839 | |

J-6

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|---|---|---|---|---|
| PMK | 298 | 956461 | 407840 | |
| PMK | 299 | 956462 | 407841 | |
| PMK | 300 | 956463 | 407842 | |
| PMK | 301 | 956464 | 407843 | |
| PMK | 302 | 956465 | 407844 | |
| PMK | 303 | 956466 | 407845 | |
| PMK | 304 | 956467 | 407846 | |
| PMK | 305 | 956468 | 407847 | |
| PMK | 306 | 956469 | 407848 | |
| PMK | 307 | 956470 | 407849 | |
| PMK | 344 | 981797 | 421834 | |
| PMK | 345 | 981798 | 421835 | |
| PMK | 346 | 981799 | 421836 | |
| PMK | 387 | 981840 | 421877 | |
| PMK | 388 | 981841 | 421878 | |
| PMK | 389 | 981842 | 421879 | |
| PMK | 390 | 981843 | 421880 | |
| PMK | 391 | 981844 | 421881 | |
| PMK | 392 | 981845 | 421882 | |
| PMK | 393 | 981846 | 421883 | |
| PMK | 394 | 981847 | 421884 | |
| PMK | 397 | 981850 | 421887 | |

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|---|---|---|---|---|
| PMK | 398 | 981851 | 421888 | |
| PMK | 399 | 981852 | 421889 | |
| PMK | 400 | 981853 | 421890 | |
| PMK | 401 | 981854 | 421891 | |
| PMK | 402 | 981855 | 421892 | |
| PMK | 403 | 981856 | 421893 | |
| PMK | 404 | 981857 | 421894 | |
| PMK | 405 | 981858 | 421895 | |
| PMK | 406 | 981859 | 421896 | |
| PMK | 407 | 981860 | 421897 | |
| PMK | 408 | 981861 | 421898 | |
| PMK | 409 | 981862 | 421899 | |
| PMK | 410 | 981863 | 421900 | |
| PMK | 411 | 981864 | 421901 | |
| PMK | 412 | 981865 | 421902 | |
| PMK | 413 | 981866 | 421903 | |
| PMK | 414 | 981867 | 421904 | |
| PMK | 415 | 981868 | 421905 | |
| PMK | 417 | 981870 | 421907 | |
| PMK | 418 | 981871 | 421908 | |
| PMK | 419 | 981872 | 421909 | |
| PMK | 420 | 981873 | 421910 | |

J-8

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|---|---|---|---|---|
| PMK | 421 | 981874 | 421911 | |
| PMK | 422 | 981875 | 421912 | |
| PMK | 423 | 981876 | 421913 | |
| PMK | 424 | 981877 | 421914 | |
| PMK | 425 | 981878 | 421915 | |
| PMK | 426 | 981879 | 421916 | |
| PMK | 427 | 981880 | 421917 | |
| PMK | 428 | 981881 | 421918 | |
| PMK | 429 | 981882 | 421919 | |
| PMK | 430 | 981883 | 421920 | |
| PMK | 431 | 981884 | 421921 | |
| PMK | 432 | 981885 | 421922 | |
| PMK | 433 | 981886 | 421923 | |
| PMK | 434 | 981887 | 421924 | |
| PMK | 435 | 981888 | 421925 | |
| PMK | 436 | 981889 | 421926 | |
| PMK | 437 | 981890 | 421927 | |
| PMK | 438 | 981891 | 421928 | |
| PMK | 449 | 981902 | 421939 | |
| PMK | 450 | 981903 | 421940 | |
| PMK | 451 | 981904 | 421941 | |
| PMK | 452 | 981905 | 421942 | |

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|------------|-----------|-------------|----------------------|------------------------|
| PMK | 453 | 981906 | 421943 | |
| PMK | 454 | 981907 | 421944 | |
| PMK | 455 | 981908 | 421945 | |
| PMK | 456 | 981909 | 421946 | |
| PMK | 457 | 981910 | 421947 | |
| PMK | 458 | 981911 | 421948 | |
| PMK | 459 | 981912 | 421949 | |
| PMK | 460 | 981913 | 421950 | |
| PMK | 461 | 981914 | 421951 | |
| PMK | 462 | 981915 | 421952 | |
| PMK | 463 | 981916 | 421953 | |
| PMK | 464 | 981917 | 421954 | |
| PMK | 465 | 981918 | 421955 | |
| PMK | 466 | 981919 | 421956 | |
| PMK | 467 | 981920 | 421957 | |
| PMK | 468 | 981921 | 421958 | |
| PMK | 469 | 981922 | 421959 | |
| PMK | 470 | 981923 | 421960 | 145035 |
| PMK | 471 | 981924 | 421961 | 145036 |
| PMK | 472 | 981925 | 421962 | 145037 |
| PMK | 473 | 981926 | 421963 | 145038 |
| PMK | 474 | 981927 | | 145039 |

J-10

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|---|---|---|---|---|
| PMK | 475 | 981928 | 421964 | 145040 |
| PMK | 476 | 981929 | | 145041 |
| PMK | 477 | 981930 | 421965 | 145042 |
| PMK | 478 | 981931 | | 145043 |
| PMK | 479 | 981932 | 421966 | 145044 |
| PMK | 480 | 981933 | | 145045 |
| PMK | 481 | 981934 | 421967 | 145046 |
| PMK | 482 | 981935 | | 145047 |
| PMK | 483 | 981936 | 421968 | 145048 |
| PMK | 484 | 981937 | 421969 | 145049 |
| PMK | 485 | 981938 | 421970 | 145050 |
| PMK | 486 | 981939 | 421971 | 145051 |
| PMK | 487 | 981940 | 421972 | 145052 |
| PMK | 488 | 981941 | | 145053 |
| PMK | 489 | 981942 | 421973 | 145054 |
| PMK | 490 | 981943 | | 145055 |
| PMK | 491 | 981944 | 421974 | 145056 |
| PMK | 492 | 981945 | | 145057 |
| PMK | 493 | 981946 | 421975 | 145058 |
| PMK | 494 | 981947 | | 145059 |
| PMK | 495 | 981948 | 421976 | 145060 |
| PMK | 496 | 981949 | | 145061 |

J-11

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|---|---|---|---|---|
| PMK | 497 | 981950 | 421977 | 145062 |
| PMK | 498 | 981951 | | 145063 |
| PMK | 499 | 981952 | 421978 | 145064 |
| PMK | 500 | 981953 | | 145065 |
| PMK | 501 | 981954 | 421979 | 145066 |
| PMK | 502 | 981955 | | 145067 |
| PMK | 503 | 981956 | 421980 | 145068 |
| PMK | 504 | 981957 | | 145069 |
| PMK | 505 | 981958 | 421981 | 145070 |
| PMK | 506 | 981959 | | 145071 |
| PMK | 507 | 981960 | 421982 | 145072 |
| PMK | 508 | 981961 | | 145073 |
| PMK | 509 | 981962 | 421983 | 145074 |
| PMK | 510 | 981963 | | 145075 |
| PMK | 511 | 981964 | 421984 | 145076 |
| PMK | 512 | 981965 | | 145077 |
| PMK | 513 | 981966 | 421985 | 145078 |
| PMK | 514 | 981967 | | 145079 |
| PMK | 515 | 981968 | 421986 | 145080 |
| PMK | 516 | 981969 | | 145081 |
| PMK | 517 | 981970 | 421987 | 145082 |
| PMK | 518 | 981971 | | 145083 |

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|---|---|---|---|---|
| PMK | 519 | 981972 | 421988 | 145084 |
| PMK | 520 | 981973 | | 145085 |
| PMK | 521 | 981974 | 421989 | 145086 |
| PMK | 522 | 981975 | | 145087 |
| PMK | 523 | 981976 | 421990 | 145088 |
| PMK | 524 | 981977 | | 145089 |
| PMK | 525 | 981978 | 421991 | 145090 |
| PMK | 526 | 981979 | | 145091 |
| PMK | 527 | 981980 | 421992 | 145092 |
| PMK | 528 | 981981 | | 145093 |
| PMK | 529 | 981982 | 421993 | 145094 |
| PMK | 530 | 981983 | | 145095 |
| PMK | 531 | 981984 | | 145096 |
| PMK | 532 | 981985 | | 145097 |
| PMK | 533 | 981986 | | 145098 |
| PMK | 534 | 981987 | | 145099 |
| PMK | 535 | 981988 | | 145100 |
| PMK | 536 | 981989 | | 145101 |
| PMK | 537 | 981990 | | 145102 |
| PMK | 538 | 981991 | | 145103 |
| PMK | 539 | 981992 | | 145104 |
| PMK | 540 | 981993 | | 145105 |

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|---|---|---|---|---|
| PMK | 541 | 981994 | | 145106 |
| PMK | 542 | 981995 | | 145107 |
| PMK | 543 | 981996 | | 145108 |
| PMK | 544 | 981997 | | 145109 |
| PMK | 545 | 981998 | | 145110 |
| PMK | 546 | 981999 | | 145111 |
| PMK | 547 | 982000 | | 145112 |
| PMK | 548 | 982001 | | 145113 |
| PMK | 549 | 982002 | | 145114 |
| PMK | 550 | 982003 | | 145115 |
| PMK | 551 | 982004 | | 145116 |
| PMK | 552 | 982005 | | 145117 |
| PMK | 553 | 982006 | | 145118 |
| PMK | 554 | 982007 | | 145119 |
| PMK | 555 | 982008 | | 145120 |
| PMK | 556 | 982009 | | 145121 |
| PMK | 557 | 982010 | | 145122 |
| PMK | 558 | 982011 | | 145123 |
| PMK | 559 | 982012 | | 145124 |
| PMK | 560 | 982013 | | 145125 |
| PMK | 561 | 982014 | | 145126 |
| PMK | 562 | 982015 | | 145127 |

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|---|---|---|---|---|
| PMK | 563 | 982016 | | 145128 |
| PMK | 564 | 982017 | | 145129 |
| PMK | 565 | 982018 | | 145130 |
| PMK | 566 | 982019 | | 145131 |
| PMK | 567 | 982020 | | 145132 |
| PMK | 568 | 982021 | | 145133 |
| PMK | 569 | 982022 | | 145134 |
| PMK | 570 | 982023 | | 145135 |
| PMK | 571 | 982024 | | 145136 |
| PMK | 572 | 982025 | | 145137 |
| PMK | 573 | 982026 | | 145138 |
| PMK | 574 | 982027 | | 145139 |
| PMK | 575 | 982028 | | 145140 |
| PMK | 576 | 982029 | | 145141 |
| PMK | 577 | 982030 | | 145142 |
| PMK | 578 | 982031 | | 145143 |
| PMK | 579 | 982032 | 421994 | |
| PMK | 587 | 982040 | 422002 | |
| PMK | 588 | 982041 | 422003 | |
| PMK | 590 | 982043 | 422005 | |
| PMK | 592 | 982045 | 422007 | |
| PMK | 594 | 982047 | 422009 | |

J-15

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|------------|-----------|-------------|----------------------|------------------------|
| PMK | 596 | 982049 | 422011 | |
| PMK | 598 | 982051 | 422013 | |
| PMK | 603 | 982056 | 422018 | |
| PMK | 604 | 982057 | 422019 | |
| PMK | 605 | 982058 | 422020 | |
| PMK | 606 | 982059 | 422021 | |
| PMK | 632 | 1059602 | 484747 | |
| PMK | 634 | 1059604 | 484749 | |
| PMK | 636 | 1059606 | 484751 | |
| PMK | 638 | 1059608 | 484753 | |
| PMK | 640 | 1059610 | 484755 | |
| PMK | 642 | 1059612 | 484757 | |
| PMK | 698 | 1068478 | 488906 | 155617 |
| PMK | 699 | 1068479 | | 155618 |
| PMK | 700 | 1068480 | 488907 | 155619 |
| PMK | 701 | 1068481 | | 155620 |
| PMK | 702 | 1068482 | 488908 | 155621 |
| PMK | 703 | 1068483 | | 155622 |
| PMK | 704 | 1068484 | | 155623 |
| PMK | 705 | 1068485 | | 155624 |
| PMK | 706 | 1068486 | | 155625 |
| PMK | 707 | 1068487 | | 155626 |

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|---|---|---|---|---|
| PMK | 708 | 1068488 | | 155627 |
| PMK | 709 | 1068489 | | 155628 |
| PMK | 710 | 1068490 | | 155629 |
| PMK | 711 | 1068491 | | 155630 |
| PMK | 712 | 1068492 | | 155631 |
| PMK | 713 | 1068493 | | 155632 |
| PMK | 714 | 1068494 | | 155633 |
| PMK | 715 | 1068495 | | 155634 |
| PMK | 716 | 1068496 | | 155635 |
| PMK | 717 | 1068497 | | 155636 |
| PMK | 718 | 1068498 | | 155637 |
| PMK | 719 | 1068499 | | 155638 |
| PMK | 720 | 1068500 | | 155639 |
| PMK | 721 | 1068501 | | 155640 |
| PMK | 722 | 1068502 | | 155641 |
| PMK | 723 | 1068503 | | 155642 |
| PMK | 724 | 1068504 | | 155643 |
| PMK | 725 | 1068505 | | 155644 |
| PMK | 726 | 1068506 | | 155645 |
| PMK | 727 | 1068507 | | 155646 |
| PMK | 728 | 1068508 | | 155647 |
| PMK | 742 | 1186807 | 592261 | |

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|---|---|---|---|---|
| PMK | 743 | 1186808 | 592262 | |
| PMK | 744 | 1186809 | 592263 | |
| PMK | 745 | 1186810 | 592264 | |
| PMK | 746 | 1186811 | 592265 | |
| PMK | 747 | 1186812 | 592266 | |
| PMK | 748 | 1186813 | 592267 | |
| PMK | 749 | 1186814 | 592268 | |
| PMK | 750 | 1186815 | 592269 | |
| PMK | 751 | 1186816 | 592270 | |
| PMK | 752 | 1186817 | 592271 | |
| PMK | 753 | 1186818 | 592272 | |
| PMK | 754 | 1186819 | 592273 | |
| PMK | 755 | 1186820 | 592274 | |
| PMK | 756 | 1186821 | 592275 | |
| PMK | 757 | 1186822 | 592276 | |
| PMK | 758 | 1186823 | 592277 | |
| PMK | 759 | 1186824 | 592278 | 170110 |
| PMK | 760 | 1186825 | 592279 | 170111 |
| PMK | 761 | 1186826 | 592280 | 170112 |
| PMK | 762 | 1186827 | 592281 | |
| PMK | 763 | 1186828 | 592282 | |
| PMK | 764 | 1186829 | 592283 | |

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|---|---|---|---|---|
| PMK | 765 | 1186830 | 592284 | 170113 |
| PMK | 766 | 1186831 | 592285 | |
| PMK | 767 | 1186832 | 592286 | 170114 |
| PMK | 768 | 1186833 | 592287 | |
| PMK | 769 | 1186834 | 592288 | 170115 |
| PMK | 770 | 1186835 | 592289 | |
| PMK | 771 | 1186836 | 592290 | 170116 |
| PMK | 772 | 1186837 | 592291 | |
| PMK | 773 | 1186838 | 592292 | 170117 |
| PMK | 774 | 1186839 | 592293 | 170118 |
| PMK | 775 | 1186840 | 592294 | 170119 |
| PMK | 776 | 1186841 | 592295 | 170120 |
| PMK | 777 | 1186842 | | 170121 |
| PMK | 778 | 1186843 | 592296 | 170122 |
| PMK | 779 | 1186844 | | 170123 |
| PMK | 780 | 1186845 | 592297 | 170124 |
| PMK | 781 | 1186846 | | 170125 |
| PMK | 782 | 1186847 | 592298 | 170126 |
| PMK | 783 | 1186848 | | 170127 |
| PMK | 784 | 1186849 | 592299 | 170128 |
| PMK | 785 | 1186850 | | 170129 |
| PMK | 786 | 1186851 | | 170130 |

J-19

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|---|---|---|---|---|
| PMK | 787 | 1186852 | | 170131 |
| PMK | 788 | 1186853 | | 170132 |
| PMK | 789 | 1186854 | | 170133 |
| PMK | 790 | 1186855 | 592300 | 170134 |
| PMK | 791 | 1186856 | | 170135 |
| PMK | 792 | 1186857 | 592301 | 170136 |
| PMK | 793 | 1186858 | | 170137 |
| PMK | 794 | 1186859 | | 170138 |
| PMK | 795 | 1186860 | | 170139 |
| PMK | 796 | 1186861 | | 170140 |
| PMK | 797 | 1186862 | | 170141 |
| PMK | 798 | 1186863 | | 170142 |
| PMK | 799 | 1186864 | | 170143 |
| PMK | 800 | 1186865 | | 170144 |
| PMK | 801 | 1186866 | | 170145 |
| PMK | 802 | 1186867 | | 170146 |
| PMK | 803 | 1186868 | | 170147 |
| PMK | 804 | 1186869 | | 170148 |
| PMK | 805 | 1186870 | | 170149 |
| PMK | 806 | 1186871 | | 170150 |
| PMK | 807 | 1186872 | | 170151 |
| PMK | 808 | 1186873 | | 170152 |

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|---|---|---|---|---|
| PMK | 809 | 1186874 | | 170153 |
| PMK | 810 | 1186875 | | 170154 |
| PMK | 811 | 1186876 | | 170155 |
| PMK | 812 | 1186877 | | 170156 |
| PMK | 813 | 1186878 | | 170157 |
| PMK | 814 | 1186879 | | 170158 |
| PMK | 815 | 1186880 | | 170159 |
| PMK | 816 | 1186881 | | 170160 |
| PMK | 817 | 1186882 | | 170161 |
| PMK | 818 | 1186883 | | 170162 |
| PMK | 819 | 1186884 | | 170163 |
| PMK | 820 | 1186885 | | 170164 |
| PMK | 821 | 1186886 | | 170165 |
| PMK | 822 | 1186887 | | 170166 |
| PMK | 823 | 1186888 | | 170167 |
| PMK | 824 | 1186889 | | 170168 |
| PMK | 825 | 1186890 | | 170169 |
| PMK | 826 | 1186891 | | 170170 |
| PMK | 827 | 1186892 | | 170171 |
| PMK | 828 | 1186893 | | 170172 |
| PMK | 829 | 1186894 | | 170173 |
| PMK | 830 | 1186895 | | 170174 |

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|---|---|---|---|---|
| PMK | 831 | 1186896 | | 170175 |
| PMK | 832 | 1186897 | | 170176 |
| PMK | 833 | 1186898 | | 170177 |
| PMK | 834 | 1186899 | | 170178 |
| PMK | 835 | 1186900 | | 170179 |
| PMK | 836 | 1186901 | | 170180 |
| PMK | 837 | 1186902 | | 170181 |
| PMK | 838 | 1186903 | | 170182 |
| PMK | 839 | 1186904 | | 170183 |
| PMK | 840 | 1186905 | | 170184 |
| PMK | 841 | 1186906 | | 170185 |
| PMK | 842 | 1186907 | | 170186 |
| PMK | 843 | 1186908 | | 170187 |
| PMK | 844 | 1186909 | | 170188 |
| PMK | 845 | 1186910 | | 170189 |
| PMK | 846 | 1186911 | | 170190 |
| PMK | 847 | 1186912 | | 170191 |
| PMK | 848 | 1186913 | | 170192 |
| PMK | 849 | 1186914 | | 170193 |
| PMK | 850 | 1186915 | | 170194 |
| PMK | 851 | 1186916 | | 170195 |
| PMK | 852 | 1186917 | | 170196 |

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|---|---|---|---|---|
| PMK | 853 | 1186918 | | 170197 |
| PMK | 854 | 1186919 | | 170198 |
| PMK | 855 | 1186920 | | 170199 |
| PMK | 856 | 1186921 | | 170200 |
| PMK | 857 | 1186922 | | 170201 |
| PMK | 858 | 1186923 | | 170202 |
| PMK | 859 | 1186924 | | 170203 |
| PMK | 860 | 1186925 | | 170204 |
| PMK | 861 | 1186926 | | 170205 |
| PMK | 862 | 1186927 | | 170206 |
| PMK | 863 | 1186928 | | 170207 |
| PMK | 864 | 1186929 | | 170208 |
| PMK | 865 | 1186930 | | 170209 |
| PMK | 866 | 1186931 | | 170210 |
| PMK | 867 | 1186932 | | 170211 |
| PMK | 868 | 1186933 | | 170212 |
| PMK | 869 | 1186934 | | 170213 |
| PMK | 870 | 1186935 | | 170214 |
| PMK | 871 | 1186936 | | 170215 |
| PMK | 872 | 1186937 | | 170216 |
| PMK | 873 | 1186938 | | 170217 |
| PMK | 874 | 1186939 | | 170218 |

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|---|---|---|---|---|
| PMK | 875 | 1186940 | | 170219 |
| PMK | 876 | 1186941 | | 170220 |
| PMK | 877 | 1186942 | | 170221 |
| PMK | 878 | 1186943 | | 170222 |
| PMK | 879 | 1186944 | | 170223 |
| PMK | 880 | 1186945 | | 170224 |
| PMK | 881 | 1186946 | | 170225 |
| PMK | 882 | 1186947 | | 170226 |
| PMK | 883 | 1186948 | | 170227 |
| PMK | 884 | 1186949 | | 170228 |
| PMK | 885 | 1186950 | | 170229 |
| PMK | 886 | 1186951 | | 170230 |
| PMK | 887 | 1186952 | | 170231 |
| PMK | 888 | 1186953 | | 170232 |
| PMK | 889 | 1186954 | | 170233 |
| PMK | 890 | 1186955 | | 170234 |
| PMK | 891 | 1186956 | | 170235 |
| PMK | 892 | 1186957 | | 170236 |
| PMK | 893 | 1186958 | | 170237 |
| PMK | 894 | 1186959 | | 170238 |
| PMK | 895 | 1186960 | | 170239 |
| PMK | 896 | 1186961 | | 170240 |

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|---|---|---|---|---|
| PMK | 897 | 1186962 | | 170241 |
| PMK | 898 | 1186963 | | 170242 |
| PMK | 899 | 1186964 | | 170243 |
| PMK | 900 | 1186965 | | 170244 |
| PMK | 901 | 1186966 | | 170245 |
| PMK | 902 | 1186967 | | 170246 |
| PMK | 903 | 1186968 | | 170247 |
| PMK | 904 | 1186969 | | 170248 |
| PMK | 905 | 1186970 | | 170249 |
| PMK | 906 | 1186971 | | 170250 |
| PMK | 907 | 1186972 | | 170251 |
| PMK | 908 | 1186973 | | 170252 |
| PMK | 909 | 1186974 | | 170253 |
| PMK | 910 | 1186975 | | 170254 |
| PMK | 911 | 1186976 | | 170255 |
| PMK | 912 | 1186977 | | 170256 |
| PMK | 913 | 1186978 | | 170257 |
| PMK | 914 | 1186979 | | 170258 |
| PMK | 915 | 1186980 | | 170259 |
| PMK | 916 | 1186981 | | 170260 |
| PMK | 917 | 1186982 | | 170261 |
| PMK | 918 | 1186983 | | 170262 |

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|---|---|---|---|---|
| PMK | 919 | 1186984 | | 170263 |
| PMK | 920 | 1186985 | | 170264 |
| PMK | 921 | 1186986 | | 170265 |
| PMK | 922 | 1186987 | | 170266 |
| PMK | 923 | 1186988 | | 170267 |
| PMK | 924 | 1186989 | | 170268 |
| PMK | 925 | 1186990 | | 170269 |
| PMK | 926 | 1186991 | | 170270 |
| PMK | 927 | 1186992 | | 170271 |
| PMK | 928 | 1186993 | | 170272 |
| PMK | 929 | 1186994 | | 170273 |
| PMK | 930 | 1186995 | | 170274 |
| PMK | 931 | 1186996 | | 170275 |
| PMK | 932 | 1186997 | | 170276 |
| PMK | 933 | 1186998 | | 170277 |
| PMK | 934 | 1186999 | | 170278 |
| PMK | 935 | 1187000 | | 170279 |
| PMK | 936 | 1187001 | | 170280 |
| PMK | 937 | 1187002 | | 170281 |
| PMK | 938 | 1187003 | | 170282 |
| PMK | 939 | 1187004 | | 170283 |
| PMK | 940 | 1187005 | | 170284 |

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|---|---|---|---|---|
| PMK | 941 | 1187006 | | 170285 |
| PMK | 942 | 1187007 | | 170286 |
| PMK | 943 | 1187008 | | 170287 |
| PMK | 944 | 1187009 | | 170288 |
| PMK | 945 | 1187010 | | 170289 |
| PMK | 946 | 1187011 | | 170290 |
| PMK | 947 | 1187012 | | 170291 |
| PMK | 948 | 1187013 | | 170292 |
| PMK | 949 | 1187014 | | 170293 |
| PMK | 950 | 1187015 | | 170294 |
| PMK | 951 | 1187016 | | 170295 |
| PMK | 952 | 1187017 | | 170296 |
| PMK | 953 | 1187018 | | 170297 |
| PMK | 954 | 1187019 | | 170298 |
| PMK | 955 | 1187020 | | 170299 |
| PMK | 956 | 1187021 | | 170300 |
| PMK | 957 | 1187022 | | 170301 |
| PMK | 958 | 1187023 | | 170302 |
| PMK | 959 | 1187024 | | 170303 |
| PMK | 960 | 1187025 | | 170304 |
| PMK | 961 | 1187026 | | 170305 |
| PMK | 962 | 1187027 | | 170306 |

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|---|---|---|---|---|
| PMK | 963 | 1187028 | | 170307 |
| PMK | 964 | 1187029 | | 170308 |
| PMK | 965 | 1187030 | | 170309 |
| PMK | 966 | 1187031 | | 170310 |
| PMK | 967 | 1187032 | | 170311 |
| PMK | 968 | 1187033 | | 170312 |
| PMK | 969 | 1187034 | | 170313 |
| PMK | 970 | 1187035 | | 170314 |
| PMK | 971 | 1187036 | | 170315 |
| PMK | 972 | 1187037 | | 170316 |
| PMK | 973 | 1187038 | | 170317 |
| PMK | 974 | 1187039 | | 170318 |
| PMK | 975 | 1187040 | | 170319 |
| PMK | 976 | 1187041 | | 170320 |
| PMK | 977 | 1187042 | | 170321 |
| PMK | 978 | 1187043 | | 170322 |
| PMK | 979 | 1187044 | | 170323 |
| PMK | 980 | 1187045 | | 170324 |
| PMK | 981 | 1187046 | | 170325 |
| PMK | 982 | 1187047 | | 170326 |
| PMK | 983 | 1187048 | | 170327 |
| PMK | 984 | 1187049 | | 170328 |

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|---|---|---|---|---|
| PMK | 985 | 1187050 | | 170329 |
| PMK | 986 | 1187051 | | 170330 |
| PMK | 987 | 1187052 | | 170331 |
| PMK | 988 | 1187053 | | 170332 |
| PMK | 989 | 1187054 | | 170333 |
| PMK | 990 | 1187055 | | 170334 |
| PMK | 991 | 1187056 | | 170335 |
| PMK | 992 | 1187057 | | 170336 |
| PMK | 993 | 1187058 | | 170337 |
| PMK | 994 | 1187059 | | 170338 |
| PMK | 995 | 1187060 | | 170339 |
| PMK | 996 | 1187061 | | 170340 |
| PMK | 997 | 1187062 | | 170341 |
| PMK | 998 | 1187063 | | 170342 |
| PMK | 999 | 1187064 | | 170343 |
| PMK | 1000 | 1187065 | | 170344 |
| PMK | 1001 | 1187066 | | 170345 |
| PMK | 1002 | 1187067 | | 170346 |
| PMK | 1003 | 1187068 | | 170347 |
| PMK | 1004 | 1187069 | | 170348 |
| PMK | 1005 | 1187070 | | 170349 |
| PMK | 1006 | 1187071 | | 170350 |

J-29

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|---|---|---|---|---|
| PMK | 1007 | 1187072 | | 170351 |
| PMK | 1008 | 1187073 | | 170352 |
| PMK | 1009 | 1187074 | | 170353 |
| PMK | 1010 | 1187075 | 592302 | |
| PMK | 1011 | 1187076 | 592303 | |
| PMK | 1012 | 1187077 | 592304 | |
| PMK | 1013 | 1187078 | 592305 | |
| PMK | 1014 | 1187079 | 592306 | |
| PMK | 1015 | 1187080 | 592307 | |
| PMK | 1016 | 1187081 | 592308 | |
| PMK | 1017 | 1187082 | 592309 | |
| PMK | 1018 | 1187083 | 592310 | |
| PMK | 1019 | 1187084 | 592311 | |
| PMK | 1023 | 1187088 | 592315 | |
| PMK | 1024 | 1187089 | 592316 | |
| PMK | 1025 | 1187090 | 592317 | 170354 |
| PMK | 1026 | 1187091 | 592318 | |
| PMK | 1027 | 1187092 | 592319 | 170355 |
| PMK | 1023 | 1187088 | 592315 | |
| PMK | 1024 | 1187089 | 592316 | |
| PMK | 1025 | 1187090 | 592317 | 170354 |
| PMK | 1026 | 1187091 | 592318 | |

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|---|---|---|---|---|
| PMK | 1027 | 1187092 | 592319 | 170355 |
| PMK | 1028 | 1187093 | | 170356 |
| PMK | 1072 | 1197066 | | 172146 |
| PMK | 1073 | 1197067 | | 172147 |
| PMK | 1074 | 1197068 | | 172148 |
| PMK | 1075 | 1197069 | | 172149 |
| PMK | 1076 | 1197070 | | 172150 |
| PMK | 1077 | 1197071 | | 172151 |
| PMK | 1078 | 1197072 | | 172152 |
| PMK | 1079 | 1197073 | | 172153 |
| PMK | 1080 | 1197074 | | 172154 |
| PMK | 1081 | 1197075 | | 172155 |
| PMK | 1082 | 1197076 | | 172156 |
| PMK | 1083 | 1197077 | | 172157 |
| PMK | 1084 | 1197078 | | 172158 |
| PMK | 1085 | 1197079 | | 172159 |
| PMK | 1086 | 1197080 | | 172160 |
| PMK | 1091 | 1204490 | | 173249 |
| PMK | 1092 | 1204491 | | 173250 |
| PMK | 1093 | 1204492 | | 173251 |
| PMK | 1094 | 1204493 | | 173252 |
| PMK | 1095 | 1204494 | | 173253 |

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|------------|-----------|-------------|----------------------|------------------------|
| PMK | 1096 | 1204495 | | 173254 |
| PMK | 1097 | 1204496 | | 173255 |
| PMK | 1098 | 1204497 | | 173256 |
| PMK | 1099 | 1204498 | | 173257 |
| PMK | 1100 | 1204499 | | 173258 |
| PMK | 1101 | 1204500 | | 173259 |
| PMK | 1102 | 1204501 | | 173260 |
| PMK | 1103 | 1204502 | | 173261 |
| PMK | 1104 | 1204503 | | 173262 |
| PMK | 1105 | 1204504 | | 173263 |
| PMK | 1106 | 1204505 | | 173264 |
| PMK | 1107 | 1204506 | | 173265 |
| PMK | 1108 | 1204507 | | 173266 |
| PMK | 1109 | 1204508 | | 173267 |
| PMK | 1110 | 1204509 | | 173268 |
| PMK | 1111 | 1204510 | | 173269 |
| PMK | 1112 | 1204511 | | 173270 |
| PMK | 1113 | 1204512 | | 173271 |
| PMK | 1114 | 1204513 | | 173272 |
| PMK | 1115 | 1204514 | | 173273 |
| PMK | 1116 | 1204515 | | 173274 |
| PMK | 1117 | 1204516 | | 173275 |

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|------------|-----------|-------------|----------------------|------------------------|
| PMK | 1118 | 1204517 | | 173276 |
| PMK | 1119 | 1204518 | | 173277 |
| PMK | 1120 | 1204519 | | 173278 |
| PMK | 1121 | 1204520 | | 173279 |
| PMK | 1122 | 1204521 | | 173280 |
| PMK | 1123 | 1204522 | | 173281 |
| PMK | 1124 | 1204523 | | 173282 |

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|------------|-----------|-------------|----------------------|------------------------|
| P | 32 | 933116 | 389064 | |
| P | 33 | 933117 | 389065 | |
| P | 34 | 933118 | 389066 | |
| P | 35 | 933119 | 389067 | |
| P | 36 | 933120 | 389068 | |
| P | 45 | 933129 | 389077 | |
| P | 46 | 933130 | 389078 | |
| P | 51 | 933135 | 389083 | |

| Claim Name | Claim No. | BLM NMC No. | Lyon County Doc. No. | Mineral County Doc No. |
|------------|-----------|-------------|----------------------|------------------------|
| BJ | 1 | 953951 | 406304 | |
| BJ | 2 | 953952 | 406305 | |

J-33

| BJ | 3 | 953953 | 406306 |
| BJ | 4 | 953954 | 406307 |
| BJ | 5 | 953955 | 406308 |
| BJ | 6 | 953956 | 406309 |
| BJ | 7 | 953957 | 406310 |
| BJ | 8 | 953958 | 406311 |

3.      Nevada Copper New Fee Land

Lyon County, Nevada

ALL THAT CERTAIN REAL PROPERTY SITUATE IN THE COUNTY OF LYON, STATE OF NEVADA, DESCRIBED AS FOLLOWS:

T. 12 N., R 25 E:

SEC. 12: SE 1/4 SE 1/4

SEC. 13: E ½ NE 1/4

T. 12 N., R 26 E:

SEC. 1: W 1/2 NW 1/4 SW 1/4 NW 1/4; W 1/2 SW 1/4 SW 1/4 NW 1/4; NW 1/4 NW 1/4 SW 1/4; SW 1/4 NW 1/4 SW 1/4; W 1/2 SE 1/4 NW 1/4 SW 1/4; W 1/2 NE 1/4 SW 1/4 SW 1/4; NW 1/4 SW 1/4 SW 1/4 AND S 1/2 SW 1/4 SW 1/4

SEC. 2: LOTS 5 THRU 14

SEC. 3: LOTS 5 THRU 13; SE 1/4 NE 1/4 AND NE 1/4 SE 1/4

SEC. 4: LOTS 5 THRU 12; SE 1/4 NW 1/4; NE 1/4 SW 1/4; SW 1/4 SW 1/4 AND NW 1/4 SE1/4

SEC. 5: LOTS 1 AND 2; S 1/2 NE 1/4; S 1/2 NW 1/4 AND S 1/2

SEC. 6: SE 1/4 NE 1/4, NE 1/4 SE 1/4 AND S 1/2 SE 1/4

SEC. 7: LOT 4; E 1/2; SE 1/4 NW 1/4; NE 1/4 SW 1/4 AND SE 1/4 SW 1/4

SEC. 8: ALL

SEC. 9: LOTS 1 AND 2; SW 1/4 NE 1/4; NW 1/4 AND S 1/2

SEC. 10: LOTS 1 THRU 5; SW 1/4; N 1/2 SE 1/4; N 1/2 SW 1/4 SE 1/4; AND N 1/2 SE 1/4 SE 1/4

SEC. 11: LOTS 1 THRU 6; S 1/2 NE 1/4; N 1/2 SW 1/4; N 1/2 SW 1/4 SW 1/4; N 1/2 SE 1/4 SW 1/4; N 1/2 SE 1/4; N 1/2 SW 1/4 SE1/4 AND N 1/2 SE 1/4 SE 1/4

SEC. 12: W 1/2 SW 1/4 NE 1/4 NW 1/4, W 1/2 NW 1/4; W 1/2 SE 1/4 NW 1/4;W 1/2 NE 1/4 NE 1/4 SW 1/4; W 1/2 SE 1/4 NE 1/4 SW 1/4; W 1/2 NE 1/4 SW 1/4; NW 1/4 SW 1/4; N 1/2 SW 1/4 SW 1/4 AND N 1/2 SE 1/4 SW 1/4

SEC. 15: NW 1/4

SEC. 16: N 1/2

SEC. 17: N 1/2

SEC. 18: LOTS 1 AND 2; NE 1/4 AND E 1/2 NW 1/4

T. 13 N., R 26 E.:

SEC. 19: W 1/2 SE 1/4; W 1/2 NE 1/4 SE 1/4; W 1/2 SE 1/4 SE 1/4; W 1/2 NE 1/4 NE 1/4 SE 1/4; W 1/2 SE 1/4 NE 1/4 SE 1/4; W 1/2 NE 1/4 SE 1/4 SE 1/4 AND W 1/2 SE 1/4 SE 1/4 SE 1/4

SEC. 29: S 1/2 NW 1/4 NE 1/4; SW 1/4 NE 1/4; S 1/2 NE 1/4 NW 1/4; S 1/2 NW 1/4 NW 1/4; S 1/2 NW 1/4; SW 1/4; S 1/2 SE 1/4 NE 1/4 SE 1/4; S 1/2 SW 1/4 NE 1/4 SE 1/4; W 1/2 SE 1/4 AND SE 1/4 SE 1/4

SEC. 30: W 1/2 NE 1/4 NE 1/4 NE 1/4; NW 1/4 NE 1/4 NE 1/4; S 1/2 NE 1/4 NE 1/4; NW 1/4 NE 1/4; S 1/2 NE 1/4 AND SE 1/4

SEC. 31: NE 1/4 AND SE 1/4NW 1/4

SEC. 32: N 1/2; NE 1/4 SW 1/4 AND SE 1/4

SEC. 33: LOTS 1 AND 2; S 1/2 NE 1/4 NE 1/4 NE 1/4; S 1/2 NW 1/4 NE 1/4 NE 1/4; S 1/2 NE 1/4 NW 1/4 NE 1/4; S 1/2 NW 1/4 NW 1/4 NE 1/4; S 1/2 NE 1/4 NE 1/4; S 1/2 NW 1/4 NE 1/4; S 1/2 NE 1/4; S 1/2 NE 1/4 NE 1/4 NW 1/4; S 1/2 NE 1/4 NW 1/4; NW 1/4 NE 1/4 NW 1/4; NW 1/4 NW1/4; S 1/2 NW 1/4; SW 1/4 AND N 1/2 SE 1/4

SEC. 34: S 1/2 NE 1/4 NE 1/4; S 1/2 NW 1/4 NE 1/4; S 1/2 NE 1/4; S 1/2 NE 1/4 NE 1/4 NW 1/4; S 1/2 NW 1/4 NE 1/4 NW 1/4; S 1/2 NE1/4 NW 1/4 NW 1/4; S 1/2 NW 1/4 NW 1/4 NW 1/4; S 1/2 NE 1/4 NW 1/4; S 1/2 NW 1/4 NW 1/4; S 1/2 NW 1/4 AND S1/2

SEC. 35: LOTS 2, 3, 6, 9 THRU 13; NE 1/4 NW 1/4; E 1/2 NE 1/4 NW 1/4 NW 1/4; S 1/2 NW 1/4 NW 1/4; S 1/2 NW 1/4;
N 1/2 SW 1/4 AND NW 1/4 SE 1/4

SEC. 36: LOTS 5, 6 AND 12

T. 13 N., R 27 E.:

SEC. 31: ALL THAT PORTION OF LOT 6 IN LYON COUNTY SAID PARCEL AS FURTHER DELINEATED ON LYON COUNTY RECORD OF SURVEY MAP, RECORDED ON OCTOBER 12, 2015 AS DOCUMENT NO. 542177.


Mineral County, Nevada

ALL THAT CERTAIN REAL PROPERTY SITUATE IN THE COUNTY OF MINERAL, STATE OF NEVADA, DESCRIBED AS FOLLOWS:

T. 13 N., R 27 E.,

SEC. 28, LOT 2;

EXCLUDING that portion of Government Lot 2 of Section 28, T. 13 N., R. 27 E., MDM, more particularly described as Parcel 3B as shown on the Record of Survey for Nevada Copper, recorded June 24, 2019, in the Office of the County Recorder of Mineral County, Nevada, as File No. 170881, Mineral County, Nevada, records.  (ASSESSOR'S PARCEL NUMBER FOR 2019-2020: 005-110-05).

SEC. 2 9, LOTS 2, 6 AND 10;

SEC. 30, LOT 6;

SEC. 31, LOTS 2 AND 6.


4.      Leased Fee Land (Walker River)


A leasehold interest in and to the following fee lands pursuant subject to that certain Lease dated effective December 1, 2018, by and between Walker River Irrigation District, as landlord, and Nevada Copper, Inc., as lessee, situated in Lyon County, Nevada:

All that certain real property situated in the County of Lyon, State of Nevada, described as follows:

Township 15 North, Range 25 East, M.D.B.&M.

Section 21:    SW1/4 of SE1/4

EXCEPTING THEREFROM that certain real property described as commencing at a point on the West boundary of the SE1/4 of the SE1/4 of Section 21, T. 15 N., R. 25 E., M.D.B.&M., from which corner common to Sections 21, 22, 27, and 28 of said Township and Range bears S. 67° 31' E. 1424.81 feet; and running thence N. 0° 16' E. 140 feet to the intersection with the South line of the S.P.R.R. right-of-way; thence along said South line of right-of-way N. 72° 31' W. 168 feet; thence S. 39° 58' E. 248.44 feet to the point of beginning.

Legal Description appeared previously in Document recorded on December 18, 1956, in Book 40 of Deeds, Page 430 Records of Lyon County, Nevada.

ALSO EXCEPTING THEREFROM everything North of the South line of the right-of-way of the Southern Pacific Railway Company.

J-37

B. Water Rights

The "Tibbals Water Rights" made subject to the Mining Lease by the First Amendment to Lease dated April 10, 2008, by and between Landlord and Nevada Copper Corp. The Tibbals Water Rights are located in Lyon County, Nevada, and are more particularly described as follows:

Base Water Right State of Nevada, Division of Water Resources, Water Rights Application No. 15425 filed on December 3, 1953, Certificate No. 4398 granted on August 2, 1954, as modified or supplemented by Water Rights Permit No. 77103 dated October 21, 2008, as abrogated by Water Rights permit Nos. 83450, 89451, 83452, and 88204 T.  The permit was originally issued to Anaconda Copper Mining Company.

Consumptive – Water Rights Permits Nos. 77104 and 77105, on file with the State of Nevada, Division of Water Resources, and any subsequent amendments, supplements, or successor rights to said Permits.

Non-Consumptive – Water Rights Permit Nos. 83090, 83454, 83455, 83552 and 83705, on file with the State of Nevada, Division of Water Resources, and any subsequent amendments, supplements, or successor rights to said Permits.

City of Yerington and Nevada Copper Inc., Water Service Agreement dated August 10, 2009, as amended.

Property acquired from Tahoe-Reno Industrial Center, LLC

**PARCEL 1:**

**LOT 99-25 OF PARCEL MAP FOR DP OPERATING PARTNERSHIP, L.P., FILED IN THE OFFICE OF THE COUNTY RECORDER OF STOREY COUNTY, STATE OF NEVADA ON JUNE 29, 1999 AS FILE NO. 85481 OF OFFICIAL RECORDS AND CERTIFICATE OF AMENDMENT RECORDED JANUARY 23, 2001 IN BOOK 140, PAGE 256 AS DOCUMENT NO. 88850 OF OFFICIAL RECORDS.**

**PARCEL 2:**

**AN EASEMENT FOR DRIVEWAY AND UTILITIES AS SET FORTH IN THAT CERTAIN ACCESS AND UTILITY EASEMENT RECORDED JUNE 22, 2001 IN BOOK 143, PAGE 207 AS DOCUMENT NO. 89655 OF OFFICIAL RECORDS; AN AMENDMENT TO ACCESS AND UTILITY EASEMENT RECORDED OCTOBER 15, 2019 AS INSTRUMENT NO. 130593 OF OFFICIAL RECORDS.**

Patented Mining Claims (Copper Ridge)

The following patented mining claims situated in Sections 20, 21, and 29, T. 13 N., R. 26 E., MDM, in Lyon County, Nevada (the "Property):

| Claim Name | Mineral Survey No. | Patent No. |
|---|---|---|
| Copper Ridge No. 1 | 3989 (Amended) | 338120 |
| Copper Ridge No. 2 | 3989 | 338120 |
| Copper Ridge No. 3 | 3989 | 338120 |
| Copper Ridge No. 4 | 3989 | 338120 |
| Copper Ridge No. 5 | 3989 | 338120 |
| Copper Ridge No. 6 | 3989 | 338120 |
| Copper Ridge No. 8 | 3989 | 338120 |
| Copper Ridge No. 9 | 3989 (Amended) | 338120 |

The Property is identified by the Lyon County Assessor's Office as APN 014-661-05.

**SCHEDULE K**

**[RESERVED]**

## SCHEDULE L

## TERMS OF SUBORDINATION

1.    <u>General</u>:  Payment of the principal of and interest on Subordinated Intercompany Debt and other amounts payable on or in respect thereof shall be subordinated and subject in right of payment to the prior payment in full in cash in Dollars of all Obligations.  Each Obligor that is a holder of Subordinated Intercompany Debt (each, a "<u>Subordinated Lender</u>") agrees that it will not ask, demand, sue for, take or receive from any other Obligor, by set off or in any other manner, or retain, payment (in whole or in part) of the Subordinated Intercompany Debt, or any security therefor, other than Restricted Payments permitted under the Senior Secured Superpriority Debtor-in-Posession Credit Agreement, unless and until all of the Obligations have been paid in full.  Each Subordinated Lender directs each Obligor to make, and each Obligor agrees to make, such prior payment of the Obligations.  Each Obligor undertakes to satisfy any requirements under applicable law that may be necessary for the effectiveness of the Subordination Terms.

2.    <u>Payment Upon Dissolution, Etc</u>.:  In the event of (a) any insolvency or bankruptcy case or proceeding in connection therewith, relative to an Obligor or to its creditors as such, or to its assets, or (b) any liquidation, dissolution or other winding up of an Obligor, whether partial or complete and whether voluntary or involuntary and whether or not involving insolvency or bankruptcy or (c) any assignment for the benefit of creditors or any other marshaling of assets and liabilities of an Obligor, then and in any such event the Secured Parties shall be entitled to receive payment in full of all amounts due or to become due on or in respect of all Obligations before any of the Subordinated Lenders shall be entitled to receive any payment on account of the Subordinated Intercompany Debt (whether in respect of principal, interest premium, fees, indemnities, commissions or otherwise) and to that end, any payment or distribution of any kind or character, whether in cash, property or securities which may be payable or deliverable in respect of the Subordinated Intercompany Debt in any such case, proceeding, dissolution, liquidation or other winding up or event shall instead be paid or delivered to the Secured Parties for application to Obligations, whether or not due, until the Obligations shall have first been fully paid and satisfied in cash in Dollars.

3.    <u>No Payment During Default</u>:  In the event and during the continuation of any Default or Event of Default, unless and until such Default or Event of Default shall have been remedied or waived, no payment (including any Restricted Payment) shall be made by any Obligor on or in respect of any Subordinated Intercompany Debt.

4.    <u>Proceeding Against Obligor; No Collateral</u>:  Whether or not any default in payment shall exist under any Finance Document, no Subordinated Lenders shall, without the prior consent of the Majority Lenders, (a) commence any proceeding against any Obligor in bankruptcy, insolvency or receivership law or (b) take any collateral security for any Subordinated Intercompany Debt.

5.    <u>Payment to the Secured Parties of Certain Amounts Received by Subordinated Lenders</u>:  In the event that any Subordinated Lender receives on account or in respect of the Subordinated Intercompany Debt any distribution of assets by any Obligor or payment by or on behalf of an

Obligor of any kind or character, whether in cash, securities or other property, other than Restricted Payments permitted under the Senior Secured Superpriority Debtor-in-Posession Credit Agreement, the Subordinated Lender shall hold in trust (as property of the Secured Parties) for the benefit of, and immediately upon receipt thereof, shall pay over or deliver to the Secured Parties, such distribution or payment in precisely the form received (except for the endorsement or assignment by such Subordinated Lender where necessary) for application in accordance with the Credit Agreement.  In the event of failure of any Subordinated Lender to make any such endorsement or assignment, the Secured Parties irrevocably are authorized and empowered by and on behalf of each Subordinated Lender to make the same.

6.    <u>Authorizations to the Secured Parties</u>:  Each Subordinated Lender (a) irrevocably authorizes and empowers (without imposing any obligation on) the Secured Parties and the Collateral Agent to demand, sue for, collect and receive all payments and distributions on or in respect of its Subordinated Intercompany Debt which are required to be paid or delivered to the Secured Parties, as provided herein, and to file and prove all claims therefor and take all such other action, in the name of a Subordinated Lender or otherwise, as the Secured Parties may determine to be necessary or appropriate for the enforcement of these subordination provisions, all in such manner as the Majority Lenders shall instruct or otherwise in accordance with the Credit Agreement, (b) irrevocably authorizes and empowers (without imposing any obligation) the Secured Parties and the Collateral Agent to vote the Subordinated Intercompany Debt (including, without limitation, voting the Subordinated Intercompany Debt in favor of or in opposition to any matter which may come before any meeting of creditors of an Obligor generally or in connection with, or in anticipation of, any insolvency or bankruptcy case or proceeding, or any proceeding under any laws relating to the relief of debtors, readjustment of indebtedness, arrangements, reorganizations, compositions or extensions relative to an Obligor) in such manner as the Majority Lenders shall instruct or otherwise in accordance with the Credit Agreement and (c) agrees to execute and deliver to the Secured Parties all such further instruments confirming the above authorization, and all such powers of attorney, proofs of claim, assignments of claim and other instruments, and to take all such other action, as may be requested by the Secured Parties in order to enable the Secured Parties to enforce all claims upon or in respect of the Subordinated Intercompany Debt.

7.    <u>Notice</u>:  Each Subordinated Lender agrees, for the benefit of the Secured Parties, that it will give the Secured Parties prompt notice of any default by any Obligor in respect of the Subordinated Intercompany Debt.

8.    <u>No Waiver; Modification to Senior Debt</u>:  No failure on the part of the Secured Parties, and no delay in exercising, any right, remedy or power hereunder shall operate as a waiver thereof by the Secured Parties, nor shall any single or partial exercise of any right, remedy or power hereunder preclude any other or future exercise by the Secured Parties of any other right, remedy or power. Each and every right, remedy and power granted to the Secured Parties, or allowed to the Secured Parties by law or other agreement shall be cumulative and not exclusive, and may be exercised by the Secured Parties from time to time.

At any time, without the consent of or notice to the Subordinated Lenders, without incurring responsibility or liability to the Subordinated Lenders and without impairing or releasing the subordination provided herein or the obligations hereunder of the Subordinated Lenders, the

Secured Parties may do any one or more of the following:  (a) change the manner, place or terms of payment of or extend the time of payment of, or renew or alter, Obligations or any collateral security or guarantee therefor, or otherwise amend or supplement in any manner Obligations or any instruments evidencing the same or any agreement under which Obligations are outstanding or the Finance Documents; (b) sell, exchange, release or otherwise deal with any property pledged, mortgaged or otherwise secured by Obligations; (c) release any Person liable in any manner for the Obligations; and (d) exercise or refrain from exercising any rights against an Obligor and any other Person.  Each Subordinated Lender unconditionally waives notice of the incurring of Obligations or any part thereof.

9.      Subrogation:  Subject to the payment in full in cash in Dollars of all Obligations, the Subordinated Lenders shall be subrogated to the rights of the Secured Parties to receive distribution of assets of any Obligor, or payments by or on behalf of any Obligor, made on the Obligations, until the Subordinated Intercompany Debt shall be paid in full.  For purposes of such subrogation, no payments over, including no payments or distributions to the Secured Parties of any cash, property or securities to which the Subordinated Lenders would be entitled except for the provisions hereof, pursuant to the provisions hereof, to the Secured Parties by the Subordinated Lenders shall, as among an Obligor, its creditors other than the Secured Parties and the Subordinated Lenders, be deemed to be a payment or distribution by an Obligor on account of the Obligations.

10.     Benefit of Subordination Provisions:  Nothing contained herein shall (a) impair, as among an Obligor, its creditors other than the Secured Parties and the Subordinated Lenders, the obligation of an Obligor, which is absolute and unconditional (and which, subject to the rights hereunder of the Secured Parties, is intended to rank equally with all other unsecured obligations of any Obligor), to pay the principal of and interest on the Subordinated Intercompany Debt as and when the same shall become due and payable in accordance with the terms thereof or (b) affect the relative rights against an Obligor of the Subordinated Lender and creditors of the Obligor other than the Secured Parties.

11.     Further Assurances:  The Subordinated Lender, at its own cost, shall take any further action as the Secured Parties may reasonably request in order to carry out more fully the intent and purpose of these subordination provisions [(including delivery of any evidence of Subordinated Intercompany Debt to the Administrative Agent or the Collateral Agent)].

12.     Governing Law:  These subordination provisions shall be governed by and construed in accordance with the laws of New York.

13.     Amendment:  These subordination provisions may not be amended or modified without the prior consent of each of the Secured Parties.

14.     Transfers:  Each Subordinated Lender acknowledges and agrees that Subordinated Intercompany Debt may not be transferred, assigned or encumbered in any manner except as expressly permitted by the terms and conditions of the Finance Documents as in effect from time to time.

L-3

15.     <u>Successors and Assigns</u>:  The Agreement shall be binding and inure to the benefit of the Subordinated Lenders, the Secured Parties and their respective successors and permitted assigns.

16.     <u>Ranking</u>:  All Subordinated Intercompany Debt shall be unsecured, rank junior to the Obligations in respect of payment and pledged as security for the Obligations.

**SCHEDULE M**

**FORM OF TRANSFER CERTIFICATE**

(Delivered pursuant to Section 14.1(c) (*Assignment by Senior Lenders*) of the Credit Agreement)

Date of this Transfer Certificate: _____, ___

For Transfer Date: _____, ___

U.S. Bank Trust Company, National Association,
as Administrative Agent
214 N. Tryon Street
Charlotte, NC 28202
Attention: James Hanley
Email: James.hanley1@usbank.com, Loan.Agency@usbank.com

Nevada Copper, Inc.,
as Borrower
61 E. Pursel Lane
P.O. Box 1640
Yerington, Nevada, USA
89447
Attention: Greg Martin
Email: gjmartin@nevadacopper.com

Copy to:
Attention: Matthew Anderson
Email: manderson@nevadacopper.com

Ladies and Gentlemen:

**Nevada Copper Project – Credit Agreement**

1.      [Permitted Transferee] (the "**Transferee**") delivers this Transfer Certificate to you pursuant to that certain Senior Secured Superpriority Debtor-in-Posession Credit Agreement, dated as of [•], by and among Nevada Copper, Inc., as Borrower, U.S. Bank Trust Company, National Association, as Administrative Agent and Collateral Agent, the Guarantors from time to time party thereto and the Senior Lenders party thereto from time to time (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"). Capitalized terms used but not defined herein shall have the respective meanings ascribed thereto in, or incorporated by reference in, the Credit Agreement.

2.      [_____] (the "**Lender**") confirms that the Lender's participation set forth on Schedule I ("**Schedule**") hereto is an accurate summary of its participation in the Commitments and requests the Transferee to accept and procure the transfer to the Transferee of the Percentage Transferred (set forth in Schedule I) of the Lender's participation specified in the Schedule hereto by counter-signing and delivering this Transfer Certificate to the Administrative Agent and the

M-1

Borrower at their respective addresses for the service of notices specified in the Credit Agreement or as otherwise notified by them pursuant to the terms thereof.

3.      The Transferee hereby requests, subject to Section 14.1 of the Credit Agreement, the Administrative Agent and the Borrower to accept this Transfer Certificate as being delivered to the Administrative Agent and the Borrower pursuant to and for the purposes of Section 14.1 of the Credit Agreement so as to take effect in accordance with the terms thereof on the Transfer Date stated above or on such later date as may be determined in accordance with the terms thereof.

4.      The Transferee confirms that it has received a copy of each of the Finance Documents together with such other information as it has required in connection with this transaction and that it has not relied and will not hereafter rely on the Lender or any Agent to check or inquire on its behalf into the legality, validity, effectiveness, adequacy, accuracy or completeness of any such information and further agrees that it has not relied and will not rely on the Lender or any Agent to assess or keep under review on its behalf the financial condition, creditworthiness, condition, affairs, status or nature of the Borrower or any other party to any of the Transaction Documents.

5.      The Lender makes no representation or warranty and assumes no responsibility with respect to the legality, validity, effectiveness, adequacy, accuracy or enforceability of any of the Transaction Documents or any document relating thereto and assumes no responsibility for the financial condition of any party thereto or for the performance and observance by such party of any of its obligations under any of the Transaction Documents or any document relating thereto and any and all such conditions and warranties, whether express or implied by law or otherwise, are hereby excluded.

6.      The Lender hereby gives notice that nothing herein or in the Finance Documents (or any document relating thereto) shall oblige it to (i) accept a re-transfer from the Transferee of the whole or any part of its rights, benefits and/or obligations under the Credit Agreement transferred pursuant hereto or (ii) support any losses directly or indirectly sustained or incurred by the Transferee for any reason whatsoever including, without limitation, the non-performance by the Borrower or any other party to any of the Transaction Documents (or any document relating thereto) of its obligations under any such document.  The Transferee hereby acknowledges the absence of any such obligation as is referred to in clause (i) or (ii) above.

7.      This Transfer Certificate shall be governed by the law of the State of New York of the United States of America and shall for all purposes be governed by and construed in accordance with the law of such state; provided, however, that to the extent any terms of this Transfer Certificate are incorporated in and made part of any other Finance Documents, any such term so incorporated shall for all purposes of such Finance Documents be governed by and construed in accordance with the law governing the Finance Documents into which such term is so incorporated.

[8.      This Transfer Certificate becomes effective upon acceptance by the Borrower.][1]

---

[1] Include if the Borrower's consent is required pursuant to Section 14.1 of the Credit Agreement.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the undersigned have executed this Transfer Certificate as of the respective dates set forth below.

[Transferee]

By_____
Name:
Title:
Date:

[Existing Lender]

By_____
Name:
Title:
Date:

[Accepted and Agreed:

Nevada Copper, Inc.,
as the Borrower

By_____
Name:
Title:
Date:][1]

---

[1] Include if the Borrower's consent is required pursuant to Section 14.1 of the Credit Agreement.

SCHEDULE I

1.    Lender:

2.    Transferee:

3.    Transfer Date:

4.    Lender's Participation:

5.    Lender's Portion of the Outstanding Commitment:

6.    Percentage Transferred:

7.    Administrative Details of Transferee

      Address:

      Contact Department and Name:

      Account for Payments:

      Facsimile:

      Telephone:

**SCHEDULE N**

**UTILIZATION REQUEST**

[DATE]

TO:         U.S. Bank Trust Company, National Association, as Administrative Agent

FROM:    Nevada Copper, Inc. as Borrower

RE:          Utilization Request Pursuant to Section 3.1 of the Senior Secured Superpriority
Debtor-in-Possession Credit Agreement (as amended from time to time, the
"**Credit Agreement**")

The Borrower hereby requests disbursement of Loans on [DATE][1] to the accounts and in the
amounts set forth in the funds flow attached hereto.

1.   The Borrower hereby represents and warrants to the Administrative Agent and each Senior
Lender that, as of the date of the Utilization:

(a)      The disbursements requested hereby are scheduled to be utilized in accordance with
Section 2.3 of the Credit Agreement.

(b)      The disbursements of Loans made to date (if any) have been or are being utilized
in accordance with Section 2.3 of the Credit Agreement.

2.   The Borrower hereby certifies to the Administrative Agent and each Senior Lender as of the
date of the Utilization pursuant to Sections 12.3 (a), (b), (c), (d), and (e) of the Credit
Agreement:[2]

(a)      no Default or Event of Default shall have occurred and be continuing or would
result from the making of the proposed Loan;

(b)      no Change of Control has occurred;

(c)      the proposed loan will be used for the purpose specified in "Use of Proceeds" in
accordance with Section 2.3 of the Credit Agreement;

(d)      no Material Adverse Effect has occurred and is continuing; and

(e)      the representations and warranties contained in Section 8.1 of the Credit Agreement
are true, accurate and complete as of the date of the Utilization in all material
respects.

---

[1] The proposed Utilization Date must be a Business Day.

[2] All other factual or evidentiary CPs to be delivered separately.

N-1

3.  The Borrower agrees that, if prior to its receipt of the disbursement requested hereby it determines that any matter certified by it herein will not be true and correct as of the time of such receipt, it will promptly so notify the Administrative Agent.

4.  All defined terms used herein and not defined herein have the meanings assigned to them in the Credit Agreement.

[*Signature Page Follows*]

**NEVADA COPPER, INC.,**
as Borrower

By: _____
    Name:
    Title:

## SCHEDULE O

## FORM OF NOTE

$[_]                                                                    [_], 20__

FOR VALUE RECEIVED, the undersigned (the "**Borrower**"), hereby promises to pay to [_] (the "**Lender**"), to the account designated by the Administrative Agent as provided for by the Credit Agreement referred to below, for the account of the Lender, the principal sum of US $[_] (or such lesser amount as shall equal the aggregate unpaid principal amount of the Loans made by the Lender to the Borrower under the Credit Agreement), in lawful money of the United States of America and in immediately available funds, on the dates and in the principal amounts provided in the Credit Agreement, and to pay interest on the unpaid principal amount of each such Loan, at such office, in like money and funds, for the period commencing on the date of such Loan until such Loan shall be paid in full, at the rates per annum and on the dates provided in the Credit Agreement.

The date, amount, type, interest rate and duration of Interest Period (if applicable) of each Loan made by the Lender to the Borrower, and each payment made on account of the principal thereof, shall be recorded by the Lender on its books and, prior to any transfer of this Note, endorsed by the Lender on the schedule attached hereto or any continuation thereof; *provided*, that the failure of the Lender to make any such recordation or endorsement shall not affect the obligations of the Borrower to make a payment when due of any amount owing under the Credit Agreement or hereunder in respect of the Loans made by the Lender.

This Note evidences Loans made by the Lender under the Senior Secured Superpriority Debtor-in-Possession Credit Ageement dated as of [•] (as amended, modified or supplemented and in effect from time to time, the "**Credit Agreement**"), among Nevada Copper, Inc. as Borrower, the Guarnators from time to time party thereto, the Senior Lenders from time to time party thereto, and U.S. Bank Trust Company, National Association, as Administrative Agent and Collateral Agent.  Terms used but not defined in this Note have the respective meanings assigned to them in the Credit Agreement.

The Credit Agreement provides for the acceleration of the maturity of this Note upon the occurrence of certain events and for prepayments of Loans upon the terms and conditions specified therein.

Unpaid balance of the principal amount of this Note, together with all accrued and unpaid interest thereon, may become, or may be declared to be, due and payable in the manner, upon the conditions and with the effect provided in the Credit Agreement.

Except as permitted by Section Article 14 (*Changes to Parties*) of the Credit Agreement, this Note may not be assigned by the Lender to any other Person.

This Note shall be governed by, and construed in accordance with, the law of the State of New York.

O-1

**NEVADA COPPER, INC.,**
as Borrower

By: _____
    Name:
    Title:

**SCHEDULE P**

**[RESERVED]**

**SCHEDULE Q**

**CORPORATE ORGANIZATION CHART**



**SCHEDULE R**
**BANK ACCOUNTS**

**<u>Nevada Copper, Inc. Bank Accounts</u>**

| Bank | Account Type | Last 4 Digits of Account Number | Description | Bank Address |
|------|------|------|------|------|
| BMO Harris Bank, N.A. | DDA – payroll and FSA/HSA | 5804 | Disbursement Account (Payroll Account) | 11 W. Monroe St., Chicago, IL 60603 |
| BMO Harris Bank, N.A. | DDA – operations; vendor payments | 5812 | Disbursement Account (Operating Account) | 11 W. Monroe St., Chicago, IL 60603 |
| BMO Harris Bank, N.A. | DDA – proceeds; fundings/payments per customers | 6629 | Proceeds Account | 11 W. Monroe St., Chicago, IL 60603 |
| BMO Harris Bank, N.A. | DDA – debt service reserve account | 6637 | Inactive Account (Debt Service Account) | 11 W. Monroe St., Chicago, IL 60603 |
| BMO Harris Bank, N.A. | DDA – loss proceeds account | 6645 | Inactive Account (Loss Proceeds Account) | 11 W. Monroe St., Chicago, IL 60603 |
| BMO Harris Bank, N.A. | DDA – approved open pit account | 6652 | Inactive Account (Approved Open Pit Account) | 11 W. Monroe St., Chicago, IL 60603 |
| BMO Harris Bank, N.A. | DDA – restricted payment account | 6702 | Inactive Account (Restricted Payment Account) | 11 W. Monroe St., Chicago, IL 60603 |

**Nevada Copper Corp. Bank Accounts**

| Bank | Bank Account Type | Last 4 Digits of Account Number | Description | Bank Address |
|---|---|---|---|---|
| Bank of Montreal | DDA – payroll | 6175 | Disbursement Account (Payroll Account) | 595 Burrard Street, Concourse Level<br><br>Vancouver, BC V7X 1L7 |
| Bank of Montreal | DDA – Canada checking | 6458 | Disbursement Account (Operating Account) | 595 Burrard Street, Concourse Level<br><br>Vancouver, BC V7X 1L7 |
| Bank of Montreal | DDA – US checking (loan proceeds account) | 0506 | NCU Concentration Account | 595 Burrard Street, Concourse Level<br><br>Vancouver, BC V7X 1L7 |
| Bank of Montreal | DDA – payroll | 6728 | Inactive Account (Cost Overrun Reserve Account) | 595 Burrard Street, Concourse Level<br><br>Vancouver, BC V7X 1L7 |

**SCHEDULE S**

**[RESERVED]**

**SCHEDULE T**

**RELATED-PARTY TRANSACTIONS**

(Excluding the transactions in respect of Subordinated Intercompany Debt, including the Equity Contribution Agreement, transactions referenced in Section 12.5(i) and Section 12.5(l), the ownership of equity, the Working Capital Facility Documents, any Material Project Document in effect on the Closing Date and as permitted in Section 11.12(l))

1.      Fourth Lien Intercreditor Agreement, dated as of October 28, 2022, among Nevada Copper Corp., Nevada Copper Inc., KfW IPEX-Bank GmbH, in its capacity as Administrative Agent, Triple Flag International Ltd., Concord Resources Limited and Pala Investments Limited.

2.      Pala/Tranche B Letter Agreement, dated as of October 28, 2022, among Pala Investments Limited, Nevada Copper Inc., KfW IPEX-Bank GmbH, as Administrative Agent and KfW IPEX-Bank GmbH, as Tranche B Senior Lender.

3.      Pala Corporate Guaranty Affirmation Letter, dated as of October 28, 2022, among Pala Investments Limited, Nevada Copper Inc., KfW IPEX-Bank GmbH, as Administrative Agent and KfW IPEX-Bank GmbH, as Tranche B Senior Lender.

4.      Amended and Restated Pala Credit Facility, dated as of October 28, 2022, among Nevada Copper Inc., Nevada Copper Corp. and Pala Investments Limited.

5.      Fourth Lien Security Agreement, dated as of October 28, 2022, among Nevada Copper Inc., Nevada Copper Corp., 0607792 B.C. Ltd., Lion Iron Corp., NC Farms LLC, NC Ditch Company LLC and Pala Investments Limited.

6.      Fourth Lien Pledge Agreement, dated as of October 28, 2022, between Nevada Copper Corp. and Pala Investments Limited.

7.      Lyon County Deed of Trust dated as of October 28, 2022, entered into among the Nevada Copper, Inc., Pala Investments Limited and First American Title Insurance Company.

8.      Mineral County Deed of Trust dated as of October 28, 2022, entered into among the Nevada Copper, Inc., Pala Investments Limited and First American Title Insurance Company.

9.      Storey County Deed of Trust dated as of October 28 2022, entered into among the Nevada Copper, Inc., Pala Investments Limited and First American Title Insurance Company.

10.     Second Amended and Restated Credit Agreement, entered into as of October 28, 2022, among the Borrower, the Guarantors, Pala Investments Limited, as a senior lender, Mercuria Investments US, Inc., as a senior lender, the other senior lenders party thereto and KfW IPEX-Bank as administrative agent (as amended, amended and restated, supplemented or otherwise modified from time to time).

11.    Promissory Note dated as of March 27, 2024, by Nevada Copper Corp. to the order of Pala Invetments Limited.

12.    Promissory Note dated as of April 15, 2024, by Nevada Copper Corp. to the order of Pala Invetments Limited.

**SCHEDULE U**

**[RESERVED]**

**SCHEDULE V**

**[RESERVED]**

**SCHEDULE W**

**LITIGATION DISCLOSURE**

None.

**EXHIBIT A-1**

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**
**(For Foreign Lender Parties That Are Not Partnerships**
**For U.S. Federal Income Tax Purposes)**

U.S. TAX COMPLIANCE CERTIFICATE

Date: _____, 202__

Reference is hereby made to the Senior Secured Superpriority Debtor-in-Possession Credit Agreement dated as of [•], 2024 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"; the terms defined therein being used herein as therein defined), by and among Nevada Copper, Inc., as Borrower, U.S. Bank Trust Company, National Association, as Administrative Agent and Collateral Agent, the Guarantors from time to time party thereto and the Senior Lenders party thereto from time to time.

Pursuant to the provisions of Section 6.1 of the Credit Agreement, the undersigned hereby certifies that (a) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (b) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (c) it is not a ten-percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (d) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (i) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (ii) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments. For the avoidance of doubt, any reference herein to any IRS Form shall be deemed to include any applicable successor form.

In witness whereof, the undersigned has duly executed and delivered this U.S. Tax Compliance Certificate as of the date first above written.

[NAME OF SENIOR LENDER]

By _____
    Name:
    Title:

EXHIBIT A-2

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**
**(For Foreign Participants That Are Not Partnerships**
**For U.S. Federal Income Tax Purposes)**

U.S. TAX COMPLIANCE CERTIFICATE

Date: _____, 202__

Reference is hereby made to the Senior Secured Superpriority Debtor-in-Possession Credit Agreement dated as of [•], 2024 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"; the terms defined therein being used herein as therein defined), by and among Nevada Copper, Inc., as Borrower, U.S. Bank Trust Company, National Association, as Administrative Agent and Collateral Agent, the Guarantors from time to time party thereto and the Senior Lenders party thereto from time to time.

Pursuant to the provisions of Section 6.1 of the Credit Agreement, the undersigned hereby certifies that (a) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (b) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (c) it is not a ten-percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, and (d) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (i) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (ii) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments. For the avoidance of doubt, any reference herein to any IRS Form shall be deemed to include any applicable successor form.

A-2-1

In witness whereof, the undersigned has duly executed and delivered this U.S. Tax Compliance Certificate as of the date first above written.

[NAME OF PARTICIPANT]

By _____
    Name:
    Title:

EXHIBIT A-3

FORM OF
U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Partnerships
For U.S. Federal Income Tax Purposes)

U.S. TAX COMPLIANCE CERTIFICATE

Date:  _____, 202__

Reference is hereby made to the Senior Secured Superpriority Debtor-in-Possession Credit Agreement dated as of [•], 2024 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"; the terms defined therein being used herein as therein defined), by and among Nevada Copper, Inc., as Borrower, U.S. Bank Trust Company, National Association, as Administrative Agent and Collateral Agent, the Guarantors from time to time party thereto and the Senior Lenders party thereto from time to time.

Pursuant to the provisions of Section 6.1 of the Credit Agreement, the undersigned hereby certifies that (a) it is the sole record owner of the participation in respect of which it is providing this certificate, (b) its direct or indirect partners/members are the sole beneficial owners of such participation, (c) with respect to such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (d) none of its direct or indirect partners or members is a ten-percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (e) none of its direct or indirect partners or members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners or members that is claiming the portfolio interest exemption:  (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's or member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (A) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (B) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.  For the avoidance of doubt, any reference herein to any IRS Form shall be deemed to include any applicable successor form.

      In witness whereof, the undersigned has duly executed and delivered this U.S. Tax Compliance Certificate as of the date first above written.

                   [NAME OF PARTICIPANT]

By  _____
     Name:
     Title:

**EXHIBIT A-4**

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**
**(For Foreign Lender Parties That Are Partnerships**
**For U.S. Federal Income Tax Purposes)**

U.S. TAX COMPLIANCE CERTIFICATE

Date: _____, 202__

Reference is hereby made to the Senior Secured Superpriority Debtor-in-Possession Credit Agreement dated as of [•], 2024 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"; the terms defined therein being used herein as therein defined), by and among Nevada Copper, Inc., as Borrower, U.S. Bank Trust Company, National Association, as Administrative Agent and Collateral Agent, the Guarantors from time to time party thereto and the Senior Lenders party thereto from time to time.

Pursuant to the provisions of Section 6.1 of the Credit Agreement, the undersigned hereby certifies that (a) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan (s)) in respect of which it is providing this certificate, (b) its direct or indirect partners or members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (c) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners or members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (d) none of its direct or indirect partners or members is a ten-percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (e) none of its direct or indirect partners or members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners or members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W- 8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W- 8BEN-E from each of such partner's or member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (A) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (B) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments. For the avoidance of doubt, any reference herein to any IRS Form shall be deemed to include any applicable successor form.

In witness whereof, the undersigned has duly executed and delivered this U.S. Tax Compliance Certificate as of the date first above written.

[NAME OF SENIOR LENDER]

By _____
Name:
Title:

## **EXHIBIT B**

**Initial Budget**

**Nevada Copper Inc.**
**13-Week DIP Budget as of Jun-06**

Preliminary and Subject to Revision
Confidential - Subject to FRE 408 and Other Relevant Analogs

($ in thousands)

| | Fcast Week 1 14-Jun | Fcast Week 2 21-Jun | Fcast Week 3 28-Jun | Fcast Week 4 5-Jul | Fcast Week 5 12-Jul | Fcast Week 6 19-Jul | Fcast Week 7 26-Jul | Fcast Week 8 2-Aug | Fcast Week 9 9-Aug | Fcast Week 10 16-Aug | Fcast Week 11 23-Aug | Fcast Week 12 30-Aug | Fcast Week 13 6-Sep | 13 Wk Period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | | | | | | | | |
| Other receipts | $ - | $ - | $ 41 | $ - | $ - | $ - | $ 41 | $ - | $ - | $ - | $ - | $ 41 | $ - | $ 123 |
| Total Receipts | - | - | 41 | - | - | - | 41 | - | - | - | - | 41 | - | 123 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Payroll, PR Taxes, 401k | - | (539) | (450) | (426) | - | (629) | - | (426) | - | (539) | - | (426) | (26) | (3,436) |
| Benefits & Insurance | (26) | (295) | - | (55) | (100) | - | (267) | (55) | - | - | (110) | (29) | (26) | (962) |
| Concentrate Delivery & Logistics | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| UG Mining Materials, Equip., & Services | (164) | (10) | (30) | (10) | (10) | (10) | (30) | (10) | (10) | (10) | (30) | (10) | (10) | (344) |
| Supplies, Parts & Services | (73) | (27) | (162) | (39) | (9) | (27) | (147) | (39) | (9) | (27) | (147) | (39) | (9) | (753) |
| Leases - Equip. & Other | (201) | - | (8) | (986) | - | - | (8) | (148) | - | - | (8) | - | (139) | (1,498) |
| Leases - Land | - | - | - | (47) | (150) | - | - | - | - | - | - | - | - | (197) |
| Property, Casualty & Bonding Insurance | (129) | (51) | - | (129) | - | - | (1,200) | (129) | (670) | - | - | (129) | - | (2,439) |
| Utilities | - | - | (9) | - | - | (536) | (9) | - | - | (360) | (9) | - | - | (923) |
| Regulatory | (44) | (2) | (45) | (165) | (1) | - | - | (45) | - | - | - | (45) | - | (347) |
| Contingency | (103) | (100) | (100) | (100) | (100) | (100) | (100) | (100) | (100) | (100) | (100) | (100) | (100) | (1,303) |
| **Total Operating Disbursements** | (739) | (1,024) | (804) | (1,958) | (370) | (1,302) | (1,760) | (953) | (789) | (1,036) | (404) | (779) | (284) | (12,202) |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | |
| **Tested** | | | | | | | | | | | | | | |
| Critical Vendors Payments | (1,371) | - | - | - | (1,421) | - | - | - | (285) | - | - | - | - | (3,078) |
| Lienholder Payments | (538) | - | - | - | (620) | - | - | - | (365) | - | - | - | - | (1,522) |
| KERP | - | - | (189) | - | - | - | - | - | - | - | - | - | - | (189) |
| Reduction in Force Expense | - | (492) | - | (492) | - | (492) | - | (692) | - | - | - | - | - | (2,168) |
| Equipment Lease Buyouts & AP Backlog | (2,079) | - | (258) | - | - | - | (447) | - | - | - | - | (63) | - | (2,847) |
| Critical Capex | (59) | - | - | (177) | - | - | - | - | - | - | - | - | - | (235) |
| D&O Tail Insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professionals (Ordinary Course) | - | - | (25) | - | - | - | (25) | - | - | - | - | (15) | - | (65) |
| Independent Director Fees | - | - | - | (622) | - | - | - | - | - | - | - | - | - | (622) |
| Utility & Other Deposits | (330) | - | - | - | - | - | - | - | - | - | - | - | - | (330) |
| ***Total Tested Non-Op. Disbursements*** | $ (4,376) | $ (492) | $ (472) | $ (1,290) | $ (2,041) | $ (492) | $ (472) | $ (692) | $ (650) | $ - | $ - | $ (78) | $ - | $ (11,055) |
| Bankruptcy Professional & US Trustee Fees | - | - | - | - | (773) | (600) | (100) | (3,240) | (311) | - | (100) | (3,140) | - | (8,263) |
| DIP Fees | (1,000) | - | - | - | - | (2,048) | - | - | - | - | - | - | - | (3,048) |
| Interest & Adequate Protection | - | - | - | (127) | - | - | - | (6,013) | - | - | - | - | (723) | (6,863) |
| Total Non-Operating Disbursements | (5,376) | (492) | (472) | (1,417) | (2,814) | (3,140) | (572) | (9,946) | (960) | - | (100) | (3,218) | (723) | (29,229) |
| Transfer NCI (to) / from NCU | (30) | (27) | (88) | (79) | (57) | (27) | (58) | (119) | (27) | (57) | (27) | (57) | (52) | (705) |
| **Net Cash Flows** | $ (6,145) | $ (1,543) | $ (1,323) | $ (3,454) | $ (3,241) | $ (4,469) | $ (2,349) | $ (11,017) | $ (1,776) | $ (1,093) | $ (531) | $ (4,013) | $ (1,060) | $ (42,013) |
| **Total Tested Disbursements** | (5,115) | (1,516) | (1,276) | (3,248) | (2,411) | (1,794) | (2,232) | (1,645) | (1,439) | (1,036) | (404) | (857) | (284) | (23,257) |
| Beginning Cash Balance | 83 | 13,939 | 12,396 | 11,073 | 7,619 | 4,378 | 39,909 | 37,560 | 26,543 | 24,766 | 23,673 | 23,143 | 19,130 | 83 |
| Net Cash Flows | (6,145) | (1,543) | (1,323) | (3,454) | (3,241) | (4,469) | (2,349) | (11,017) | (1,776) | (1,093) | (531) | (4,013) | (1,060) | (42,013) |
| Borrowing/Repayment (net) | 20,000 | - | - | - | - | 40,000 | - | - | - | - | - | - | - | 60,000 |
| **Ending Cash Balance** | $ 13,939 | $ 12,396 | $ 11,073 | $ 7,619 | 4,378 | 39,909 | $ 37,560 | $ 26,543 | $ 24,766 | $ 23,673 | $ 23,143 | $ 19,130 | $ 18,070 | $ 18,070 |
| **Cumulative DIP Borrowing** | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 |
| **Cumulative Transfer NCI (to) / from NCU** | (30) | (57) | (145) | (224) | (281) | (308) | (366) | (485) | (512) | (569) | (596) | (653) | (705) | (818) |

**EXHIBIT C**

**DIP / Adequate Protection Lien Priorities**[8]

| Non-WCF Collateral | WCF Collateral Prior to Repayment of WCF Obligations | WCF Collateral After Repayment of WCF Obligations |
|---|---|---|
| DIP Liens | Working Capital Facility Adequate Protection Liens[9] | DIP Liens |
| Senior Secured Term Loan Adequate Protection Liens[10] | Senior Secured Term Loan Adequate Protection Liens | Senior Secured Term Loan Adequate Protection Liens |
| TF Adequate Protection Liens[11] | TF Adequate Protection Liens | TF Adequate Protection Liens |
| Working Capital Facility Adequate Protection Liens | Junior Secured Term Loan Adequate Protection Liens | Junior Secured Term Loan Adequate Protection Liens |
| Junior Secured Term Loan Adequate Protection Liens[12] | | |

---

[8]  For the avoidance of doubt, all DIP Liens and Adequate Protection Liens shall be subject to (i) the Carve-Out, (ii) the Administration Charge, (iii) the Prepetition Permitted Liens and (iv) the Prepetition Trisura Lien.

[9]  "**Working Capital Facility Adequate Protection Liens**" means the Adequate Protection Liens granted to the Working Capital Facility Lender in accordance with the terms hereof.

[10]  "**Senior Secured Term Loan Adequate Protection Liens**" means the Adequate Protection Liens granted to KfW and the Prepetition Senior Secured Term Loan A-2 Parties in accordance with the terms hereof.

[11]  "**TF Adequate Protection Liens**" means the Adequate Protection Liens granted to the Prepetition TF Stream Lender in accordance with the terms hereof.

[12]  "**Junior Secured Term Loan Adequate Protection Liens**" means the Adequate Protection Liens granted to the Prepetition Junior Secured Term Loan Parties in accordance with the terms hereof.